UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 05 CV 10317 MLW |
| v. | ) ) | |
| UNITED VAN LINES, LLC, et al., | ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO TRANSFER VENUE
PURSUANT TO 28 U.S.C. § 1404**

COME NOW defendants United Van Lines, LLC, Vanliner Insurance Company, and

UniGroup, Inc., and respectfully move this Court to transfer this action to the United States

District Court for the Eastern District of Missouri or, in the alternative, to the United States

District Court for the Southern District of Indiana pursuant to 28 U.S.C. § 1404.[1]  In support

thereof, defendants state as follows:

1.      This is a putative nationwide class action for damages purportedly arising under

federal regulations governing interstate motor carriers' leases with independent owner-operator

drivers.   However, the Commonwealth of Massachusetts has no meaningful connection to, or

local interest in, the parties to this case or the underlying facts and events.

2.      By contrast, there are at least two alternative federal courts (in Missouri and

Indiana) which properly can exercise jurisdiction over this lawsuit and which are far more logical

and convenient forums.

---

[1] UniGroup is concurrently moving to dismiss all claims against it for lack of personal jurisdiction.  In the
event its personal jurisdiction motion is not granted, then it joins in the present motion to transfer.

3.      Most notably, none of the parties to this case—plaintiff or defendant—is a citizen or resident of Massachusetts.  Conversely, all defendants, as well as lead plaintiff Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), are citizens of the State of Missouri.

4.      Moreover, while potential witnesses and relevant documents may be located throughout the United States, by far the greatest single concentration of such witnesses and documents is in Missouri, where all defendants' (and lead plaintiff's) headquarters are located.

5.      Accordingly, "for the convenience of parties and witnesses, [and] in the interest of justice," this Court should transfer the present case to the U. S. District Court for the Eastern District of Missouri.

6.      Alternatively, another more appropriate forum—and one which would promote the interests of efficiency and judicial economy—is the U.S. District Court for the Southern District of Indiana.  That is where plaintiff OOIDA and defendants' other motor carrier affiliate (Mayflower Transit, LLC) have for several years litigated many of the same legal issues presented in this  lawsuit.

7.      While the parties to the present case are not identical to those in the Mayflower suit, other factors—including the important federal policy favoring resolution of related cases by the same court—favor transferring to Indiana.

8.      Accordingly, if transfer to the Eastern District of Missouri is not granted, then this suit should be transferred to the Southern District of Indiana.

9.      In further support of this Motion, defendants incorporate herein by reference their accompanying memorandum of law, together with the following exhibits attached hereto:

> a.    Ex. A – First Amended Class Action Complaint in *OOIDA*, *et al., v.*
> *Mayflower Transit, LLC*, No. IP98-0457 (without its exhibits), presently
> pending in the U.S. District Court for the Southern District of Indiana.

    b.  <u>Ex. B</u> – First Amended Class Action Complaint in *OOIDA, et al., v. Mayflower Transit, LLC*, No. IP98-0458 (without its exhibits), presently pending in the U.S. District Court for Southern District of Indiana.

    c.  <u>Ex. C</u> – Affidavit of Joseph Schmelzle.

    d.  <u>Ex. D</u> – Memorandum Opinion and Order in *OOIDA v. C.R. England, Inc.*, No. CV F 02-5664, slip op. (E.D. Cal. Aug. 19, 2002).

## **LOCAL RULE 7.1(A)(2) CERTIFICATE**

10.    Michael Morris, one of the counsel for defendants herein, conferred with David A. Cohen, one of the counsel for plaintiffs, on April 29, 2005 in a good faith but unsuccessful effort to resolve or narrow the issues presented by this Motion.

## **REQUEST FOR ORAL ARGUMENT**

11.    Defendants believe that oral argument on the present Motion would be beneficial to the parties and would assist the Court in its determination of the issues presented. Accordingly, pursuant to Local Rule 7.1(d), defendants request the Court to schedule oral argument on this Motion.

       WHEREFORE, defendants United Van Lines, LLC, Vanliner Insurance Company, and UniGroup, Inc. respectfully move this Court to transfer this action to the United States District Court for the Eastern District of Missouri or, in the alternative, to the United

States District Court for the Southern District of Indiana, pursuant to 28 U.S.C. § 1404.


Respectfully submitted,

SALLY & FITCH LLP


By:  /s/ *Jennifer E. Greaney*
Francis J. Sally (BBO # 439100)
Jennifer E. Greaney (BBO # 643337)
225 Franklin Street
Boston, Massachusetts 02110
(617) 542-5542 (phone)
(617) 542-1542 (facsimile)

THOMPSON COBURN LLP
David Wells (*pro hac vice* app. pending)
Michael J. Morris (*pro hac vice* app. pending)
Rebecca A. Pinto (*pro hac vice* app. pending)
One U.S. Bank Plaza
St. Louis, MO 63101
(314) 552-6000 (phone)
(314) 552-7000 (facsimile)

Attorneys for Defendants United Van Lines, LLC,
Vanliner Insurance Company, and UniGroup, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing Defendants' Motion to Transfer Venue Pursuant to 28 U. S. C. §1404 has been served upon the following counsel of record this 2nd day of May, 2005, by U.S. Mail first class postage prepaid.

Paul D. Cullen, Sr.
David A. Cohen
Susan Van Bell
THE CULLEN LAW FIRM, PLLC
1101 30th Street, N.W., Suite 300
Washington, DC 20007

John A. Kiernan
Kenneth H. Naide
BONNER KIERNAN TREBACH & CROCIATE
One Liberty Square, 6th Floor
Boston, MA 02109
(617) 426-3900

/s/ *Jennifer E. Greaney*
Jennifer E. Greaney

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

**OWNER-OPERATOR INDEPENDENT
DRIVERS ASSOCIATION, INC.,
WOOD-CHUCK LEASING, INC.,
MARK DUDGEON, and JOHN E. NEIDIG,
Individually and on behalf of all others
similarly situated,**

     **Plaintiffs,**

**v.**

**MAYFLOWER TRANSIT, INC.,**

     **Defendant.**

**Case No. IP98-0457
Complaint – Class Action**


**(Consolidated with IP98-0458
   C B/S for Discovery)**

---

### FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY
### AND INJUNCTIVE RELIEF AND DAMAGES
### DEMAND FOR JURY TRIAL

The Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), Wood-Chuck

Leasing, Inc., Mark Dudgeon, and John E. Neidig (collectively, "Plaintiffs" or "class

representatives"), bring this action, on behalf of themselves and all others similarly situated,

against Defendant Mayflower Transit, Inc. ("Mayflower" or "Defendant") or its successors in

interest and allege as follows:

### NATURE OF THE ACTION

1.     This is a class action pursuant to which Plaintiffs, as class representatives on behalf

of themselves and all others similarly situated, challenge the lawfulness of Mayflower's practices

of converting to its own use funds which rightfully belong to the potential members of the plaintiff



J-11-0b

class ("Owner-Operators"), including, but not limited to, funds deducted from compensation, funds described as "cash deposit account" funds, and credits resulting from the overpayment by Plaintiffs of state fuel taxes.

## JURISDICTION AND VENUE

2.      Jurisdiction of this claim is granted to this court by 28 U.S.C. §§ 1331 (federal question jurisdiction), 1337 (proceedings arising under an act of Congress regulating commerce) and 1367 (supplemental jurisdiction). The causes of action alleged in this complaint arise under the laws of the United States regulating commerce and the activities of motor carriers engaged in the transport of property in interstate and foreign commerce, including 49 U.S.C. §§ 13501, 14102 and 14704(a)(1) and (2), and 49 C.F.R. Part 376 or are state law claims so related to the federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is based upon 28 U.S.C. § 1391(b) in that Defendant was, at the time the lawsuit was filed, incorporated in the State of Indiana and a substantial part of the events giving rise to the claims raised herein occurred within this district.

## PARTIES TO THE ACTION

4.      Plaintiff OOIDA is a business association of persons and entities, commonly known as "owner-operators", who own and operate motor carrier equipment. OOIDA is a not-for-profit corporation incorporated in the State of Missouri, with its headquarters located at 311 Mize Road, P.O. Box L, Grain Valley, Missouri 64029. OOIDA was founded in 1973 and now has over 45,000 members residing in all fifty (50) states and in Canada. Owner-operators are typically small business men and women who own and operate Class 7 and 8 trucks (large tractor-

trailers) in interstate commerce.  Owner-operators typically lease their equipment, with drivers, to

private carriers and/or regulated motor carriers operating under the authority granted by the U.S.

Department of Transportation ("DOT") and formerly by the Interstate Commerce Commission

("ICC").  Each such lease is regulated under Title 49, Subpart B, Chapter III, Part 376 of the

Code of Federal Regulations.  49 C.F.R. § 376.1 *et seq.*  Owner-operators comprise one of the

primary sectors of the interstate motor carrier industry, accounting for an estimated forty percent

(40%) of all inter-city truck traffic in the United States.  The number of owner-operators

nationwide totals in the hundreds of thousands. A large number of OOIDA's members are owner-

operators who operate motor vehicles in the transport of property, including household goods, in

interstate commerce and who have been, are, or are likely to be, operating under contract or

otherwise associated with Defendant.  Accordingly, OOIDA is a suitable representative to

champion the class and protect the interests of its members.

5.      Wood-Chuck Leasing, Inc. ("Wood-Chuck"), Mark Dudgeon ("Dudgeon"), and

John E. Neidig ("Neidig") are independent truck owner-operators who have leased motor vehicle

equipment and provided services to Mayflower.

6.      Wood-Chuck is an Illinois corporation located at 1035 Nottingham Lane, Hoffman

Estates, Illinois.  Wood-Chuck has leased motor vehicle equipment and related services to

Mayflower through one or more of Mayflower's agents within the meaning of 49 U.S.C. § 13907.

The lease agreement has terminated.

7.      Dudgeon is an individual and a resident of the State of Illinois. Dudgeon leased his

motor vehicle and related services to Mayflower directly and through one or more of Mayflower's

authorized agents.  Those lease agreements have terminated.

8.    Neidig is an individual and a resident of the State of Washington. Neidig leased his motor vehicle and related services to Mayflower through one or more of Mayflower's authorized agents. The lease agreement has terminated.

9.    Wood-Chuck, Dudgeon, and Neidig individually, and other similarly situated Owner-Operators, are "owners" within the meaning of 49 C.F.R. § 376.2(d).

10.    Wood-Chuck, Dudgeon, and Neidig individually, and other similarly situated Owner-Operators, are "lessors" within the meaning of 49 C.F.R. § 376.2(f).

11.    The vehicles provided for use to Mayflower by named Plaintiffs and other similarly situated Owner-Operators are "equipment" within the meaning of 49 C.F.R. § 376.2(b).

12.    Upon information and belief, at the time the lawsuit was filed, Mayflower was an Indiana corporation doing business in Indiana. Mayflower is a regulated motor carrier, primarily engaged in the enterprise of providing transportation services to the shipping public under authority granted by DOT and formerly the ICC.

13.    Mayflower is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

14.    Title 49 U.S.C. § 13907 provides that a motor carrier, such as Mayflower, which provides transportation of household goods, is legally responsible for all acts or omissions of any of its agents which relate to the performance of household good transportation services, and which are within the actual or apparent authority of the agent, or which are ratified by the carrier.

15.    Title 49 C.F.R. § 376.12(m) imposes on each motor carrier, such as Mayflower, the legal responsibility for ensuring that its agents provide, and that owner-operators, such as named Plaintiffs and the unnamed members of the potential class of Owner-Operators, receive the rights and benefits due under the federal motor carrier leasing regulations in connection with lease

agreements between the carrier and/or its agents and the owner-operator.

16.    On information and belief, the terms of the leasing agreements between the named

Plaintiffs and Mayflower or its authorized agents are substantively the same in material respects as

the terms of the leasing agreements entered into between Mayflower or its authorized agents and

each of the Owner-Operators.

17.    The potential class consists of owner-operators who, like Wood-Chuck, Dudgeon,

and Neidig, have contracted with Mayflower, either directly or indirectly through an authorized

agent, to lease equipment and to provide driving services to Mayflower.  On information and

belief, the number of persons making up this potential class is in the thousands, thus making

joinder of all such persons impracticable.

## CLASS ACTION ALLEGATIONS

18.    **Class Description**.  Pursuant to Fed. R. Civ. P. 23, named Plaintiffs bring this

action on behalf of Owner-Operators who entered into regulated leases with Mayflower or its

authorized agents pursuant to which Mayflower leased motor vehicle equipment from and

contracted for services by, the Owner-Operators, who have been harmed by Mayflower's failure

to return compensation due to carriers or monies held in cash deposit accounts and state fuel-tax

credit accounts, including pre- and post-judgment interest thereon, as allowed by law.

19.    **Impracticability of Joinder**.  On information and belief, there are several

thousand independent owner-operators who have leased their equipment and services to

Mayflower or its authorized agents who have not received compensation, refunds of escrow

amounts and fuel tax credits.  All such persons are potential class members.  Individual joinder of

all potential class members is thus impracticable.

20.    **Commonality**. Mayflower has acted and/or failed to act in a way that affects all potential class members similarly. Accordingly, any questions of fact are common to the potential class as a whole. Mayflower's actions and failures to act have also caused the same harm to potential class members. Accordingly, questions of Mayflower's liability to the class are common to all class members. Additionally, Mayflower has acted and/or refused to act in generally the same manner with respect to each member of the class. Therefore, class-wide injunctive relief against such conduct is also appropriate.

21.    **Typicality**. The claims of the Plaintiffs are typical of the claims of the potential class as a whole.

22.    **Fair and Adequate Representation**. Plaintiffs are capable of fairly and adequately protecting the interests of the potential class.

23.    **Class Action Appropriate Under Rule 23(b)(2)**. Mayflower has acted and/or failed to act on grounds generally applicable to the potential class as a whole. Thus injunctive and declaratory relief is appropriate with respect to the potential class as a whole, making class certification appropriate under Fed. R. Civ. P. 23 (b)(2).

24.    **Class Action Appropriate Under Rule 23(b)(3)**. The questions of law, enumerated in the counts below, are common to all potential class members, and predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the claims herein.

25.    **Other Factors.** Other factors favoring the maintenance of this suit as a class action include:

(a) the amounts in controversy for individual plaintiffs are relatively small so that

individual members of the potential class would not find it cost-effective to bring individual claims;

(b) requiring individuals to prosecute separate actions would substantially impair or impede the individual members' ability to protect their interests;

(c) on information and belief, there is no litigation already commenced by class members concerning the causes of action raised in this complaint;

(d) it is desirable to concentrate the individual members' claims in one forum, because given the amount in controversy to require these claims to be brought in separate forums would effectively prevent individuals from bringing claims to recover their damages;

(e) no substantial difficulties are likely to be encountered in managing this class action; and

(f) counsel in this matter are experienced in both the trucking industry and in the management of class action litigation.

## APPLICABLE STATUTORY AND REGULATORY PROVISIONS

26.    DOT regulations establish various terms and conditions governing the leasing arrangements between owner-operators and regulated carriers. These regulations provide for the manner in which regulated motor carriers, such as Mayflower, are required to compensate owner-operators, charge-back owner-operators, maintain owner-operators' escrow funds, and provide an accounting--during the term of the lease agreement as well as upon the termination of the lease agreement.

26A.    The following DOT provision regulates compensation:

**Compensation. Payment period.** The lease shall specify

that payment to the lessor shall be made within 15 days after submission of the necessary delivery documents and other paperwork concerning a trip in the service of the authorized carrier. The paperwork required before the lessor can receive payment is limited to log books required by the Department of Transportation and those documents necessary for the authorized carrier to secure payment from the shipper. In addition, the lease may provide that, upon termination of the lease agreement, as a condition precedent to payment, the lessor shall remove all identification devices of the authorized carrier, and except in the case of identification painted directly on equipment, return them to the carrier. If the identification device has been lost or stolen, a letter certifying its removal will satisfy this requirement. Until this requirement is complied with, the carrier may withhold final payment. The authorized carrier may require the submission of additional documents by the lessor but not as a prerequisite to payment. Payment to the lessor shall not be made contingent upon submission of a bill of lading to which no exceptions have been taken. The authorized carrier shall not set time limits for the submission by the lessor of required delivery documents and other paperwork.

49 C.F.R. § 376.12(f).

    26B.   Where amounts are charged-back to owner-operators (and deducted from

compensation), the following DOT regulation applies:

> **Charge-back items.**  The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.

49 C.F.R. § 376.12(h).

    27.   DOT regulations, 49 C.F.R. 376.2(l), define an "escrow fund" as:

> Money deposited by the lessor with either a third party or the lessee to guarantee performance, to repay advances, to cover repair expenses, to handle claims, to handle license and State permit costs, and for any other purpose mutually agreed upon by the lessor and lessee.

28.    49 C.F.R. § 376.12(k) provides:

If escrow funds are required, the lease shall specify:

(1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.

(2) The specific items to which the escrow fund can be applied.

(3) That while the escrow fund is under control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions involving such fund. The carrier shall perform this accounting in one of the following ways:

(i) By clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund; or

(ii) By providing a separate accounting to the lessor of any transactions involving the escrow fund. This separate accounting shall be done on a monthly basis.

(4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.

(5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid. The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91-day, 13-week Treasury bills as established in the weekly auction by the Department of Treasury.

(6) The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor or all such final deductions made to the escrow fund. The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.

49 C.F.R. § 376.12(k).

29.    Ind. Code § 35-43-4-3 defines criminal conversion as a Class A misdemeanor

-9-

which occurs when "a person...knowingly or intentionally exerts unauthorized control over property of another person."

30.    Ind. Code § 34-4-30-1 provides that "if a person suffers a pecuniary loss as a result of a violation of IC 35-43, ...the person may bring a civil action against the person who caused the loss...."

## FACTS COMMON TO ALL COUNTS

31.    Owner-operators are small business persons who own and/or control truck tractors, and sometimes truck trailers, used to transport property over the nation's highways. Acting as independent contractors, owner-operators lease their equipment and services to motor carriers who possess the requisite legal operating authority under DOT regulations to enter into contracts with shippers for the transportation of property. Owner-operators are typically compensated for their respective services on a per-load basis and share the revenue derived from a specific transportation movement. The carrier typically deducts its share of the revenues, as well as other expenses or costs incurred, from the settlement statement that it issues to the owner-operator.

32.    The Plaintiffs and the unnamed potential class of Owner-Operators have entered into lease agreements with Mayflower or its authorized agents to transport and deliver household goods and other property on Mayflower's behalf, under Mayflower's operating authority.

33.    Mayflower collects transportation from revenues from shippers, then compensates Owner-Operators, by driver and transaction, either directly or through its authorized agents. Mayflower also charges back to Owner-Operators and deducts from their compensation or their

escrow accounts, by driver and transaction, either directly or through authorized agents, amounts for various items initially paid for or advanced by Mayflower.

34.    For example, through a standard lease provision, Owner-Operators must provide their state fuel tax information directly to Mayflower, which uses the information to file quarterly tax returns on a fleet-wide basis. Mayflower provides a monthly fuel tax report directly to Owner-Operators relating to certain taxing events, these amounts correspond with amounts charged-back to Owner-Operators by Mayflower directly or through an authorized agent. In general, states impose fuel taxes based upon fuel consumption within the state's border. Drivers are required to keep logs of the mileage driven in each state as well as their fuel purchases in each state. If a driver purchases fuel in State A, just before driving across the border into State B, that fuel may carry the truck all the way through State B and into State C. Thus, the driver purchases no fuel in State B, but is still responsible for paying taxes based upon the fuel consumed within State B's borders. By virtue of having purchased the fuel in State A, the driver is deemed to have underpaid fuel taxes in State B. Conversely, the driver has paid taxes on fuel purchased in State A (taxes are included in the purchase price of the fuel), but the fuel was not consumed in State A. Thus, the driver is deemed to have overpaid fuel taxes in State A.

35.    While fuel taxes that are to be paid by Mayflower on behalf of its Owner-Operators are charged against an Owner-Operator's settlement and deducted from an Owner-Operator's compensation each month, the credits due to an Owner-Operator (shown as a positive amount by state on the fuel tax accounting sheet) are "carried over" to the next month and kept by Mayflower indefinitely.

36.    Article 17 of the leasing agreement between Mayflower (through its agent, Glen

Ellyn Storage Corp.) and Wood-Chuck establishes the terms pursuant to which an escrow fund is

established, maintained and liquidated.  A true and correct copy of the Glen Ellyn Lease

Agreement is attached as Exhibit "A."  Article 17 of the leasing agreement between Mayflower

and Wood-Chuck states:

> Article 17.  Cash Deposit.  The Independent Contractor [Wood-Chuck] shall post a cash deposit of One Thousand Dollars ($1,000) with the Company at the time of entering into this Agreement, or at a subsequent date determined by the Company.  Such deposit or portion thereof, if such deposit is not posted in toto at one time, shall be held in the Independent Contractor's cash deposit account. Interest shall be posted to the Independent Contractor's cash deposit account quarterly at the rate equal to the average yield or equivalent coupon issue yield on 91 day, 13 week treasury bills as established in the weekly auction of the Department of Treasury. Independent Contractor shall have the right to demand to have an accounting for transactions involving his deposit account at any time.  *Upon cancellation or non-renewal of this Agreement, Independent Contractor's cash deposit account shall first be applied to any debit amount in the Independent Contractor's statement account and any balance remaining shall be paid to the Independent Contractor within 45 days of termination of this Agreement.*  (Emphasis added.)

37.    Article 23, Paragraph 5, of the leasing agreement between Mayflower and Wood-

Chuck provides:

> Settlement of the Independent Contractor's Statement Account. The company may defer partial or final settlement of the Independent Contractor's statement account until such time as (a) the Independent Contractor has complied fully with all provisions of this Agreement, and (b) the time has elapsed within which claims by or on behalf of the Company's shippers may be filed against the Company with respect to the last shipment carried by the Independent Contractor.  *Upon the occurrence of the above two circumstances, the balance of his account shall be delivered to the Independent Contractor, less the maximum chargeback amount in accordance with existing Company policy* for each claim pending with respect to any shipment carried by the Independent Contractor and also less any amounts then due the Company from the

-12-

Independent Contractor. Upon settlement of any amounts to the Company, the balance of the Independent Contractor's account shall be delivered to him. The independent Contractor shall not entertain an action or suit against the Company contesting the status of his account prior to the final settlement of such account nor subsequent to the elapse of two years following the final settlement of such account. (Emphasis added.)

37A.   Article 20 of the lease agreement between Mayflower (through its authorized agent, Glen Ellyn Storage) and Wood-Chuck provides for compensation of the Owner-Operator "within 15 days after receipt of shipping papers enabling the company to audit the papers for correct billing ..."

38.   On information and belief, the provisions of the lease agreement between Mayflower's authorized agent and Wood-Chuck are substantively the same in material respects as those contained in each and every lease agreement entered into between Mayflower or its authorized agents and the Owner-Operators.

39.   Upon termination of each of the Plaintiff's respective lease agreements, Mayflower failed to provide an accounting or final settlement of the amounts deducted or withheld from compensation and bases therefor as well as deductions from outstanding escrow funds to each of the Plaintiffs.

40.   Upon termination of each of the Owner-Operators lease agreements, Mayflower imposed improper chargebacks, failed to properly compensate, or failed to return credits, overpayments, interest, and outstanding escrow fund amounts to each of the Plaintiffs.

41.   Mayflower failed to return fuel tax credits on a current basis or otherwise to Owner-Operators.

42.   Omitted.

## COUNT ONE:  VIOLATION OF FEDERAL LEASING REGULATIONS

43.     The allegations contained in paragraphs 1 through 42 above are realleged and incorporated herein by reference as though fully set forth herein.

44.     Mayflower, as a regulated motor carrier, is required to ensure that potential class member Owner-Operators receive their compensation within 15 days from submission of necessary paperwork by the Owner-Operator.

45.     Mayflower, as a regulated motor carrier, is required to ensure that potential class member Owner-Operators receive their escrow funds within 45 days following termination of the lease.

46.     Mayflower, as a regulated motor carrier, is required to refund fuel tax credits on a current basis.

47.     The language in the lease agreements which purports to authorize Mayflower or its authorized agents to deduct, withhold, or otherwise keep sums from drivers' compensation, escrow or other funds---including anticipated claims and state fuel tax credits---for any period of time in excess of 15 or 45 days directly violates the provisions of 49 C.F.R. § 376.12(f), (h) and/or (k), and is void and unenforceable.

48.     The provisions of Article 23, Paragraph 5 of the leasing agreement which purports to bar drivers (a) from filing suits contesting either the failure of Mayflower to render a final accounting in a timely fashion or to make a final settlement within 45 days of the termination or non-renewal of the lease or (b) from filing suit subsequent to two years following the final settlement of the drivers' settlement account denies the Owner-Operators their rights under 49 C.F.R. § 376.12(f), (h) and (k), and are void and unenforceable.

-14-

49.    Omitted.

50.    Mayflower's failure to provide an accounting or to return escrow funds is actionable, under 49 U.S.C. § 14704(a)(1) and (2), as a violation of 49 C.F.R. § 376.12(f), (h) and/or (k).

51.    As a direct and proximate result of Mayflower's violations of 49 C.F.R. § 376.12(f), (h) and/or (k), the Owner-Operators have been deprived of sums rightfully belonging to them and have incurred substantial monetary damages.

## COUNT TWO: STATUTORY CONVERSION OF ESCROW FUNDS

52.    The allegations contained in paragraphs 1 through 51 above are realleged and incorporated herein by reference as though fully set forth herein.

53.    By failing to provide an accounting, to pay compensation, or to return escrow funds owed to the Owner-Operators within the period provided for in both the lease agreements and in the federal leasing regulations, Mayflower knowingly or intentionally exerted unauthorized control over property belonging to Plaintiffs in violation of IC § 35-43-4-3.

54.    By failing to return fuel-tax credits owed to Owner-Operators on a current basis, Mayflower knowingly or intentionally exerted unauthorized control over property belonging to Plaintiffs in violation of IC § 35-43-4-3.

55.    The Plaintiffs, and, on information and belief, the Owner-Operators, have suffered pecuniary losses as a result of this violation of IC § 35-43 within the meaning of IC § 34-4-30-1.

## COUNT THREE:  BREACH OF CONTRACT

56.    The allegations contained in paragraphs 1 through 55 above are realleged and incorporated herein by reference as though fully set forth herein.

57.    The leasing agreements between Mayflower or its authorized agents and the Plaintiffs and, on information and belief, the substantially similar leasing agreements between Mayflower or its authorized agents and the Owner-Operators, call for the payment of compensation to Owner-Operators within 15 days of submission of the necessary paperwork by Owner-Operators, and the return of all funds held in escrow by Mayflower or its authorized agents within 45 days following the termination of the agreement.  Other provisions of the agreement which may purport to curtail, limit, or nullify these provisions are contrary to federal law (as set out in 49 C.F.R. § 376.12), violate public policy and are therefore void and of no legal force and effect.

58.    Mayflower breached its contracts with the Owner-Operators by failing to fully compensate the Owner-Operators within the specified time frame, by failing to return escrow funds within the specified time frame, with interest, following termination of individual leasing agreements, and by failing to provide an accounting of the funds held in escrow as required by the specific terms of said agreements.  As a direct and proximate result of this conduct, Plaintiffs have been deprived of sums rightfully belonging to them and have incurred substantial monetary damages.  Mayflower's breaches of contract have involved conduct so malicious, fraudulent, grossly negligent, and/or oppressive as to constitute an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded.

## PRAYERS FOR RELIEF

Wherefore, Wood-Chuck Leasing, Inc., Mark Dudgeon, and John E. Neidig, and OOIDA, on behalf of Owner-Operators, respectfully request that this Court:

1. Declare Defendant in violation of federal and state law and regulations;

2. Declare Defendant in breach of the lease agreements;

3. Order that Defendant provide to Owner-Operators an accounting of all transactions, including escrow funds and fuel tax credits held on behalf of Owner-Operators;

4. Enjoin Defendant from future violations of DOT regulations and wrongful acts in breach of contract;

5. Certify a class comprised of current and former owner-operators who have entered into lease agreements with the Defendant and who have not received money to which they were entitled, including refunds of escrow funds and fuel-tax credits.

6. Enjoin Defendant from any acts of retaliation, harassment, or intimidation against class members and others who may assist and/or participate in this action;

7. Enter judgment against Defendant in favor of individual class members for all actual damages for violation of 49 C.F.R. § 376.12 pursuant to 49 U.S.C. § 14704(a)(2), including pre- and post-judgment interest, as allowed by law;

8. Enter judgment against Defendant in favor of individual class members for treble damages, costs of this action, reasonable attorneys' fees, and other costs reasonably related to collections, pursuant to IC 34-4-30-1, for the conversion of driver funds, such as escrow fund amounts, including pre- and post-judgment interest, as allowed by law;

9. Enter judgment against Defendant in favor of individual class members for all actual damages for breach of contract, including pre- and post-judgment interest, as allowed by law, and such punitive damages as this Court may deem proper;

10. Create a common fund made up of all damages owed by Mayflower to individual class members;

11. Award class counsel a sum for reasonable attorneys' fees and expenses incurred in the prosecution of this action to be paid out of the common fund; and

12. Award such other relief as this Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by

jury on all issues triable as of right by a jury.

Respectfully submitted,
Owner Operator Independent Drivers Association,
    Inc., Plaintiff
Wood-Chuck Leasing, Inc., Plaintiff
Mark Dudgeon, Plaintiff
John E. Neidig, Plaintiff

By: _____
    PAUL D. CULLEN, SR.
    JOSEPH A. BLACK
    DIANA E. STEIN

THE CULLEN LAW FIRM, PLLC
1101 30th Street, N.W., Suite 300
Washington, D.C. 20007
Telephone: (202) 944-8600

and

By: _____
    DAVID J. CARR

JOHNSON SMITH PENCE & HEATH LLP
Suite 1800
One Indiana Square
Indianapolis, IN 46204
Telephone: (317) 634-9777

Counsel for Plaintiffs OOIDA, WOOD-
CHUCK LEASING, INC., MARK
DUDGEON and JOHN E. NEIDIG

-18-

## Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing was sent via first-class U.S. mail, postage prepaid, this 11th day of January, 2000 to the following:

James A. Calderwood, Esq.
Richard P. Schweitzer, Esq.
Jeffrey L. Karlin, Esq.
ZUCKERT SCOUTT & RASENBERGER, LLP
888 Seventeenth Street, NW
Suite 600
Washington, DC  20006

David C. Campbell, Esq.
James M. Hinshaw, Esq.
BINGHAM SUMMERS WELSH & SPILMAN
2700 Market Tower
10 West Market Street
Indianapolis, IN  46204-2982

David J. Carr

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

OWNER-OPERATOR INDEPENDENT          )
DRIVERS ASSOCIATION, INC. and       )
JOHN E. NEIDIG,                     )
Individually and on behalf of all others )
sinilarly situated,                 )       Case No. IP98-0458 C B/S
                                             )       Complaint–Class Action
      Plaintiffs,                 )
                                             )
v.                                  )       (Consolidated with IP98-0457
                                             )         C B/S for Discovery)
MAYFLOWER TRANSIT, INC.,            )
                                             )
      Defendant.                  )
                                             )

## FIRST AMENDED CLASS ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES
## DEMAND FOR JURY TRIAL

The Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), and John E. Neidig

(collectively, "Plaintiffs" or "class representatives"), bring this action, on behalf of themselves and all

others similarly situated, against Defendant Mayflower Transit, Inc. ("Mayflower" or "Defendant")

or its successors in interest and allege as follows:

### NATURE OF THE ACTION

1.      This is a class action against the Defendant, pursuant to which Plaintiffs, as class

representatives on behalf of themselves and all others similarly situated, challenge the lawfulness of

Mayflower's practice of overcharging or improperly charging independent owner-operators, who are

members of the class ("Owner-Operators"), for insurance policies and/or insurance coverage.

### JURISDICTION AND VENUE

2.      Jurisdiction of this claim is granted to this court by 28 U.S.C. §§ 1331 (federal



EXHIBIT
B

PENGAD-Bayonne, N. J.

question jurisdiction), 1337 (proceedings arising under an act of Congress regulating commerce) and 1367 (supplemental jurisdiction). The causes of action alleged in this complaint arise under the laws of the United States regulating commerce and the activities of motor carriers engaged in the transportation of property in interstate and foreign commerce, including 49 U.S.C. §§ 13501, 14102 and 14704(a)(1) and (2), and 49 C.F.R. § 376 *et seq.*, or are state law claims so related to the federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

3.     Venue is based upon 28 U.S.C. § 1391(b) in that Defendant was, at the time the lawsuit was filed, incorporated in the State of Indiana and in that a substantial part of the events giving rise to the claims raised herein occurred in this district or state.

## PARTIES TO THE ACTION

4.     Plaintiff OOIDA is a business association of persons and entities, commonly known as "owner-operators," who own and operate motor carrier equipment. OOIDA is a not-for-profit corporation incorporated in the State of Missouri, with its headquarters located at 311 Mize Road, P.O. Box L, Grain Valley, Missouri 64029. OOIDA was founded in 1973 and now has over 45,000 members residing in all fifty (50) states and in Canada. Owner-operators are typically small business men and women who own and operate Class 7 and 8 trucks (large tractor-trailers) in interstate commerce. Owner-operators typically lease their equipment, with drivers, to private carriers and/or regulated motor carriers operating under the authority granted by the U.S. Department of Transportation ("DOT") and formerly, by the Interstate Commerce Commission ("ICC"). Each such lease is regulated under Title 49, Subpart B, Chapter III, Part 376 of the Code of Federal Regulations. 49 C.F.R. § 376.1 et seq. Owner-operators comprise one of the primary sectors of the

2

interstate motor carrier industry, accounting for an estimated forty (40%) percent of all inter-city truck traffic in the United States. The number of owner-operators nationwide totals in the hundreds of thousands. A large number of OOIDA's members are owner-operators who operate motor vehicles in the transport of property, including household goods, in interstate commerce and who have been, are, or are likely to be, operating under contract or otherwise associated with Defendant. Accordingly, OOIDA is a suitable representative to champion the class and protect the interests of its members.

5.     Plaintiff John E. Neidig ("Neidig"), a citizen of the state of Washington, is an owner-operator who has leased motor vehicle equipment, with drivers, to Mayflower through one or more of Mayflower's agents within the meaning of 49 U.S.C. § 13907.

6.     Neidig individually is, and other similarly situated Owner-Operators are, "owners" within the meaning of 49 C.F.R. § 376.2(d).

7.     Neidig individually is, and other similarly situated Owner-Operators are, "lessors" within the meaning of 49 C.F.R. § 376.2(f).

8.     The vehicles provided for use by Neidig and other Owner-Operators to Mayflower are "equipment" within the meaning of 49 C.F.R. § 376.2(b).

9.     Upon information and belief, at the time the lawsuit was filed, Mayflower was an Indiana corporation doing business in Indiana. Mayflower is a regulated motor carrier, primarily engaged in the enterprise of providing transportation services to the shipping public under authority granted by DOT and formerly the ICC.

10.     Mayflower is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

11.     49 U.S.C. § 13907 provides that a motor carrier, such as Mayflower, which provides

3

transportation of household goods, is legally responsible for all acts or omissions of any of its agents which relate to the performance of household goods transportation services, and which are within the actual or apparent authority of the agent, or which are ratified by the carrier.

12.     49 C.F.R. § 376.12(m) imposes on a motor carrier, such as Mayflower, the legal responsibility for ensuring that its agents provide, and that Owner-Operators, such as Neidig and the unnamed members of the potential class herein, receive the rights and benefits due under the federal leasing regulations in connection with leasing agreements between the carrier and the Owner-Operator.

13.     On information and belief, the terms of the leasing agreements between Neidig and Mayflower's authorized agents are substantively the same in material respects as the terms of the leasing agreements entered into between Mayflower, or its authorized agents, and each of the unnamed potential class members.

14.     The potential class of unnamed plaintiffs consists of owner-operators and other entities who, like Neidig, have contracted with Mayflower, either directly or indirectly through an authorized agent, to lease equipment and to provide driving services to Mayflower. On information and belief, the number of persons making up this potential class is in the thousands, thus making joinder of all such persons impracticable.

## CLASS ACTION ALLEGATIONS

15.     **Class Description**. Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of Owner-Operators who entered into regulated leases with Mayflower or its authorized agents, pursuant to which Mayflower or its authorized agents leased motor vehicle equipment from, and contracted for services by, the Owner-Operator and who purchased insurance from or through

4

Mayflower or its authorized agents as part of those lease agreements and who were harmed by the practice of Mayflower or its authorized agents of overcharging or improperly charging for such insurance.

16.    **Impracticability of Joinder**.    On information and belief, several thousand independent owner-operators have leased their equipment and services to, or otherwise have been associated with Mayflower and purchased insurance policies or coverage from or through Defendant Mayflower or its authorized agents pursuant to those lease agreements.    All such persons are potential class members.  Individual joinder of all potential class members is thus impracticable.

17.    **Commonality**.  Mayflower has acted and/or failed to act in a way that affects all potential class members similarly.  Accordingly, any questions of fact are common to the potential class as a whole. Mayflower's actions and failures to act have also caused the same harm to potential class members.  Accordingly, questions of Defendant's liability to the class are common to all class members.  Additionally, Mayflower has acted and/or refused to act in generally the same manner with respect to each member of the class.   Therefore, potential class-wide injunctive relief against such conduct is also appropriate.

18.    **Typicality**.  The claims of the Plaintiffs are typical of the claims of the potential class as a whole.

19.    **Fair and Adequate Representation**.    The Plaintiffs are capable of fairly and adequately protecting the interests of the class.

20.    **Class Action Appropriate Under Rule 23(b)(2)**. Mayflower has acted and/or failed to act on grounds generally applicable to the potential class as a whole.   Thus, injunctive and declaratory relief is appropriate with respect to the potential class as a whole, making class

certification appropriate under Fed. R. Civ. P. 23 (b)(2).

21.    **Class Action Appropriate Under Rule 23(b)(3)**. The questions of law, enumerated

in the counts below, are common to all potential class members, and predominate over any questions

affecting only individual members, and a class action is superior to other available methods for the

fair and efficient adjudication of the claims herein.

22.    Other factors favoring the maintenance of this suit as a class action include:

(a)    the amounts in controversy for individual plaintiffs are relatively small so that

individual members of the potential class would not find it cost-effective to bring individual claims;

(b)    requiring individuals to prosecute separate actions would substantially impair

or impede the individual members' ability to protect their interests;

(c)    on information and belief, there is no litigation already commenced by class

members concerning the causes of action raised in this complaint;

(d)    it is desirable to concentrate the individual members' claims in one forum,

because given the amount in controversy, to require these claims to be brought in separate forums

would effectively prevent individuals from bringing claims to recover their funds;

(e)    no substantial difficulties are likely to be encountered in managing this class

action; and

(f)    counsel in this matter are experienced in both the trucking industry and in the

management of class action litigation.

## REGULATORY SETTING AND FACTUAL ASSERTIONS

23.    Owner-operators are small business persons who own and/or control truck tractors,

and sometimes truck trailers, used to transport property over the nation's highways.   Acting as

independent contractors, owner-operators lease their equipment and services to motor carriers who possess the requisite legal operating authority under DOT regulations to enter into contracts with shippers for the transportation of property. Owner-operators are typically compensated for their respective services on a per-load basis and share the revenue derived from a specific transportation movement. The carrier typically deducts its share of the revenues, as well as other expenses or costs incurred, from the settlement statement that it issues to the owner-operator.

24.    Under federal law, "the authorized carrier may perform authorized transportation in equipment it does not own only under . . . a written lease granting use of the equipment and meeting the requirements contained in § 376.12." 49 C.F.R. § 376.11. *See also* 49 U.S.C. § 14102.

25.    The lease requirements provide that the lease contain specific provisions and require that the regulated motor carrier adhere to those terms. 49 C.F.R. § 376.12.

26.    Neidig entered into a federally-regulated lease agreement (the "Glen Ellyn Lease Agreement") with Glen Ellyn Storage Corporation of Glen Ellyn, Illinois ("Glen Ellyn"), an authorized agent of Defendant Mayflower, on or about November 15, 1994. The Glen Ellen Lease Agreement was terminated on or about January 8, 1996, when Neidig stopped driving for Glen Ellyn. A true and correct copy of the Glen Ellyn Lease Agreement is attached hereto as Exhibit "A."

27.    The Glen Ellyn Lease Agreement constitutes a "lease" within the meaning of the federal leasing regulations because it is:

> A contract or arrangement in which the owner [Plaintiff] grants the use of equipment, with or without driver, for a specified period to an authorized carrier [Defendant Mayflower or its authorized agent] for use in the regulated transportation of property, in exchange for compensation.

49 C.F.R. § 376.2(e)

7

28.    The lease regulations specifically govern the parties' rights and obligations with respect to "charge-back items." Specifically, 49 C.F.R. § 376.12(h) provides:

> **Charge-back items.** The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents, which are necessary to determine the validity of the charge.

29.    The lease regulations provide:

> If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.

49 C.F.R. § 376.12(j)(1).

30.    Article 13 of the Glen Ellyn Lease Agreement specifically provides that "[t]he *cost* of all insurance shall be charged to the [owner-operator] statement account" (emphasis added).

31.    Neidig purchased occupational accident insurance through Glen Ellyn. Glen Ellyn charged Neidig $290.00 per month for this insurance. Mayflower, and/or its agent, Glen Ellyn, actually paid the insurance company a total of $210.50 per month for the cost of this insurance. Therefore, Neidig was charged a total of $79.50 per month for the insurance in excess of the cost borne by Mayflower, and/or its agent, Glen Ellyn. Since this charge exceeded "the cost of [the] insurance," it constitutes a violation of the lease agreement between the parties and a violation of the "charge-back " provisions of federal lease regulations.

32.    On or about May 23, 1993, Neidig entered into a federally-regulated lease agreement ("the Gazda Lease Agreement") with Gazda Transportation System, Inc. ("Gazda"). Gazda is an Indiana corporation, with its registered office at One North Capitol Ave., Indianapolis, IN 46204.

8

Gazda is an authorized agent of Mayflower. The Gazda Lease Agreement was terminated during November, 1994, when Neidig stopped driving for Gazda. A true and correct copy of the Gazda Lease Agreement is attached hereto as Exhibit B.

33.    Article 14 of the Gazda Lease Agreement specifically provides that "The *cost* of such insurance shall be charged to the Contractor's statement of account ..." (emphasis added). Schedule "B" of the Gazda Lease Agreement states that Gazda will charge back "100% of the premium amount" for insurance policies.

34.    Neidig also purchased occupational accident insurance through Gazda. Mayflower, and/or its agent, Gazda, charged Neidig $310.00 per month for this insurance. On information and belief, Mayflower, and/or its agent, Gazda, actually paid the insurance company approximately $210.00 per month. Therefore, Neidig was charged approximately $100.00 more for the insurance than it cost Mayflower, and/or its agent, Gazda. Since this charge exceeded "100% of the premium amount for [the] insurance policy," it constitutes a breach of the lease agreement between the parties, and a violation of the "charge-back" provisions of federal lease regulations.

35.    On information and belief, Mayflower, directly or indirectly through its authorized agents, overcharges or improperly charges Owner-Operators that purchase other insurance policies or insurance coverage through Mayflower or its authorized agents in a manner similar to that described above. These overcharges or improper charges constitute violations of the federal lease regulations and a breach of each lease agreement between the authorized agents and each individual Owner-Operator.

35A.    On information and belief, Mayflower directly or indirectly through its authorized agents, overcharges or improperly charges Owner-Operators for public liability and other insurance

coverage that it is obligated to obtain for the protection of the public. These overcharges or improper charges constitute violations of the federal lease regulations and a breach of each lease agreement between the authorized agents and each individual Owner-Operator.

## COUNT I

## VIOLATION OF FEDERAL MOTOR CARRIER LEASING REGULATIONS

36.    Plaintiffs reallege and incorporate herein the allegations set forth in paragraphs 1 through 35 above.

37.    Pursuant to 49 U.S.C. §§ 14704(a)(1) and (2) and 14704(e), this is an action against Mayflower by Neidig, individually, and on behalf of Owner-Operators, for equitable relief, damages, costs, and attorneys' fees. The relief sought by OOIDA is limited to declaratory and injunctive relief and related costs and recovery of attorneys' fees.

38.    The authority of the Secretary of Transportation to issue regulations governing the relationship between motor carriers, such as Mayflower, its authorized agents, and owner-operators, such as Neidig, and others similarly situated, is set forth in 49 U.S.C. §14102.

39.    49 U.S.C. § 14704(a) provides:

In General.—

(1)  . . . A person may bring a civil action for injunctive relief for violations of sections 14102 and 14103.

(2)    Damages for violations.—A carrier or broker providing transportation or service subject to jurisdiction under Chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part.

49 U.S.C. § 14704(a)

40.    49 U.S.C. § 14704(e) provides:

> Attorney's fees.—The district court shall award a reasonable attorney's fee under this section. The district court shall tax and collect that fee as part of the costs of the action.

U.S.C. § 14704(e).

41.    The acts and omissions of Mayflower or its authorized agents specifically failing to adhere to the terms of the lease agreement by overcharging or improperly charging Owner-Operators for insurance policies and insurance coverage, constitute material violations of 49 C.F.R. § 376.12 of the DOT lease regulations.

42.    As a direct and proximate result of the acts and omissions, of Mayflower or its authorized agents Neidig, and the members of the potential class, have suffered substantial damages.

## COUNT II

## BREACH OF CONTRACT

43.    Plaintiffs reallege and incorporate herein the allegations set forth in paragraphs 1 through 42 above.

44.    This is an action brought by Neidig individually, and on behalf of Owner-Operators, for damages based upon breach of contract.

45.    Pursuant to each Owner-Operator's respective lease agreements, Mayflower and its authorized agents are obligated with respect to insurance to confine charge-backs to the cost of charges for insurance.

46.    Mayflower, and/or its authorized agents, materially breached the lease agreements with Owner-Operators by charging back amounts in excess of the actual cost of insurance policies. As a direct result of the breach of the lease agreements by Mayflower, and/or its authorized agents, the Owner-Operators have suffered substantial damages.

11

## PRAYERS FOR RELIEF

WHEREFORE, OOIDA and Neidig, individually, and on behalf of Owner-Operators, request

that this Court:

(1)    Declare Defendant in violation of Federal law and regulations;

(2)    Declare Defendant in breach of the lease agreements;

(3)    Order the Defendant to provide the Plaintiffs with an accounting of all items charged back to Owner-Operators;

(4)    Enjoin Defendant from future violations of Federal regulations and wrongful acts in breach of contract;

(5)    Certify a class comprised of owner-operators who have entered into lease agreements with the Defendant and who were overcharged for insurance policies by the Defendant.

(6)    Enjoin Defendant from any acts of retaliation, harassment, and intimidation against class members and others who may assist and/or participate in this action;

(7)    Enter judgment against Defendant in favor of individual class members for all actual damages for violation of 49 C.F.R. § 376.12(k) pursuant to 49 U.S.C. § 14704(a)(2), including pre- and post-judgment interest, as allowed by law;

(8)    Enter judgment against Defendant in favor of Plaintiff Neidig individually, and on behalf of Owner-Operators, for all actual damages for breach of contract, including pre- and post-judgment interest, as allowed by law;

(9)    Create a common fund made up of all damages owed by Mayflower to individual class members;

(10)    Award class counsel a sum for reasonable attorneys' fees and expenses incurred in the prosecution of this action to be paid out of the common fund; and

(11)    Award such other relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable as of right by a jury.

Respectfully submitted,

Owner Operator Independent Drivers Association, Inc.,
& John E. Neidig, Plaintiffs

By:    PAUL D. CULLEN, SR.
       JOSEPH A. BLACK
       DIANA E. STEIN

       THE CULLEN LAW FIRM, PLLC
       1101 30th Street, N.W., Suite 300
       Washington, D.C. 20007
       Telephone: (202) 944-8600

By:    _____
       DAVID J. CARR
       STEVEN J. MOSS

       JOHNSON SMITH PENCE & HEATH LLP
       Suite 1800
       One Indiana Square
       Indianapolis, Indiana 46204
       Telephone: (317) 634-9777

       Counsel for Plaintiffs OOIDA and JOHN E. NEIDIG

13

## Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing was sent via first-class U.S. mail, postage prepaid, this 11th day of January, 2000 to the following:

James A. Calderwood, Esq.
Richard P. Schweitzer, Esq.
Jeffrey L. Karlin, Esq.
ZUCKERT SCOUTT & RASENBERGER, LLP
888 Seventeenth Street, NW
Suite 600
Washington, DC 20006

David C. Campbell, Esq.
James M. Hinshaw, Esq.
BINGHAM SUMMERS WELSH & SPILMAN
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204-2982

David J. Carr

255479.1                                    14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OWNER-OPERATOR INDEPENDENT DRIVERS )
ASSOCIATION, INC., et al. )
                                    )
        Plaintiffs,                 )
                                    )         No. 05 CV 10317 MLW
v.                                  )
                                    )
UNITED VAN LINES, LLC., et al.      )
                                    )
        Defendants.                 )

**AFFIDAVIT OF JOSEPH SCHMELZLE**

Joseph Schmelzle, being first duly sworn, deposes and states as follows:

1.      I am  a Senior Director of defendant UniGroup, Inc. ("UniGroup").  I have been employed by UniGroup since 1992.

2.      I am over the age of 21.  I am competent to give this affidavit, which is being submitted in support of Defendants' Motion to Transfer Venue.  The facts stated herein are based upon my personal knowledge and/or examination of business records kept in the ordinary course of business, and are true and correct to the best of my knowledge, information, and belief.

3.      I have reviewed plaintiffs' Complaint in the present case, *OOIDA, Inc., et al. v. United Van Lines, LLC, et al.*, No. 05 CV 10317 MLW, in which plaintiffs complain about several of defendants' alleged practices concerning the calculation of owner-operator compensation, the provision of rated freight bills and similar documents to owner-operators, the pass-through of PL/PD insurance costs to owner-operators, and defendants' alleged failure to adequately monitor the leasing relationship between independent local agents of United Van Lines and their respective owner-operators.

4.      Defendants UniGroup and United Van Lines, LLC ("United") are each organized under Missouri law, and defendant Vanliner Insurance Company ("Vanliner") is organized under Arizona law.  Each of the three companies—UniGroup, United, and Vanliner—maintain their headquarters and principal place of business at One Premier Drive, Fenton, Missouri 63026.

5.      All officers and employees of UniGroup and United work at corporate headquarters in Missouri, and all reside in or around the St. Louis, Missouri metropolitan area. Similarly, all Vanliner officers and employees, except for one employee located in California, work and reside in or around the St. Louis metropolitan area.

6.      UniGroup is a holding company that owns various operating subsidiaries.  Among its wholly-owned direct and indirect subsidiaries are defendant Vanliner and defendant United. UniGroup has no office in Massachusetts, employs no Massachusetts residents, and maintains no corporate records in Massachusetts.

7.      UniGroup's Board of Directors is comprised of eighteen individuals, only one of whom is a Massachusetts resident.  Similarly, United's Board of Directors is comprised of eighteen people, only one of whom resides in Massachusetts.  Finally, Vanliner's Board of Directors is comprised of ten persons, and only one is a Massachusetts resident.

8.      Vanliner is an insurance company.  It has no offices in Massachusetts, employs no Massachusetts residents, and maintains no corporate records in Massachusetts.

9.      United is a federally regulated motor carrier which provides property transportation services under the authority of the U.S. Department of Transportation, and conducts business in all fifty states.  United has no offices in Massachusetts, employs no Massachusetts residents, and maintains no corporate records in Massachusetts.

10.     United operates through a network of nearly five hundred local agencies.  All United agents are independent business entities and are separately owned, managed, and operated.  United's agents are located, and conduct business in, each of the fifty states.

11.     Only thirteen full service United agencies (comprised of eleven different agent entities) are located in Massachusetts.  Thus, less than three percent of all United agencies are located in Massachusetts.

12.     To the best of my knowledge, all of the witnesses to, and persons with knowledge of, the parties' policies, practices, actions, and/or conduct which are at issue in this case are (a) located in or around defendants' headquarters in Missouri, (b) located in or around plaintiff OOIDA's headquarters in Missouri, (c) are present or former employees of United agents located throughout the United States, or (d) are present or former owner-operators of United agents located throughout the United States.  Since plaintiff OOIDA and all three defendants are located in Missouri, I believe that substantially more witnesses with relevant knowledge work and/or reside in Missouri than work or reside in any other state.

13.     Similarly, the documents that reflect or relate to the parties' policies, practices, actions, and/or conduct which are at issue in this case are (a) located in or around defendants' headquarters in Missouri, (b) located in or around plaintiff OOIDA's headquarters in Missouri, (c) located in or around the headquarters of United's hundreds of independent agents throughout the United States, or (d) are in the possession of thousands of present or former owner-operators of United agents located throughout the United States.  Since plaintiff OOIDA and all three defendants are located in Missouri, I believe that substantially more relevant documents are located in Missouri than in any other state.

14.     Further affiant sayeth not.

/s/ Joseph Schmelzle
Joseph Schmelzle


Sr. Director Agency Development
[Title]

STATE OF MISSOURI           )
                            )  SS.
COUNTY OF ST. LOUIS         )


      On this _____ day of April, 2005, before me appeared Joseph Schmelzle, to me personally known, who being by me duly sworn, did state that he is authorized to make this affidavit, and that the statements made herein are true to the best of his knowledge, information and belief.

      IN TESTIMONY WHEREOF, I hereunto set my hand and affix my official seal in the County and State aforesaid, the date and year written above.


_____
                     Notary Public


(SEAL)

My Commission Expires:

_____

FILED

Aug 19  3 44 PH '02

CLERK U.S. DISTRICT COURT
EASTERN DIST. OF CALIF.
AT FRESNO

BY _____ DEPUTY

1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

10
11
12
13
14

OWNER-OPERATOR INDEPENDENT  )
DRIVERS ASSOCIATION, INC., and  )
THOMAS SHUTT, WILLIAM PIPER,  )
DON SULLIVAN, SR., JAMES  )
MURPHY, and WALTER WILLIAMS,  )
individually, and on behalf of all others  )
similarly situated,  )

CV F 02-5664 AWI SMS

MEMORANDUM OPINION
AND ORDER

15                    Plaintiffs,  )

16          v.  )

17  C. R. ENGLAND, INC.,  )

18                    Defendant.  )
    _____ )

19

20      Plaintiffs ("Drivers") have moved  for a preliminary injunction enjoining and

21  restraining Defendant C.R. England, Inc. ("C.R. England") from performing transportation of

22  property that requires Department of Transportation authorization in motor vehicle

23  equipment that C. R. England does not own until C. R. England executes written lease

24  agreements with the owners of such equipment that meet the requirements contained in

25  49 C.F.R. § 376.12.

26      Drivers present this statement of the case:

27          Plaintiffs, owners of motor carrier equipment (truck tractors) under lease to
        Defendant, filed this action against Defendant for its failure to comply with the Truth-
28      In-Leasing regulations found at 49 C.F.R. Part 376.  Defendant is directly regulated



EXHIBIT
D

by the United States Department of Transportation ("DOT"). Under the authority of 49 U.S.C. § 14102, the DOT forbids "authorized carriers" from performing transportation services in equipment that they do not own, unless the carriers execute lease agreements that meet the requirements set forth in 49 C.F.R. § 376.12. *See* 49 C.F.R. § 376.11(a). Section 376.12 requires that authorized motor carriers enter into written lease agreements that include specifically prescribed terms and that the carriers adhere to those terms. Violations of these federal regulations are privately actionable under 49 U.S.C. § 14704(a)(1) and (2).

Defendant is currently performing transportation services using equipment and services lease from Plaintiff drivers and other similarly situated. The lease agreements governing the use of this equipment do not meet the requirements of 49 C.F.R. § 376.12. These lease agreements fail to contain numerous provisions required by 49 C.F.R. § 376.12 and contain other provisions that conflict with these regulations. Defendant's noncompliant leases are attached to Plaintiffs' Complaint at Tabs 1 and 2. The text of these leases provides reasonable cause to believe that the statutes and their implementing regulations have been violated and will be violated in the future. Plaintiff drivers have suffered economic injury as a direct result of Defendant's non-compliant leases and Plaintiff's seek redress of their economic injury in this litigation. (See attached Declaration of Walter Williams, Don Sullivan, Sr., James Murphy, and James J. Johnston in support of the Motion for a Preliminary Injunction). Title 49, Sections 14704(a)(1) and (2) of the United States Code authorizes persons injured because of a motor carrier's violations of these regulations to seek injunctive relief and damages. In this motion, Plaintiffs respectfully urge the Court to enter a preliminary injunction barring Defendant from providing authorized transportation services until such time as it executes lease agreements that comply with 49 C.F.R. Part 376.

Memorandum of Law in Support of Motion for a Preliminary Injunction, 2:2 - 25.

The court previously heard the parties' arguments on Drivers' motion for a preliminary injunction on July 22, 2002. The court ordered further briefing on Drivers' motion, and ordered the parties to return on August 19, 2002, the same day C. R. England's motion to dismiss or transfer venue and stay or compel arbitration, was set to be heard. Also set to be heard on that date was C. R. England's motion to dismiss for lack of subject matter jurisdiction.

In the motion to dismiss or transfer venue and stay or compel arbitration, C. R. England contends the court should:

1) Dismiss this case or transfer this case to the United States District Court for the District of Utah, Salt Lake City Division, pursuant to 28 U.S.C. § 1406;

2) Transfer this case to the District of Utah under 28 U.S.C. § 1404(a); or

2

1    3) Stay the case and compel arbitration under the Utah Arbitration Act, Utah Code Ann.§ 78-

2    31(a) -1 to -20.

3                                    **DISCUSSION**

4    Dismissal or Transfer pursuant to 28 U.S.C. § 1406

5           C. R. England argues that the arbitration clauses contained within the leasing

6    agreements contain provisions mandating arbitration in Salt Lake City, Utah, of all disputes

7    arising under the lease agreements or interpreting the lease agreements.  C. R. England

8    contends that under this circumstance, venue should be transferred to the United States

9    District Court for the District of Utah under 28 U.S.C. § 1406 ("Section 1406"), which

10   provides as follows:

11          § 1406. Cure or waiver of defects

12          (a) The district court of a district in which is filed a case laying venue in the wrong
             division or district shall dismiss, or if it be in the interest of justice, transfer such case
13          to any district or division in which it could have been brought.
             (b) Nothing in this chapter shall impair the jurisdiction of a district court of any
14          matter involving a party who does not interpose timely and sufficient objection to the
             venue.
15          (c) As used in this section, the term "district court" includes the District Court of
             Guam, the District Court for the Northern Mariana Islands, and the District Court of
16          the Virgin Islands, and the term "district" includes the territorial jurisdiction of each
             such court.

17

18          C. R. England relies on Flake v. Medline Industries, Inc., 882 F.Supp. 947 (E.D. Cal.

19   1995), in which a former employee brought an age discrimination action in California state

20   court.  The employer removed to federal court and then sought dismissal for improper venue,

21   arguing that venue was controlled by the forum selection clause in the contract that provided

22   that "any disputes arising under this Agreement shall be tried in the Courts sitting within the

23   State of Illinois."  The court found that the forum selection clause should be given effect and

24   that the case should be transferred to the Northern District of Illinois pursuant to 28 U.S.C. §

25   1406.

26          C. R. England also relies on Scherk v. Alberto-Culver Company, 94 S.Ct. 2449

27

28                                          3

1    (1974), in which an action was brought by an American company, a purchaser of European

2    business entities, against a German citizen, the seller of the business entities.   The seller

3    sought to stay the proceedings while the parties arbitrated the dispute before the International

4    Chamber of Commerce tribunal, as provided by the contract.   The Supreme Court held that

5    the arbitration clause would be enforced.   In so doing, the Court stated, "An agreement to

6    arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause

7    that posits not only the situs of the suit but also the procedure to be used in resolving the

8    dispute." Id. at 519.   From this, C. R. England argues that the United States Supreme Court

9    "has specifically found that an arbitration clause is a forum selection clause."

10        Based on Flake and Sherck, C. R. England argues that the arbitration clause in the

11    leasing agreements amounts to a forum selection clause which the court should enforce under

12    Section 1406.   Specifically, C. R. England argues that this case should be dismissed because

13    there have already been two similar lawsuits against C.R. England in Salt Lake City, Utah.

14    Further, C. R. England asserts that before the August 19, 2002 hearing date, it will have filed

15    its Complaint to Compel Arbitration in Utah for the purpose of enforcing the Arbitration

16    Clause.   Thus, C. R. England argues, nothing further is required to initiate a case in Utah.

17    Finally, C. R. England argues that at the very least, this case should be transferred to Utah.

18        In response, Drivers argue that Section 1406 is not applicable to the facts at hand

19    because (1) the Supreme Court has held that forum selection clauses are not dispositive,

20    Stewart Org., Inc. v. Ricoh Corp, 487 U.S. 22, 31 (1988), and (2) the arbitration provision at

21    issue here is not enforceable.

22        After considering the arguments of the parties, the court finds that the one sentence in

23    Scherk relied upon by C. R. England does not establish that the arbitration clauses at issue

24    here amount to a forum selection clause such as would support dismissal or transfer under

25    Section 1406.   Thus, the court will decline to grant the motion to transfer pursuant to Section

26    1406.

27

28                                          4

1  Transfer pursuant to 28 U.S.C. § 1404(a)

2      C. R. England contends that if the court concludes that this case should not be

3  dismissed or transferred under Section 1406, it should transfer venue to the United States

4  District Court for the District of Utah under 28 U.S.C. § 1404(a) ("Section 1404"), which

5  provides: "(a) For the convenience of parties and witnesses, in the interest of justice, a district

6  court may transfer any civil action to any other district or division where it might have been

7  brought." Defendant relies on Jones v. GNC Franchising, Inc., 211 F.3d 495, 498 - 99 (9th

8  Cir. 2000), in which the court explained as follows:

9      II. Transfer of Venue under § 1404(a)
           GNC also claims error in the district court's denial of its motion to transfer
10     venue to the Western District of Pennsylvania under the provisions of § 1404(a). We
       review that order for abuse of discretion. [FN16]
11
       FN16. Lou v. Belzberg, 834 F.2d 730, 734 (9th Cir.1987), cert. denied, 485 U.S. 993,
12     108 S.Ct. 1302, 99 L.Ed.2d 512 (1988).

13     [4] Under § 1404(a), the district court has discretion "to adjudicate motions for
       transfer according to an 'individualized, case-by-case consideration of convenience
14     and fairness.' " [FN17] A motion to transfer venue under § 1404(a) requires the court
       to weigh multiple factors in its determination whether transfer is appropriate in a
15     particular case. [FN18] For example, the court may consider: (1) the location where
       the relevant agreements were negotiated and executed, (2) the state that is most
16     familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective
       parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of
17     action in the chosen forum, (6) the differences in the costs of litigation in the two
       forums, (7) the availability of compulsory process to compel attendance of unwilling
18     non-party witnesses, and (8) the ease of access to sources of proof. [FN19]
       Additionally, the presence of a forum selection clause is a "significant factor" in the
19     court's § 1404(a) analysis. [FN20] We also conclude that the relevant public policy of
       the forum state, if any, is at least as significant a factor in the § 1404(a) balancing.
20     [FN21]

21     FN17. Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22
       (1988) (citation omitted).
22
       FN18. Id.
23
       FN19. See, e.g., Stewart, 487 U.S. at 29-31, 108 S.Ct. 2239;
24
       Lou, 834 F.2d at 739.
25
       FN20. Stewart, 487 U.S. at 29, 108 S.Ct. 2239 (holding that § 1404(a) governed a
26     forum non conveniens motion to transfer based upon a forum selection clause despite
       the current forum's public policy that "may refuse to enforce" such provisions). A
27

28                                                5

forum selection clause, however, is not dispositive. Id. at 31, 108 S.Ct. 2239.

FN21. Although the majority opinion in Stewart did not expressly state that the law of the forum is a relevant factor for consideration under § 1404(a), the Court noted that the district court must weigh "those public-interest factors of systemic integrity and fairness that ... come under the heading of 'the interest of justice.' " Id. at 30, 108 S.Ct. 2239. In a concurring opinion, Justice Kennedy and Justice O'Connor recognized that "state policies should be weighed in the balance." Id. at 33, 108 S.Ct. 2239. We conclude that the public policy of the forum is not dispositive in a § 1404(a) determination but, rather, it is another factor that should be weighed in the court's § 1404(a) "interest of justice" analysis.

The district court weighed each of the aforementioned factors and concluded that GNC failed to meet its burden of showing that Pennsylvania was the more appropriate forum for the action. [FN22] Although the forum selection clause designates Pennsylvania as the exclusive forum, the court determined that other factors "clearly" demonstrated that California was more appropriate. For example, the court found that the vast majority of the other agreements underlying Jones' claims were negotiated and executed in California. The court noted that Jones chose California as the forum for his lawsuit, and his choice is supported by California's strong public policy to provide a protective local forum for local franchisees. The court further found that the extent of the parties' contacts with Pennsylvania and California clearly favored California, and that Jones' claims arose out of the construction and initial operation of the store located in LaVerne, California. The court also concluded that the relative financial burdens of litigating in each of the forums favored California. Finally, the court noted that more of the relevant witnesses and other sources of proof were located in California. Review of the relevant law and record on appeal persuades us that the trial court did not abuse its discretion in denying the motion to transfer venue under § 1404(a).

FN22. Under the doctrine of forum non conveniens, GNC bears the burden of proving that an adequate alternative forum exists. Cheng v. Boeing Co., 708 F.2d 1406, 1411 (9th Cir.), cert. denied, 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983).

C. R. England addresses several of the considerations to be weighed by courts in considering a motion to transfer venue pursuant to Section 1404(a) as follows.

The state most familiar with the governing law.

C. R. England argues that as a general rule, federal courts favor adjudication of actions by the court that sits in the state whose laws will govern the case. See Laumann Mfg. v. Castings USA, Inc., 913 F.Supp. 712, 722 (E.D.N.Y. 1996) ("According to the Supreme Court of the United States in Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), '[t]here is an appropriateness ... in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in

6

1   some other forum untangle problems in conflict of laws, and in law foreign to itself.' <u>Van</u>

2   <u>Dusen</u>, 376 U.S. at 645, 84 S.Ct. at 824, quoting, <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 67

3   S.Ct. 839, 91 L.Ed. 1055 (1940)."). C. R. England argues that in this case, the arbitration

4   clauses state that the lease agreements "shall be interpreted under the laws of the State of

5   Utah." Defendant claims therefore that this factor strongly supports transferring this case to

6   the District of Utah.

7        In response, Drivers do not discuss the terms of the arbitration clause, but argue that

8   their claims are brought pursuant to the federal Truth-In-Leasing Regulations, and state law is

9   not directly implicated. Drivers argue that this court is well able to apply those regulations to

10  C.R. England's lease agreement. The court finds that while Drivers' argument is correct, it

11  is not persuasive because it does not address the arbitration clauses, a major issue in this case.

12  It is undisputed that the arbitration clauses are controlled by Utah law. The court concludes

13  that while all federal district courts are equally equipped to resolve claims brought pursuant

14  to the federal Truth-In-Leasing Regulations, the United States District Court for the District

15  of Utah is particularly well equipped to resolve the issues in this case controlled by Utah law.

16  <u>The Location of Events and Execution of Documents</u>

17       C. R. England argues that all operative events in this case occurred in or around Salt

18  Lake City including: 1) all contacts between C. R. England and the contractors occurred in

19  Salt Lake City; 2) C.R. England is based in Utah, all of the lease agreements were negotiated

20  and executed in Utah, and the primary business relationship between the parties was at C.R.

21  England's headquarters and principal place of business in Salt Lake City; 3) C. R. England's

22  recruiting department is located in Salt Lake City and when a potential driver expresses an

23  interest in working for C.R. England, the driver is evaluated in Salt Lake City and attends a

24  two and a half day orientation program in Salt Lake City; 4) if the driver begins working for

25  C. R. England, all documents related to the relationship are signed in Utah including the lease

26  agreements, insurance enrollment forms, and compensation deduction forms; 5) after a driver

27

28                                         7

is under contract, all future communications and transaction relate to Salt Lake City; 6) the

contractors receive their dispatch instructions from Salt Lake City, and they regularly contact

C. R. England in Salt Lake City when they agree to accept a load, depart from a customer's

facility, arrive at the destination, have a break down, and need another load; and 7) the

contractors send all information and documentation relating to complete load to Salt Lake

City for the processing of compensation.

C. R. England concludes that given that all of the operative events and the entire

business relationship between C.R. England and the Drivers focuses entirely on Salt Lake

City, Utah, this factor weighs heavily in favor of transferring the case to Utah. Drivers do not

dispute C. R. England's factual claims regarding this factor. The court must conclude that

in this case, the location of events and execution of documents weighs heavily in favor of

transferring to the United States District Court for the District of Utah.

Plaintiffs' choice of forum

While it is well-established that the plaintiff's choice of forum must given

considerable weight when a court is analyzing a motion for transfer of venue pursuant to

Section 1404(a), C. R. England argues that the plaintiff's choice of forum is given less weight

if the state in which the action is filed is not the plaintiff's state of residence. C. R. England

cites Burstein v. Applied Extrusion Technologies, Inc., 829 F.Supp. 106, 110 (D.Del. 1992),

in which the court explained:

> The forum chosen by the Plaintiff must reflect rational and legitimate
> concerns. Waste Distillation Technology, Inc. v. Pan American Res., Inc., 775
> F.Supp. 759, 764 (D.Del.1991) (citing Clopay Corp. v. Newell Cos., Inc., 527 F.Supp.
> 733, 736 (D.Del.1981)). When the plaintiff has chosen to bring suit in a district that is
> not his "home turf" and which has no connection to any of the acts giving rise to the
> lawsuit, the convenience to the plaintiff is "not as great as it would be were [he]
> litigating at or near [his] principal place of business or at the site of the activities at
> issue in the lawsuit." Sports Eye, Inc. v. Daily Racing Form, Inc., 565 F.Supp. 634,
> 637 (D.Del.1983) (citations omitted). See also Magee v. Essex-Tec Corp., 704
> F.Supp. 543, 547 (D.Del.1988); Kirschner, 697 F.Supp. at 806. Consequently, the "
> 'quantum of inconvenience to defendant needed to tip the balance strongly in favor of
> transfer' is concomitantly reduced." Clopay Corp., 527 F.Supp. at 736 (quoting
> General Instrument Corp. v. Mostek Corp., 417 F.Supp. 821, 822-23 (D.Del.1976)).

8

1   The named Plaintiffs in the present action are Owner-Operator Independent Drivers

2   Association, Inc., Thomas Shutt, William Piper, Don Sullivan, Sr., James Murphy, and

3   Walter Williams.  C. R. England argues that Sullivan is the only Plaintiff who is allegedly a

4   citizen of California.  C. R. England argues that he demonstrated in his declaration that he

5   can easily travel to Salt Lake City, when he described how he voluntarily traveled to C. R.

6   England's corporate headquarters in Utah for purposes of resolving issues regarding his

7   settlement and escrow accounts.[1]  According to the complaint, all of the other Plaintiffs

8   reside in states other than California, with Shutt being a citizen of Iowa, Piper being a citizen

9   of Nevada, Murphy being a citizen of Florida and Williams being a citizen of Minnesota.

10  OODIA is a non-profit association incorporated in Missouri and with its headquarters in

11  Grain Valley, Missouri.  Its members reside all over the United States and Canada.

12      In addition,  C. R. England argues that the weight given to the plaintiff's choice of

13  forum is further reduced when the plaintiff's choice of forum is largely fortuitous and the

14  class members may reside in many different states, such as in a class action lawsuit.  C. R.

15  England cites Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987), in which the court

16  explained:

17          Although great weight is generally accorded plaintiff's choice of forum, Texas
            Eastern Transmission Corp. v. Marine Office-Appleton & Cox Corp., 579 F.2d 561,
18          567 (10th Cir.1978), when an individual brings a derivative suit or represents a class,
            the named plaintiff's choice of forum is given less weight. Helfant v. Louisiana &
19          Southern Life Ins. Co., 82 F.R.D. 53, 58 (E.D.N.Y.1979); Stolz v. Barker, 466
            F.Supp. 24, 27 (M.D.N.C.1978).
20          In judging the weight to be accorded Lou's choice of forum, consideration
            must be given to the extent of both Lou's and the Belzbergs' contacts with the forum,
21          including those relating to Lou's cause of action. Pacific Car & Foundry Co. v. Pence,
            403 F.2d 949, 954 (9th Cir.1968). If the operative facts have not occurred within the
22          forum and the forum has no interest in the parties or subject matter, Lou's choice is
            entitled to only minimal consideration. Id.
23
24  C. R. England argues that in the present case, OODIA and the other Plaintiffs have filed a

25  class action lawsuit with the named Plaintiffs scattered throughout the country, and all of the

26  _____

27  [1]C. R. England further argues that Sullivan's claims are barred by the applicable two-year
    statute of limitations.  The court will not consider this argument in deciding the present motion.

28                                              9

1     operative events have taken place in Utah. C. R. England conclude that these facts strongly

2     favor transferring the case to Utah under Section 1404(a).

3         In response, Drivers argue that they have chosen as their forum the Eastern District,

4     where one of the named Plaintiffs reside. Drivers assert that out of the 561 currently leased

5     operators, 78 reside in California, just four less than reside in Utah. Plaintiffs claim that the

6     fact that owner-operators reside all over the United States, have little in the way of economic

7     resources or bargaining power, emphasizes the need for their choice of forum to be weighted

8     heavily. Plaintiffs provide no authority for this claim, which is contrary to the law as set

9     forth in Lou v. Belzberg, quoted above.

10        The court finds that in the present case, the considerable weight usually given to the

11     plaintiffs' choice of forum is reduced somewhat by the fact that California is the state of

12     residence of only one of the named Plaintiffs, and reduced even more by the fact that this is a

13     class action and that none of the operative facts regarding the creation of the leasing

14     agreements occurred in this forum. Further, as discussed below, this forum has much less

15     interest in the parties and subject matter of this litigation than does the State of Utah.

16     Accordingly, the court concludes that the weight usually given to the plaintiffs' choice of

17     forum in considering transfer of venue pursuant to Section 1404(a) is significantly reduced in

18     this case.

19     <u>Convenience of the Parties</u>

20        C. R. England argues that the location of the parties is a logical starting point in

21     analyzing convenience of the parties. C.R. England is headquartered in Salt Lake City, Utah.

22     OOIDA is based in Missouri, with the five remaining Plaintiffs residing in California, Iowa,

23     Nevada, Florida and Minnesota. Relying on the declaration on James Johnston, C. R.

24     England asserts that OOIDA has established a separate Business Services Department

25     dedicated to gathering information and filing lawsuits against motor carriers. C. R. England

26     claims that OOIDA has already filed numerous lawsuits against several motor carriers in

27

28                          10

1   many different states and jurisdictions, which include claims similar to those in this case.

2   C. R. England argues that given that OOIDA has an entire division dedicated to pursuing

3   litigation against motor carriers and has significant experience in pursuing similar lawsuits in

4   numerous jurisdictions around the country, OOIDA has demonstrated that it can easily travel

5   and engage in litigation in almost any jurisdiction. Further, if this case is transferred to Utah,

6   not only will it be closer to C.R. England's headquarters, it will be closer to OOIDA's

7   Missouri headquarters, to its principal lawyers' office in Washington, D.C., and the state of

8   residence of at least three of the other named Plaintiffs. C. R. England concludes that these

9   facts weigh strongly in favor of transferring the case.

10       Also related to the convenience of the parties, C. R. England urges the court to

11   consider disruption to a corporate party's business caused by the absence of key employees.

12   Relying on the MacInnes Declaration, C. R. England argues that allowing this case to remain

13   in California will cause disruption to C.R. England's business, because a number of its key

14   employees, important to the daily operations of the company, may have to travel back and

15   forth to California for purposes of this litigation. C. R. England asserts that this will have an

16   adverse effect on the company's daily operations and overall profitability. On the other hand,

17   C. R. England argues, transferring the case to Utah should have little or no effect on OOIDA,

18   considering that it has an entire division dedicated to pursuing litigation all over the country.

19   C. R. England argues that OOIDA should bear the burden of any inconvenience.

20       In their opposition, Drivers dispute C. R. England's claim that litigating this case in

21   Utah will disrupt the company's daily operations and overall profitability. In addition,

22   Drivers claim that C.R. England has not shown an untoward hardship in litigating in

23   California. The court finds Drivers' arguments on this issue to be unpersuasive.

24       The court finds that in this case, the convenience of the parties weighs in favor of

25   litigating this case in Utah.

26   //

27

28                                                    11

1    <u>Convenience of the Witnesses</u>

2         "The convenience of the witnesses is often the most important factor considered by

3    the court when deciding a motion to transfer for convenience." <u>Steelcase, Inc. v. Haworth,</u>

4    <u>Inc.,</u>  41 U.S.P.Q.2d 1468, 1470 (C.D.Cal. 1996).  C. R.  England argues that only one of

5    the six Plaintiffs, Mr. Sullivan, who may also be a witness, is located in California.  C. R.

6    England argues that transferring the case to Utah should be more convenient for the other

7    Plaintiff-witnesses because it will reduce their travel distance and time.  C. R. England

8    further argues that almost all of its witnesses reside in or around Salt Lake City, Utah.

9    Defendant lists approximately 40 witnesses, stating that some 30 of them live in or around

10    Salt Lake City, and explains why each of their testimony is necessary.  C. R. England

11    concludes that given that the majority of the witnesses in this case are located in or around

12    Salt Lake City, and considering that the witnesses will not be subject to the compulsory

13    process of the court because they reside more than 100 miles from the court, these factors

14    weigh heavily in favor of transferring this case to Utah.

15         In response, Drivers  argue that the convenience of the witnesses factor does not

16    include employee witness, but contemplates the convenience of nonparty witnesses, citing

17    <u>Los Angeles Memorial Coliseum Comm'n v. NFL,</u> 89 F.R.D. 497, 501 (C.D.Cal. 1981).

18    The case holds as follows:

19         C. Convenience of Witnesses
            The convenience of witnesses is said to be the most important factor in
20    passing on a transfer motion. <u>Saminsky v. Occidental Petroleum Corp.,</u> 373 F.Supp.
      257, 259 (S.D.N.Y.1974); 15 Wright, Miller & Cooper, supra, s 3851, at 264 ("If the
21    forum chosen by plaintiff will be most convenient for the witnesses, this is a powerful
      argument against transfer.").
22         In assessing the effect of a transfer on the convenience of witnesses, courts
      consider the effect of a transfer on the availability of certain witnesses, and their live
23    testimony, at trial. E. g., <u>B. J. McAdams, Inc. v. Boggs,</u> 426 F.Supp. 1091, 1104-05
      (E.D.Pa.1977); <u>Commercial Solvents Corp. v. Liberty Mutual Ins.,</u> 371 F.Supp. 247
24    (S.D.N.Y.1974); <u>Polaroid Corp. v. Casselman,</u> 213 F.Supp. 379, 382 (S.D.N.Y.1962)
      ("Depositions, deadening and one-sided, are a poor substitute for live testimony
25    especially where, as here, vital issues of fact may hinge on credibility.").
            Witnesses may not be compelled to attend trial unless they can be served with
26    subpoenas within the trial district, or at any place outside of the district that is within
      100 miles of the place of trial. Fed.R.Civ.P. 45(e). Thus, transfer may be denied when

27

28                                          12

witnesses either live in the forum district or are within the 100-mile reach of the subpoena power. 15 Wright, Miller & Cooper, supra at 267-68; B. J. McAdams, Inc. v. Boggs, supra (transfer refused where plaintiff asserted that compulsory process might be necessary to secure the live testimony of witnesses who could not be compelled to testify in the proposed transferee district); U.S. Industries, Inc. v. Procter & Gamble Co., 348 F.Supp. 1265 (S.D.N.Y.1972).

Plaintiff claims that many of its witnesses will be beyond the court's subpoena power if transfer is granted. Among the witnesses, whose names and testimony plaintiff has specified, are members of the Los Angeles County Board of Supervisors, representatives of other Coliseum tenants, and the owners of the Los Angeles Rams and the San Diego Chargers. The last two names, those of the Rams and Chargers owners, are contained in the NFL's tentative witness list, filed January 14, 1981. The NFL, on the other hand, has not indicated that a transfer is necessary for the convenience of any of its other witnesses. The factor of convenience of witnesses therefore provides additional support for denial of the requested transfer.

This court finds that this case does not stand for the proposition for which Plaintiffs have cited it, as nowhere does it hold that the convenience of employee witnesses is not to be considered. Similarly, the case cited to the court by Drivers at the hearing does not preclude the consideration of the convenience of employee witnesses. See Gundle v. Fireman's Fund Insurance Co., 844 F.Supp. 1163, 1166 (S.D.Tex. 1994) ("It is the convenience of non-party witnesses, rather than that of employee witnesses, however, that is the more important factor and is accorded greater weight."). Here, Drivers have not argued that California is a more convenient forum for any non-party witness.

Drivers also argue, without any support, that it is doubtful that all of the potential witnesses listed by C. R. England will need to travel to California for trial and that it is doubtful that their absence will have a serious adverse effect on C. R. England. In light of the statements in the MacInnes declaration as to the function of each of C. R. England's listed witnesses and the need to have them testify, the court finds that Drivers' argument is not persuasive. Drivers also speculate that it is quite possible that a number of C. R. England's Utah employees regularly travel to California, as C. R. England has significant business interests in California. Drivers argue that in light of C. R. England's willingness to avail itself of business opportunities in California, its argument that it is inconvenient for it to litigate disputes in California rings hollow.

13

The court finds that while the reference to C. R. England availing itself of business opportunities in California may be directly relevant for the analysis for personal jurisdiction, it is less relevant for the issue of transfer pursuant to Section 1404.   Drivers have presented the court with nothing to rebut C. R. England's claims that litigating this case would be inconvenient for its witnesses, who happen to be its employees.   Nor have Drivers presented any evidence, or even any argument, that it would be inconvenient for their own witnesses to litigate in Utah.   The court finds, therefore, that this important factor weighs in favor of transfer of venue.

Access to the Evidence

C. R. England  correctly asserts that OOIDA has raised allegations that the lease agreements do not comply with federal regulations, that C.R. England may have improperly deducted amounts for insurance, maintenance, truck payments, and other charges from the contractors' compensation, and that it failed to provide the contractors with documentation including certificates of insurance, insurance policies, and documentation necessary to determine the validity of chargebacks.   C. R. England asserts that all of the documents relative to these allegations are located in Salt Lake City.   C. R. England also asserts that all records regarding each contractor's prior compensation, deductions, reimbursements, repair costs, maintenance records, fuel charges, insurance premiums and other related information in Salt Lake City.   Finally, C. R. England asserts that these records are voluminous and transporting them would be time consuming and expensive, and could significantly disrupt the organization of the documents and records.   C. R. England concludes that the document-laden nature of this case tips the scales in favor of transferring the case to Salt Lake City.

In response, Drivers argue that it is almost certain that most, if not all, of the documentation relevant to this litigation is stored electronically.   Drivers assert, "This greatly reduces the amount of physical paper that will need to be transported to California, as the electronic form is not only welcomed, but preferred, " and that the "burden of producing and

14

1  transporting electronically stored information is minimal."  Drivers, however,  present no

2  evidence to support these assertions, and certainly cannot dictate to C. R. England as to what

3  form its evidence will be in when it is presented to the jury.  Further, as C. R. England

4  argues in its reply, Drivers' apparent offer to accept documentary evidence produced in

5  electronic form is an indirect acknowledgment by Drivers that the documentary evidence is

6  all located in Utah.

7        The court finds that this factor weighs in favor of transfer of venue to Utah.

8  Consolidating with Other Claims

9        The feasibility of consolidation of claims is also a factor for the court to consider in

10  determining whether to allow a transfer of venue under section 1404(a).  Decker Coal Co. v.

11  Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986).  Relying on the MacInnes

12  declaration, C. R. England asserts that at least two separate cases have already been filed by

13  Plaintiff William Piper against C.R. England in Salt Lake City.  One of these cases is

14  currently on appeal.  C. R. England argues that if the present case is transferred to Utah, the

15  related cases could be consolidated.  This would promote judicial economy and allow the

16  parties to resolve all differences in a single forum and avoid conflicting decisions by different

17  courts.

18        Drivers do not address this factor in their opposition.  The court finds that while the

19  feasibility of consolidation of claims is a minor factor in the present case, it weighs in favor

20  of transfer of venue.

21  Local Interest in Controversy

22        Another important consideration in the transfer of venue is the "local interest in

23  having local controversies decided at home."  Decker Coal, 805 F.2d at 843.  C. R. England

24  claims that the Utah courts have a significant local interest in resolving the disputes involved

25  in this case.  It argues that two cases have already been brought in Salt Lake City against

26  C.R. England, which is a large corporation with a significant presence in Utah and which

27

28                                        15

1   employs hundreds of Utah residents. C. R. England concludes that because this case may

2   have a significant impact on C.R. England and many residents of Utah, the local interest

3   factor weighs heavily in favor of transferring the case to Utah.

4   In response, Drivers do not address C. R. England's argument, but argue that C. R.

5   England has substantial contacts with California, all of which are related to its transportation

6   of goods in interstate commerce using leased equipment. Drivers argue that these

7   transportation services affect the economy of every community in California, both through

8   the businesses that rely on the services and through the citizens who are the leased owner-

9   operators providing the services. Drivers argue that the federal regulations at issue govern

10  the transportation services, and California has a significant interest in ensuring that foreign

11  corporations operating in California do so lawfully. Drivers assert that California residents

12  represent the second largest contingent of drivers under lease to C. R. England, and

13  California has an interest in protecting the rights of those drivers.  In addition, Drivers argue

14  that California is affected by several of C. R. England's business practices, including: 1)

15  advertising to recruit drivers; 2)  78 owner-operators for C. R. England (out of a total of 561)

16  reside in California; 3) physical locations in the form of a driver training school and

17  maintenance facility, and two drop yards in California; and 4) driving the highest percentage

18  of the total miles it drives in California.

19  Drivers  conclude, based on the above, that C. R. England has substantial contacts

20  with California. This, of course, is again the standard for personal jurisdiction, not for

21  transfer under Section 1404.  The issue here is the interest of having local controversies

22  decided locally. The controversy here involves the leasing agreements between a Utah

23  company and drivers who live all over the United States and Canada. There is no claim in

24  this case concerning events that occurred in California.   It is undisputed that the agreements

25  at issue were entered into in Utah. The court finds, therefore, that this factor weighs heavily

26  in favor of transfer to Utah.

27

28                                          16

<u>Relative Court Congestion</u>

C. R. England argues that according to the Judicial Caseload Profiles, published by the Statistical Office of the Administrative Office of the United States Courts, a total of 5,029 cases were filed in this court during 2001, with approximately 803 cases allocated to each judge. In contrast, the District Court for the District of Utah had only 1,756 cases filed in 2001, with only 390 cases allocated to each judge. C. R. England conclude that the congestion of this court compared with the Utah court weighs in favor of transferring the case to Utah under Section 1404.

In response, Drivers argue that this court has demonstrated that it is capable of effecting a timely disposition of the matter before it, as evidenced by the quick pace of the briefing and hearing schedules set by this court. Drivers assert that court congestion does not appear to be an exceptional problem in this case.

The court finds that there is no requirement that court congestion be an "exception problem" in order for a case to be transferred pursuant to Section 1404. Rather, court congestion is simply another factor to be considered. Clearly, this factor, while not the most important one, weighs in favor of transferring the case to Utah.

## CONCLUSION

It is clear under the law of the Ninth Circuit that transfer of venue based on forum non conveniens pursuant to Section 1404(a) is "an exceptional tool to be applied sparingly." <u>Ravelo Monegro v. Rosa</u>, 211 F.3d 509, 514 (9th Cir. 2000). It is also clear that normally, a strong presumption exists in favor of the plaintiff's choice of forum. <u>See</u> <u>Decker Coal Co. v. Commonwealth Edison Co.</u>, 805 F.2d 834, 843 (9th Cir. 1986). The great weight usually accorded the plaintiff's choice is forum is, however, reduced when the plaintiff's choice of forum is not the plaintiff's state of residence and has no connection to the operative facts. <u>See</u> <u>Burstein v. Applied Extrusion Technologies</u>, 829 F.Supp. at 110. In the present case, Drivers seek to represent a class and the operative facts did not occur in this district. Further,

17

1   the court finds that this forum has significantly less interest in the parties and the subject

2   matter than does Utah, which also reduces the weight to be given to Plaintiffs' choice of

3   forum. See Lou v. Belzberg, 834 F.2d at 739.

4          As discussed in detail above, the court finds that the factors of the state most familiar

5   with the governing law, the location of events and execution of documents, the convenience

6   of the parties, the convenience of the witnesses, the access to evidence, consolidation with

7   other claims, local interest in the controversy, and relative court congestion all weigh in favor

8   of transfer of venue to Utah.

9          It is undisputed that Utah is a forum in which this action might have originally been

10  brought. Based on all of the foregoing, the court concludes that C. R. England has met its

11  burden of showing that the balances of conveniences in this case weigh heavily in favor of

12  transfer of venue to Utah. See Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d at

13  843. The court further concludes that transfer of venue to Utah would serve the convenience

14  of the parties and witnesses and the overall interests of justice. See Arley v. United Pac. Ins.

15  Co., 379 F.2d 183, 185 (9th Cir. 1969). Accordingly, the court, finding that this is one of the

16  rare cases in which transfer of venue pursuant to Section 1404(a) is proper, will exercise its

17  discretion to order this case transferred to the United States District Court for the District of

18  Utah. Under this circumstance, the court declines to rule on any other pending motions in

19  this case.

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27

28                                                18

1

**ORDER**

2     Based on the foregoing, IT IS HEREBY ORDERED that C.R. England's motion to

3   dismiss or transfer venue and stay or compel arbitration is GRANTED to the extent of the

4   motion to transfer venue pursuant to Section 1404(a).   This entire action SHALL

5   IMMEDIATELY BE TRANSFERRED to the United States District Court for the District of

6   Utah pursuant to 28 U.S.C. § 1404(a).

7

8   DATED:  _8-19-02_                                        _____

9                                                ANTHONY W. ISHII
                                               UNITED STATES DISTRICT JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                         19

jh

United States District Court
for the
Eastern District of California
August 20, 2002

* * CERTIFICATE OF SERVICE * *

1:02-cv-05664

Owner-Operator

v.

C R England, Inc

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  August 20, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

    Brian C Leighton                          AWI SMS
    Law Offices of Brian Leighton
    701 Pollasky
    Clovis, CA  93612

    Joyce E Mayers
    PRO HAC VICE
    Cullen Law Firm PLLC
    1191 30th Street NW
    Suite 300
    Washington, DC  20007

    Paul D Cullen SR
    Cullen Law Firm PLLC
    1191 30th Street NW
    Suite 300
    Washington, DC  20007

    Belinda L Harrison
    PRO HAC VICE
    Cullen Law Firm PLLC
    1191 30th Street NW
    Suite 300
    Washington, DC  20007

    Bradley Allen Silva

Law Office of Bradley  Llen Silva
8483 North Millbrook Avenue
Suite 104
Fresno, CA  93710

Robert L Browning
10 West Market Street
1500
Indianapolis, IN  46204

Timothy W Wiseman
10 West Market Street
1500
Indianapolis, IN  46204

Daniel R Barney
Scopelitis Garvin Light and Hanson
1850 M Street NW
280
Washington, DC  20036-5804

United States District Court
District of Utah
150 Frank E. Moss United States Courthouse
350 South Main Street
Salt Lake City, UT 84101

CERTIFIED COPY

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk