UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OWNER-OPERATOR INDEPENDENT DRIVERS )
ASSOCIATION, INC., et al., )
 )
    Plaintiffs, )
 )    No. 05 CV 10317 MLW
v. )
 )
UNITED VAN LINES, LLC, et al., )
 )
    Defendants. )

## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT

COME NOW defendants United Van Lines, LLC ("United"), Vanliner Insurance

Company ("Vanliner"), and UniGroup, Inc. ("UniGroup") and respectfully move to dismiss each

count of plaintiffs' Class Action Complaint pursuant to Fed. R. Civ. P. 12(b)(6).[1]  In support

thereof, defendants state as follows:

1.      The Complaint herein purports to allege the following claims under the federal

leasing regulations codified at 49 C.F.R. Part 376:

> *Count I*—    alleged unauthorized deductions from owner-operator compensation, in purported violation of 49 C.F.R. § 376.12(d);
>
> *Count II*—    alleged failure to provide owner-operators with rated freight bills or similar documents, in purported violation of 49 C.F.R. § 376.12(g);
>
> *Count III*—    alleged improper pass-through of public liability/property damage insurance costs to owner-operators, in purported violation of 49 C.F.R. § 376.12(j)(1); and

---

[1] Defendant UniGroup is concurrently moving to dismiss all claims against it for lack of personal jurisdiction.  If its personal jurisdiction motion is not granted, then it joins in the present motion.

    ***Count IV*—**    alleged failure to monitor and oversee the business practices of
United's independent agents, in purported violation of 49 U.S.C. §
13907 and 49 C.F.R. § 376.12(m).

Each of these counts is legally deficient and should be dismissed pursuant to Fed. R. Civ. P.

12(b)(6) for the reasons summarized below.

    2.    Count I fails to state a claim because the named plaintiffs do not allege that they

were subject to the challenged compensation practices described in this count.  To establish

standing to sue under Article III of the U.S. Constitution, plaintiffs must allege ultimate facts

sufficient to support an inference that **they**—as opposed to United's agents or unnamed members

of the putative class—suffered an injury fairly traceable to the conduct of which they complain.

    3.    Count II should be dismissed because plaintiffs set forth no facts suggesting that

the alleged failure of United's agents to supply them with rated freight bills caused them (or

indeed, any other owner-operator) any cognizable harm.  49 U.S.C. § 14704(a), the statute under

which plaintiffs purport to sue, expressly provides that "damages" is an essential element of

plaintiffs' claimed private right of action.

    4.    Count III should be dismissed because plaintiffs' attempt to challenge the

standard industry practice of passing through to owner-operators the cost of liability insurance

coverage for owner-operators' acts and omissions is legally baseless.  In fact, the very leasing

regulation upon which Count III is based, 49 C.F.R. § 376.12(j)(1), expressly permits motor

carriers to charge back the cost of "any insurance" to the owner-operators from whom they lease

equipment.  *See* 49 C.F.R. § 376.12(j)(1).  Conversely, there is no precedent or support for

plaintiffs' attempt to obtain 100% cost-free liability insurance by means of judicial decree rather

than through the contract negotiation process.

5.      Count IV, styled "Failure to Monitor and Control the Actions of Local Agents," is properly dismissed because neither the cause of action nor the sweeping "accounting" remedy plaintiffs seek exist as a matter of law. Specifically, the federal statute pursuant to which this count is brought, 49 U.S.C. § 13907, does not provide a private right of action and in fact expressly restricts enforcement authority to the U.S. Department of Transportation. Moreover, neither the statute nor the leasing regulations establish or contemplate a so-called "duty" on the part of motor carriers to "monitor and oversee the business practices" of their independent agents, as plaintiffs erroneously claim. Indeed, Congress has for decades refused to interfere with the business relationships between motor carriers and their agents.

6.      Accordingly, because none of plaintiffs' claims in this case states a legally cognizable cause of action, their Complaint should be dismissed pursuant to Fed. R. Civ. 12(b)(6).

7.      In further support of this Motion, defendants incorporate herein by reference their accompanying memorandum of law, together with the following exhibits attached hereto:

a.  Ex. A – H.R. Rep. No. 1372, *reprinted in* U.S.C.C.A.N. 4271;

b.  Ex. B – Entry Regarding Motions for Partial Summary Judgment in *OOIDA et al. v. Mayflower Transit, LLC,* No. IP98-0457 and No. IP98-0458, slip op. (S.D. Ind. Dec. 14, 2004);

c.  Ex. C – Entry on Plaintiffs' Motion to Compel in *OOIDA, et al. v. Mayflower Transit, LLC,* No. IP98-045 and No. IP98-0458, slip op. (S.D. Ind. Oct. 20, 1998).

## LOCAL RULE 7.1(A)(2) CERTIFICATE

8.      Michael Morris, one of the counsel for defendants herein, conferred with David A. Cohen, one of the counsel for plaintiffs, on April 29, 2005 in a good faith but unsuccessful effort to resolve or narrow the issues presented by this Motion.

- 3 -

## REQUEST FOR ORAL ARGUMENT

9.      Defendants believe that oral argument on the present Motion would be beneficial to the parties and would assist the Court in its determination of the issues presented. Accordingly, pursuant to Local Rule 7.1(d), defendants request the Court to schedule oral argument on this Motion.

WHEREFORE, defendants United Van Lines, LLC, Vanliner Insurance Company, and UniGroup, Inc.  respectfully request this Court to dismiss each count of plaintiffs' Class Action Complaint with prejudice and at plaintiffs' costs, and for such other and further relief as may be appropriate in the circumstances.

Respectfully submitted,

SALLY & FITCH LLP


By:  /s/ *Jennifer E. Greaney*
    Francis J. Sally (BBO # 439100)
    Jennifer E. Greaney (BBO # 643337)
    225 Franklin Street
    Boston, Massachusetts 02110
    (617) 542-5542 (phone)
    (617) 542-1542 (facsimile)

    THOMPSON COBURN LLP
    David Wells (*pro hac vice* app. pending)
    Michael J. Morris (*pro hac vice* app. pending)
    Rebecca A. Pinto (*pro hac vice* app. pending)
    One U.S. Bank Plaza
    St. Louis, MO 63101
    (314) 552-6000 (phone)
    (314) 552-7000 (facsimile)


    Attorneys for Defendants United Van Lines,
    Vanliner Insurance Company, and UniGroup, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Class Action Complaint has been served upon the following counsel of record this 2nd day of May, 2005, by U.S. Mail first class postage prepaid.

> Paul D. Cullen, Sr.
> David A. Cohen
> Susan Van Bell
> THE CULLEN LAW FIRM, PLLC
> 1101 30th Street, N.W., Suite 300
> Washington, DC 20007
>
> John A. Kiernan
> Kenneth H. Naide
> BONNER KIERNAN TREBACH & CROCIATA
> One Liberty Square, 6th Floor
> Boston, MA 02109
> (617) 426-3900

/s/ *Jennifer E. Greaney*
Jennifer E. Greaney

H.R. REP. 96-1372                                                    Page 1

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


                P.L. 96-454, HOUSEHOLD GOODS TRANSPORTATION ACT OF 1980
                            SEE PAGE 94 STAT. 2011
            SENATE REPORT (COMMERCE, SCIENCE, AND TRANSPORTATION COMMITTEE
                NO. 96-497, DEC. 13, 1979 (TO ACCOMPANY S. 1798)
              HOUSE REPORT (PUBLIC WORKS AND TRANSPORTATION COMMITTEE)
                NO. 96-1372, SEPT. 23, 1980 (TO ACCOMPANY S. 1798)
                        CONG. RECORD VOL. 125 (1979)
                        CONG. RECORD VOL. 126 (1980)
                    DATES OF CONSIDERATION AND PASSAGE
                SENATE DECEMBER 20, 1979; SEPTEMBER 30, 1980
                            HOUSE SEPTEMBER 29, 1980
                        THE HOUSE REPORT IS SET OUT.


(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)


                        HOUSE REPORT NO. 96-1372
                            SEPT. 23, 1980
   *1 **4271 THE COMMITTEE ON PUBLIC WORKS AND TRANSPORTATION TO WHOM WAS REFERRED
THE BILL (S. 1798) TO REDUCE REGULATION OF AND INCREASE COMPETITION IN THE
HOUSEHOLD GOODS MOVING INDUSTRY, AND FOR OTHER PURPOSES, HAVING CONSIDERED THE
SAME, REPORT FAVORABLY THEREON WITH AN AMENDMENT AND RECOMMEND THAT THE BILL AS
AMENDED DO PASS.

                    *           *           *           *

                            INTRODUCTION

   TODAY, APPROXIMATELY 2,650 INDIVIDUAL CARRIERS MAKE UP THE INTERSTATE HOUSEHOLD
GOODS MOVING INDUSTRY.  HOWEVER, MANY OF THESE CARRIERS DO NOT OPERATE UNDER THEIR
OWN AUTHORITY; INSTEAD, THEY ACT AS AGENTS FOR OTHER AUTHORIZED CARRIERS.  IN THE
1979 CALENDAR YEAR, 1,156 CARRIERS ACTUALLY ENGAGED IN OPERATIONS UNDER THEIR OWN
INTERSTATE AUTHORITY.  TOGETHER, THESE CARRIERS TRANSPORTED 1,189,401 SHIPMENTS,
AND THEIR REVENUES FOR THAT YEAR WERE ABOUT $1.4 BILLION.  THE TEN LARGEST
CARRIERS ACCOUNTED FOR ABOUT $1 BILLION, OR 75 PERCENT, OF THOSE REVENUES.  THE
AVERAGE REVENUE PER SHIPMENT WAS $1,211.  THE TEN LARGEST CARRIERS SHARED AN
OPERATING RATIO IN 1979 OF 98.09.  THAT WAS SLIGHTLY LOWER THAN THE 99.3 OPERATING
RATIO FOR THE INDUSTRY AS A WHOLE.  DURING THIS COMMITTEE'S HEARINGS ON THE
HOUSEHOLD GOODS MOVING INDUSTRY, THE INDUSTRY CITED THESE OPERATING *2 RATIOS AS
INDICIA OF ITS POOR FINANCIAL CONDITION.  THIS ALLEGATION IS ONE OF THE FACTORS
WHICH PROMPTED THE COMMITTEE'S CONSIDERATION OF THE HOUSEHOLD GOODS MOVING

              © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



H.R. REP. 96-1372                                                    Page 2

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


INDUSTRY APART FROM THE REST OF THE TRUCKING INDUSTRY.
  ONE OF THE OTHER FEATURES OF THE MOVING INDUSTRY WHICH SETS IT APART IS ITS
HEAVY DEPENDENCE ON AGENTS.  THE USE OF AGENTS DEVELOPED **4272 IN RESPONSE TO THE
EMPTY BACKHAUL PROBLEM FACED BY THE CARRIERS. HOUSEHOLD GOODS OFTEN MOVE
SPORADICALLY OVER IRREGULAR ROUTES WITH NO REPETITIVE PATTERN.  TODAY, SOME
CARRIERS DEPEND ON THE AGENTS TO PROVIDE THE RESOURCES USED IN THEIR
TRANSPORTATION OPERATIONS.  THE AGENTS BOOK THE SHIPMENTS; ARRANGE FOR THEM TO BE
WEIGHED; PROVIDE PACKING, UNPACKING, AND STORAGE SERVICES; AND OFTEN TRANSPORT THE
SHIPMENTS.  TODAY, THERE ARE APPROXIMATELY 6,500 HOUSEHOLD GOODS MOVING AGENTS.
THREE OF THE TEN LARGEST CARRIERS-- ALLIED VAN LINES, ATLAS VAN LINES, AND UNITED
VAN LINES-- ARE OWNED OR CONTROLLED BY THEIR AGENTS.  ALL OF THE DIRECTORS OF
UNITED VAN LINES ARE AGENTS.  THESE THREE CARRIERS SHARE 50 PERCENT OF THE MARKET
OF THE TEN LARGEST CARRIERS.
  THE HOUSEHOLD GOODS MOVING INDUSTRY PROVIDES SERVICES TO INDIVIDUAL SHIPPERS,
COMMERCIAL ACCOUNTS, THE UNITED STATES GOVERNMENT, AND TO CERTAIN OTHER
BUSINESSES.  THE INDIVIDUAL SHIPPERS ARE INDIVIDUALS MOVING THEIR PERSONAL
EFFECTS.  THEY PAY THEIR OWN SHIPPING COSTS, NORMALLY ON A COLLECT-ON-DELIVERY
BASIS.  THE SERVICES FOR COMMERCIAL ACCOUNTS AND THE GOVERNMENT ALSO INVOLVE
MOVING PERSONAL EFFECTS. HOWEVER, THE OWNERS OF THE SHIPMENTS DO NOT PAY THE
MOVING COSTS; INSTEAD, THE OWNERS' EMPLOYERS OR THE GOVERNMENT, AS THE CASE MAY
BE, PAY THOSE COSTS.  GENERALLY, THE CARRIERS EXTEND CREDIT TO THE COMMERCIAL
ACCOUNTS AND THE GOVERNMENT.  FREQUENTLY, CARRIERS BID ON GOVERNMENT SHIPMENTS.
HOUSEHOLD GOODS CARRIERS ALSO PROVIDE MOVING SERVICES TO STORES, OFFICES, AND
OTHER ESTABLISHMENTS WHICH ARE MOVING THEIR FACILITIES.  FINALLY, THESE CARRIERS
MOVE SUCH ARTICLES AS ELECTRONIC COMPUTERS AND DISPLAY MATERIALS, WHICH, BECAUSE
OF THEIR UNUSUAL NATURE OR VALUE, REQUIRE THE SPECIALIZED HANDLING AND EQUIPMENT
USUALLY EMPLOYED IN MOVING HOUSEHOLD GOODS. AGAIN, CARRIERS GENERALLY EXTEND
CREDIT FOR THESE TYPES OF MOVES.
  THE FACT THAT THE HOUSEHOLD MOVING SECTOR DOES BUSINESS DIRECTLY WITH INDIVIDUAL
SHIPPERS ALSO SETS IT APART FROM THE REST OF THE TRUCKING INDUSTRY. THESE SHIPPERS
USUALLY MOVE ONLY ONCE OR TWICE IN THEIR LIVES AND, CONSEQUENTLY, LACK A THOROUGH
UNDERSTANDING OF THE INDUSTRY AND SUFFICIENT CLOUT TO NEGOTIATE WITH IT.  THEIR
SITUATION IS MADE MORE VULNERABLE BY THE FACT THAT THE MOVES INVOLVE ALL OF THEIR
PERSONAL POSSESSIONS, WHICH OFTEN ARE OF A FRAGILE NATURE.  FURTHER, 60 PERCENT OF
THE HOUSEHOLD GOODS MOVES TAKE PLACE BETWEEN JUNE 1 AND OCTOBER 1.  CLEARLY, THIS
CONDITION POSES OPERATIONAL PROBLEMS WHICH STRAIN THE INDUSTRY'S RESOURCES.
  THE HOUSEHOLD GOODS MOVING INDUSTRY IS THE SINGLE MOST FREQUENT SUBJECT OF
CONSUMER COMPLAINTS TO THE INTERSTATE COMMERCE COMMISSION. DURING 1979, THE
COMMISSION RECEIVED 24,609 CONSUMER COMPLAINTS, AN AVERAGE OF 2.1 COMPLAINTS PER
100 SHIPMENTS TRANSPORTED.  BASICALLY, THESE COMPLAINTS CAN BE DIVIDED INTO THREE
GROUPS:  43.14 PERCENT WERE RELATED TO THE LOSS OR DAMAGE OF GOODS AND THE
HANDLING OF COMPLAINTS ARISING FROM SUCH LOSS OR DAMAGE; 36.36 PERCENT WERE
RELATED TO THE FAILURE OF CARRIERS TO PROVIDE THE AGREED TO SERVICE, INCLUDING
FAILURE TO PICK UP AND DELIVER GOODS ON *3 TIME, AND 20.50 PERCENT WERE RELATED TO
RATES AND CHARGES, INCLUDING ESTIMATES AND IMPROPER WEIGHING.  SIMILARLY, DURING
THE FIRST SIX MONTHS OF 1980, THE COMMISSION RECEIVED 10,954 SUCH CONSUMER
COMPLAINTS, OR FROM 2.2 TO 2.3 COMPLAINTS PER 100 SHIPMENTS.  THE **4273

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


DISTRIBUTION OF COMPLAINTS FOR THE SAME CATEGORIES IS 56.31 PERCENT, 16.87
PERCENT, AND 26.82 PERCENT, RESPECTIVELY.
    TAKING INTO ACCOUNT THE PROFILE OF THE HOUSEHOLD GOODS MOVING INDUSTRY, THE
COMMITTEE PROCEEDED TO EXPLORE THE POSSIBILITY OF LEGISLATION DEALING SPECIFICALLY
WITH THE MOVING INDUSTRY.  THIS LEGISLATION WAS CONSIDERED APART FROM THE MOTOR
CARRIER ACT OF 1980, WHICH APPLIES ACROSS THE BOARD TO MOTOR CARRIERS.  IN PUTTING
TOGETHER THIS LEGISLATION, THE COMMITTEE FOCUSED ITS ATTENTION ON THE INDIVIDUAL
SHIPPER'S SPECIAL SITUATION AND ON ALLEGATIONS THAT THE AMOUNT OF REGULATION AND
PAPERWORK IMPOSED UPON THE MOVING INDUSTRY WAS EXCESSIVE.  FURTHER, THE COMMITTEE
CONSIDERED THE NEED FOR GREATER OPERATIONAL FLEXIBILITY FOR THE CARRIERS AND THE
NEED TO ADDRESS CERTAIN PROBLEMS IN THE AGENT-CARRIER RELATIONSHIP.
    ON FEBRUARY 20, 1980, THE SUBCOMMITTEE ON SURFACE TRANSPORTATION HELD A HEARING
ON THE MOVING INDUSTRY.  DURING THAT HEARING, THE SUBCOMMITTEE HEARD TESTIMONY ON
S. 1798, WHICH PASSED THE SENATE ON DECEMBER 20, 1979.  IT ALSO RECEIVED TESTIMONY
BY THE HONORABLE BOB ECKHARDT, CHAIRMAN, SUBCOMMITTEE ON OVERSIGHT AND
INVESTIGATIONS, COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE, ON H.R. 6541, A BILL
INTRODUCED ON THIS SUBJECT BY THE CONGRESSMAN.  A NUMBER OF INTERESTED PARTIES
TESTIFIED THAT DAY AND THEREAFTER WORKED WITH THE COMMITTEE IN THE DEVELOPMENT OF
THE LEGISLATION.  AMONG THOSE WHO WERE ACTIVE IN THE DEVELOPMENT OF THE
LEGISLATION WERE CONGRESSMAN ECKHARDT, THE WHITE HOUSE, THE COMMISSION, THE
DEPARTMENTS OF JUSTICE AND DEFENSE, REPRESENTATIVES OF THE INDUSTRY, AND VARIOUS
CONSUMER GROUPS.  THE RECOMMENDATIONS OF THESE GROUPS WERE INVALUABLE AND HELPED
FORM THE BASIS FOR AN EFFECTIVE, WELL-BALANCED BILL.
    AS REPORTED BY THE COMMITTEE, SUBSTANTIAL CHANGES HAVE BEEN MADE IN  S. 1798.
THOSE CHANGES HAVE STRENGTHENED AND SOLIDIFIED SUPPORT FOR THIS LEGISLATION.  THE
COMMITTEE BELIEVES THAT, IF ENACTED, S. 1798 WILL FURNISH A FRAMEWORK FOR
REGULATION OF THE HOUSEHOLD GOODS INDUSTRY, A FRAMEWORK THAT WILL PLACE EMPHASIS
WHERE THE EMPHASIS SHOULD BE.
    S. 1798, AS REPORTED, DOES NOT CONTAIN ANY PROVISIONS DEALING WITH RATE BUREAUS,
GENERAL ENTRY, OR GENERAL PRICING FLEXIBILITY.  THAT IS BECAUSE THE PROVISIONS OF
THE MOTOR CARRIER ACT OF 1980 APPLY TO THE MOVING INDUSTRY IN THESE AREAS.  IN
DECIDING TO ADOPT THE ENTRY PROVISIONS OF THE MOTOR CARRIER ACT FOR THE HOUSEHOLD
GOODS MOVING INDUSTRY, THE COMMITTEE WAS PARTICULARLY CONCERNED ABOUT THE ABILITY
OF MINORITY APPLICANTS TO ENTER THE INTERSTATE HOUSEHOLD GOODS MOVING INDUSTRY.
MANY EXISTING MINORITY TRUCKERS ARE LOCAL HOUSEHOLD MOVERS AND AN IMPORTANT
ELEMENT OF THEIR GROWTH IS ACCESS TO INTERSTATE MARKETS.  THE COMMITTEE IS MINDFUL
THAT THE ENTRY PROVISION OF THE MOTOR CARRIER ACT AND THE REVISED NATIONAL
TRANSPORTATION POLICY, WHICH ACKNOWLEDGES THE NEED TO PROMOTE INCREASED
PARTICIPATION BY MINORITIES IN THE TRUCKING INDUSTRY, APPLY TO THE MOVING
INDUSTRY.  THE COMMITTEE BELIEVES THAT THE NEW NATIONAL TRANSPORTATION POLICY
LANGUAGE WILL BE ESPECIALLY HELPFUL IN THIS AREA.  IN SITUATIONS WHERE A MINORITY
APPLICANT FOR HOUSEHOLD GOODS AUTHORITY IS SUPPORTED BY THE U.S. GOVERNMENT, THE
COMMITTEE BELIEVES **\*4** THAT THE REVISED NATIONAL TRANSPORTATION POLICY WILL REQUIRE
THE COMMISSION TO CONSIDER THE NEED OF THE FEDERAL GOVERNMENT TO PROMOTE USE OF
MINORITY BUSINESSES.
    **\*\*4274** IT SHOULD BE NOTED THAT THE COMMITTEE DID NOT INCLUDE ANY PROVISION IN
THE BILL DEALING WITH BROKERS FOR THE TRANSPORTATION OF HOUSEHOLD GOODS. HENCE,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                    Page 4

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372, 1980 U.S.C.C.A.N. 4271)**


ANY LICENSING OF SUCH BROKERS MUST CONFORM TO EXISTING LAW.  UNDER SECTION
10924(A) OF TITLE 49, WHICH GOVERNS THE ISSUANCE OF SUCH LICENSES, THE COMMISSION
MUST CONSIDER REQUESTS FOR LICENSES ON A CASE-BY-CASE BASIS.  MASTER LICENSING OR
LICENSING BASED SOLELY UPON A SHOWING OF FITNESS IS PROHIBITED. THE COMMITTEE
CONSIDERED OPENING ENTRY FOR BROKERS FOR THE TRANSPORTATION OF HOUSEHOLD GOODS BY
PROVIDING FOR A FITNESS TEST ONLY AS CONGRESS DID IN THE MOTOR CARRIER ACT OF 1980
FOR BROKERS OF NONHOUSEHOLD GOODS TRANSPORTATION. HOWEVER, THE COMMITTEE BELIEVES
THAT THE COMMISSION HAS SUFFICIENT AUTHORITY UNDER SECTION 10924(A) TO PROVIDE
EASED ENTRY FOR BROKERS FOR THE TRANSPORTATION OF HOUSEHOLD GOODS.  THUS, IF THE
COMMISSION DETERMINES THAT A POLICY OF EASED ENTRY WILL PROMOTE COMPETITION AND
PROVIDE IMPROVED SERVICE AND PRICES FOR CONSUMERS, IT HAS THE AUTHORITY NECESSARY
TO ISSUE BROKERS' LICENSES IN ORDER TO CARRY OUT THAT POLICY.
   DURING THE COMMITTEE'S DELIBERATIONS ON THE LEGISLATION, COMMENTS WERE RECEIVED
INDICATING THAT THE INDUSTRY NEEDED IMPROVED TRAINING PROGRAMS. FURTHER, IT WAS
SUGGESTED THAT INCREASED EMPLOYEE TRAINING WOULD IMPROVE SERVICE TO CONSUMERS AND
IMPROVE THE EFFICIENCY OF THE MOVING AND STORAGE INDUSTRY.  THE COMMITTEE AGREES;
HOWEVER, SPECIFIC GUIDANCE FROM CONGRESS IN THIS AREA DOES NOT APPEAR NECESSARY.
RATHER, THE COMMITTEE BELIEVES THAT THE INDUSTRY SHOULD DEVELOP ITS OWN TRAINING
PROGRAM, SUCH AS THAT OF THE NATIONAL INSTITUTE OF CERTIFIED MOVING CONSULTANTS
(NICMC).  WITH RESPECT TO THAT PARTICULAR PROGRAM, THE COMMITTEE GENERALLY AGREES
WITH THE THRUST OF THE SENATE REPORT LANGUAGE FAVORING THE PROGRAM.  THE COMMITTEE
REITERATES ITS SUPPORT FOR BONA FIDE TRAINING, EDUCATION, AND CERTIFICATION
ACTIVITIES, AND ENCOURAGES THE INDUSTRY TO SUPPORT BROAD-BASED ACTIVITIES IN THE
TRAINING FIELD.
   THE REPORTED BILL MAKES CHANGES IN THREE GENERAL CATEGORIES.  IT REDUCES
UNNECESSARY GOVERNMENT REGULATION; IT ESTABLISHES NEW REMEDIES AND PROTECTIONS FOR
CONSUMERS; AND IT FURNISHES ADDITIONAL PRICING OPTIONS FOR THE CARRIERS AND THE
CONSUMERS.
   THE POLICY DECLARATION IN SECTION 2 CLEARLY CALLS FOR REDUCED REGULATION.
SECTION 6 DIRECTS THE COMMISSION TO MINIMIZE REGULATIONS AND PAPERWORK FOR THE
INDUSTRY.  UNDER THE REPORTED BILL, THE COMMISSION MUST ALLOW MORE INDUSTRY
FLEXIBILITY FOR QUOTING ESTIMATES, FOR WEIGHING SHIPMENTS, AND FOR PROVIDING
SERVICE OPTIONS.  SIMILARLY, THE COMMISSION, WHERE APPROPRIATE, IS REQUIRED TO
ESTABLISH PERFORMANCE STANDARDS FOR COMPLIANCE WITH ITS REGULATIONS RELATING TO
CONSUMER PROTECTION.  FURTHER, AS A MEANS OF REDUCING UNNECESSARY REGULATION,
SECTION 8 DIRECTS THE COMMISSION NOT TO SEEK CIVIL PENALTY REDRESS FOR VIOLATIONS
OF REGULATIONS PERTAINING TO RECORDKEEPING AND CONSUMER PROTECTION THAT DO NOT
RESULT IN HARM TO INDIVIDUAL SHIPPERS.  THE ONLY EXCEPTION TO THIS LIMITATION IS
CONTAINED IN THE PENALTY PROVISION GOVERNING FALSIFICATION OF DOCUMENTS AND
CHARGING FOR SERVICES NOT PERFORMED.
   HERE, ONE OTHER POINT NEEDS TO BE ADDRESSED.  SECTION 5 GIVES THE COMMISSION
CLEAR AUTHORITY TO IMPOSE SANCTIONS ON AGENTS FOR ENGAGING IN CERTAIN WRONGFUL
BUSINESS PRACTICES.  THIS IS NOT A GREEN *5 LIGHT THE THE COMMISSION TO EMBARK
UPON WHOLESALE REGULATION OF AGENTS.  RATHER, THE AUTHORITY OF THE COMMISSION IS
LIMITED TO **4275 TAKING DISCIPLINARY ACTION WHERE AN AGENT HAS BEEN CONSISTENTLY
UNFIT OR HAS BEEN INVOLVED IN FRAUDULENT PRACTICES OR WEIGHT BUMPING.
   ANOTHER MAJOR THRUST OF THE REPORTED BILL IS TO PROVIDE BETTER CONSUMER

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                              Page 5

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


PROTECTION.  IT DOES SO IN THE FOLLOWING WAYS:
   1.  SECTION 4 GIVES SHIPPERS THE BENEFIT OF VARIOUS PRICE AND SERVICE OPTIONS;
   2.  SECTION 4 PROVIDES A MECHANISM FOR A PRICE OPTION IN THE AREA OF ESTIMATING
THAT GIVES THE CONSUMER PRICE CERTAINTY FOR MOVING COSTS;
   3.  SECTION 6 REAFFIRMS AND CLARIFIES THE COMMISSION'S AUTHORITY TO ISSUE
REGULATIONS FOR THE PROTECTION OF INDIVIDUAL SHIPPERS;
   4.  SECTION 6 REAFFIRMS CLEARLY THAT CONSUMERS MUST BE INFORMED OF THEIR RIGHTS
AND REMEDIES AND OF THE QUALITY AND COST OF AVAILABLE SERVICE;
   5.  SECTION 7 PROVIDES THE STATUTORY GUIDELINES FOR DISPUTE SETTLEMENT PROGRAMS
WHICH OFFER SHIPPERS A FORUM FOR THE FAIR AND EXPEDITIOUS SETTLEMENT OF CLAIMS;
   6.  SECTION 7 PROVIDES SHIPPERS WITH RECOVERY OF ATTORNEY FEES STEMMING FROM
LITIGATION INVOLVING CLAIMS WHERE NO DISPUTE SETTLEMENT PROGRAM IS AVAILABLE;
   7.  SECTION 8 STRENGTHENS THE COMMISSION'S ENFORCEMENT AUTHORITY BY EXPANDING
ITS CIVIL PENALTY CAPABILITY;
   8.  SECTION 8 ENCOURAGES COMPENSATION TO SHIPPERS WHERE A VIOLATION HAS RESULTED
IN HARM TO A SHIPPER; AND
   9.  SECTIONS 8 AND 9 IMPOSE CIVIL PENALTIES FOR SPECIFIED VIOLATIONS AND
CRIMINAL PENALTIES FOR WEIGHT BUMPING.
   THE COMMITTEE INTENDS TO ENSURE THAT THE END RESULT OF THIS LEGISLATION OVERALL
WILL BE A BENEFIT TO ALL THE PEOPLE OF THIS COUNTRY, AND VIGOROUS OVERSIGHT WILL
BE CONDUCTED TO SEE THAT THAT RESULT IF REALIZED.

                         SECTION 2.   DECLARATION OF POLICY

    SECTION 2 SETS FORTH CONGRESSIONAL POLICY WITH RESPECT TO THE HOUSEHOLD GOODS
MOVING INDUSTRY.  THE EMPHASIS IN THE POLICY STATEMENT IS THREEFOLD-- THE
REDUCTION OF UNNECESSARY REGULATION, THE STRENGTHENING OF CONSUMER REMEDIES AND
PROTECTIONS, AND THE ESTABLISHMENT OF MAXIMUM CARRIER FLEXIBILITY IN PRICING THEIR
SERVICES AND MEETING THE NEEDS OF THEIR SHIPPERS.  THE SPECIFIC PROVISIONS OF THE
LEGISLATION REFLECT THE POLICY STATEMENT.
    THE NEW MOTOR CARRIER ACT OF 1980 AND THIS BILL BOTH STRESS COMPETITION AND
REDUCED REGULATION AS WAYS OF ACHIEVING A BETTER AND MORE EFFECTIVE MOTOR CARRIER
SYSTEM.  THE COMMITTEE BELIEVES THAT THE INDUSTRY AND THE SHIPPERS IT SERVE BOTH
BENEFIT FROM SUCH AN APPROACH. AT THE SAME TIME, THE COMMITTEE RECOGNIZES THAT
MANY USERS OF HOUSEHOLD GOODS CARRIERS ARE ORDINARY CONSUMERS UNFAMILIAR WITH HOW
THE INDUSTRY WORKS AND WITHOUT THE ECONOMIC LEVERAGE OF COMMERCIAL SHIPPERS.
THESE PERSONS TEND TO BE MORE VULNERABLE THAN OTHER SHIPPERS AND HENCE, IN NEED OF
PROTECTIONS THAT ARE NOT NECESSARY FOR OTHER MOTOR CARRIER SHIPPERS.  ACCORDINGLY,
THIS BILL PROVIDES THE INTERSTATE COMMERCE COMMISSION WITH SPECIAL AUTHORITY **6** TO
PROTECT THESE SHIPPERS.  IT ALSO ESTABLISHES SELF-HELP REMEDIES.
    **\*\*4276** SECTION 2 ALSO DIRECTS THE APPROPRIATE CONGRESSIONAL AUTHORIZATION
COMMITTEES TO HOLD PERIODIC OVERSIGHT HEARINGS TO ENSURE THAT THE HOUSEHOLD GOODS
ACT IS BEING IMPLEMENTED ACCORDING TO CONGRESSIONAL INTENT AND PURPOSE. DURING THE
FIRST FIVE YEARS AFTER ENACTMENT OF THE ACT, THE COMMITTEES ARE TO HOLD SUCH
HEARINGS NO LESS THAN ANNUALLY. THE ACT PROVIDES MAXIMUM FLEXIBILITY FOR THE
INDUSTRY, INCREASED PROTECTION FOR SHIPPERS AND SOME NEW AUTHORITY FOR THE
COMMISSION.  THE COMMITTEE IS CONCERNED THAT THE RIGHTS ACCRUE TO THE BENEFIT OF

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                    Page 6

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**

THOSE INVOLVED AND THAT THE COMMISSION CARRY OUT THE ACT ACCORDING TO
CONGRESSIONAL INTENT.

                    SECTION 3.   DEFINITIONS

   THE REVISED INTERSTATE COMMERCE ACT DOES NOT PROVIDE A DEFINITION OF  'HOUSEHOLD
GOODS.'  HOWEVER, THE INTERSTATE COMMERCE COMMISSION HAS ESTABLISHED A DEFINITION
BY REGULATION WHICH APPEARS AT 49 CFR 1056.1(A) WITH INTERPRETIVE GUIDELINES AT 49
CFR 1056.1(B).  SECTION 3 MERELY CODIFIES THE EXISTING DEFINITION AND INTERPRETIVE
GUIDELINES OF 'HOUSEHOLD GOODS' AS DEFINED AT 49 CFR 1056.1(A) AND (B).
   THE SECTION PERMITS THE COMMISSION, BY REGULATION, TO EXPAND UPON THIS
DEFINITION OF 'HOUSEHOLD GOODS.'  IN THIS REGARD, THE COMMITTEE SPECIFICALLY
INTENDS THAT THE COMMISSION BE ABLE TO BROADEN THIS DEFINITION IN RESPONSE TO NEW
TECHNOLOGY OR PRODUCTS WHICH MAY BE USED IN A HOUSEHOLD.  HOWEVER, IT IS NOT THE
INTENT OF THE COMMITTEE TO AUTHORIZE THE COMMISSION TO ALTER THIS DEFINITION WITH
UNLIMITED DISCRETION.  IN ADDITION, THE COMMITTEE EXPECTS THAT ANY PROPOSAL TO
EXPAND THE DEFINITION BE SUBJECT TO RULEMAKING PROCEDURES WHICH PROVIDE FOR NOTICE
AND OPPORTUNITY FOR COMMENT BY INTERESTED PARTIES BEFORE THE COMMISSION ACTS TO
GRANT OR TO DENY SUCH CHANGE.
   NOTHING IN THIS SECTION IS INTENDED TO AMEND THE PROVISIONS OF THE MOTOR CARRIER
ACT OF 1980 REGARDING THE PROCEDURES REQUIRED OF A PERSON TO REQUEST OPERATING
AUTHORITY FOR TRANSPORTING COMMODITIES BY COMMON CARRIER IN INTERSTATE COMMERCE OR
THOSE PROCEDURES REQUIRED OF A CARRIER TO REQUEST AN EXTENSION OF OPERATING
AUTHORITY FOR TRANSPORTING OTHER COMMODITIES BY COMMON CARRIER IN INTERSTATE
COMMERCE.

                    SECTION 4.   RATES

   SECTION 4 ADDS A NEW SECTION 10734 TO TITLE 49 OF THE UNITED STATES CODE.  NEW
SECTION 10734(A) PROVIDES THAT A CARRIER MAY ESTABLISH A RATE FOR THE
TRANSPORTATION OF HOUSEHOLD GOODS WHICH IS BASED UPON THE CARRIER'S WRITTEN
BINDING ESTIMATE.  IN ADDITION, SUBSECTION (A)(2) REQUIRES THAT SUCH RATES MUST BE
AVAILABLE ON A NONPREFERENTIAL BASIS TO SHIPPERS AND MUST NOT RESULT IN CHARGES TO
SHIPPERS WHICH ARE PREDATORY.  CARRIERS MAY CHARGE FOR WRITTEN BINDING ESTIMATES;
HOWEVER, AS POINTED OUT IN SECTION 6, SUCH CHARGES MUST NOT BE SET COLLECTIVELY
AND ARE FULLY SUBJECT TO THE ANTITRUST LAWS.  THE INTERSTATE COMMERCE COMMISSION
HAS COMPLETE JURISDICTION OVER THESE RATES AND CHARGES.
   **\*7 \*\*4277** AN ESTIMATE IS A PRICE QUOTE FOR PERFORMANCE OF TRANSPORTATION
SERVICES BY A HOUSEHOLD GOODS CARRIER.  UNDER EXISTING LAW, AN ESTIMATE IS BASED
UPON AN ASSESSMENT OF THE WEIGHT OF THE SHIPMENT, PLUS OTHER INCIDENTS OF THE
SERVICE, SUCH AS DISTANCE AND THE AMOUNT OF ACCESSORIAL WORK THAT IS TO BE
PERFORMED.  THE ESTIMATE IS NOT BINDING.  THE ACTUAL CHARGE FOR THE TRANSPORTATION
SERVICE IS BASED ON THE ACTUAL WEIGHT OF THE SHIPMENT AND THE COST FOR THE WEIGHT.
THEREFORE, IF A HOUSEHOLD GOODS CARRIER GIVES A CONSUMER AN ESTIMATE OF $1,200 FOR
ITS SERVICE, AND AFTER WEIGHING THE SHIPMENT, THE CHARGE IS $1,800, THE CARRIER
MUST CHARGE THE SHIPPER $1,800.  THIS REQUIREMENT HAS RESULTED IN A GREAT DEAL OF
CONSUMER DISSATISFACTION.  IN ORDER TO ADDRESS THIS PROBLEM, THESE SUBSECTIONS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372, 1980 U.S.C.C.A.N. 4271)**

CREATE A FOUNDATION FOR WRITTEN BINDING ESTIMATES.
    UNDER SUBSECTION (A), A CARRIER MAY GIVE A WRITTEN BINDING ESTIMATE OF $1,200,
AND REGARDLESS OF THE WEIGHT OF THE SHIPMENT, THE CARRIER CAN CHARGE THE CONSUMER
THE QUOTED PRICE OF $1,200. THE BENEFIT TO THE SHIPPER IS THAT HE OR SHE ACHIEVES
PRICE CERTAINTY, A GOAL THAT THE CONSUMER GROUPS ARDENTLY SEEK. PLAINLY, THIS
SUBSECTION PERMITS THIS TYPE OF PRICING AT THE DISCRETION OF THE CARRIER, SUBJECT
TO THE GUIDELINES SET FORTH IN THIS SUBSECTION.
    SUBSECTION (B) PROVIDES A BASIS FOR THE FILING OF RATES FOR THE TRANSPORTATION
OF HOUSEHOLD GOODS WHICH GUARANTEE THAT THE CARRIER WILL PICK UP AND DELIVER THE
GOODS AT THE TIMES SPECIFIED IN THE CONTRACT FOR SUCH SERVICES. ESSENTIALLY, IT
ALLOWS A PENALTY OR PER DIEM PAYMENT IN THE EVENT THAT THE CARRIER FAILS TO PICK
UP OR DELIVER SUCH HOUSEHOLD GOODS AT THE SPECIFIED TIMES.
    THIS SUBSECTION ADDRESSES A MAJOR CONSUMER PROBLEM; THAT IS, THE FAILURE BY A
CARRIER TO PICK UP OR DELIVER A SHIPMENT AT A TIME THAT WAS AGREED TO BY THE
SHIPPER AND THE CARRIER. UNDER EXISTING LAW, CARRIERS ARE REQUIRED TO PROVIDE
SERVICE WITH REASONABLE DISPATCH. IF THE CARRIER FAILS TO COMPLY, THE SHIPPER
MIGHT HAVE A CAUSE OF ACTION FOR ANY DAMAGES THAT MIGHT HAVE OCCURRED AS A RESULT
OF UNTIMELY SERVICE. IF A CAUSE OF ACTION SHOULD LIE AND NO VOLUNTARY SETTLEMENT
HAD BEEN MADE, THE SHIPPER'S ONLY PRIVATE REMEDY WOULD BE TO BRING AN ACTION IN
THE COURTS. THIS SUBSECTION WOULD PERMIT ALTERNATIVE METHODS FOR HANDLING THIS
TYPE OF PROBLEM.
    FOR EXAMPLE, SUBSECTION (B) WOULD PERMIT THE CARRIERS TO PROVIDE CONTRACTUAL
COVERAGE FOR UNTIMELY PICKUPS OR DELIVERIES. THUS, CARRIERS COULD AGREE WITH
SHIPPERS THAT CERTAIN AMOUNTS OF MONEY WOULD BE PAID TO THE SHIPPER IF THE PICKUP
OR DELIVERY DATES ARE NOT MET. SUCH CONTRACTUAL COVERAGE WOULD BE SUBJECT TO A
CHARGE FOR THE SHIPPER THAT IS REASONABLE. SIMILARLY, THE PENALTY OR PER DIEM
PAYMENT MUST BE REASONABLE. WITH THIS MECHANISM, THE SHIPPER WOULD HAVE THE
CONVENIENCE OF ASSURING HIMSELF OR HERSELF THAT COSTS INCURRED AS A RESULT OF
UNTIMELY PICKUP OR DELIVERY WOULD BE PAID IN ACCORDANCE WITH THE TERMS OF THE
CONTRACT COVERAGE, AND HE OR SHE THEN WOULD NOT HAVE TO PURSUE OTHER LEGAL
REMEDIES. FOR EXAMPLE, A CARRIER COULD FILE A RATE THAT PROVIDES THAT FOR AN
ADDITIONAL CHARGE OF $50, A SHIPPER WOULD BE ASSURED THAT HE OR SHE RECEIVES A
CERTAIN AMOUNT OF MONEY FOR HOUSING ACCOMMODATIONS FOR EACH DAY THE SHIPMENT IS
LATE. HOWEVER, THIS SCHEME WOULD NOT PRECLUDE PURSUIT OF TRADITIONAL REMEDIES.
RATES AND CHARGES FILED PURSUANT TO THIS SUBSECTION ARE SUBJECT TO THE
JURISDICTION OF THE COMMISSION.
    SUBSECTION (B)(2) AUTHORIZES THE COMMISSION TO REQUIRE THAT ANY CARRIER FILING
RATES UNDER THE AUTHORITY CONFERRED IN SUBSECTION **4278 *8 (B) (1) MUST HAVE IN
EFFECT RATES THAT DO NOT INCLUDE A SIMILAR TYPE OF CONTRACT COVERAGE. RATES NOT
PROVIDING FOR PENALTIES OR PER DIEM PAYMENTS ASSUMEDLY WOULD BE LOWER. THUS, A
FOUNDATION IS ESTABLISHED FOR PRICE AND SERVICE OPTIONS WHICH COULD BE BENEFICIAL
TO BOTH SHIPPERS AND CARRIERS.
    FINALLY, BY CITING THESE PARTICULAR EXAMPLES, THE COMMITTEE DOES NOT MEAN TO
PRECLUDE OR TO DISCOURAGE CARRIERS FROM PROPOSING ANY OTHER INNOVATIVE RATES OR
PRACTICES.

                              SECTION 5. AGENTS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                    Page 8

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


   SECTION 5 AMENDS TITLE 49 BY ADDING A NEW SECTION 10934 ON HOUSEHOLD GOODS
AGENTS.  HOUSEHOLD GOODS CARRIERS HEAVILY DEPEND ON SUCH AGENTS TO PROVIDE THE
NECESSARY EQUIPMENT AND SERVICES FOR THE TRANSPORTATION OF HOUSEHOLD GOODS. FOR
THIS REASON, MANY OF THE PROBLEMS EXPERIENCED BY SHIPPERS IN THIS AREA INVOLVE
AGENTS.
   CURRENTLY, THE INTERSTATE COMMERCE COMMISSION EXERTS VERY LITTLE DIRECT CONTROL
OVER AGENTS.  EVEN IN A SITUATION WHERE AN AGENT IS DISHONEST OR CONSISTENTLY
PROVIDES POOR SERVICE TO SHIPPERS, THE COMMISSION SELDOM BECOMES INVOLVED.
INSTEAD, IT RELIES PRIMARILY ON THE CARRIERS TO DISCIPLINE THESE AGENTS.  HOWEVER,
THIS ARRANGEMENT HAS NOT ALWAYS BEEN EFFECTIVE.  THE COMMISSION HAS REPORTED
SEVERAL REASONS FOR THIS SITUATION.  SOME CARRIERS SEEM UNWILLING TO DIRECT OR
CONTROL THE OPERATIONS OF THEIR AGENTS, BECAUSE THEY DEPEND ON THE AGENTS FOR THE
PERFORMANCE OF THE TRANSPORTATION SERVICES.  ALSO, SEVERAL OF THE MAJOR CARRIERS
ARE OWNED AND CONTROLLED BY THEIR AGENTS. FURTHER, IN SOME INSTANCES WHERE
PRINCIPAL CARRIERS HAVE REPRIMANDED AGENTS OR TERMINATED AGENCY AGREEMENTS, THOSE
AGENTS SIMPLY HAVE MOVED TO OTHER CARRIERS.  NEW SECTION 10934 GIVES STATUTORY
RECOGNITION TO THE CARRIERS' RESPONSIBILITY FOR CONTROLLING THE ACTS OF THEIR
AGENTS AND PROVIDES THE COMMISSION WITH AUTHORITY TO PROCEED DIRECTLY AGAINST
DISHONEST OR UNFIT AGENTS WHERE THE PRINCIPAL CARRIERS HAVE BEEN UNWILLING OR
UNABLE TO DO SO.
   THE BILL INCREASES THE COMMISSION'S AUTHORITY OVER AGENTS, BUT THE COMMITTEE
WISHES TO MAKE IT VERY CLEAR THAT THIS NEW AUTHORITY DOES NOT AUTHORIZE THE
COMMISSION TO CREATE A NEW REGULATORY STRUCTURE TO IMPOSE RESTRICTIONS OR
REGULATIONS UPON HOUSEHOLD GOODS AGENTS.  INSTEAD, THE PROVISION IS INTENDED ONLY
TO ALLOW THE COMMISSION TO TAKE DISCIPLINARY ACTION WHERE AN AGENT HAS BEEN
INVOLVED IN WEIGHT BUMPING OR OTHER FRAUDULENT PRACTICES OR WHERE THE AGENT HAS
CONSISTENTLY BEEN UNFIT TO PROVIDE TRANSPORTATION SERVICES.  THIS IS AN AREA THAT
THE COMMITTEE INTENDS TO MONITOR CLOSELY DURING ITS OVERSIGHT HEARINGS TO ASSURE
THAT THE COMMISSION CARRIES OUT ITS RESPONSIBILITIES UNDER THIS SECTION WITH THE
LEAST AMOUNT OF REGULATION POSSIBLE.
   SUBSECTION (A) OF NEW SECTION 10934 PROVIDES THAT CARRIERS SHALL BE RESPONSIBLE
FOR THE ACTS OR OMISSIONS OF THEIR AGENTS.  THIS REQUIREMENT IS CONSISTENT WITH
AGENCY LAW AND IS BASED ON EXISTING COMMISSION REGULATIONS.
   SUBSECTION (B) DIRECTS THE CARRIERS TO USE DUE DILIGENCE IN SELECTING AND
MAINTAINING AGENTS WHO ARE SUFFICIENTLY KNOWLEDGEABLE, FIT, WILLING, AND ABLE TO
PROVIDE SERVICE AND FULFILL THE OBLIGATIONS IMPOSED **4279 ON THEM BY THE STATUTE
AND THE PRINCIPAL CARRIERS.  AGAIN, THIS REQUIREMENT IS BASED ON EXISTING
COMMISSION REGULATIONS.  THE *9 COMMITTEE DETERMINED THAT IT WAS IMPORTANT TO MAKE
THIS REQUIREMENT A STATUTORY ONE IN ORDER TO MAKE IT CLEAR THAT THE CARRIERS HAVE
PRIMARY RESPONSIBILITY FOR THE ACTS OF THEIR AGENTS WHICH ARE RELATED TO SERVICES
PERFORMED FOR THE CARRIERS.  THE COMMITTEE BELIEVES THAT SELF-REGULATION IS
PREFERABLE TO DIRECT COMMISSION REGULATION AND THAT THE COMMISSION SHOULD
INTERVENE ONLY IN THE MOST SERIOUS CASES OR WHERE THE PRINCIPAL CARRIER HAS BEEN
UNABLE OR UNWILLING TO CONTROL ITS AGENTS.
   IT SHOULD BE NOTED THAT WHILE SUBSECTION (B) IS BASED ON THE COMMISSION'S
REGULATIONS, IT CONTAINS ONE IMPORTANT CHANGE.  THE COMMISSION'S REGULATIONS STATE

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                          Page 9

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


THAT THE CARRIER SHALL SELECT AGENTS THAT ARE ABLE TO FULFILL OBLIGATIONS IMPOSED
ON THEM 'BY THE COMMISSION.'  THE LEGISLATION REFERS TO OBLIGATIONS IMPOSED 'BY
THIS SUBTITLE.'  THE COMMITTEE BELIEVES THAT THIS LANGUAGE MORE ACCURATELY
REFLECTS ITS PURPOSE NOT TO CREATE A NEW REGULATORY STRUCTURE UNDER WHICH THE
COMMISSION COULD IMPOSE NEW REGULATIONS DIRECTLY APPLICABLE TO AGENTS.
   SUBSECTION (C) ESTABLISHES THE COMMISSION'S AUTHORITY TO TAKE DIRECT ENFORCEMENT
ACTION AGAINST AGENTS WHERE SERIOUS VIOLATIONS HAVE OCCURRED. SPECIFICALLY, THIS
PROVISION AUTHORIZES THE COMMISSION AFTER NOTICE AND HEARING TO ISSUE AN ORDER TO
COMPEL AN AGENT TO COMPLY WITH THE REQUIREMENT THAT IT BE FIT, WILLING, AND ABLE,
WHERE THE COMMISSION FINDS THAT THE AGENT HAS ENGAGED IN WEIGHT BUMPING OR OTHER
FRAUDULENT PRACTICES OR HAS CONSISTENTLY NOT BEEN FIT TO PROVIDE ADEQUATE
TRANSPORTATION SERVICES.  IF, AFTER FURTHER NOTICE AND EARING, THE COMMISSION
FINDS THAT THE AGENT HAS WILLFULLY FAILED TO COMPLY WITH ITS ORDER WITHIN 30 DAYS,
THE COMMISSION THEN MAY ISSUE ANOTHER ORDER LIMITING, CONDITIONING, OR PROHIBITING
THAT AGENT FROM PROVIDING TRANSPORTATION SERVICES.
   THE COMMITTEE RECOGNIZES THAT THE COMMISSION'S ORDER LIMITING OR PROHIBITING AN
AGENT FROM PROVIDING TRANSPORTATION SERVICES COULD HAVE VERY SERIOUS CONSEQUENCES
FOR AN AGENT.  HOWEVER, THE COMMITTEE BELIEVES THE COMMISSION NEEDS THIS AUTHORITY
IN ORDER TO PROTECT SHIPPERS FROM THE INDUSTRY'S WORST OFFENDERS.  IN VIEW OF THE
SERIOUS CONSEQUENCES, THE COMMITTEE HAS BEEN CAREFUL TO ENSURE CERTAIN PROTECTIONS
FOR THE AGENT.  OF FIRST IMPORTANCE IS THE REQUIREMENT THAT THE COMMISSION USE A
TWO-STEP PROCESS BEFORE IMPOSING ANY LIMITATIONS ON THE AGENT'S SERVICES.
FURTHER, THE AGENT CAN USE THE COMMISSION'S NORMAL PROCEDURES TO APPEAL THE
COMMISSION'S ORDERS, AS WELL AS SEEK JUDICIAL REVIEW.  FINALLY, AN AGENT THAT
BELIEVES IT OUGHT TO BE ABLE TO RESUME ITS NORMAL OPERATIONS OR GET BACK INTO
BUSINESS, CAN PETITION THE COMMISSION FOR THIS PURPOSE.  THE AGENT IS ENTITLED TO
A HEARING ON THE QUESTION OF RESCINDING THE ORDER LIMITING, CONDITIONING, OR
PROHIBITING IT FROM PROVIDING SERVICES.
   TWO OTHER POINTS SHOULD BE NOTED REGARDING THIS SUBSECTION.  FIRST, WHILE THE
COMMISSION IS NOT TO ISSUE EXTENSIVE REGULATIONS DIRECTLY APPLICABLE TO AGENTS,
THE COMMITTEE THINKS IT REASONABLE TO EXPECT THE COMMISSION TO ISSUE SOME
REGULATIONS TO CARRY OUT THIS SECTION. SPECIFICALLY, THE COMMISSION MAY ISSUE
CERTAIN GUIDELINES INDICATING UNDER WHAT CIRCUMSTANCES IT INTENDS TO USE THE
AUTHORITY **4280 GRANTED TO IT IN SUBSECTION (C).  SECOND, IN IMPOSING SANCTIONS
ON AN AGENT, THE COMMISSION SHOULD CONSIDER THE SEVERITY OF THE VIOLATIONS.
   *10 NEW SECTION 10934 ALSO CONTAINS A PROVISION WHICH IMMUNIZES FROM THE
ANTITRUST LAWS CERTAIN DISCUSSIONS EXERCISE AGREEMENTS BETWEEN CARRIERS AND THEIR
AGENTS RELATED TO RATES, CHARGES, AND ALLOWANCES FOR TRANSPORTATION PROVIDED UNDER
THE AUTHORITY OF THE CARRIERS.  FURTHER, SUCH DISCUSSIONS AND AGREEMENTS RELATED
TO THE OWNERSHIP OF A CARRIER BY AN AGENT OR MEMBERSHIP ON THE CARRIER'S BOARD OF
DIRECTORS BY AN AGENT ARE IMMUNE.  THE PURPOSE OF THIS PROVISION IS TO ALLOW THE
CONTINUATION OF CERTAIN RELATIONSHIPS BETWEEN CARRIERS AND AGENTS WHICH HAVE BEEN
ESTABLISHED OVER THE YEARS.  IN SOME CASES, THE CARRIERS ARE COMPOSED AND OWNED BY
AGENTS WHO THEMSELVES ARE CARRIERS WITHIN LIMITED GEOGRAPHICAL AREAS.  IN OTHER
CASES, THE AGENTS, AS CARRIERS THEMSELVES, HAVE INDEPENDENT AUTHORITY TO OPERATE
IN AREAS IN WHICH THE PRINCIPAL CARRIER OPERATES.  THESE RELATIONSHIPS COULD BE
JEOPARDIZED IN THE ABSENCE OF ANTITRUST IMMUNITY.  IT IS IMPORTANT TO NOTE THAT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                    Page 10

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


THESE EXEMPTIONS ARE NARROW ONES.  SPECIFICALLY, THE IMMUNITY PROVIDED BY
SUBSECTIONS (D)(1)-(3) APPLIES ONLY TO DISCUSSIONS OR AGREEMENTS RELATED TO RATES,
CHARGES, AND ALLOWANCES OFFERED ON TRAFFIC CARRIED UNDER THE AUTHORITY OF THE
PRINCIPAL CARRIER.  SIMILARLY, SUBSECTION (D)(4) PROVIDES ONLY A LIMITED
EXEMPTION.  IT DOES NOT EXEMPT FROM THE ANTITRUST LAWS SUCH THINGS AS
ANTICOMPETITIVE MERGERS.
   SECTION 5 OF THE BILL ALSO AMENDS SECTION 11342 OF TITLE 49, WHICH DEALS WITH
POOLING ARRANGEMENTS.  DURING THE COMMITTEE'S HEARINGS ON THE HOUSEHOLD GOODS
BILL, IT WAS SUGGESTED THAT NEW SECTION 10934(D) INCLUDE A SPECIAL ANTITRUST
EXEMPTION FOR POOLING ARRANGEMENTS BETWEEN CARRIERS AND AGENTS THAT HAVE THEIR OWN
AUTHORITY TO ACT AS CARRIERS. SUCH POOLING ARRANGEMENTS ARE COMMON AMONG CARRIERS
AND THEIR AGENTS. HOWEVER, THE COMMITTEE DETERMINED THAT SUCH AN EXEMPTION WAS
UNNECESSARY, BECAUSE SECTION 11342 PROVIDES FOR EXPEDITED COMMISSION REVIEW OF
POOLING AGREEMENTS.  COMMISSION APPROVAL OF SUCH AGREEMENTS CARRIES WITH IT AN
EXEMPTION FROM THE ANTITRUST LAWS.  HOWEVER, IN ORDER TO ALLEVIATE SOME CONCERN
THAT THE COMMISSION MIGHT DISRUPT THE CURRENT PRACTICES FOR SUCH POOLING
AGREEMENTS, THE COMMITTEE ADDED THE PROVISION AMENDING SECTION 11342.  THE NEW
PROVISION ESTABLISHES A PRESUMPTION IN FAVOR OF A POOLING AGREEMENT BETWEEN A
PRINCIPAL CARRIER AND ITS AGENTS, WHERE THE PRACTICES PROPOSED TO BE CARRIED OUT
UNDER THE AGREEMENT ARE THE SAME OR SIMILAR TO PRACTICES NOW CARRIED OUT UNDER
SUCH COMMISSION-APPROVED AGREEMENTS.  FURTHER, THE COMMISSION IS DIRECTED TO
SIMPLIFY AND EXPEDITE ITS REVIEW OF SUCH AGREEMENTS TO THE MAXIMUM EXTENT
PRACTICABLE.  THE COMMITTEE BELIEVES THAT THE PROVISION WILL ALLOW CONTINUATION OF
THE AGREEMENTS WHERE THEY ARE IN THE PUBLIC INTEREST AND DO NOT UNDULY RESTRAIN
COMPETITION.  AT THE SAME TIME, THE PROVISION RETAINS THE COMMISSION'S AUTHORITY
TO REVIEW THESE AGREEMENTS AND TO OVERCOME THE STATUTORY PRESUMPTION WHERE THE
FACTS SO WARRANT.


                         SECTION 6.  REGULATIONS

   SECTION 6 ADDS A NEW SECTION 11110 TO TITLE 49 OF THE UNITED STATES CODE.
   **4281** SUBSECTION (A) DIRECTS THAT REGULATIONS AND PAPERWORK REQUIRED OF MOTOR
CARRIERS PROVIDING TRANSPORTATION OF HOUSEHOLD GOODS BE MINIMIZED TO THE MAXIMUM
EXTENT FEASIBLE CONSISTENT WITH THE PROTECTION OF INDIVIDUAL SHIPPERS.
   *11 SUBSECTION (A)(2) AUTHORIZES THE COMMISSION TO ISSUE REGULATIONS TO CARRY
OUT THIS SUBTITLE AND CLEARLY REAFFIRMS ITS AUTHORITY TO ISSUE REGULATIONS
PROTECTING INDIVIDUAL SHIPPERS.  IT SHOULD BE NOTED THAT THIS PROVISION DOES NOT
ESTABLISH NEW SUBSTANTIVE AUTHORITY; RATHER, IT SIMPLY CLARIFIES THE COMMISSION'S
EXISTING AUTHORITY.
   AS CLARIFIED, THIS AUTHORITY, COUPLED WITH THE NEW CIVIL PENALTY AUTHORITY IN
SECTION 8, WILL PERMIT THE COMMISSION IN CERTAIN CIRCUMSTANCES TO SEEK REDRESS FOR
VIOLATIONS OF THESE REGULATIONS THROUGH THE ASSESSMENT OF CIVIL PENALTIES. THE
BASIS FOR SUCH ACTION WOULD NOT LONGER BE DEPENDENT UPON A PAPERWORK VIOLATION AS
NOW LIMITED BY SUBSECTION 11901(GOF TITLE 49 OF THE UNITED STATES CODE.
   SUBSECTION (A)(3) REQUIRES THE COMMISSION, WHERE APPROPRIATE, TO INCLUDE
PERFORMANCE STANDARDS IN ANY REGULATIONS PROMULGATED BY IT. PERFORMANCE STANDARDS
SHALL TAKE INTO ACCOUNT AT LEAST THE FOLLOWING CRITERIA:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                    Page 11

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


   (A) THE LEVEL OF PERFORMANCE THAT CAN BE ACHIEVED BY A WELL-MANAGED MOTOR COMMON
CARRIER TRANSPORTING HOUSEHOLD GOODS;
   (B) THE DEGREE OF HARM TO INDIVIDUAL SHIPPERS WHICH COULD RESULT FROM A
VIOLATION OF THE REGULATION;
   (C) THE NEED TO SET THE LEVEL OF PERFORMANCE AT A LEVEL SUFFICIENT TO DETER
ABUSES WHICH RESULT IN HARM TO CONSUMERS AND VIOLATIONS OF REGULATIONS;
   (D) SERVICE REQUIREMENTS OF THE CARRIERS;
   (E) THE COST OF COMPLIANCE IN RELATION TO THE CONSUMER BENEFITS TO BE ACHIEVED
FROM SUCH COMPLIANCE; AND
   (F) THE NEED TO SET THE LEVEL OF PERFORMANCE AT A LEVEL DESIGNED TO ENCOURAGE
CARRIERS TO OFFER SERVICE RESPONSIVE TO SHIPPER NEEDS.
   IN SETTING THESE PERFORMANCE STANDARDS, THE COMMITTEE EXPECTS THE COMMISSION TO
GIVE CONSIDERATION TO THE OPERATING CHARACTERISTICS OF BOTH REGIONAL AND
NATIONWIDE CARRIERS.  ALSO, THE COMMITTEE BELIEVES THAT, IN CONSIDERING THE
SERVICE REQUIREMENTS OF THE CARRIERS, THE COMMISSION SHOULD BE MINDFUL OF THE
CYCLICAL NATURE OF THE MOVING INDUSTRY.
   SUBSECTION (A)(4) RETAINS AND REAFFIRMS THE COMMISSION'S AUTHORITY TO REQUIRE
REPORTS FROM HOUSEHOLD GOODS CARRIERS OR TO REQUIRE SUCH CARRIERS TO PROVIDE
INFORMATION TO SHIPPERS CONCERNING THEIR PAST PERFORMANCE.
   SUBSECTION (B)(1) ESTABLISHES THAT THE HOUSEHOLD GOODS CARRIERS HAVE DISCRETION
AS TO WHETHER OR NOT THEY WILL PROVIDE ESTIMATES FOR THE TRANSPORTATION OF
HOUSEHOLD GOODS.  THE SUBSECTION PROHIBITS THE COMMISSION FROM PRESCRIBING
SPECIFIC FORMULAS, FORMS, METHODS, OR TECHNIQUES FOR PROVIDING A PROSPECTIVE
SHIPPER WITH AN ESTIMATE.  IN ADDITION, THE SUBSECTION PLAINLY REQUIRES THE
COMMISSION TO ALLOW CARRIERS TO CHARGE FOR WRITTEN BINDING ESTIMATES AND TO BASE
THEIR FINAL CHARGES UPON SUCH AN ESTIMATE.  HOWEVER, THE COMMISSION IS NOT
PRECLUDED FROM PROHIBITING ANY PARTICULAR ESTIMATING PRACTICE THAT IS CLEARLY
DECEPTIVE.
   **\*\*4282** SUBSECTION (B)(2) PROVIDES THAT ANY CHARGES FOR WRITTEN BINDING ESTIMATES
ARE NOT IMMUNIZED FROM THE ANTITRUST LAWS; HENCE, THESE CHARGES MUST BE SET
INDIVIDUALLY.
   SUBSECTION (C) REQUIRES THE COMMISSION TO ISSUE REGULATIONS THAT PROVIDE
HOUSEHOLD GOODS CARRIERS WITH MAXIMUM FLEXIBILITY IN WEIGHING SHIPMENTS CONSISTENT
WITH ASSURANCES TO SHIPPERS OF ACCURATE WEIGHING PRACTICES.  THE COMMISSION CANNOT
PROHIBIT CARRIERS **\*12** FROM BACKWEIGHING SHIPMENTS OR FROM BASING THEIR CHARGES ON
THE REWEIGH WEIGHTS IF THE SHIPPER OBSERVES BOTH THE TARE AND GROSS WEIGHINGS AND
SUCH WEIGHINGS ARE ON THE SAME SCALE.  IF THE SHIPPER ELECTS, HE OR SHE MAY WAIVE
THE OPPORTUNITY TO OBSERVE THE REWEIGHING.
   SUBSECTION (B)(1) OF THE BILL REQUIRES THE COMMISSION TO INSTITUTE A RULEMAKING
PROCEEDING TO REVIEW AND REVISE ALL OF ITS OPERATIONAL REGULATIONS PERTAINING TO
THE TRANSPORTATION OF ALL HOUSEHOLD GOODS FOR THE PURPOSE OF CARRYING OUT THE
PROVISIONS OF NEW SECTION 11110.  THE PROCEEDING MUST BE INSTITUTED WITHIN 60 DAYS
AFTER DATE OF ENACTMENT OF THIS ACT.
   SUBSECTION (B)(2) REQUIRES THAT THE RULEMAKING PROCEEDING PROVIDED FOR IN
SUBSECTION (B)(1) BE COMPLETED WITHIN 270 DAYS AFTER THE DATE OF ENACTMENT.
   SUBSECTION (B)(3) APPLIES ALL OF THE APPLICABLE PROVISIONS OF THIS SECTION TO
RULES AND REGULATIONS FOR THE TRANSPORTATION OF HOUSEHOLD GOODS FOR THE UNITED

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                    Page 12

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


STATES GOVERNMENT ISSUED BY DEPARTMENTS, AGENCIES, AND INSTRUMENTALITIES OF THE
UNITED STATES OTHER THAN THE COMMISSION. THE APPLICABLE PROCEEDINGS ARE TO BE
INSTITUTED AND CARRIED OUT BY THE RESPECTIVE ENTITIES, SUCH AS THE DEPARTMENT OF
DEFENSE, OR ANY OTHER DEPARTMENT, AGENCY OR INSTRUMENTALITY HAVING REGULATIONS
THAT PERTAIN TO THE TRANSPORTATION OF HOUSEHOLD GOODS FOR THE UNITED STATES
GOVERNMENT.

                         SECTION 7.  DISPUTE SETTLEMENT

   SECTION 7 AMENDS TITLE 49 OF THE U.S.C. BY ADDING A NEW SECTION 11711.  THE NEW
SECTION ESTABLISHES MINIMUM REQUIREMENTS FOR INFORMAL DISPUTE SETTLEMENT PROGRAMS
TO BE ESTABLISHED BY HOUSEHOLD GOODS CARRIERS FOR THE PURPOSE OF RESOLVING SHIPPER
DISPUTES IN A FAIR, EXPEDITIOUS AND INEXPENSIVE MANNER.  AT A MINIMUM, THESE
PROGRAMS MUST BE AVAILABLE TO SHIPPERS WHO PAY TO TRANSPORT THEIR OWN SHIPMENTS
AND WHO TRANSPORT THEIR HOUSEHOLD GOODS ON A 'COLLECT ON DELIVERY' BASIS, I.E.,
THOSE WHO PAY BY CASH, CERTIFIED CHECK, OR CREDIT CARD.  HOWEVER, THE COMMITTEE
DOES NOT INTEND TO PRECLUDE OR TO DISCOURAGE CARRIERS FROM MAKING SUCH PROGRAMS
AVAILABLE TO COMMERCIAL ACCOUNT AND GOVERNMENT SHIPPERS.
   TO ENCOURAGE CARRIERS TO ESTABLISH DISPUTE SETTLEMENT PROGRAMS, THE SECTION
PROVIDES FOR THE AWARD OF ATTORNEY'S FEES TO THE SUCCESSFUL SHIPPER CLAIMANT WHERE
NO PROGRAM WAS AVAILABLE FOR USE BY THE SHIPPER TO RESOLVE THE DISPUTE. TO
ENCOURAGE CARRIERS TO EXPEDITIOUSLY SETTLE DISPUTES UNDER THE PROGRAMS, THE
SECTION ALSO PROVIDES FOR THE AWARD OF ATTORNEY'S FEES TO THE SUCCESSFUL SHIPPER
CLAIMANT WHERE A DECISION WAS NOT RENDERED WITHIN THE TIME FRAME, OR THE EXTENSION
THEREOF, AS PROVIDED UNDER THE PROGRAM.  FINALLY, TO ENCOURAGE CARRIERS TO COMPLY
WITH THE DECISIONS ISSUED UNDER THE **4283 PROGRAMS, THE SECTION PROVIDES FOR THE
AWARD OF ATTORNEY'S FEES TO THE SUCCESSFUL SHIPPER CLAIMANT WHO BROUGHT COURT
ACTION TO ENFORCE THE DECISION ISSUED UNDER THE PROGRAM. UNDER SUBSECTION (D) OF
THIS SECTION, THE 120-DAY TIME FRAME, WHEREBY THE SHIPPER IS TO FILE A CLAIM UNDER
A DISPUTE SETTLEMENT PROGRAM, IS NOT INTENDED TO SUPERSEDE THE NINE-MONTH PERIOD
PROVIDED BY 49 U.S.C. 11707(E), WHEREBY THE SHIPPER IS TO FILE A LOSS AND DAMAGE
CLAIM WITH A CARRIER.
   **13 FOR THE PURPOSE OF DISCOURAGING SHIPPERS FROM FILING NONMERITORIOUS CLAIMS
IN COURT, THE SECTION PROVIDES FOR THE AWARD OF ATTORNEY'S FEES TO THE SUCCESSFUL
CARRIER CLAIMANT WHERE A SHIPPER HAS BROUGHT COURT ACTION IN BAD FAITH EITHER (A)
AFTER A DECISION HAS BEEN ISSUED UNDER THE PROGRAM; OR (B) AFTER A SHIPPER HAS
INSTITUTED A PROCEEDING UNDER THE PROGRAM, BUT BEFORE THE DECISION HAS BEEN
RENDERED WITHIN THE TIME FRAME OR EXTENSION THEREOF PROVIDED UNDER THE PROGRAM.
   THE RELEVANT PROVISIONS OF STATE LAW WILL APPLY TO THE COURT'S DISCRETION FOR
AWARDING ATTORNEY'S FEES TO EITHER THE SHIPPER OR THE CARRIER WHERE SUCH STATE LAW
IS CONSISTENT WITH THE PROVISIONS OF THIS SECTION.
   THE COMMISSION SPECIFICALLY IS AUTHORIZED TO APPROVE AND TO REVIEW SUCH PROGRAMS
FOR THE PURPOSE OF ENSURING COMPLIANCE WITH THE MINIMUM STATUTORY REQUIREMENTS
ESTABLISHED IN THIS SECTION AND ANY REGULATIONS ISSUED THEREUNDER BY THE
COMMISSION.  FURTHER, NEW SECTION 11711(A)(3) AUTHORIZES THE COMMISSION TO SUSPEND
OR REVOKE ITS APPROVAL OF SUCH PROGRAMS FOR FAILURE TO MEET THESE REQUIREMENTS.
   SUBSECTION (B)(4) OF THIS SECTION DIRECTS THE COMMISSION TO ENSURE THAT ANY

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


PERSON AUTHORIZED TO SETTLE THE DISPUTES IS BOTH INDEPENDENT AND CAPABLE OF
RESOLVING SUCH DISPUTES FAIRLY AND EXPEDITIOUSLY.  THE COMMITTEE INTENDS THAT THE
COMMISSION POSSESS THE AUTHORITY TO SUSPEND OR TO REVOKE APPROVAL FOR THE
OPERATION OF SUCH PROGRAMS WHERE THE COMMISSION FINDS ANY PERSON NOT TO BE
SETTLING DISPUTES IN A FAIR AND EXPEDITIOUS MANNER.
   ADDITIONALLY, SUBSECTION (B)(8) OF THIS SECTION REQUIRES THAT, UNDER THE DISPUTE
SETTLEMENT PROGRAMS, DECISIONS BE ISSUED WITHIN 60 DAYS OR WITHIN 'A REASONABLE
PERIOD OF TIME,' AS MAY BE DETERMINED BY THE DISPUTE SETTLER.  THE COMMITTEE
INTENDS FOR THE COMMISSION TO ESTABLISH GUIDELINES AS TO WHAT CONSTITUTES A
'REASONABLE PERIOD OF TIME.'
   SECTION 7 ALSO PROVIDES FOR THE ORAL PRESENTATION OF A HOUSEHOLD GOODS SHIPPER
DISPUTE UNDER A DISPUTE SETTLEMENT PROGRAM AT THE REQUEST OF EITHER PARTY TO THE
DISPUTE.  SINCE THE PURPOSE OF THIS SECTION IS TO ENCOURAGE THE INFORMAL
SETTLEMENT OF SUCH DISPUTES, THE COMMITTEE HAS NOT REQUIRED SUCH PROGRAMS TO
INCLUDE THE MORE FORMALIZED PROCEDURE OF AN ORAL HEARING.  WHILE THE COMMITTEE
FAVORS AN INFORMAL APPROACH TO RESOLVE SUCH DISPUTES, THIS SECTION DOES NOT
PROHIBIT OR DISCOURAGE CARRIERS FROM INCLUDING THE MORE FORMALIZED PROCEDURE OF AN
ORAL HEARING IN THEIR PROGRAMS SO LONG AS THIS PROCEDURE CONFORMS WITH THE
REQUIREMENTS OF SUBSECTION (B)(7) OF THIS SECTION.
   AN IMPORTANT REQUIREMENT FOR DISPUTE SETTLEMENT PROGRAMS CONCERNS THE ADEQUATE
NOTICE GIVEN SHIPPERS REGARDING THE AVAILABILITY AND THE OPERATIONS OF THE
PROGRAM.  THE SECTION IS CLEAR IN PROHIBITING **4284 CARRIERS FROM CONDITIONING
THEIR TRANSPORTATION SERVICES UPON A SHIPPER'S AGREEMENT TO USE OR TO ABIDE BY A
DISPUTE SETTLEMENT PROGRAM.  IN ADDITION, THE SECTION IS CLEAR ON REQUIRING
CARRIERS TO DISCLOSE TO SHIPPERS THE LEGAL EFFECTS OF ELECTION TO UTILIZE THE
PROGRAM AFTER THE DISPUTE HAS ARISEN, BUT BEFORE THE SHIPPER ELECTS THE PROGRAM.
THE COMMITTEE INTENDS FOR THE CARRIER TO DETAIL THE RIGHTS OF THE SHIPPER UNDER
THE PROGRAM AS WELL AS THE FRAMEWORK FOR AWARDING ATTORNEY'S FEES WHERE THE
SHIPPER SEEKS COURT ACTION.  PARTICULARLY WHERE THE PROGRAM MAY BE BINDING UPON
EITHER PARTY, THE *14 COMMITTEE INTENDS FOR THE CARRIER TO NOTIFY THE SHIPPER OF
THE LEGAL EFFECTS OF ELECTION TO USE SUCH PROGRAM.  IN THIS REGARD, THE COMMITTEE
NOTES THAT, IF THE PROGRAM IS BINDING SOLELY ON THE CARRIER, THE SHIPPER MAY BE
CHARGED A FEE OF NOT MORE THAN $25 FOR INSTITUTING A PROCEEDING UNDER THE PROGRAM.
  HOWEVER, THE COMMITTEE DOES NOT INTEND TO PRECLUDE OR TO DISCOURAGE CARRIERS FROM
OFFERING SUCH PROGRAMS WITHOUT A FEE TO THE SHIPPER.


                        SECTION 8.  PENALTIES


   SECTION 8 OF THE BILL RESTRUCTURES THE PENALTY PROVISIONS OF THE INTERSTATE
COMMERCE ACT RELATING TO THE TRANSPORTATION OF HOUSEHOLD GOODS.
   UNDER EXISTING LAW, THE COMMISSION HAS SEVERAL FORMAL REMEDIES AVAILABLE TO IT
WITH RESPECT TO CIVIL ENFORCEMENT ACTIONS AGAINST HOUSEHOLD GOODS CARRIERS. FOR
EXAMPLE, UNDER 49 U.S.C. 11901(G), THE UNITED STATES MAY BRING AN ACTION IN
DISTRICT COURT TO ASSESS A CIVIL PENALTY NOT TO EXCEED $400 FOR VIOLATION BY A
HOUSEHOLD GOODS CARRIER OF A RECORDKEEPING REQUIREMENT ESTABLISHED BY THE
COMMISSION.  UNDER 49 U.S.C. 11702(A)(4), THE COMMISSION MAY INSTITUTE A CIVIL
INJUNCTIVE ACTION TO ENFORCE A REGULATION OF THE COMMISSION.  THE COMMISSION MAY

             © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                    Page 14

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


ALSO INSTITUTE AN ADMINISTRATIVE PROCEEDING TO SUSPEND OR REVOKE A CARRIER'S
OPERATING AUTHORITY FOR FAILURE TO COMPLY WITH THE INTERSTATE COMMERCE ACT AND
COMMISSION REGULATIONS.
  A SIGNIFICANT AMOUNT OF TESTIMONY WAS RECEIVED BY THE COMMITTEE AT ITS HEARINGS
WITH RESPECT TO THE SPECIAL ENFORCEMENT PROBLEMS ENCOUNTERED IN THE HOUSEHOLD
GOODS MOVING AREA.  CONSUMER GROUPS AND REPRESENTATIVES OF THE INDUSTRY, AS WELL
AS THE COMMISSION ITSELF, VIEWED THE CURRENT CIVIL PENALTY PROVISIONS OF THE
INTERSTATE COMMERCE ACT AS UNSATISFACTORY.
  THE ADMINISTRATION, THE COMMISSION, AND CONSUMER GROUPS ADVOCATED CHANGES
DESIGNED TO MAKE ENFORCEMENT MORE EFFECTIVE AND LESS CUMBERSOME, IN THEIR VIEW,
THE NEED FOR AN ENHANCED ENFORCEMENT SYSTEM WITH SOME FORCE BEHIND IT WAS
PERFECTLY CLEAR, GIVEN THE INCREASED VOLUME OF CONSUMER COMPLAINTS IN RECENT
YEARS.  A NUMBER OF CHANGES WAS SUGGESTED.  FOR EXAMPLE, IT WAS SUGGESTED THAT THE
COMMISSION BE GIVEN THE AUTHORITY TO ASSESS CIVIL PENALTIES ADMINISTRATIVELY.  A
PRIVATE RIGHT OF ACTION FOR CONSUMERS WAS ALSO ADVOCATED BY A NUMBER OF WITNESSES.
  FURTHER, IT WAS SUGGESTED THAT THE CIVIL PENALTY PROVISIONS BE BROADENED TO
INCLUDE VIOLATIONS OF ALL COMMISSION REGULATIONS. AND FINALLY, SEVERAL WITNESSES
PROPOSED AN INCREASE IN THE LEVEL OF THE CIVIL PENALTIES ON THE GROUNDS THAT THE
EXISTING LEVEL WAS INSUFFICIENT TO DETER CARRIERS FROM VIOLATING THE COMMISSION'S
REGULATIONS.
  **4285 OTHER WITNESSES, INCLUDING REPRESENTATIVES OF THE INDUSTRY, WERE ALSO
DISSATISFIED WITH THE COMMISSION'S ENFORCEMENT PROGRAM, BUT FOR DIFFERENT REASONS.
 FOR EXAMPLE, REPRESENTATIVES OF THE INDUSTRY TESTIFIED THAT THE COMMISSION HAD
BEEN OVERZEALOUS IN ITS USE OF THE CIVIL PENALTY PROVISION PROVIDED FOR IN SECTION
11901(G).  IN MANY INSTANCES, IT WAS CLEAR FROM THE RECORD THAT INDIVIDUAL
CARRIERS WERE BEING FINED FOR INSIGNIFICANT RECORDKEEPING VIOLATIONS THAT HAD NO
BEARING WHATSOEVER ON THE SATISFACTION OF THE SHIPPER WITH THE SHIPMENT.  HOWEVER,
IT SHOULD BE EMPHASIZED THAT THE COMMISSION'S AUTHORITY TO SEEK CIVIL PENALTIES
UNDER EXISTING LAW IS LIMITED TO REPORTING *15 AND RECORDKEEPING VIOLATIONS BY THE
PROVISIONS OF SECTION 11901(G).  THUS, IN ORDER TO ASSESS A PENALTY UNDER EXISTING
LAW, THE COMMISSION HAD TO SHOW THAT A REPORTING OR RECORDKEEPING VIOLATION HAD
OCCURRED.
  AFTER CAREFULLY REVIEWING THE NEED FOR CHANGE IN THE COMMISSION'S ENFORCEMENT
PROGRAM, THE COMMITTEE HAS PROPOSED A RESTRUCTURING OF THE PENALTY PROVISIONS
RELATING TO THE TRANSPORTATION OF HOUSEHOLD GOODS. IN MAKING THESE CHANGES, THE
COMMITTEE HAS THREE PRIMARY PURPOSES.  ONE PURPOSE IS TO PROVIDE THE COMMISSION
WITH AN IMPROVED SET OF ENFORCEMENT TOOLS.  THIS SHOULD MAKE FOR A MORE CREDIBLE
AND LESS BURDENSOME ENFORCEMENT PROGRAM.  A SECOND PURPOSE IS TO REDIRECT THE
COMMISSION'S ENFORCEMENT RESOURCES FROM THE PURELY TECHNICAL OF 'PAPERWORK'
VIOLATIONS TOWARDS A FOCUS ON THE WIDESPREAD VIOLATIONS WHICH CAUSE INJURY TO
CONSUMERS.  THE THIRD PURPOSE IS TO PLACE NEW EMPHASIS ON THE NEED FOR CARRIERS TO
MINIMIZE SHIPPER HARM AND TO ENCOURAGE COMPENSATION WHEN HARM DOES OCCUR.
  SECTION 8 AMENDS SECTION 11901 OF TITLE 49, U.S.C.  BY ADDING THREE NEW
SUBSECTIONS WHICH PROVIDE CIVIL PENALTIES FOR VIOLATIONS OF COMMISSION
REGULATIONS.  IT ALSO PROHIBITS THE COMMISSION FROM IMPOSING CIVIL PENALTIES UNDER
EXISTING SUBSECTION (G) OF SECTION 11901 OF THE INTERSTATE COMMERCE ACT, OR FROM
COLLECTING CIVIL PENALTIES ALREADY IMPOSED UNDER SUBSECTION (G) UNLESS IN

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 16 of 22

H.R. REP. 96-1372                                                    Page 15

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**

ACCORDANCE WITH THE STANDARDS SET OUT IN NEW SUBSECTION (H).
   NEW SECTION 11901(H) PROVIDES FOR CIVIL PENALTIES FOR RECORDKEEPING, REPORTING,
AND OPERATING RIGHTS VIOLATIONS.  THIS SECTION SIGNIFICANTLY CUTS BACK ON THE
COMMISSION'S CIVIL PENALTY AUTHORITY IN THE AREA OF RECORDKEEPING BY REQUIRING THE
GOVERNMENT TO SHOW HARM TO THE SHIPPER.
   THE TERM 'HARM' IS NOT DEFINED IN THE LEGISLATION.  NORMALLY A MONETARY LOSS
(OUT-OF-POCKET EXPENSES) WILL BE INCURRED BY THE SHIPPER AS A RESULT OF THE
CARRIER'S VIOLATION OF A COMMISSION REGULATION. HOWEVER, THERE MAY BE SOME
SITUATIONS WHERE THE SHIPPER DOES NOT INCUR ACTUAL OUT-OF-POCKET EXPENSES BUT
STILL SUFFERS HARM.  AN EXAMPLE OF SUCH HARM MAY BE TAKEN FROM THE COMMITTEE'S
HEARING RECORD WHERE A CONSUMER TESTIFIED THAT SHE HAD PACKED UP ALL OF HER GOODS;
TURNED OFF THE HEAT, LIGHT AND WATER, AGREED TO LET SOMEONE ELSE MOVE IN; AND
CONSEQUENTLY HAD TO STAY WITH FRIENDS.  BY STAYING WITH FRIENDS OR RELATIVES, A
SHIPPER MAY AVOID HOTEL AND MEAL EXPENSES, BUT THE FACT OF SHIPPER HARM IS CLEAR.
   THE COMMITTEE EXPECTS THE SHIPPER TO REGISTER THE FACT THAT THERE HAS BEEN HARM
BY NOTIFYING THE COMMISSION, THE CARRIER, OR SOME OTHER ORGANIZATION, SUCH AS THE
BETTER BUSINESS BUREAU.  THE COMMITTEE **4286 WANTS TO EMPHASIZE THAT THE
COMMISSION MUST SHOW ACTUAL HARM; IT CANNOT SIMPLY INFER THAT THERE HAS BEEN HARM
BECAUSE OF A VIOLATION OF A REGULATION DESIGNED TO PROTECT INDIVIDUAL SHIPPERS.
THE COMMITTEE ALSO NOTES THAT THE 'HARM' STANDARD IN THE HOUSE VERSION OF THE BILL
IS INTENDED TO BE THE SAME AS THE 'ACTUAL HARM' STANDARD IN THE SENATE VERSION OF
THE BILL.  THE WORD 'ACTUAL' WAS DELETED BY THE COMMITTEE BECAUSE IT WAS
CONSIDERED SURPLUSAGE.
   UNDER NEW SECTION 11901(H), ANY PERSON MAY BE ASSESSED A CIVIL PENALTY OF UP TO
$500 FOR EACH VIOLATION AND OF UP TO $250 FOR EACH ADDITIONAL DAY DURING WHICH THE
VIOLATION CONTINUES.  IN DETERMINING THE ACTUAL LEVEL OF PENALTIES TO BE IMPOSED,
THE COMMISSION OR THE COURT IS TO CONSIDER SEVERAL FACTORS, SUCH AS THE DEGREE OF
CULPABILITY *16 OF THE CARRIER, ANY HISTORY OF PRIOR SUCH CONDUCT, THE DEGREE OF
HARM TO THE SHIPPER, ABILITY TO PAY, THE EFFECT ON ABILITY TO DO BUSINESS, WHETHER
THE SHIPPER HAS BEEN COMPENSATED AND ANY OTHER MATTERS REQUIRED BY FAIRNESS.
THESE CONSIDERATIONS ARE NOT INTENDED TO FAVOR EITHER CARRIERS OR THE COMMISSION.
RATHER, IN THE ASSESSMENT OF PENALTIES, THE COMMITTEE EXPECTS THAT CARRIERS WHO
HAVE CONSISTENTLY VIOLATED COMMISSION RULES OR CAUSED SERIOUS HARM TO SHIPPERS AS
A RESULT OF SUCH VIOLATIONS CAN EXPECT TO RECEIVE HARSHER PENALTIES UNDER THIS
SECTION.
   NEW SECTION 11901(I) EXPANDS THE AUTHORITY OF THE COMMISSION TO IMPOSE CIVIL
PENALTIES ON CARRIERS.  UNDER NEW SECTION 11901(I), THE COMMISSION WILL BE ABLE TO
IMPOSE CIVIL PENALTIES FOR VIOLATIONS OF REGULATIONS PROTECTING INDIVIDUAL
SHIPPERS.  IN ADDITION, THE COMMISSION WILL BE ABLE, IN CERTAIN SITUATIONS, TO
ASSESS CIVIL PENALTIES ADMINISTRATIVELY.
   NEW SECTION 11901(I)(1) SUBJECTS HOUSEHOLD GOODS CARRIERS TO CIVIL PENALTIES OF
UP TO $1,000 FOR EACH VIOLATION OF A REGULATION RELATING TO THE PROTECTION OF
INDIVIDUAL SHIPPERS.  AN ENFORCEMENT ACTION COULD BE BROUGHT UNDER THIS SUBSECTION
REGARDLESS OF THE NUMBER OF ALLEGED VIOLATIONS.
   NEW SUBSECTION 11901(I)(2) AUTHORIZES THE COMMISSION IN CERTAIN CASES TO ELECT
TO ASSESS CIVIL PENALTIES THROUGH AN ADMINISTRATIVE PROCEEDING.  IN ORDER TO
PROCEED ADMINISTRATIVELY, THE COMMISSION MUST MAKE A DETERMINATION THAT THE

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                                    Page 16

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


CARRIER HAS VIOLATED A REGULATION RELATED TO THE PROTECTION OF INDIVIDUAL SHIPPERS
IN EXCESS OF THE PERFORMANCE STANDARDS ESTABLISHED IN SUCH REGULATION.  THE
PURPOSE OF GIVING THIS ADMINISTRATIVE REMEDY TO THE COMMISSION IS TO ASSURE SWIFT,
CERTAIN ENFORCEMENT ACTION WHERE A CARRIER CONSISTENTLY VIOLATES THE COMMISSION'S
REGULATIONS.  AT THE SAME TIME, IT ENSURES THAT THE COMMISSION WILL CONCENTRATE
ITS EFFORTS ON THE FLAGRANT OFFENDERS. THOSE CASES INVOLVING A NUMBER OF
VIOLATIONS WHICH ARE NOT IN EXCESS OF THE PERFORMANCE STANDARDS WILL REMAIN IN THE
HANDS OF THE ATTORNEY GENERAL UNDER NEW SECTION 11901(I)(1).
   ALSO, SHOULD THE COMMISSION ELECT NOT TO PROCEED ADMINISTRATIVELY IN THOSE CASES
WHERE IT IS PERMITTED, IT CAN SEEK ENFORCEMENT THROUGH THE ATTORNEY GENERAL.
NORMALLY, THE COMMISSION AND THE CARRIER WILL BE INVOLVED IN AN EFFORT TO SETTLE
THE CIVIL FORFEITURE CLAIMS PENDING AGAINST THE CARRIER. WHERE THE COMMISSION AND
THE CARRIER ARE UNABLE TO SETTLE THOSE CLAIMS, THE COMMISSION MUST DECIDE WHETHER
TO PROCEED ADMINISTRATIVELY UNDER (I)(2) OR REFER THE MATTER TO THE U.S. ATTORNEY
UNDER (I)(1).  THE COMMISSION IS EXPECTED TO NOTIFY THE CARRIER ACCORDINGLY.  THIS
ELECTION WILL BE BINDING **4287 AND WILL PRECLUDE THE COMMISSION FROM ASSESSING
DUPLICATE PENALTIES FOR THE SAME VIOLATION.
   SECTION 11901(I)(2)(C) PROVIDES FOR APPELLATE REVIEW OF COMMISSION ORDERS
ASSESSING CIVIL PENALTIES IN THE U.S. COURT OF APPEALS.  THE COMMITTEE INTENDS
THAT ENFORCEMENT OF THESE ORDERS BE IN THE U.S. DISTRICT COURT.
   SECTION 11901(I)(4)(A) PROVIDES THAT NO CIVIL PENALTY MAY BE IMPOSED FOR
VIOLATIONS OF REGULATIONS PROTECTING INDIVIDUAL SHIPPERS UNLESS THE SHIPPER HAS
SUFFERED HARM AS A RESULT OF THE VIOLATION.  THE TERM 'HARM' IS USED HERE IN THE
SAME SENSE THAT IT IS USED IN NEW SECTION 11901(H).
   SECTION 11901(I)(3) AND SECTION 11901(I)(4)(B) ARE INTENDED TO ENCOURAGE
CARRIERS TO COMPENSATE SHIPPERS FOR THE HARM THAT THEY *17 HAVE SUFFERED.  THIS IS
ACCOMPLISHED IN TWO WAYS.  FIRST, SECTION 11901(I)(4)(B) PROVIDES THAT NO PENALTY
CAN BE ASSESSED IF THE CARRIER ADEQUATELY COMPENSATES, OR OFFERS ADEQUATE
COMPENSATION TO, THE SHIPPER PRIOR TO THE TIME THAT THE CARRIER IS NOTIFIED OF THE
VIOLATION BY THE COMMISSION.  FURTHERMORE, NO PENALTY CAN BE ASSESSED IF THE
CARRIER ADEQUATELY COMPENSATES, OR OFFERS ADEQUATE COMPENSATION TO, THE SHIPPER
PRIOR TO THE HEARING OR TRAIL IN THE CASE WHERE THE CARRIER DID NOT KNOW OF THE
HARM TO THE SHIPPER PRIOR TO BEING NOTIFIED OF THE VIOLATION BY THE COMMISSION.
SECOND, SECTION 11901(I)(3) PROVIDES FOR A REDUCTION IN THE MAXIMUM PENALTY THAT
CAN BE ASSESSED IF THE CARRIER ADEQUATELY COMPENSATES, OR OFFERS ADEQUATE
COMPENSATION TO, THE SHIPPER AFTER RECEIVING NOTICE OF THE VIOLATION BUT BEFORE
THE HEARING OR TRAIL.  THE MAXIMUM PENALTY WOULD BE REDUCED FROM $1,000 PER
VIOLATION TO $500 PER VIOLATION AND FROM $500 TO $250 A DAY FOR EACH DAY THE
VIOLATION CONTINUES. NORMALLY, ADEQUATE COMPENSATION IS REIMBURSEMENT BY THE
CARRIER TO THE PERSON SUFFERING HARM FOR OUT-OF-POCKET EXPENDITURES WHICH ARISE AS
A RESULT OF THE CARRIER'S VIOLATION OF A RULE OR REGULATION RELATING TO THE
PROTECTION OF INDIVIDUAL SHIPPERS.
   FOR PURPOSES OF THIS SECTION, THE COMMISSION MAY BE GUIDED IN ITS DETERMINATION
ON ADEQUATE COMPENSATION BY WHETHER THE SHIPPER HAS ACCEPTED THE CARRIER'S OFFER
OF COMPENSATION.  ASSUMING THAT THE SAME BASIC FACTS GIVE RISE TO THE OFFER OF
COMPENSATION AND THE COMMISSION'S ENFORCEMENT ACTION, AN ACCEPTANCE OF AN OFFER
NORMALLY WOULD INDICATE THAT THE SHIPPER HAS BEEN ADEQUATELY COMPENSATED.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                    Page 17

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


SIMILARLY, THE COMMISSION MAY FIND SOME GUIDANCE WHERE A SHIPPER HAS DECLINED AN
OFFER, BUT A COURT OR DISPUTE SETTLER LATER AWARDS APPROXIMATELY THE SAME AMOUNT
TO THE SHIPPER.  AGAIN, ASSUMING THE SAME BASIC FACTS GIVE RISE TO THE AWARD AND
THE COMMISSION'S ENFORCEMENT ACTION, THAT AWARD NORMALLY WOULD INDICATE THAT A
CARRIER HAS OFFERED ADEQUATE COMPENSATION.  THERE MAY BE OTHER CASES WHICH ARE
LESS CLEAR THAN THE TWO CITED ABOVE.  THE COMMISSION WILL HAVE TO EXERCISE ITS
JUDGMENT CAREFULLY IN THOSE CASES.
   THE COMMITTEE INCLUDED THE LANGUAGE 'OR OFFERS ADEQUATE COMPENSATION' IN THIS
SECTION, SO THAT A CARRIER THAT MAKES A GOOD FAITH OFFER OF COMPENSATION WOULD NOT
BE DENIED THE OPPORTUNITY TO AVOID OR REDUCE THE LEVEL OF PENALTIES.
   WHILE THE COMMISSION WILL HAVE TO MAKE A FINDING ON THE QUESTION OF ADEQUATE
COMPENSATION, THIS PROVISION IS NOT INTENDED TO GET THE COMMISSION INTO THE
BUSINESS OF SETTLING LOSS AND DAMAGE **4288 CLAIMS.  THE COMMISSION'S LACK OF
JURISDICTION IN THIS AREA REMAINS UNCHANGED.
   IN DETERMINING THE ACTUAL LEVEL OF PENALTIES TO BE IMPOSED UNDER SECTION 11901(I)
, THE COMMISSION OR THE COURT IS TO CONSIDER SEVERAL FACTORS, INCLUDING THE DEGREE
OF CULPABILITY OF THE CARRIER, HISTORY OF PRIOR SUCH CONDUCT, AND ANY OTHER
MATTERS REQUIRED BY FAIRNESS.  THE CONSIDERATIONS ARE NOT INTENDED TO FAVOR EITHER
CARRIERS OR THE COMMISSION.  RATHER, IN ASSESSMENT OF PENALTIES, THE COMMITTEE
EXPECTS THAT CARRIERS WHO HAVE CONSISTENTLY VIOLATED COMMISSION RULES OR CAUSED
HARM TO SHIPPERS CAN EXPECT TO RECEIVE HARSHER PENALTIES UNDER THIS SECTION.  IN
EVALUATING THE 'DEGREE OF CULPABILITY' FACTOR, THE COMMISSION SHALL TAKE INTO
ACCOUNT, AMONG OTHER THINGS, THE CARRIER'S EFFORTS TO COMPLY WITH PERFORMANCE
STANDARDS.
   AS PREVIOUSLY MENTIONED, SECTION 11901(I) ESTABLISHES CIVIL PENALTIES FOR EACH
DAY A VIOLATION CONTINUES.  WHERE A VIOLATION IS OF A *18 CONTINUING NATURE, THE
COMMITTEE EXPECTS THE COMMISSION TO ADVISE THE CARRIER OF THAT FACT IN THE
'DEMAND' LETTER IT SENDS THE CARRIER NOTIFYING THE CARRIER OF CLAIMS BEING MADE
AGAINST IT.
   THE COMMITTEE DOES NOT EXPECT THE COMMISSION OR THE COURT, IN ASSESSING
PENALTIES FOR VIOLATIONS OF THE COMMISSION'S REGULATIONS ON TIMELY PICKUP AND
DELIVERY OF SHIPMENTS, TO ASSESS SEPARATE PENALTIES FOR EACH DAY THE CARRIER DOES
NOT MEET THE AGREED UPON PICKUP AND DELIVERY DATES.  THE COMMITTEE VIEWS SUCH A
VIOLATION AS A SINGLE VIOLATION OF THE COMMISSION'S REGULATIONS AND NOT ONE OF A
CONTINUING NATURE.  FURTHER, THE COMMITTEE BELIEVES THAT THE FACT THAT THE CARRIER
IS SUBJECT TO A POSSIBLE $1,000 PENALTY FOR SUCH A VIOLATION WILL DETER THE
CARRIER, WHOSE AVERAGE REVENUE PER SHIPMENT IS ONLY $1,200.  IN ADDITION, THE
COMMITTEE RECOGNIZES THAT THE CARRIER ALSO WILL BE LIABLE TO THE SHIPPER FOR ANY
HARM RESULTING FROM ITS FAILURE TO PROVIDE TIMELY SERVICE. THE 'HARM' STANDARD AND
THE STANDARD OF ADEQUATE COMPENSATION ARE STANDARDS FOR IMPLEMENTATION OF SECTIONS
11901(H) AND (I) AND DO NOT ALTER, CHANGE, OR MODIFY APPLICABLE STATE LAW.  IN
DETERMINING THE ACTUAL LEVEL OF PENALTIES TO BE IMPOSED FOR UNTIMELY PICKUP OR
DELIVERY, THE COMMISSION OR COURT SHOULD TAKE INTO ACCOUNT THE NUMBER OF DAYS THE
CARRIER WAS EARLY OR LATE.
   NEW SECTION 11901(J) ESTABLISHES CIVIL PENALTIES FOR WEIGHT BUMPING.
SPECIFICALLY, IT PROVIDES THAT ANYONE WHO KNOWINGLY ENGAGES IN OR KNOWINGLY
AUTHORIZES AN GENT OR OTHER PERSON TO FALSIFY DOCUMENTS OR CHARGE FOR SERVICES NOT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


PERFORMED SHALL BE LIABLE FOR A CIVIL PENALTY NOT TO EXCEED $2,000 FOR EACH
VIOLATION AND $5,000 FOR EACH SUBSEQUENT VIOLATION.  THE TERM 'DELIBERATE' WAS
ELIMINATED BECAUSE IT COULD BE INTERPRETED AS REQUIRING A SHOWING OF CRIMINAL
INTENT.  THE PARAGRAPH ON CARRIER REFUSAL TO ALLOW A SHIPPER TO OBSERVE A REWEIGH
WAS ELIMINATED, BECAUSE SUCH AN ACT WOULD BE SUBJECT TO THE PENALTIES OF NEW
SECTION 11901(I).

                      SECTION 9.  WEIGHT BUMPING

  SECTION 9 AMENDS CHAPTER 119 OF TITLE 49 OF THE U.S.C. BY ADDING A NEW SECTION
11917 TO MAKE WEIGHT BUMPING FOR HOUSEHOLD GOODS TRANSPORTATION A SPECIFIC CRIME.
THE PENALTY FOR WEIGHT BUMPING WOULD BE A FINE OF NOT LESS THAN $1,000 NOR MORE
**4289 THAN $10,000 FOR EACH OFFENSE, IMPRISONMENT OF NOT MORE THAN TWO YEARS, OR
BOTH.  WEIGHT BUMPING IS THE WILLFUL AND KNOWING MAKING OR SECURING OF A
FRAUDULENT WEIGHT ON A SHIPMENT OF HOUSEHOLD GOODS.

                    SECTION 10.  GOVERNMENT TRAFFIC

  SUBSECTION (A) AMENDS SECTION 10922(B) OF TITLE 49 OF THE U.S.C. BY ADDING A NEW
PARAGRAPH (9).  NEW PARAGRAPH (9) ELIMINATES THE PUBLIC CONVENIENCE AND NECESSITY
TEST FOR APPLICANTS SEEKING AUTHORITY TO PROVIDE TRANSPORTATION FOR THE UNITED
STATES GOVERNMENT OF USED HOUSEHOLD GOODS, WHICH TRANSPORTATION IS INCIDENTAL TO A
PACK-AND-CRATE SERVICE ON BEHALF OF THE DEPARTMENT OF DEFENSE. HENCE, THIS TYPE OF
APPLICANT WOULD ONLY HAVE TO SHOW THAT IT IS FIT TO PROVIDE THE PROPOSED
TRANSPORTATION SERVICE.  GENERALLY, PACK-AND-CRATE OPERATIONS ARE THOSE THAT
PERFORM CONTAINERIZATION, DECONTAINERIZATION, AND LOCAL TRANSPORTATION SERVICES
FOR *19 FREIGHT FORWARDERS AND THE DEPARTMENT OF DEFENSE ON SHIPMENTS BEING
TRANSPORTED BEYOND THE LOCAL AREA BY A LINE-HAUL RAIL OR MOTOR CARRIER.  THIS
SECTION IS CONSISTENT WITH THE ACTION TAKEN BY THE INTERSTATE COMMERCE COMMISSION
IN EX PARTE NO. MC-115, TRANSPORTATION OF USED HOUSEHOLD GOODS IN CONNECTION WITH
A PACK-AND-CRATE OPERATION ON BEHALF OF THE DEPARTMENT OF DEFENSE, AND IT IS
APPLICABLE ONLY TO THOSE APPLICANTS SEEKING TO PERFORM THE PERTINENT OPERATIONS ON
BEHALF OF THE DEPARTMENT OF DEFENSE.
  SUBSECTION (B) AMENDS SECTION 10721 OF TITLE 49 TO PROHIBIT PREDATORY PRICING IN
THE TRANSPORTATION OF HOUSEHOLD GOODS FOR THE UNITED STATES GOVERNMENT.  IT ALSO
MAKES CLEAR THE COMMISSION'S AUTHORITY TO SUSPEND AND INVESTIGATE PROPOSED RATES
ON SUCH TRAFFIC ON THE BASIS THAT THEY CONSTITUTE PREDATORY PRACTICES IN
CONTRAVENTION OF THE NATIONAL TRANSPORTATION POLICY.
  UNDER THE CURRENT STATUTE, CARRIERS ARE PERMITTED TO TRANSPORT PROPERTY FOR THE
GOVERNMENT WITHOUT CHARGE OR AT REDUCED RATES.  IT HAS BEEN BROUGHT TO THE
COMMITTEE'S ATTENTION THAT THERE HAVE BEEN ALLEGATIONS OF PREDATORY PRICING IN THE
HOUSEHOLD GOODS MOVING INDUSTRY UNDER THIS PROVISION.  THE COMMISSION HAS BEEN
UNABLE TO INVESTIGATE THESE ALLEGATIONS BECAUSE THE STATUTE HAS BEEN INTERPRETED
AS LIMITING THE COMMISSION'S AUTHORITY TO INVESTIGATE AND SUSPEND RATES ON THE
BASIS THAT THEY ARE UNLAWFUL.  THIS SECTION WILL CORRECT THAT SITUATION, BECAUSE
IT WILL ENABLE THE COMMISSION TO DEAL WITH PREDATORY RATES IN THIS AREA.  THE
COMMITTEE INTENDS THAT THIS PROVISION SHALL NOT AUTHORIZE THE COMMISSION TO REVIEW

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


RATES FOR GOVERNMENT TRAFFIC ON ANY OTHER BASIS.
    IN ORDER TO AVOID POSSIBLE HARASSMENT OF SMALL CARRIERS, THE COMMITTEE LIMITED
THE COMMISSION'S SUSPENSION AUTHORITY TO INSTANCES WHERE IT IS ESTABLISHED FROM A
VERIFIED COMPLAINT THAT, WITHOUT SUSPENSION, THE PROPOSED RATE WILL CAUSE
SUBSTANTIAL INJURY TO THE COMPLAINANT AND THAT THE COMPLAINANT IS LIKELY TO
PREVAIL ON THE MERITS.  THE COMPLAINANT HAS THE BURDEN OF PROOF ON THESE TWO
POINTS. ONCE THE COMMISSION SUSPENDS THE PROPOSED RATE, THE BURDEN IS ON THE
PROPONENT OF THE RATE TO PROVE ITS LAWFULNESS.

                    **4290 SECTION 11.   TECHNICAL AMENDMENTS

    SECTION 11 AMENDS SECTION 10526(A) OF TITLE 49, U.S.C.  TO REDESIGNATE THE LAST
THREE PARAGRAPHS OF SUCH SECTION WHICH WERE DESIGNATED INCORRECTLY IN THE MOTOR
CARRIER ACT OF 1980 AND AMENDS SECTION 10528 OF SUCH TITLE TO CORRECT A
CROSS-REFERENCE TO SUCH PARAGRAPHS ACCORDINGLY.

                        COST OF THE LEGISLATION

    IN ACCORDANCE WITH RULE XIII(7) OF THE RULES OF THE HOUSE OF REPRESENTATIVES,
THE FOLLOWING INFORMATION IS FURNISHED:  THERE IS NOT SIGNIFICANT ADDITIONAL COST
TO THE FEDERAL GOVERNMENT.

                        COMMITTEE ACTION AND VOTE

    PURSUANT TO RULE XI, CLAUSE 2(L)(2)(B), THE MAJORITY OF THE COMMITTEE HAVING
BEEN PRESENT, THE BILL WAS REPORTED BY A VOICE VOTE.

        *20 COMPLIANCE WITH CLAUSE 2(L)(3)(A) OF RULE XI OF THE RULES OF THE HOUSE
                           OF REPRESENTATIVES

    (1) WITH REFERENCE TO CLAUSE 2(L)(3)(A) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, NO SEPARATE HEARINGS WERE HELD ON THE SUBJECT MATTER OF THIS
LEGISLATION BY THE SUBCOMMITTEE ON OVERSIGHT AND REVIEW.  THE SUBCOMMITTEE ON
SURFACE TRANSPORTATION HELD HEARINGS ON THIS SUBJECT MATTER IN 1979 AND 1980.
    (2) CLAUSE 2(L)(3)(B) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES,
REQUIRES THAT THE REPORT OF ANY COMMITTEE ON A MEASURE SHALL INCLUDE A STATEMENT
REQUIRED BY SECTION 308(A) OF THE CONGRESSIONAL BUDGET ACT OF 1974, IF THE MEASURE
PROVIDES NEW BUDGET AUTHORITY OR NEW OR INCREASED TAX EXPENDITURES.
    WITH RESPECT TO SECTION 308(A)(1)(B), BUDGET OUTLAYS ASSOCIATED WITH THE BUDGET
AUTHORITY PROVIDED IN THE BILL ARE ESTIMATED TO BE THOSE WHICH APPEAR IN THE
REPORT OF THE CONGRESSIONAL BUDGET OFFICE.
    (3) WITH RESPECT TO CLAUSE 2(L)(3)(D) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, THE COMMITTEE HAS NOT RECEIVED A REPORT FROM THE COMMITTEE ON
GOVERNMENT OPERATIONS PERTAINING TO THIS SUBJECT MATTER.
    (4) WITH RESPECT TO CLAUSE 2(L)(4) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, THE FOLLOWING INFORMATION IS PROVIDED.
    THE EFFECTS OF CARRYING OUT S. 1798 SHOULD BE MINIMAL WITH RESPECT TO COSTS AND

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372                                                          Page 20

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


PRICES.
  (5) WITH RESPECT TO CLAUSE 2(L)(3)(C) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, THE COMMITTEE HAS RECEIVED A REPORT PREPARED **4291 BY THE
CONGRESSIONAL BUDGET OFFICE UNDER SECTION 403 OF THE CONGRESSIONAL BUDGET ACT. THE
REPORT IS AS FOLLOWS:
  U.S. CONGRESS,
  CONGRESSIONAL BUDGET OFFICE,
  WASHINGTON, D.C., SEPTEMBER 19, 1980.
  HON. HAROLD T. JOHNSON,
  CHAIRMAN, COMMITTEE ON PUBLIC WORKS AND TRANSPORTATION, U.S. HOUSE OF
REPRESENTATIVES, RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C.
  DEAR MR. CHAIRMAN:  PURSUANT TO SECTION 403 OF THE CONGRESSIONAL BUDGET ACT OF
1974, THE CONGRESSIONAL BUDGET OFFICE HAS REVIEWED S. 1798, THE HOUSEHOLD GOODS
TRANSPORTATION ACT OF 1980, AS ORDERED REPORTED BY THE HOUSE COMMITTEE ON PUBLIC
WORKS AND TRANSPORTATION, SEPTEMBER 16, 1980.  BASED ON THIS REVIEW, IT APPEARS
THAT THERE WILL BE NO SIGNIFICANT ADDITIONAL COST TO THE FEDERAL GOVERNMENT AS A
RESULT OF ENACTMENT OF THIS BILL.
  THE BILL IS DESIGNED TO REDUCE INTERSTATE COMMERCE COMMISSION (ICC) REGULATION
OF THE HOUSEHOLD GOODS MOVING INDUSTRY.  IT STREAMLINES CERTAIN ICC PROCEDURES TO
ALLOW EXPEDITIOUS SETTLEMENT OF CLAIMS AND DISPUTES.  S. 1798 ALLOWS CARRIERS OF
HOUSEHOLD GOODS GREATER FLEXIBILITY IN SERVING THE NEEDS OF THEIR SHIPPERS, WHILE
STRENGTHENING REMEDIES FOR VIOLATIONS OF THOSE REGULATIONS THAT ARE NECESSARY FOR
PROTECTION OF INDIVIDUAL SHIPPERS. SECTION 9 OF THE BILL AMENDS THE CRIMINAL CODE
TO MAKE WEIGHT BUMPING (WHICH IS THE ACT OF INTENTIONALLY FALSIFYING WEIGHT
TICKETS) A SPECIFIC CRIME WITH ATTENDANT PENALTIES. IN ADDITION, THE BILL ALLOWS
FOR CONGRESSIONAL REVIEW OF SOME PROPOSED ICC RULES PERTAINING TO MOTOR CARRIERS
*21 TRANSPORTING HOUSEHOLD GOODS, AND SPECIFIES PROCEDURES FOR A LEGISLATIVE VETO
THROUGH A CONCURRENT RESOLUTION OF BOTH HOUSES OF THE CONGRESS.  THE COSTS OF THIS
PROCESS ARE HIGHLY DEPENDENT ON THE NUMBER OF RULES REVIEWED BY THE RELEVANT
COMMITTEES AND THE EXTENSIVENESS OF SUCH REVIEW; HOWEVER, THE COSTS ASSOCIATED
WITH THIS PROVISION ARE NOT EXPECTED TO BE SIGNIFICANT.
  SHOULD THE COMMITTEE SO DESIRE, WE WOULD BE PLEASED TO PROVIDE FURTHER DETAILS
ON THIS ESTIMATE.
  SINCERELY,
  ALICE M. RIVLIN, DIRECTOR.
  NOTE.-- THE CONGRESSIONAL BUDGET OFFICE LETTER OF SEPTEMBER 19, 1980, REFERS TO
A LEGISLATIVE VETO OF COMMISSION REGULATIONS; HOWEVER, ON TUESDAY, SEPTEMBER 23,
1980, THE COMMITTEE ON PUBLIC WORKS AND TRANSPORTATION RECONSIDERED THE BILL AND
THE AMENDMENT CONTAINING THE LEGISLATIVE VETO AND VOTED TO DELETE THE AMENDMENT.

                        *         *         *         *


(Note:  1.  PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE
DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS,
ARE OMITTED.  OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS:  *****.
          2.  TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 96-1372

H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

**(Cite as: H.R. REP. 96-1372,  1980 U.S.C.C.A.N. 4271)**


USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

 H.R. REP. 96-1372, H.R. Rep. No. 1372, 96TH Cong., 2ND Sess. 1980, 1980
U.S.C.C.A.N. 4271, 1980 WL 12988 (Leg.Hist.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ENTERED

DEC 1 4 2004

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

OWNER-OPERATORS INDEPENDENT     )
DRIVERS ASSOCIATION, INC., et. al.,     )
                                        )
          Plaintiffs,                   )     CAUSE NO. IP–457-C B/S
                                        )     CAUSE NO. IP 98-458-C B/S
          vs.                           )
                                        )
MAYFLOWER TRANSIT, INC.,                )
                                        )
          Defendant.

## ENTRY REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT

These cases are before the Court on Plaintiffs' Motion for Partial Summary

Judgment on Statute of Limitations and Retroactivity and Defendant's Motion for Partial

Summary Judgment on Time Limitations Issues. The motions are fully briefed, and the

Court, being duly advised, rules as follows.



EXHIBIT

B

## BACKGROUND

Defendant Mayflower Transit, Inc. ("Mayflower") is engaged in the business of

transporting household goods nationwide via tractor-trailers owned and operated by

"owner-operators" nationwide. Mayflower generally operates through a network of

nationwide agents; its agents lease equipment (tractors and/or trailers) and services

from individual agent van operators who own and operate their own equipment.

Mayflower also operates through "contract truck men," with whom it deals directly.

Mayflower is an authorized carrier under federal law, *see* 49 C.F.R. § 376.2(a), and as

such its lease agreements are subject to federal regulation under the Truth-in-Leasing

regulations found at 49 C.F.R. Part 376 ("Leasing Regulations").

The plaintiffs in each of these cases consist of a class[1] of owner-operators who entered into lease agreements with Mayflower or its agents to haul goods. The plaintiffs allege generally that Mayflower violated the Leasing Regulations and breached the leases by failing to return general escrow funds and fuel tax credits to the owner-operators and by overcharging or improperly charging the owner-operators for insurance coverage. The plaintiffs assert claims pursuant to the Interstate Commerce Commission Termination Act ("ICCTA") as well as state law breach of contract and conversion[2] claims.

## DISCUSSION

In the instant motions, the parties seek a determination of the limitations period applicable to each of the plaintiffs' claims. Specifically, the parties disagree on what statute of limitations period applies to the plaintiffs' federal claims, and they also disagree whether the ICCTA is applicable to any contracts executed or conduct occurring before its effective date of January 1, 1996. The parties further disagree as to the applicable limitations periods for the plaintiffs' breach of contract and conversion claims under state law. Each of these issues is addressed in turn below.

---

[1]A class has been certified in each case, with class membership conditioned on compliance with the applicable statutes of limitations.

[2]The conversion claim is asserted only in Case No. 0457.

2

A. <u>Limitations Period for Federal Claims</u>

The authority for the plaintiffs' federal claims for damages is found in 49 U.S.C. § 14704(a)(2), which provides:

> (2) Damages for violations.  A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part.

The plain language of the statute contains no express statute of limitations applicable to an action brought under § 14704(a)(2).  Therefore, the plaintiffs argue, 28 U.S.C. § 1658(a)[3] provides for a four-year statute of limitations for their claims under § 14704(a)(2).  However, it is Mayflower's position that Congress intended the limitations period found in 49 U.S.C. § 14705(c) to apply to such claims.[4]  Section 14705(c) provides: "A person must file a complaint with the Board or Secretary,[5] as

---

[3]28 U.S.C. § 1658(a)  provides: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [December 1, 1990] may not be commenced later than 4 years after the cause of action accrues."  The ICCTA was enacted in 1995.

[4]Mayflower suggests in its opening brief that the limitations periods contained in many of the contracts at issue should be applied to the plaintiffs' federal claims, but appears to abandon this argument in its response brief.  The Court notes that the plain language of the contractual provisions–at least those illustrative provisions provided by the parties in support of the instant motions–is narrow and does not apply to a claim for violation of the Leasing Regulations, but rather applies only to claims "to contest the status of his account."  *See* discussion in Part C below.  Thus, absent a showing that other contracts contain broader language, the Court need not determine whether an appropriately worded contractual provision could limit the time within which federal claims such as the plaintiffs' assert may be brought.

[5]The plain language of this statute obviously refers to complaints before "the Board or Secretary," not civil actions.  The same is true of the parallel provisions of the

3

applicable, to recover damages under section 14704(b) within 2 years after the claim

accrues." Obviously, § 14705(c) on its face applies to § 14704(b), not § 14704(a)(2).

However, Mayflower argues that this is a scrivener's error, and that Congress intended

for § 14705(c) to refer to § 14704(a)(2).

As the Seventh Circuit recently noted,

> Black's Law Dictionary defines "scrivener's error" as a synonym for
> "clerical error."   A "clerical error" is one "resulting from a minor mistake or
> inadvertence, esp. in writing or copying something on the record, and not
> from judicial reasoning or determination."  Examples of clerical, or
> "scrivener's," errors include "omitting an appendix from a document;
> typing an incorrect number; mistranscribing a word; and failing to log a
> call."

*U.S. v. Gibson,* 356 F.3d 761, 766 n.3 (7th Cir. 2004).  As Justice Stevens very recently

recognized, "a busy Congress is fully capable of enacting a scrivener's error into law,"

*Koons Buick Pontiac GMC, Inc. v. Nigh*, 125 S.Ct. 460, 470 (2004) (Stevens, J.,

concurring), and courts may recognize and correct such errors when they occur.  *See,*

*e.g.,United States v. Bhutani*, 266 F.3d 661, 665-668 (7th Cir. 2001) (recognizing

typographical error in statute and applying criminal penalties despite the error); *In re*

---

ICCTA that apply to other types of carriers.  *See* 49 U.S.C. § 11704(b) (rail carriers); 49
U.S.C. § 15904(b)(2) (pipeline carriers).  However, a long and consistent line of cases
has held that this same language in previous versions of the statutes applies equally to
civil actions.  *See, e.g., Atchison, Topeka & Santa Fe Railway Co. v. Blanchette*, 628
F.2d 1011, 1013 n.2 (7th Cir. 1980) (citing *A.J. Phillips Co. v. Grand Trunk Western
Railway Co.*, 236 U.S. 662, 667 (1915) and *Kansas City Southern Railway v. Wolf*, 261
U.S. 133, 139 (1923)); *Fitzpatrick v. Morgan Southern, Inc.*, 261 F.Supp.2d 978, 984
n.5 (W.D. Tenn. 2003); *Engelhard Corp. v. Springfield Term. Ry. Co.*, 193 F. Supp.2d
385, 390 (D. Mass. 2002) (citing *Aluminum Ass'n, Inc. v. Atchison, Topeka & Santa Fe
Railway Co.*, 746 F. Supp. 207, 213 n.18 (D.D.C. 1990)).

*Chateaugay Corp.*, 89 F.3d 942, 954 (2nd Cir. 1996) (recognizing scrivener's error in statute).

Mayflower argues that a scrivener's error occurred here when a change was made to the statute at the last minute:

> [T]he provision purportedly authorizing plaintiffs' damages action under the ICCTA was originally included in subsection (b) of § 14704. When this provision was later moved to subsection (a) of § 14704 immediately before final enactment, the legislative scriveners inadvertently failed to make the corresponding technical change in the limitations provision, § 14705(c), to make it clear that the two-year statute of limitations period established for such damages suits applies to newly-relocated subsection (a) actions.

Mayflower's Brief at 10. Mayflower cites to *Fitzpatrick v. Morgan Southern, Inc.*, 261 F.Supp.2d 978, 982 (W.D. Tenn. 2003), in support of its argument. The court in *Fitzpatrick*, after a thorough analysis of the structure and history of the ICCTA, held that the failure of § 14705(c) to refer to § 14704(a)(2) was a scrivener's error. However, other courts that have examined the issue have come to the opposite conclusion. *See Owner-Operator Independent Drivers Ass'n v. C.R. England, Inc.*, 325 F. Supp.2d 1252, 1255-56 (D. Utah 2004) (declining to follow *Fitzpatrick,* instead applying four-year statute of limitations of 28 U.S.C. § 1658 and citing three unpublished decisions that did the same). Therefore, there is no definitive position taken by other courts.

"It is well established that when the statute's language is plain, the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 124 S. Ct. 1023, 1030 (2004)

(citations omitted).  Section 14705(c) appears at first blush to be unambiguous, and the mere absence of an express limitations period for claims brought pursuant to § 14704(a)(2) is not an "absurd result" that would compel–or even allow–us to look beyond the plain language of the statute, as it is not uncommon for federal statutes to lack a limitations period.  *See Jones v. R.R. Donnelley & Sons Co.*, 124 S. Ct. 1836, 1839 (2004) (noting that "many" federal statutes do not contain a statute of limitations).  However, "[s]tatutory construction is a holistic endeavor," *Nigh*, 125 S.Ct. at 466 (citations omitted), and "[i]n ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991).  In this case, when viewed as a whole, applying the plain meaning of § 14705(c) would lead to an absurd result, inasmuch as § 14705(c) purports to apply to complaints "to recover damages under section 14704(b)" when, in fact, § 14704(b) as written does not provide for the recovery of damages, but rather for overcharges:

> (b) Liability and damages for exceeding tariff rate.  A carrier providing transportation or service subject to jurisdiction under chapter 135 is liable to a person *for amounts charged that exceed the applicable rate for transportation or service contained in a tariff* in effect under section 13702.

49 U.S.C. § 14704(b) (emphasis added).[6]  Further, 49 U.S.C. § 14705(b) expressly provides for an 18-month limitations period for civil actions to recover overcharges.

---

[6]The distinction between overcharges and damages in this context has long been recognized.  *See, e.g., Davis v. Portland Seed Co.*, 264 U.S. 403, 420 (1924); *Chesapeake & Ohio Railway Co. v. U.S. Steel Corp.*, 878 F.2d 686, 688-90 (3rd Cir. 1989).

Given this incongruity, it is appropriate for us to look beyond the plain language of the statute to determine its intended meaning. *See Matter of Udell*, 18 F.3d 403, 411 (7th Cir. 1994) ("[W]here the plain language of the statute would lead to patently absurd consequences, then we need not so apply the language.") (citations omitted).

The legislative history of the statute gives strong support to Mayflower's argument that § 14705(c) was intended to apply to actions brought pursuant to § 14704(a)(2). First, as noted above, the fact that the statute was rearranged as a result of a last minute change provides an explanation for how a scrivener's error could have occurred.[7] Second, as the court in *Fitzpatrick* points out:

> The Conference Report accompanying the passage of § 14705, which prescribes the relevant limitations periods for various actions under § 14704, by both houses of Congress states, "This section preserves relevant statutes of limitations for bringing court suits by or against carriers and makes the time limitation uniform for all types of traffic."

*Fitzpatrick*, 261 F. Supp.2d at 983 (quoting H.R. Conf. Rep. No. 104-422, at 222 (1995), *reprinted in* 1995 U.S.C.C.A.N. 851, 907). The previous version of the statute provided a two-year statute of limitations for claims for damages against other types of carriers.[8]

___

[7]The Court notes that bills were introduced (although not ultimately made law) in 2003 in both the House and Senate that, inter alia, would have moved § 14704(a)(2) to § 14704(b)(2) and changed § 14705(c) to refer specifically to § 14704(b)(2), which would have corrected the error in issue. *See* S. 1072, 108th Cong., Subtitle B (Miscellaneous Technical Corrections to Title 49 § 7201) (2003); H.R. 2088, 108th Cong., Subtitle B (Miscellaneous Technical Corrections to Title 40 § 7201) (2003).

[8]In the earlier statute, 49 U.S.C. § 11705(b)(2) provided that rail, pipeline and water carriers were "liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this subtitle." 49 U.S.C. § 11705(c)(1), in turn, provided that a person could "file a complaint with the Commission under section

7

Further, the ICCTA clearly provides for a two-year statute of limitations for such claims against rail carriers, *see* 49 U.S.C. § 11704(b) ("A  rail carrier . . . is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part.") and 49 U.S.C. § 11705(c) ("A person must file a complaint with the Board to recover damages under section 11704(b) of this title within 2 years after the claim accrues."); and pipeline carriers, *see* 49 U.S.C. § 15904(b)(2) ("A pipeline carrier . . . is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part.") and 49 U.S.C. § 15905(c) ("A person must file a complaint with the Board to recover damages under section 15904(b)(2) within 2 years after the claim accrues.").

Applying § 14705(c) to suits brought under § 14704(a)(2) would avoid the absurdity that results from applying the statute as literally written.  It would also be consistent with the clearly stated intention of providing uniform time limitations for all types of traffic and for maintaining the limitations period that were previously in place. Accordingly, we hold that claims brought pursuant to § 14704(a)(2) are subject to a two-year statute of limitation.  Any of the plaintiffs' federal claims that accrued prior to April 2, 1996, therefore are time barred.

---

11701(b) of this title or bring a civil action under subsection (b)(1) or (2) of this section to enforce liability" against such a carrier.  49 U.S.C. § 11706(c)(1) then provided that "A person must file a complaint with the Commission to recover damages under section 11705(b)(2) of this title within 2 years after the claim accrues."

## B.  Retroactivity of the ICCTA

The next issue is whether the right to bring a civil action found in 49 U.S.C.

§ 11704(a)(2) can be applied to contracts that were executed prior to January 1, 1996,

the effective date of the ICCTA.[9]  Because the ICCTA contains no express directive as

to whether it should be applied retroactively, we must determine whether applying it to

contracts executed prior to its enactment would have an impermissible retroactive effect.

*See Stone v. Hamilton*, 308 F.3d 751, 755 (7th Cir. 2002) ("Where there is no

congressional directive as to whether the statute should be applied retroactively the

court must determine whether the application has a retroactive effect.").

> Deciding whether a statute operates retroactively is not always a simple or
> mechanical task.  A statute does not have a retroactive effect merely
> because it applies to conduct occurring before the statute's enactment.  A
> statute has a retroactive effect when it takes away or impairs vested rights
> acquired under existing laws, or creates a new obligation, imposes a new
> duty, or attaches a new disability, in respect to transactions or
> considerations already past.  In making its evaluation, this court must apply
> a commonsense, functional judgment about whether the new provision
> attaches new legal consequences to events completed before its
> enactment. This judgment should be informed and guided by familiar
> considerations of fair notice, reasonable reliance, and settled expectations.

*Id.* (citations and internal quotation marks omitted).

Mayflower, relying upon *Owner-Operator Independent Drivers Ass'n, Inc. v. New

Prime, Inc.*, 339 F.3d 1001 (8th Cir. 2003), and several unpublished decisions, argues

---

[9]We must address this issue because it is possible that a claim arising under a
contract that was executed prior to January 1, 1996, could have accrued after April 2,
1996, and we understand Mayflower's retroactivity argument to apply to any claim
arising out of contracts executed–not claims that accrued–prior to 1996.

that applying the ICCTA to pre-1996 contracts would have a retroactive effect because the ICCTA provides for a private right of action in federal court to enforce the Leasing Regulations, while such actions could previously be filed only by the Interstate Commerce Commission ("ICC").  *But see Owner-Operator Independent Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 270 F. Supp.2d 990 (S.D. Ohio 2003) (*"Arctic Express I*), *aff'd on reh'g.*, 288 F. Supp.2d 895 (S.D. Ohio 2003) (*Arctic Express II*) (arriving at the opposite conclusion).  The court in *New Prime*, when faced with the precise question at issue here, held that the ICCTA could not be applied to contracts executed prior to 1996 because the statute "expands the class of plaintiffs who could bring claims, thereby altering the motor carriers' substantive rights."  339 F.3d at 1007.  The court based its holding on *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997).

In *Hughes Aircraft*, the issue before the Court was whether an amendment to the False Claims Act ("FCA") which permitted suits by private parties on behalf of the United States for violations of the FCA was retroactive.  Prior to the amendment, such private *qui tam* suits were barred if they were based upon information that was already in the Government's possession; in other words, a defendant in such a suit could assert as a defense the fact that the Government knew about the alleged violation and had not brought suit itself.  *Id.* at 948.  The Court noted that private citizens, as a class of plaintiffs, "are different in kind than the Government," in that "[t]hey are motivated primarily by prospects of monetary reward rather than the public good" and therefore are "less likely than is the Government to forgo an action arguably based on a mere technical noncompliance with the reporting requirements that involved no harm to the

10

public fisc." *Id.* at 949. The court then held that by eliminating the defense of prior disclosure to the Government and "permitting actions by an expanded universe of plaintiffs with different incentives," the amendment "essentially create[d] a new cause of action, not just an increased likelihood that an existing cause of action will be pursued," and the amended statute therefore could not be applied to conduct completed before its enactment. *Id.* at 950, 952.

Unlike the court in *New Prime*, we believe that the situation in *Hughes Aircraft* is readily distinguishable from the instant case. Unlike the statutory amendment in *Hughes Aircraft*, the ICCTA did not create a new class of plaintiffs who could pursue claims; rather, it simply gave those plaintiffs a new forum in which to bring them. Prior to the enactment of the ICCTA, the law provided that a person could "file with the [ICC] a complaint about a violation of this subtitle by a carrier providing, or broker for, transportation or service subject to the jurisdiction of the [ICC] under this subtitle." 49 U.S.C. § 11701(b) (1990). The ICC had the authority to resolve the dispute, including awarding the type of relief sought by the plaintiffs in this case and, if necessary, could bring a civil action to enforce its orders. *See Arctic Express I,* 270 F. Supp.2d 990, 995 n.5 (discussing *Interstate Commerce Comm'n v. Atlas Van Lines, Inc.,* 825 F. Supp. 771 (N.D. Tex. 1993) as an example of such an action). Therefore, this case is governed by the well-settled proposition that a statute that "'simply changes the tribunal that is to hear the case'" has no impermissible retroactive effect. *Turkhan v. Perryman,* 188 F.3d 814, 826 (7th Cir. 1999) (quoting *Landgraf v. USI Film Products,* 511 U.S. 244, 274 (1994) (in turn quoting *Hallowell v. Commons,* 239 U.S. 506, 508-509 (1916) and *Republic Nat'l*

11

*Bank of Miami v. United States*, 506 U.S. 80, 100 (1992) (Thomas, J., concurring))).

Thus, for example, in *Hallowell* a statute was passed during the pendency of the case

that gave exclusive jurisdiction over such claims to the Secretary of the Interior. The

court found no impermissible retroactive effect in applying the statute to the case at

hand and dismissing it for lack of jurisdiction, because the newly-enacted statute "[took]

away no substantive right, but simply change[d] the tribunal that [was] to hear the case."

*Hallowell*, 239 U.S. at 508-09.

The ICCTA permits individuals to bring suits in federal court to enforce the

Leasing Regulations when they could not do so before. However, those individuals

could pursue their claims in another forum–by filing a complaint with the ICC–prior to the

enactment of the ICCTA. Accordingly, we hold that applying the ICCTA to permit civil

actions based upon pre-1996 conduct (or, as Mayflower has framed the issue, to permit

civil actions arising out of contracts executed prior to 1996) does not have an

impermissible retroactive effect.

## C. Limitations Period for Breach of Contract Claims

In addition to their claims under the ICCTA, the plaintiffs have asserted pendent

state law claims for breach of contract. The parties disagree regarding the limitations

period that applies to these claims. As a federal district court sitting in Indiana, we apply

Indiana's choice-of-law rules to pendent state claims. *Baltimore Orioles, Inc. v. Major*

*League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986). Indiana, in turn,

considers statutes of limitations to be procedural questions governed by the law of the

forum. *Lee v. Estate of Cain*, 476 N.E.2d 922, 924 (Ind. App. 1985); *cf. Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707 (7th Cir. 2004).   Thus, absent an applicable and enforceable contractual provision to the contrary, Indiana's ten-year statute of limitation for breach of contract claims found in Ind. Code 34-11-2-11 will apply to the plaintiffs' breach of contract claim.

The parties agree, however, that some (Mayflower suggests "many if not most") of the contracts contain a contractual time limit for asserting claims under the contract.[10] Whether those contractual provisions are enforceable is a question of substantive law. Many of the contracts  also contain a choice of law provision, and as "Indiana choice of law doctrine favors contractual stipulations as to governing law," *Allen v. Great American Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002), the Court sees no reason why those provisions would not be enforced.  Thus, determining the applicable limitations period for those contracts that contain an express time limit  for filing suits (typically one or two years, according to the parties, although again we note that all of the contracts at issue are not before us), will be a multi-step process, which will have to be conducted for each contract (or, more likely, for each group of identical contracts).  If the contract contains a choice of law provision, the law of the state named in the contract must be applied to determine whether the contractual time limit is enforceable.  If the contract

---

[10]For example, a contract dated March 22, 1988, between Glen Ellyn Storage Corporation ("the Company") and Wood Chuck Leasing, Inc. ("the Independent Contractor"), contained in Exhibit B to Mayflower's Appendix in support of its instant motion, contains the following provision: "The Independent Contractor shall not entertain an action or suit against the Company contesting the status of his account prior to the final settlement of such account nor subsequent to the elapse of two years following the final settlement of sch account."

does not contain a choice of law provision, Indiana's choice of law rules must be applied

to determine which state's substantive law will apply,[11] and that state's substantive

contract law will determine whether the contractual time limit is enforceable.

Obviously, these are fact-sensitive determinations that cannot be made on the

record currently before us.  It also is impossible to determine on the current record

whether Mayflower is correct that class certification for the plaintiffs' breach of contract

claims is inappropriate due to the number of different states' substantive contract law

that will have to be applied.  The Court determines that additional briefing–and

supplementation of the record–on this issue is necessary.  Therefore, Mayflower shall

file its Supplemental Motion for Reconsideration of Class Certification by **January 21,**

**2005**; the plaintiffs shall respond by **February 11, 2005**; and Mayflower shall reply by

**February 25, 2005.**

### D.  Limitations Period for Conversion Claims

The plaintiffs in Case No.  0457 assert a claim for conversion pursuant to Ind.

Code 34-24-3-1.  The parties agree that a two-year statute of limitations applies to this

claim.  The parties disagree, however, as to which plaintiffs are entitled to assert this

claim.  The plaintiffs argue that "all owner-operators whose escrow funds and fuel-tax

---

[11]Indiana's choice of law rule for contract actions calls for "applying the law of the forum with the most intimate contacts to the facts."  *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind. App. 1999).  In making that determination, a court must consider factors such as "(a) the place of contracting; (b) the place of contract negotiation; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties."  *Id.*

14

credits were improperly retained by Mayflower *while Mayflower was located in Indiana* have stated a valid cause of action under Indiana's conversion statute." Plaintiffs' Response Brief at 18 (emphasis added).[12] Mayflower, relying on *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002), argues that the Indiana conversion statute can be applied only to those plaintiffs who suffered injury in the state of Indiana as a result of the alleged conversion. The Court determines that this issue–and its effect on class certification issues– would also benefit from additional briefing, and the parties shall address it in their supplemental briefs.

## CONCLUSION

For the reasons set forth above, the Court determines that a two-year statute of limitations applies to the plaintiffs' federal claims and that the ICCTA may be applied to claims that arise out of contracts executed prior to 1996. The Court further determines that various statutes of limitations will apply to the plaintiffs' breach of contract claims, and that additional briefing is required regarding the propriety of class treatment of those claims. Additional briefing also is required on the applicability of Indiana's conversion statute to the various plaintiffs. Mayflower shall address all of these issues in a Supplemental Motion for Reconsideration of Class Certification, which it shall file by **January 21, 2005**; the plaintiffs shall respond by **February 11, 2005**; and Mayflower shall reply by **February 25, 2005**.

---

[12]Mayflower's headquarters apparently were located in Indiana until sometime in 1997, when they were moved to Missouri.

15

ENTERED this ___14th___ day of December 2004.

_Sarah Evans Barker_
Sarah Evans Barker, Judge
United States District Court
Southern District of Indiana

Copies to:

David Carr
Ice Miller
One American Square
Box 82001
Indianapolis, IN 46282

Paul D. Cullen Sr.
The Cullen Law Firm PLLC
1101 30th Street NW
Suite 300
Washington, DC 20007

James A. Calderwood
Zuckert Scoutt & Rasenberger
888 Seventeenth St. N.W.
Washington, DC 20006-3939

David C. Campbell
Bingham McHale LLP
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204-4900

David Wells
Thompson Coburn LLP
One Firstar Plaza
St Louis, MO 63101

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CAUSE NO.  IP 98-457-C (B/S) CAUSE NO.  IP 98-458-C (B/S) |
| MAYFLOWER TRANSIT, INC., | ) ) | Consolidated for Discovery Purposes |
| Defendant. | ) | |

## ENTRY ON PLAINTIFFS' MOTION TO COMPEL

These causes are before the magistrate judge on plaintiffs' Motion to Compel Defendant to Produce Documents Responsive to Plaintiffs' First Requests for Production of Documents. The motion is fully briefed, and the magistrate judge, being duly advised, **GRANTS IN PART** the motion for the reasons set forth below.

Plaintiffs are owner-operators of motor carrier equipment[1] who entered into lease agreements with defendant (directly or indirectly through authorized agents of defendant) to lease equipment and provide services to defendant's household goods moving business. Plaintiffs have filed this class action suit on behalf of themselves and similarly-situated owner-operators alleging, inter alia, that certain provisions of the lease agreements, specifically those involving the return of plaintiffs' cash deposit accounts and the refunding of fuel tax credits to plaintiffs, violated federal regulations. Plaintiffs have filed a motion for class certification, but at this time the motion is not yet fully briefed.

---

[1]Plaintiff Owner-Operator Independent Drivers Association is an association of motor carrier equipment owner-operators.

EXHIBIT

C

PENGAD-Bayonne, N. J.

The instant motion involves plaintiffs' document requests, in which plaintiffs seek class-wide discovery relating to the merits of their contentions. Defendant objects to the requests on several grounds. First, defendant argues that class-wide discovery on the merits should not be permitted pending a ruling on the plaintiffs' motion for class certification. The magistrate judge finds that bifurcated discovery is not appropriate in this case and therefore overrules this objection.

The defendant next argues that many of the document requests are overly broad and unduly burdensome because they implicate hundreds of agents and thousands of owner-operators over a six-year period. This objection has been eliminated by plaintiffs' offer to limit their requests to a sampling of owner-operators, a compromise which the magistrate judge finds appropriate and reasonable.

Finally, defendant argues that it does not have possession or control of many of the requested documents. The magistrate judge agrees that defendant does not have possession or control of documents simply because the documents are possessed by defendant's agents, nor do the federal regulations cited by plaintiffs mean that defendant has the legal right to obtain the requested documents from its agents. Accordingly, as to those documents which belong to defendant's independent agents, defendant's objection is sustained, and plaintiffs must obtain those documents by means of third party discovery.

To the extent that defendant has any responsive documents in its possession or control, discovery shall proceed according to the compromise outlined in plaintiffs' motion to compel, and the parties shall confer to establish a schedule for that discovery.

-2-

ENTERED this *21* day of *October*             , 1998.

*V. Sue Shields*

V. Sue Shields
United States Magistrate Judge
Southern District of Indiana

Copies to:

David J Carr
Johnson Smith Pence Densborn Wright & Heath
1800 INB Tower, One Indiana Square
Indianapolis, IN 46204

Paul D Cullen Sr
Cullen & O'connell
1101 30th Street NW
Suite 301
Washington, DC 20007

James A Calderwood
Zuckert Scoutt & Rasenberger
888 Seventeenth St N W
Washington, DC 20006-3939

David C Campbell
Bingham Summers Welsh & Spilman
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204-2982