UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OWNER-OPERATOR INDEPENDENT DRIVERS          )
ASSOCIATION, INC., et al.,                  )
                                            )
        Plaintiffs,                         )
                                            )        No. 05 CV 10317 MLW
v.                                          )
                                            )
UNITED VAN LINES, LLC, et al.,              )
                                            )
        Defendants.                         )

## MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT

Defendants United Van Lines, LLC ("United"), Vanliner Insurance Company ("Vanliner"), and UniGroup, Inc. ("UniGroup") respectfully submit the following Memorandum of Law in support of their Rule 12 (b)(6) Motion to Dismiss Plaintiffs' Class Action Complaint.[1]

## INTRODUCTION

This putative class action is one of numerous lawsuits which plaintiff Owner-Operator Independent Drivers Association, Inc. ("OOIDA") has brought against motor carriers throughout the United States over the past decade. In these lawsuits, OOIDA purports to assert claims on behalf of independent truck owner-operators who lease their transportation equipment and driving services to motor carriers. In this case, OOIDA advances a number of untested and unprecedented legal theories in a failed effort to state a claim against one motor carrier (United) and two of its corporate affiliates (Vanliner and UniGroup). Specifically, the Complaint alleges the following claims under the truth-in-leasing regulations codified at 49 C.F.R. Part 376:

---

[1] UniGroup is concurrently moving to dismiss all claims against it for lack of personal jurisdiction. In the event its personal jurisdiction motion is not granted, then it joins in the present motion.

*Count I—*     alleged undisclosed deductions from owner-operator
compensation, in purported violation of 49 C.F.R. § 376.12(d)
[Compl. ¶¶ 33-34];

*Count II—*    alleged failure to provide owner-operators with rated freight bills
or similar documents, in purported violation of 49 C.F.R. §
376.12(g) [Compl. ¶¶ 38-40];

*Count III—*   alleged improper charge-backs of public liability/property damage
insurance costs to owner-operators, in purported violation of 49
C.F.R. § 376.12(j)(1) [Compl. ¶ 43]; and

*Count IV—*    alleged failure to monitor and oversee the business practices of
United's independent agents, in purported violation of 49 U.S.C. §
13907 and 49 C.F.R. § 376.12(m) [Compl. ¶ 48, 52].

Each of these counts is legally deficient and should be dismissed pursuant to Fed. R. Civ. P.

12(b)(6) for the following reasons.

*First*, Count I fails to state a claim because the named plaintiffs do not allege that they

were subject to United's allegedly undisclosed compensation deductions.  To establish standing

to sue under Article III of the U.S. Constitution, plaintiffs must allege ultimate facts sufficient to

support an inference that **they**—as opposed to United's agents or unnamed members of the

putative class—suffered an injury fairly traceable to the conduct of which they complain.

*Second*, Count II should be dismissed because plaintiffs set forth no facts suggesting that

the alleged failure of United's agents to supply them with rated freight bills caused them (or

indeed any owner-operator) any cognizable harm.  49 U.S.C. § 14704(a), the statute under which

plaintiffs purport to sue, expressly provides that "damages" is an essential element of plaintiffs'

claimed private right of action.

*Third*, plaintiffs' attempt in Count III to challenge the standard practice of passing

through to owner-operators the cost of insuring them against third-party liability claims arising

from their own negligence is legally baseless.  In fact, the very leasing regulation upon which

Count III is based, 49 C.F.R. § 376.12(j)(1), expressly **permits** motor carriers to charge back the cost of "**any insurance**" to such owner-operators. Conversely, there is no support for plaintiffs' claim that carriers are legally required to provide them with 100% cost-free liability insurance. Rather, and as the former Interstate Commerce Commission ("ICC") and the courts have stressed for decades, the leasing regulations are not intended to "allocat[e] revenues between the parties in owner-operator lease agreements"[2] or to "regulat[e] owner-operator compensation."[3]

_Fourth_, Count IV, styled "Failure to Monitor and Control the Actions of Local Agents," is properly dismissed because neither the cause of action nor the sweeping "accounting" remedy plaintiffs seek exist as a matter of law. Indeed, the federal statute pursuant to which this count is allegedly brought, 49 U.S.C. § 13907, does not provide a private right of action at all but rather explicitly restricts enforcement authority to the U.S. Department of Transportation. Moreover, neither the statute nor the leasing regulations contain any requirement that motor carriers must "monitor and control the actions" of their independent agents. Rather, as the legislative history and a large body of case law confirms, § 13907 is a consumer protection statute which merely makes carriers responsible for losses suffered by shippers—**not** owner-operators—due to an agent's acts or omissions. There is nothing in § 13907 or in the leasing regulations which purports to regulate the business relationship between motor carriers and their agents, and indeed Congress has for decades refused to interfere with such relationships.

Accordingly, because none of plaintiffs' claims in this case states a legally cognizable

---

[2] _Petition for Investigation of Insurance Surcharges_, Ex. Parte No. MC-178 (Sub-No. 1), 1987 WL 98704, at *1 (I.C.C. June 15, 1987).

[3] _Petition for Investigatory Rulemaking: Insurance Surcharges_, Ex Parte No. MC-178 (Sub-No. 5), 1991 WL 148568, at *3 n.3 (I.C.C. July 29, 1991).

cause of action, their Complaint should be dismissed pursuant to Fed. R. Civ. 12(b)(6).

## BACKGROUND

Defendant United is a federally regulated motor carrier which provides interstate transportation services under authority of the U.S. Dept. of Transportation. [Compl. ¶ 8]. United operates its business through a network of nearly five hundred local agencies. [*Id.*] Its agents are independent businesses, located in all fifty states, and are all owned, managed, and operated by those agents. Motor carriers' reliance upon such agents is sensible and quite common in the household goods industry, and has evolved from the business necessities of that industry.[4]

Many of the individuals who drive for United's local agents are "owner-operators"—i.e., independent contractors who lease transportation equipment (usually a tractor) and their driving services to the agents. [*Compl*. ¶¶ 4-7]. Other than OOIDA, which is an owner-operator trade association, the named plaintiffs in this case are drivers who formerly leased their equipment and services to four independent United agents. [*Id.* ¶¶ 5-7]. Specifically:

- Plaintiff Bullard alleges that between October 2003 and December 2004, he leased his truck and services to a United agent in Florida;

- Plaintiff Lee alleges that between November 1998 and April 2003, he leased his truck and services to a United agent in New Jersey, and between April 2004 and December 2004 he signed a lease with a different United agent in Minnesota; and

---

[4] As early as 1980, Congress recognized that:

> The use of agents developed in response to the empty backhaul problem faced by the carriers. Household goods often move sporadically over irregular routes with no repetitive pattern. Today, some carriers depend on the agents to provide the resources used in their transportation operations. The agents book the shipments; arrange for them to be weighed; provide packing, unpacking, and storage services; and often transport the shipments.

H.R. Rep. No. 1372, at 2, *reprinted in* 1980 U.S.C.C.A.N. 4271, *4271-72. A copy of this report is annexed to the present Motion as Exhibit A.

- Plaintiff Pelletier alleges that between May 1997 and March 2003, he leased his truck and services to a United agent in Massachusetts.

[Compl. ¶¶ 5-7].[5]

Plaintiffs purport to sue on their own behalf and on behalf of the following putative class:

[A]ll similarly-situated owner-operators of motor vehicle equipment who were parties to leases with one or more of United's authorized agents, in which owner-operators made their equipment available for the movement of freight under United's federal operating authority.

[Compl. ¶ 19]. Plaintiffs claim that United's independent agents supposedly did not comply with several regulations comprising 49 C.F.R. Part 376 ("the leasing regulations"). Such regulations provide that motor carriers who conduct interstate transportation services by means of equipment they do not own must enter into written lease agreements containing the disclosures specified in 49 C.F.R. § 376.12. [*See, e.g.*, Compl. ¶ 13, citing 49 U.S.C. §§ 376.11(a) and 376.12].[6]

Plaintiffs have sued not only United, but also its corporate parent (UniGroup) and its insurance company affiliate (Vanliner). Neither of these corporate affiliates is subject to suit because they are not "motor carriers" and thus are not subject to the leasing regulations as a

---

[5] Due to the dates of plaintiffs' lease agreements as alleged in the Complaint, it is likely that most of their claims (and those of many putative class members) are barred by the applicable two-year statute of limitations. *See OOIDA v. Mayflower Transit Inc.*, Nos. IP 98-457 and 98-458, slip op. at 3-8 (S.D. Ind. Dec. 14, 2004)(a copy of which is attached to present motion as Ex. B); *Fitzpatrick v. Morgan Southern*, 261 F. Supp.2d 978, 983-94 (W.D. Tenn. 2003). If the present motion is not granted, defendants anticipate filing a dispositive motion on time limitations issues.

[6] Notably, plaintiffs do not claim that United **itself** violated the leasing regulations. Rather, United's alleged liability is premised on its supposed vicarious responsibility for its independent agents' purported regulatory noncompliance. *See* Compl. ¶16 ("Defendant United is fully responsible for harm inflicted upon owner-operator drivers by its local agents under the Truth-in-Leasing regulations…."). Defendants do not agree that such a theory of vicarious liability is legally permissible, and intend to further address this contention in later proceedings if necessary.

matter of law.[7]

## LEGAL STANDARDS

A Rule 12(b)(6) motion should be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987)(quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While the Court must accept plaintiffs' factual allegations as true, it need not accept "legal conclusions or...bald assertions" without factual support. *RTC. v. Driscoll*, 985 F.2d 44, 48 (1st Cir. 1993). *See also Davidson v. State of Georgia*, 622 F.2d 895, 897 (5th Cir. 1980) ("When the [plaintiffs'] allegations…are wholly conclusory…and fail to set forth facts which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim").

## ARGUMENT

**I.    Count I Should Be Dismissed Because Plaintiffs Do Not Allege The Requisite Standing To Challenge The Allegedly Undisclosed Compensation Deductions**

It is firmly established that "a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 676 (N.D. Ga. 2003). To satisfy Article III standing requirements, moreover, "for **each claim**…at least one named Plaintiff…must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 676-77 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)(emphasis added). In other words, and as the

---

[7] Accordingly, UniGroup and Vanliner are concurrently filing their separate Motion to Dismiss Non-Motor Carrier Defendants.

Supreme Court has repeatedly stressed, the fact that a claim purports to be asserted on behalf of a

class is irrelevant to whether Article III standing requirements are satisfied:

> That a suit may be a class action…adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class…which they purport to represent.

*Simon v. Eastern Ky. Welf. Rights Org.*, 426 U.S. 26, 40 n.20 (1976).  *See also In re Eaton Vance*

*Corp. Sec. Litig.*, 219 F.R.D. 38, 41 (D. Mass. 2003)(plaintiffs' burden to adequately allege

standing "is in no way lessened by the fact that they seek to represent a class"); *In re Pharm. Ind.*

*Avg. Wholesale Price Litig.*, 263 F. Supp.2d 172, 193 (D. Mass. 2003)("[A] named plaintiff

cannot acquire standing to sue by bringing his action on behalf of others who suffered injury

which would have afforded them standing had they been named plaintiffs").

Consistent with these principles, the First Circuit and numerous other federal courts have

held that facts establishing the named plaintiffs' standing must be specifically pleaded in the

complaint.  *See, e.g.*, *United States v. AVX Corp.* 962 F.2d 108, 115 (1st Cir. 1992)("Because

standing is fundamental to the ability to maintain a suit…where standing is at issue, **heightened**

**specificity is obligatory at the pleading stage**.  The resultant burden cannot be satisfied by

purely conclusory allegations or by a Micawberish reading of a party's generalized averments")

(emphasis added); *Warth v. Seldin*, 422 U.S. 490, 518 (1975)("It is the responsibility of the

complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial

resolution of the dispute and the exercise of the court's remedial powers"); *Anderson v. City of*

*Alpharetta*, 770 F.2d 1575, 1582 (11th Cir. 1985)("It is not the role of the court to speculate

concerning the existence of standing nor to piece together support for the plaintiff").

Accordingly, courts have not hesitated to dismiss claims which fail to include well-

pleaded allegations of the named plaintiffs' standing to sue.  For example, in *Pagan v. Dubois*,

894 F. Supp. 45 (D. Mass. 1995), plaintiffs alleged in conclusory fashion that defendants'
discriminatory practices violated their constitutional rights, and the rights of other Latino
prisoners, at a Massachusetts correctional facility. *Id.* at 46. However, because the named
plaintiffs did not allege that they had been individually harmed by defendants' alleged wrongs,
the Court dismissed their suit. In doing so, the court reasoned that "plaintiffs do not allege in
their complaint that they themselves have been injured in some particularized, concrete way by
the actions of the defendant." *Id.* at 47.

Similarly, in this case plaintiffs allege in Count I that United made several allegedly
"undisclosed" deductions from owner-operators' compensation. [*See* Compl. ¶31]. Such
deductions, say plaintiffs, include (1) fees paid by United to third-party relocation companies, (2)
fees paid by United to third-party credit card issuers, and (3) the cost of providing contractually-
required free cargo insurance to United's large national account customers. [*Id.* at ¶¶31(A),(B),
and (C)]. Conspicuously absent from Count I, however, is any allegation that the named
plaintiffs "themselves have been injured in some particularized, concrete way by the actions of
the defendant." *Pagan*, 894 F. Supp. at 47.

The omission of such allegations is no accident, because—as plaintiffs themselves
concede in their Complaint—their former lease agreements were not with United, but rather with
United's independent agents. [Compl. ¶¶5-7]. Thus, the only parties with standing to complain
about United's supposedly "undisclosed" deductions are the **agents** whose compensation from
United was thereby reduced. United has never entered into any lease, contract, or other
agreement with any of the plaintiffs, and indeed plaintiffs do not contend otherwise.

Thus, the third-party fees and costs which United deducts before paying its **agents** is simply not an "injury" about which any of the **plaintiffs** have standing to complain. This is true not only for the individual plaintiffs, but also for plaintiff OOIDA as well.[8]

In sum, Count I must be dismissed since it does not allege any facts demonstrating that any of the plaintiffs have suffered monetary or other loss as a direct consequence of United's alleged nondisclosure of various compensation deductions to its agents. *E.g.*, *Pagan*, 894 F. Supp. at 47; *In re Pharm. Ind. Avg. Wholesale Price Litig.*, 263 F. Supp.2d at 192-93.[9]

## II.    Count II Does Not State A Claim Because It Alleges No Damages Resulting From The Claimed Failure Of United's Agents To Provide Rated Freight Bills

In Count II, plaintiffs complain that United's independent agents did not provide owner-operators with copies of rated freight bills or similar computer-generated documents, as prescribed by of 49 C.F.R. § 376.12(g). [Compl. ¶ 38]. Like plaintiffs' other pleaded claims, Count II is purportedly brought pursuant to 49 U.S.C. § 14704(a) (2), which provides as follows:

> (2) Damages for violations.—A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 **is liable for damages** sustained by a person as a result of an act or omission of that carrier or broker in violation of this part.

---

[8] *See, e.g.*, *Cons. Law Foundation of New England, Inc. v. Reilly*, 950 F.2d 38, 42 (1st Cir. 1991) (organizational plaintiffs lacked standing where "none of the individual members of plaintiffs here have showed that they suffered injury directly traceable to the alleged illegal conduct"); *In re Pharm. Ind. Avg. Wholesale Price Litig.*, 263 F. Supp.2d at 194 (organizations lacked standing to sue for misstatements relating to pharmaceutical pricing; "[n]one of the associations alleges specific members who purchased a specific drug from a specific company").

[9] At a minimum, plaintiffs must be required to replead Count I to delineate specific facts describing (1) which contractual or other duty of disclosure United supposedly owed to the named plaintiffs (as opposed to its independent agents), and (2) how the named plaintiffs (and other putative class members) sustained specific monetary loss resulting from the alleged United nondisclosures to its agents.

49 U.S.C. § 14704(a)(2) (emphasis added).[10]

The express language of Section 14704(a)(2) thus makes clear that "damages" is an essential *prima facie* element of any cause of action asserted thereunder.  *See also OOIDA v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir. 2003)("As the district court pointed out, 49 U.S.C. § 14704(a)(2) provides a right to recover **only to persons who have sustained damages as a result of a carrier violation**")(emphasis added).  In other words, mere technical noncompliance with the leasing regulations, without accompanying damages, is not actionable. Indeed, the former ICC specifically rejected a request by plaintiff OOIDA to prescribe automatic statutory fines for certain violations § 376.12(g)—the specific regulation upon which the present Count II is premised.  [Compl. ¶¶38-40].[11]

---

[10] Defendants do not concede that § 14704 in fact authorizes private suits against motor carriers for alleged noncompliance with the leasing regulations.  On the contrary, the plain language of the statute only creates a right of action to enforce a specific "order" of the Department of Transportation or the Surface Transportation Board:

> A person injured because a carrier…does not obey an **order** of the Secretary [of the Department of Transportation] or the [Surface Transportation] Board…**may bring a civil action to enforce that order** under this subsection.

49 U.S.C. § 14704(a)(1) (emphasis added).  The necessary "damages sustained" under subsection (a)(2) plainly must relate to defendants violation of a specific agency "order" as described in subsection (a)(1). Plaintiffs do not allege the existence of any such order in this case.

[11] In *Lease and Interchange of Vehicles*, 3 I.C.C.2d 887, *available at* 1987 WL 101285 (ICC Feb. 23, 1987), OOIDA resisted a proposed regulatory change permitting carriers to provide computer-generated documents in lieu of freight bills.  As an alternative, OOIDA requested that the ICC mandate automatic monetary penalties for violation of §376.12(g).  The ICC rejected both OOIDA positions:

> In the event that we adopt the proposed rule, OOIDA requests that we subject carriers to severe penalties to discourage them from giving false information to owner-operators. It suggests that violators be subject to a fine of not to exceed $1,000 for each misrepresentation and that their operating rights be revoked for multiple offenses.… However, there is no indication in this record that such abuses are so widespread as to warrant imposition of sanctions like those OOIDA suggests.

*Id.* at 889, 891; 1987 WL 101285, at * 2-*3.

The foregoing principles are dispositive of Count II.  Plaintiffs claim that United's agents failed to provide them with rated freight bills or equivalent documents, but set forth no facts demonstrating how this alleged omission resulted in cognizable damages to them or the other putative class members.  Hence, even viewed in the light most favorable to plaintiffs, the conduct alleged in Count II amounts to, at most, a technical regulatory violation for which monetary relief is unavailable.  *See Williams v. Charlottesville School Bd.*, 940 F. Supp. 143, 147 (W.D. Va. 1996)("In numerous walks of law the principle is endorsed that there should be no redress for technical violations of the law that do not impose harm"); *Northern Petrochem. Co. v. Tomlinson*, 484 F.2d 1057, 1059 (7th Cir. 1973)(unlawful disclosures did "no harm other than to stand as technical violations").[12]

    While section 14704(a)(1) also provides for injunctive relief, plaintiffs do not request an injunction requiring United's agents to provide rated freight bills in the future.  This omission is not surprising, for plaintiffs lack standing to seek prospective relief.  Lack of standing is evident from the Complaint itself: since plaintiffs admit that none of them presently has a contract or relationship with United or any of its agents, *see* Compl. ¶¶ 5-7, they cannot establish a likelihood of future harm to themselves.  *See, e.g., Pierce v. Ohio Dept. of Rehab.*, 284 F.

---

[12] Consistent with this principle, courts have held that actual damages are a prima facie element of innumerable statutory and common law claims.  *See, e.g., Cash Energy, Inc. v. Weiner*, 1996 WL 141787, *2 & n.3 (1st Cir. Mar. 29, 1996)(damages is a prima facie requirement of a statutory claim under CERCLA); *Conair Corp. v. Old Dominion Freight Line, Inc.*, 22 F.3d 529, 531 (3d Cir. 1994)(proof of both existence and amount of damages is a necessary element of a plaintiff's prima facie damages claim under the ICC Act's Carmack Amendment); *Dairy Farmers of America, Inc. v. Travelers Ins. Co.*, 292 F.3d 567, 575 (8th Cir. 2002)(damages is a required element of a common law breach of fiduciary duty claim); *TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 698 (9th Cir. 1990) (damages is a prima facie element of tortious interference); *EPIS, Inc. v. Fid. & Guar. Life Ins. Co.*, 156 F. Supp.2d 1116, 1127 (N.D. Cal. 2001)(damages is a prima facie element of a contract claim).  *See also Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 652 (5th Cir. 1994) ("It is truistic…that one who seeks compensatory damages must present evidence of those damages").

Supp.2d 811, 826 (N.D. Ohio 2003)(Former employees did not "have standing to seek

declaratory or injunctive relief because they are no longer subject to the challenged practices");

*Stevens v. Harper*, 213 F.R.D. 358, 367-69 (E.D. Cal. 2002)(plaintiffs must show they "will be

subjected to the [challenged] policy again and that the threat of repetition is sufficiently real and

immediate to justify equitable relief"); *Ass'n for Disabled Americans v. Claypool Holdings*, 2001

WL 1112109, *16 (S.D. Ind. Aug. 6, 2001)("[P]ast exposure to illegal conduct does not…show a

present case or controversy...if unaccompanied by any continuing, present adverse effects").

Accordingly, since plaintiffs allege, at most, technical noncompliance with §376.12(g)

without any resulting damages, Count II should be dismissed.

**III.    Count III Must Be Dismissed Because, As a Matter of Law, Motor Carriers Are Authorized To Pass Through To Their Owner-Operators The Cost Of Legally Required Liability Insurance**

In Count III, plaintiffs allege that United's agents have "unlawfully transferred" to owner-

operators the costs of mandatory public liability and property damage ("PL/PD") insurance.

[Compl. ¶ 45].  Plaintiffs purport to base this claim on 49 C.F.R. § 376.12(j)(1), which requires a

motor carrier's lease with an owner-operator to "specify the legal obligation of the authorized

carrier to maintain insurance coverage for the protection of the public."  [*Id.* ¶ 43].  However, the

legal meritlessness of Count III is readily demonstrated by the plain language of the regulation,

which expressly authorizes carriers to charge back the costs of **all** driver insurance—including

PL/PD insurance—to their owner-operators.

This conclusion is further reinforced by the legislative history of the enabling statute, 49

U.S.C. § 13906(a)(1), as well as the express purpose of the PL/PD requirement—which is to

ensure that the public is protected against damages caused by potentially judgment-proof drivers.

Thus, both the former ICC and the courts have consistently ruled that while motor carriers are

answerable to the public for damages caused by independent drivers who operate under their authority, they also have every right to pass along to such drivers the costs of liability insurance to protect against driver acts and omissions for which the carrier may be ultimately responsible.

Conversely, there is no support at all for plaintiffs' claim that carriers are legally obligated to supply them with 100% free liability insurance.  Rather, the consistent theme of all relevant judicial and administrative pronouncements is that the leasing regulations may not, as a matter of law, be used to (1) allocate costs between motor carriers and owner-operators, or (2) accord owner-operators economic advantages they fail to obtain for themselves in contract negotiations with carriers.  Because such substantive economic benefits (free insurance) are precisely what plaintiffs seek in Count III, that claim must be dismissed with prejudice.

A.    The Plain Language of 49 C.F.R. § 376.12(j)(1) Contemplates That A Carrier May Pass Its Public Liability Insurance Costs Along To Its Owner-Operators

The express provisions of the pertinent leasing regulation, §376.12(j)(1), could not be clearer:  although a carrier is required to "maintain" liability insurance for the protection of the public, it may pass the cost of obtaining such insurance along to the owner-operators whose acts and omissions are being insured against.  The regulation states as follows:

(j)    Insurance.

(1)    The lease shall clearly specify the legal obligation of the authorized carrier to **maintain** insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. 13906.  The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance.  **If the authorized carrier will make a charge back to the lessor for _any of this insurance_**, the lease shall specify the amount which will be charged-back to the lessor.

49 C.F.R. § 376.12(j)(1)(emphasis added).

Thus, § 376.12(j)(1) regulates two categories of insurance: (1) public liability insurance, and (2) "any other insurance coverage for the operation of the leased equipment." The first category, public liability insurance, must be "maintained" (not "paid for") by the carrier. As to the second category (all other forms of insurance), the carrier and the owner-operators are free to negotiate who will be responsible for "providing" (again, as distinct from "paying for") such insurance. Finally, the regulation's last sentence makes it clear that the carrier may "charge back" to the owner-operator the costs of "**any of this insurance**"—regardless of whether it is in the first or the second category.

It is difficult to imagine clearer regulatory language than a provision stating that "charge backs" for "**any**" of the insurance described in § 376.12(j)(1) are lawful as long as they are adequately disclosed. Plaintiffs in this case do not allege any deficiency in disclosure. Rather, they claim an absolute legal right to require motor carriers to provide them with free insurance.

The above-quoted leasing regulation—requiring motor carriers to "maintain" but not bear ultimate financial responsibility for PL/PD insurance—is both logical and consistent with sound public policy. It is entirely sensible to require motor carriers to ensure that adequate liability insurance exists to protect the public from losses or damages caused by owner-operators driving under their authority, while at the same time permitting the carriers to pass along the resulting insurance costs to the very persons whose actions and omissions are being insured against. Historically, owner-operators often have been underinsured and essentially judgment-proof. Thus, Congress and the ICC quite rationally concluded that the public should not be required to look solely to the owner-operator to make good for the losses they cause while driving under the motor carrier's operating authority.

At the same time, carriers have every right to recover the very substantial costs of such insurance from their owner-operators.  As one appellate court aptly put it:

> **[**W]hile as a matter of policy the primary liability to the plaintiff is fixed upon the carrier, **the carrier has a right of indemnity against the lessor [owner-operator.]  If the carrier has been derelict in employing an underinsured [or] financially irresponsible…lessor, it has only itself to blame.**

*Rediehs Express v. Maple*, 491 N.E.2d 1006, 1010-12 (Ind. Ct. App. 1986)(emphasis added).

Yet regardless of whether plaintiffs believe that § 376.12(j)(1) promotes sound public policy, there is no ambiguity in the language of the regulation.  Had the ICC intended to require motor carriers to not only **"maintain"** the necessary liability insurance, but also bear 100% of the **costs** of such insurance, it would have expressly said so in the regulation itself.  Instead, the ICC unequivocally provided in the regulation's third sentence that motor carriers may charge back to their owner-operators the costs of **"any of this insurance**."  The ICC's decision not to exclude PL/PD insurance from motor carriers' express chargeback authority makes it quite clear that, as a matter of law, no such exclusion can be inferred or implied.

The ICC plainly knew how to allocate cost-related responsibilities in the leasing regulations when it so intended.  For example, a different subparagraph of the leasing regulations provides that the lease must specify the responsibility of each party "with respect to the **cost** of" fuel, fuel taxes, permits, tolls, ferries, and other items.  49 C.F.R. § 376.12(e)(emphasis added).  Later in the same paragraph, the ICC again distinguished between "responsibility for" and "cost of," requiring that "the lease shall clearly specify who is responsible for loading and unloading the property...and the compensation, if any, to be paid for this service."  *Id.*

Simply put, § 376.12(j)(1) unambiguously permits a carrier to charge back all insurance costs, including PL/PD insurance costs, to the owner-operators with whom it contracts.  This

Court should reject plaintiffs' attempt to rewrite the plain language of this regulation so as to substantially increase their compensation at the direct expense of motor carriers.

> B.    The Express Language of 49 C.F.R. § 376.12(j)(1) Is Also Consistent With The Purposes And Policies Of The Interstate Commerce Act

In light of the clear language of § 376.12(j)(1), there is no need to resort to external sources such as legislative history or administrative policy statements. Notably, however, both the legislative history and relevant agency pronouncements further support dismissal of Count III. The House Report addressing the Interstate Commerce Act, for example, confirms that the reason carriers are required to maintain liability insurance is to protect the public from accidents caused by owner-operators, and **not** (contrary to the Complaint's insinuations) to enable owner-operators to obtain free liability insurance:

> Some Committee members fear that [this legislation] will open the highways to truckers who might have little concern for the safe operation and maintenance of their vehicles, thereby posing a threat to those who share the highways with them. That concern...is reflected in the bill's inclusion of minimum insurance coverage for operators. * * * The purpose of this provision is to assure that motor carriers...maintain the minimum level of financial responsibility required by section 30 of this Act.

H.R. Rep. No. 96-1069, at 6, 41, *reprinted in* 1980 U.S.C.C.A.N. 2283, 2288, 2323.

This legislative history also resoundingly answers the Complaint's suggestion that allowing carriers to obtain reimbursement for PL/PD insurance costs will somehow undermine carriers' incentive "to maintain and operate their vehicles in a safe manner." [Compl. ¶ 43]. In fact, and as stated in the legislative history, if a carrier fails to operate safely it will soon discover that the required liability insurance is either unavailable or prohibitively expensive:

> Specifying insurance levels is one way to help improve motor carrier safety. Insurance companies are equipped to evaluate the performance of the motor carriers. The premiums they assess are in direct relation to the risks they assume. Therefore, **an unsafe carrier will have an increased premium, and a totally**

> **unsafe carrier may not be able to obtain the insurance necessary to operate,
> or at best will be at an insurance cost disadvantage.**

*Id.* at 41, 43 *reprinted in* 1980 U.S.C.C.A.N. at 2323, 2325 (emphasis added).

In other words, no matter who ultimately pays for public liability insurance, a carrier faces significant business risks (including loss of customers and loss of valuable independent owner-operators) if its insurance costs are materially higher than its competitors'.  And if a carrier is unable to obtain the necessary insurance due to a poor safety record, it will of course go out of business.  Thus, the requirement that carriers "maintain" PL/PD insurance provides them with a strong financial incentive to operate safely regardless even if some of their insurance costs are reimbursed by owner-operators.

By contrast, plaintiffs' claim that owner-operators are entitled to free liability insurance creates a very strong potential safety disincentive.  As the U.S. Supreme Court emphasized thirty years ago:

> "The lessor [owner-operator], as a general rule, is the party more familiar with the equipment [he] leases....**An agreement placing the ultimate financial responsibility upon the negligent lessor thus may have a tendency to provide greater protection to the public and to shippers**."

*Transamerican Freight Lines, Inc.  v. Brada Miller Freight Sys.*, *Inc.,* 423 U.S. 28, 41 (1975)(emphasis added).

Hence, the legislative history and case law is consistent with the language of § 376.12(j).  And the plain language of that regulation, it bears repeating, permits motor carriers to charge back the costs of "any" insurance—including PL/PD insurance—to owner-operators.

C.    The ICC And The Courts Have Long Made Clear That The Leasing Regulations Are Not Intended To Regulate The Manner In Which Carriers and Owner-Operators Allocate Costs and Revenues Among Themselves

A large body of judicial and ICC precedent further confirms the legal propriety of carrier chargebacks for PL/PD insurance.  Indeed, the Supreme Court rejected a claim very similar to plaintiffs' Count III in its seminal 1975 decision in *Brada Miller*.  Confronted with a legal challenge to indemnity and "hold harmless" clauses in transportation lease agreements, the Court concluded that such provisions are fully consistent with ICC regulations, including the requirement that carriers maintain full operational responsibility for the leased equipment. *Brada Miller,* 423 U.S. at 38.  The Court reasoned that such clauses "d[o] not affect this basic responsibility of the lessee to the public; [but rather] **affect[] only the relationship between the lessee [motor carrier] and the lessor [owner-operator]**."  *Id.* at 39 (emphasis added).

Since losing in the Supreme Court, plaintiff OOIDA has persistently but unsuccessfully sought to persuade the ICC and the courts to change the result in *Brada Miller*.  In 1988, for example, OOIDA asked the ICC to institute rulemaking procedures to prohibit or at least regulate indemnification and hold harmless clauses.  The ICC expressly refused to do so:

> Petitioner [OOIDA] contends that it is unfair…to permit carriers to hold themselves out to the public as for-hire motor carriers, while at the same time shifting their traditional common carrier liabilities for cargo damage and injury to the public to independent contractors.…The issue before us, then, is whether we should exercise our general powers to proscribe or...control or limit their use in some fashion.  **We conclude that there is no compelling public policy reason to do either**....Our decision[s]...already provides that the lease 'shall clearly specify who is responsible for providing the various types of insurance coverage.  All lease provisions regarding insurance must state, in unambiguous language, any insurance responsibility of the lessor, and any related indemnification agreement between the parties.... **The specific terms of indemnification and hold-harmless clauses are best left to the parties to negotiate**.

*Pet. for Investigation of Indemnification and Hold-Harmless Clauses*, 1988 WL 225577, *2-*4

(I.C.C. June 9, 1988)(emphasis added).

This ICC ruling is consistent with a long line of judicial and agency decisions holding that the government may not interfere in the substantive allocation of costs and revenues negotiated by carriers and owner-operators in their lease agreements. For example, in the landmark case of *Central Forwarding, Inc. v. ICC*, 698 F.2d 1266 (5th Cir. 1983), the Fifth Circuit invalidated an ICC regulation requiring motor carriers to refund a portion of owner-operators' fuel costs. *Id.* at 1284-85. In so holding, the Court noted as follows:

> [The ICC's rule] cannot be described as...a measure aimed at simply promoting or policing fair dealings among private parties. Instead, it removes from the control of these parties their private determination of one aspect of their leasing arrangements, and in effect rewrites each private agreement, to the benefit of one party and the chagrin of the other...**By directly regulating private sector compensation, the Commission has taken upon itself a task that Congress does not frequently delegate.**

*Id.* at 1272 (emphasis added).

Thereafter, and until the agency was abolished in 1996, the ICC consistently heeded the Fifth Circuit's mandate, correctly concluding that it lacked authority to regulate the substance of compensation or deduction provisions in carrier/owner-operator lease agreements. For example, in 1987, the ICC rejected OOIDA's demand for a regulation prohibiting carriers from excluding insurance-related surcharges from their calculation of owner-operators' compensation. Relying on *Central Forwarding*, the ICC concluded that "the proposed rule...impermissibly would involve this agency in allocating revenues between the parties in owner-operator lease agreements." *Pet. for Investigation of Insurance Surcharges*, Ex. Parte No. MC-178 (Sub-No. 1), 1987 WL 98704, at *1 (I.C.C. June 15, 1987).

Four years later, when OOIDA again asked the ICC to regulate carriers' insurance surcharge practices, the ICC again refused. *Pet. for Investigatory Rulemaking: Insurance Surcharges*, Ex Parte No. MC-178 (Sub-No. 5), 1991 WL 148568, at *2 (I.C.C. July 29,

1991)("OOIDA is still asking the Commission to regulate owner-operator compensation. As the Commission made clear,...compensation is a matter of private contract over which the commission has no jurisdiction under *Central Forwarding*"). *See also McDonald v. C&H Nationwide, Inc.*, No. MC-C-30189, 1992 WL 161020, at *2 (I.C.C. June 29, 1992)("The leasing regulations do not, and cannot, set the precise terms of the contracts between the parties").

Count III of the present lawsuit is simply OOIDA's latest effort to end-run the leasing regulations to attain a goal directly contrary to the above settled precedent—*i.e.,* to attain substantive economic concessions from litigation which owner-operators have been unable to secure via contract. However, as the relevant judicial and administrative rulings make clear, the leasing regulations are not intended to mandate the economic terms of business arrangements between carriers and owner-operators; nor is there any "compelling public policy reason" to do so. *Pet. for Investigation of Indemnity and Hold-Harmless Clauses*, 1988 WL 225577, *2. In fact, as discussed above, there are compelling policy reasons not to permit owner-operators to evade all financial responsibility for their own actions by receiving free liability insurance.

Accordingly, consistent with the Supreme Court's settled and clear directive in *Brada Miller*, this Court should dismiss Count III because the standard industry practice of obtaining reimbursement for necessary PL/PD insurance costs "d[oes] not affect this basic responsibility of the [motor carrier] lessee to the public; it affect[s] only the relationship between the [motor carrier] and the [owner-operator]." *Brada Miller's* 423 U.S. at 39. *See also Carolina Cas. Ins. Co. v. Transport Indem. Co.*, 533 F. Supp. 22, 25-26 (D.C.S.C. 1981)("Implicit in [*Brada Miller's*] approach is the proposition that once the public is protected by the existence of an adequate fund, the purpose of the regulations is fulfilled and the parties and their insurers are free to allocate ultimate responsibility among themselves").

**IV.    Count IV Should Be Dismissed Because There Is No Cause Of Action For A Carrier's "Failure to Monitor And Control" The Actions Of Its Independent Agents, And No Precedent For The Sweeping "Relief" Sought By Plaintiffs**

Count IV, styled "Failure to Monitor and Control the Actions of Local Agents," should be dismissed because no such cause of action exists as a matter of law.  Plaintiffs' purported legal basis for this count, 49 U.S.C. § 13907, is not privately enforceable and does not require carriers to "monitor and control the actions" of independent agents in any event.  Rather, that statute simply imposes vicarious liability upon household goods carriers for claims against their agents "which relate to the performance" of household goods transportation services:

> (a) <u>Carriers responsible for agents</u>.—Each motor carrier providing transportation of household goods shall be responsible for all acts or omissions of any of its agents **which relate to the performance of household goods transportation services…**and which are within the actual or apparent authority of the agent from the carrier….

> (b) <u>Standard for selecting agents</u>.—Each motor carrier providing transportation of household goods shall use due diligence and reasonable care in selecting and maintaining agents who are sufficiently knowledgeable, fit, willing and able **to provide adequate household goods transportation services…** and to fulfill the obligations imposed upon them by this part and by such carrier.

49 U.S.C. § 13907 (emphasis added).

The legislative history of §13907 confirms what its plain language states: namely, that it is a consumer protection statute designed to make carriers responsible to **shippers** for damages caused by independent agents while performing transportation services.  Congress believed such regulation of household goods carriers was appropriate because their customers (individual consumers shipping their personal belongings) were considered to be particularly vulnerable:

> The household goods moving industry provides services to individual shippers …[who] are individuals moving their personal effects.…The fact that the household moving sector does business directly with individual shippers also sets it apart from the rest of the trucking industry.  These shippers usually move only once or twice in their lives and, consequently, lack a thorough understanding of the industry and sufficient clout to negotiate with it.  Their

> situation is made more vulnerable by the fact that the moves involve all of their personal possessions, which often are of a fragile nature.…

H.R. Rep. No. 1372, at 2, *reprinted in* 1980 U.S.C.C.A.N. 4271, 4272; *see also id.* at 3, *reprinted in* 1980 U.S.C.C.A.N. at 4273 ("In putting together this legislation, the Committee focused its attention on the individual shipper's special situation"); *id.* at 5, *reprinted in* 1980 U.S.C.C.A.N. at 4275 ("The committee recognizes that many users of household goods carriers are ordinary consumers unfamiliar with how the industry works and without the economic leverage of commercial shippers. These persons tend to be more vulnerable tha[n] other shippers…"); *id.* (consumer protection is the bill's "major thrust").[13]

Accordingly, those courts that have invoked § 13907 have invariably done so in the context of resolving who, as between carrier and agent, should be liable for a consumer's losses stemming from a shipment and/or claims under a bill of lading. *See*, *e.g. Schwarz v. National Van Lines, Inc.*, 2004 WL 1497804, *2 (N.D. Ill. Jul 02, 2004)(addressing carrier's vicarious liability to shipper based upon agent's alleged actions); *Taylor v. Mayflower Transit, Inc.*, 161 F. Supp.2d 651, 652 (W.D.N.C. 2000)(same); *Werner v. Lawrence Transp. Systems, Inc.*, 52 F.Supp.2d 567, 567 (E.D.N.C. 1998)(same); *Marks v. Suddath Relocation Systems, Inc.*, 319 F.Supp.2d 746, 747 (S.D. Tex. 2004)(same).

Critically, moreover, there is no private right of action relating to any aspect of § 13907. Rather, enforcement of the statute is expressly and exclusively vested in the U.S. Department of Transportation, and consists solely of administrative proceedings against the allegedly culpable agent (and not the motor carrier under whose authority the agent is operating). Subsection (c) of

---

[13] The above-quoted House Report (Ex. A) relates to the Household Goods Transportation Act, which included § 13907's identically worded predecessor statute. *See* 49 U.S.C. § 10934, P.L. 96-454 (1980)(repealed).

§ 13907, entitled "Enforcement," provides as follows:

   (c)   <u>Enforcement</u>.

      (1)  <u>Complaint.</u>  Whenever **the Secretary** has reason to believe…that **an agent** providing household goods transportation services…under the authority of a motor carrier…has violated section 14901(e) or 14912 or is consistently not fit, willing, and able to provide adequate household goods transportation services…, **the Secretary** may issue to such **agent** a complaint stating the charges….

      (2)  <u>Right to Defend</u>.  The **agent** shall have the right to appear at such [administrative] hearing and rebut the charges in the complaint.

      (3)  <u>Order</u>.  \*\*\*[After the administrative hearing], **the Secretary** may issue an order to limit, condition, or prohibit such **agent** from any involvement in the transportation or provision of services incidental to the transportation of household goods….

                \*\*\*

      (5)  <u>Court Review</u>.  Any **agent** adversely affected or aggrieved by an order of **the Secretary** issued under this subsection may seek relief in the appropriate United States court of appeals….

(emphasis added).  Thus, the express language of §13907(c) makes it clear that no private right of action exists, and that even governmental enforcement is limited to administrative proceedings against agents rather than the motor carriers with whom they are affiliated.

In addition, neither § 13907 nor the leasing regulations impose upon motor carriers the supposed "duty" conjured up by plaintiffs to "monitor and oversee the business practices of [their] local agents."  [*See* Compl. ¶49].  At most, the leasing regulations require carriers to ensure that their agents provide "the rights and benefits" specified in 49 C.F.R. § 376.12 in the lease agreements such agents enter into with their owner-operators.  *See* 49 C.F.R. § 376.12(m).  There is no provision whatever in the regulations which purports to regulate the substance of a motor carrier's business relationship with its independent agents.  Nor is there any hint in the regulations, their administrative history, or the relevant case law that owner-operators are

somehow entitled to sue for judicial regulation of a carrier's relationship with its agents.  On the

contrary, as previously explained (*see* Part II, pp. 9-11 above), the enforcement scheme created

by the ICC Termination Act provides only for recovery of "damages…as a result of an act or

omission of [the carrier] in violation of this part," and for injunctive relief (which, as noted,

plaintiffs cannot seek).  49 U.S.C. § 14704(a).

Accordingly, to plead a cognizable claim under the leasing regulations, plaintiffs must at

the very least allege (1) a specific regulatory "violation," and (2) resulting "damages."  *See* 49

U.S.C. § 14704(a)(2).  Count IV alleges neither a violation nor alleged damages, but merely

states in sweeping and conclusory fashion that "United's local agents have engaged in a pattern

and practice" of supposed noncompliance with leasing regulation requirements, "including

compensation, charge-back, escrow and insurance related violations." [Compl. ¶ 50].  Even

under liberal federal pleading standards, such a broad-brush allegation adds nothing to plaintiffs'

Complaint, for it fails to give defendants fair notice of the nature of the purported violations, how

plaintiffs claim they were directly injured thereby, or the extent of their damages.  As the First

Circuit has emphasized:

> Even though we give plaintiffs the benefit of the doubt in reviewing a
> complaint's sufficiency, we need not credit bald assertions, periphrastic
> circumlocutions [or] unsubstantiated conclusions…. [Rule 8(a)(2)], establishing
> the requirements for an adequate complaint, does not entitle a plaintiff to rest on
> subjective characterizations or conclusory descriptions of a general scenario
> which could be dominated by unpleaded facts. **Even under the modern "notice
> pleading" regime, a plaintiff is required to set forth factual allegations,
> either direct or inferential, respecting each material element necessary to
> sustain recovery under some actionable legal theory.**

*Arroyo-Santiago v. Garcia-Vicario*, 1999 WL 551294, *4 (1st Cir. Jul. 28, 1999)(emphasis

added; citations omitted).[14]

Equally irrelevant is plaintiffs' pejoratively-phrased allegation that "[s]ince United's corporate officers and board of directors are comprised largely of representatives of United['s]… local agents, United occupies the classic position of a fox superintending activities in the chicken coop." [Compl. ¶ 49]. Plaintiffs' unfounded assertion that United's very corporate structure is somehow privately actionable simply highlights their Kafkaesque view of motor carriers' "obligations" under the leasing regulations.

From the short and simple list of lease disclosure requirements prescribed by 49 C.F.R. § 376.12, plaintiffs seek to invent a sweeping legal "duty" on the part of United (and all its corporate affiliates) to "monitor and oversee the business practices" of all United agents—even though the relevant agency agreements between United and its independent agents flatly prohibit any such systematic and sweeping interference with the agents' business.

Plaintiffs also claim that by suing United in this lawsuit, they automatically acquire the right—as self-appointed private attorneys general—to institute a boundless inquisition of all "compensation, charge-back, escrow, and insurance" practices of each and every one of United's hundreds of agents. Not **one** of these independently-owned and independently-operated agents, it is important to emphasize, is a party to this lawsuit. Nevertheless, plaintiffs in Count IV purport to require United to "render an accounting" for the completely unspecified "wrongdoing

---

[14] *See also Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 198 (7th Cir. 1985)("Even the liberal notice pleading allowed by the federal rules requires the complaint to include the operative facts upon which a plaintiff bases his claim."); *Lasky v. Shearson Lehman Bros. Inc.*, 139 F.R.D. 597, 598-99 (S.D.N.Y. 1991)(dismissing RICO claim where "the allegations set forth merely state the factual and legal conclusions necessary to prevail on the merits and are unsupported by facts"); *Ruderman v. Police Dept. of City of New York*, 857 F. Supp. 326, 330 (S.D.N.Y. 1994)("mere conclusory allegations fail to give notice of the basic events and circumstances of which the plaintiff complains. Such allegations are meaningless as a practical matter and, as a matter of law, insufficient to state a claim").

of [all] its local agents." [Compl. ¶52]. Yet there is not a single statute, regulation, administrative pronouncement, or judicial ruling which supports this sweeping demand for an "accounting" of the detailed business practices of hundreds of non-parties. To the contrary, the stated premise of Count IV—that United has a legal duty to "monitor and oversee [agent] business practices"—runs directly contrary to Congress's long-standing policy of noninterference with the relationships between motor carriers and their agents.[15]

Apart from the fact that Count IV pleads a nonexistent cause of action, 49 U.S.C. § 14704(a) does not authorize the extravagant "accounting" remedy demanded by plaintiffs. Indeed, § 14704(a) nowhere lists "accounting" as an available remedy, let alone authorizes the sweeping, massively expensive, and unlawful expedition through hundreds of non-party agents' files which plaintiffs apparently wish to pursue.

Ultimately, Count IV is no more than a thinly-veiled attempt by plaintiffs to end run several fundamental principles governing discovery in federal courts. These include the well-established rule that the discovery sought should be reasonably related to the claims or defenses

---

[15] When it enacted the Household Goods Transportation Act in 1980, Congress recognized that motor carriers' use of independent agents is the product of pressing and legitimate business needs, and that a great many carriers rely heavily upon such agents to conduct their business. H.R. Rep. No. 1372, at 2, *reprinted in* 1980 U.S.C.C.A.N. 4271, 4272. Accordingly, Congress "ma[d]e it very clear that the new authority [granted to the ICC] does not authorize the Commission to create a new regulatory structure to impose restrictions or regulations upon household goods agents." *Id.* at 8, *reprinted in* 1980 U.S.C.C.A.N. at 4278. Additionally, as described in the House Report, the Act also granted antitrust immunity for the very purpose of preserving carriers' relationships with their agents:

> **The purpose of the [immunity provision] is to allow the continuation of certain relationships between carriers and agents which have been established over the years.** In some cases, the carriers are composed and owned by agents who themselves are carriers within limited geographical areas…. These relationships could be jeopardized in the absence of antitrust immunity.

*Id.* at 10, *reprinted in* 1980 U.S.C.C.A.N. 4271, *4280 (emphasis added).

actually asserted in the action.  *See, e.g., Kadar Corp. v. Milbury*, 549 F.2d 230, 233 n.2 (1st Cir. 1977)(a plaintiff is not entitled to discovery "merely to find out whether or not there may be a factual basis for a claim which she has not made")(quoting *Cohen v. Illinois Inst. of Technology*, 524 F.2d 818, 827 (7th Cir. 1975)).  A second key principle is that civil litigants such as the defendants in this case cannot be compelled to provide documents or information in the hands of non-parties, let alone "render an accounting" for such non-parties' vaguely described wrongs.[16]

Plaintiffs may not circumvent these well-established limits on discovery merely by asserting a broad-brush, unsupported, and legally unprecedented demand that defendants provide a so-called "accounting" of the detailed business operations of numerous non-parties. *Cf. Home Ins. Co. v. First Nat. Bank of Rome*, 89 F.R.D. 485, 488 (N.D. Ga. 1980)("It is well-established that independent relief is not customarily available in aid of or in lieu of discovery under Rule 34, particularly when discovery rules provide an adequate remedy").

Accordingly, because there is no precedent or legal basis for the cause of action or the relief requested by plaintiffs in Count IV, it should be summarily dismissed.

## <u>CONCLUSION</u>

For all of the foregoing reasons, defendants United Van Lines, Vanliner Insurance

---

[16] In fact, the district court in OOIDA's separate class action against UniGroup's other motor carrier subsidiary, Mayflower Transit, squarely rejected OOIDA's attempt to require Mayflower to collect and produce documents from each of its more than 400 independent non-party agents.  As the court explained:

> The magistrate judge agrees that defendant does not have possession or control of [agent] documents simply because the documents are possessed by defendant's agents, nor do the federal [leasing] regulations cited by plaintiffs mean that defendant has the legal right to obtain the requested documents from its agents.  **Accordingly, as to those documents which belong to defendant's independent agents, defendant's objection is sustained, and plaintiffs must obtain these documents by means of third-party discovery.**

*See* Ex. C, *OOIDA v. Mayflower*, Nos. IP98-0457 and IP98-0458, slip. op. (S.D. Ind. Oct. 20, 1998) (emphasis added).

Company, and UniGroup, Inc. respectfully request this Court to dismiss all counts of Plaintiffs'

Class Action Complaint with prejudice and at plaintiffs' costs, and to grant defendants such other

and further relief as may be appropriate in the circumstances.

Respectfully submitted,

SALLY & FITCH LLP


By: /s/ *Jennifer E. Greaney*
Francis J. Sally (BBO # 439100)
Jennifer E. Greaney (BBO # 643337)
225 Franklin Street
Boston, Massachusetts 02110
(617) 542-5542 (phone)
(617) 542-1542 (facsimile)

THOMPSON COBURN LLP
David Wells (*pro hac vice* app. pending)
Michael J. Morris (*pro hac vice* app. pending)
Rebecca A. Pinto (*pro hac vice* app. pending)
One U.S. Bank Plaza
St. Louis, MO 63101
(314) 552-6000 (phone)
(314) 552-7000 (facsimile)

Attorneys for Defendants United Van Lines, LLC,
Vanliner Insurance Company, and UniGroup, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Memorandum in Support of Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Class Action Complaint has been served upon the following counsel of record this 2nd day of May, 2005, by U.S. Mail first class postage prepaid.

Paul D. Cullen, Sr.
David A. Cohen
Susan Van Bell
THE CULLEN LAW FIRM, PLLC
1101 30th Street, N.W., Suite 300
Washington, DC 20007

John A. Kiernan
Kenneth H. Naide
BONNER KIERNAN TREBACH & CROCIATA
One Liberty Square, 6th Floor
Boston, MA 02109
(617) 426-3900

/s/ *Jennifer E. Greaney*
Jennifer E. Greaney