## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **OWNER-OPERATOR INDEPENDENT** | ) | |
| **DRIVERS ASSOCIATION, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No. 05 CV 10317 MLW** |
| | ) | |
| **UNITED VAN LINES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

### PLAINTIFFS' OPPOSITION TO DEFENDANT UNIGROUP, INC.'S
### MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Pursuant to Federal Rule of Civil Procedure 7 and Local Rule 7.1, Plaintiffs respectfully submit this Opposition to Defendants UniGroup, Inc.'s ("UniGroup") Motion to Dismiss For Lack of Personal Jurisdiction. In the alternative, should the Court conclude that Plaintiffs have not thus far made the required showing for a finding of personal jurisdiction, Plaintiffs respectfully request that the Court stay its decision on the motion to dismiss and grant leave for jurisdictional discovery to be taken.

In opposition to Defendants' Motion, Plaintiffs submit the following:

### I. INTRODUCTION

Defendant UniGroup and Vanliner, as affiliates of Defendant United, have directed, aided, and profited from United's violations of the Truth-in-Leasing regulations. Contrary to UniGroup's claims, UniGroup is subject to personal jurisdiction under the Massachusetts long-arm statute because UniGroup is transacting business in Massachusetts by virtue of its relationship with United and United's local agents.

## II.  STANDARD OF REVIEW OF MOTION TO DISMISS
## FOR LACK OF PERSONAL JURISDICTION

Defendants have brought their motion to dismiss under Fed. R. Civ. P. 12(b)(2).  The

most commonly used method for determining a motion to dismiss for lack of personal

jurisdiction is for the district court to consider only whether the plaintiff has proffered evidence

that, if credited, is enough to support findings of facts essential to personal jurisdiction.[1]  The

court reviews whether the plaintiff has shown facts sufficient to satisfy "both the forum's long-

arm statute and the due process clause of the Constitution."[2]  This standard is referred to as the

"*prima facie*" standard.  Although plaintiffs may not rely on unsupported allegations in their

pleadings to make a *prima facie* showing of personal jurisdiction, the district court is not acting

as a factfinder but must instead accept properly supported proffers of evidence by plaintiff as

true.[3]  Applying this standard, Plaintiffs are able to offer sufficient evidence to make a *prima*

*facie* showing that the Court has personal jurisdiction over UniGroup.

## III.  THIS COURT MAY ASSERT JURISDICTION OVER UNIGROUP UNDER THE
## MASSACHUSETTS LONG-ARM STATUTE.

Contrary to UniGroup's claims, this Court may properly exercise jurisdiction over

UniGroup pursuant to the Massachusetts long-arm statute.

### A.  Requirements to satisfy "transacting business" under the long-arm statute.

The Massachusetts long-arm statute, M.G.L. c. 223A, § 3 made applicable by virtue of

Fed. R. Civ. P. 4(e) in a federal question case, establishes jurisdiction when the claim arises from

the person's "(a) transacting any business in this Commonwealth."  To establish jurisdiction

---

[1]  *Boit v. Gar-Tec Products, Inc.,* 967 F.2d 671, 675 (1st Cir. 1992).

[2]  *Id.*, quoting *U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.*, 894 F.2d 9, 11 (1st Cir. 1990).

[3]  *Id.* (Citations omitted).

under § 3(a), the plaintiff must proffer evidence tending to show two things: the defendant "transacted business" in the Commonwealth, and the plaintiff's claim "arose from" the transaction of business by the defendant.[4] Section 3(a) has been interpreted to extend to its due process limits.[5]

The "transacting business" clause in § 3(a) has been construed broadly.[6] "Just a few acts on a defendant's part can often suffice to satisfy the long-arm statute's threshod for transacting business."[7] The defendant need not be physically present in the state to "transact business" in the state.[8] In addition, the reference to "transacting business" does not require that the defendant have engaged in commercial activity. "That language is general and applies to any purposeful acts by an individual, whether personal, private or commercial."[9] The jurisdictional factors set forth in Section IV below show that UniGroup is "transacting business" within Massachusetts

---

[4] *Pike v. Clinton Fishpacking, Inc.,* 2001 U.S. Dist. LEXIS 7334 (D. Mass. 2001), citing *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 767, 625 N.E.2d 549 (1994).

[5] *Catrone v. Ogden Suffolk Downs, Inc.,* 647 F.Supp. 850, 858 (D. Mass. 1986), citing *Balloon Bouquets, Inc. v. Balloon Telegrams Delivery, Inc.,* 18 Mass.App. 935, 936, 466 N.E.2d 523 (1984).

[6] *Workgroup Technology Corp. v. MGM Grand Hotel, LLC,* 246 F.Supp.2d 102, 110 (D. Mass. 2003), citing *United Elec. Radio and Machine Workers of America v. 163 Pleasant St. Corp.,* 960 F.2d 1080,1086 (1st Cir. 1992) (Citation omitted).

[7] *Id.* , citing *Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.,* 764 F.2d 928, 931 (1st Cir. 1985) (Holding that mailing four letters and receiving one telephone call from plaintiff in Massachusetts in the course of negotiating a guaranty satisfied the transacting business requirement of § 3(a). *See also Hahn v. Vermont Law School,* 698 F.2d 48 (1st Cir. 1983) (Actions of defendant in mailing to plaintiff in Massachusetts application information and an acceptance letter were sufficient to constitute transacting business under the broadly construed Massachusetts long-arm statute); *Nova Biomedical Corp. v. Moller,* 629 F.2d 190 (1st Cir. 1980) (Defendant's mailing two letters to plaintiff in Massachusetts demanding that it cease and desist from infringing defendant's patent constituted transacting business for purposes of long-arm statute).

[8] *Workgroup Technology,* 246 F.Supp. at 110 (citation omitted).

[9] *Catrone v. Ogden Suffolk Downs,* 647 F.Supp. at 858, citing *Hahn v. Vermont Law School,* 698 F.2d at 51.

3

within the meaning of § 3(a).

## B. Jurisdiction over an out-of-state parent corporation with a subsidiary in Massachusetts.

UniGroup, relying primarily on cases that discuss the situation in which a parent corporation is only a "passive investor," contends that the relationship between UniGroup and United is insufficient to confer jurisdiction over UniGroup. However, looking at all the factors considered by the courts, the relationship between UniGroup and United is sufficient to confer jurisdiction over UniGroup in Massachusetts.

While the parent-subsidiary relationship in itself is insufficient to justify the exercise of jurisdiction, "the close relationship between the two companies is a relevant factor that may be considered."[10] The "nature and extent" of the parent-subsidiary relationship, as well as "the relevance of the subject matter of the suit to defendant's affairs within the state" are significant factors.[11] As discussed by the First Circuit in *Donatelli v. National Hockey League*,

We start with the relationship between corporation and wholly-owned subsidiary. In general, the courts have presumed the institutional independence of parent and subsidiary when determining whether jurisdiction may be asserted over the parent solely on the basis of the subsidiary's contacts with the forum. But, the fact of separate incorporation is not alone determinative of a court's constitutional power to assert personal jurisdiction over the parent based on the subsidiary's activities; rather, "[t]here is a presumption of corporate separateness that [may] be overcome by clear evidence." Despite the fact that corporate entities are distinct and their veils unpierced, courts can – and usually do – make an actual inquiry into the nature of the interrelationship before abandoning the jurisdictional quest.[12]

"Significant exercise of control by an out-of-state parent corporation over a subsidiary

---

[10] *Mangual v. General Battery Corp.*, 710 F.2d 15, 21 (1st Cir. 1983).

[11] *Volkswagen Interamericana. S.A. v. Rohlsen,* 360 F.2d 437, 440 (1st Cir. 1966).

[12] 893 F.2d 459, 465 (1st Cir. 1990) (Internal citations omitted).

and significant intermingling of officers and directors between parent and subsidiary have served to establish jurisdiction in the State where the subsidiary is conducting its business operations."[13] In *Kleinerman,* the court found jurisdiction over a non-resident parent corporation that exercised significant control over activities of its Massachusetts subsidiary by way of budget and staffing decisions. The *Kleinerman* court noted that "[r]unning the operations of a subsidiary in Massachusetts constitutes a breadth of business activity that necessarily involves exercise of the privilege of conducting business here."[14] *See also Donatelli*, 893 F.2d at 466 ("Since the essence of personal jurisdiction is to bring responsible parties before the court, a corporation which is actually responsible for its subsidiary's decision to undertake instate activities should, in all fairness, be within the state court's jurisdictional reach.").[15]

The jurisdictional factors set forth below show that UniGroup has significant control over United and its local agents. UniGroup, by virtue of its relationship with United and its local agents in Massachusetts, has subjected itself to the jurisdiction of this Court.

---

[13] *Kleinerman v. Phillip H. Morse*, 26 Mass.App.Ct. 819, 823, 533 N.E.2d 221, 224 (Mass. App. 1989) (citations omitted).

[14] *Id.*

[15] In *United Elec. Radio and Machine Workers of America v. 163 Pleasant St. Corp.,* 960 F.2d at 1091-1092, the First Circuit noted that, although Massachusetts common law permits disregarding the corporate form only in rare situations, in a federal question case "courts are wary of allowing the corporate form to stymie legislative policies." The court instructed that a federal court should "look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the common law strict alter ego doctrine." Quoting *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981) (citations omitted). In this instance, as is fully set forth in the Plaintiffs' Opposition to UniGroup and Vanliner's Motion to Dismiss Non-Carrier Defendants, the purpose of the Motor Carrier Act has been interpreted to prevent collusion between a motor carrier and its affiliates to violate the Truth-in-Leasing regulations. That is exactly what Plaintiffs allege has occurred between United, UniGroup and Vanliner.

## IV. JURISDICTIONAL FACTS CONCERNING UNIGROUP

Among the jurisdictional allegations concerning UniGroup in Plaintiffs' Complaint are

the following:

UniGroup is owned and operated by local agents for Defendant United and Mayflower Transit, LLC. (Complaint ¶ 10).

No shares of UniGroup may be acquired by anyone who is not an active local agent for either United or Mayflower. (Complaint ¶ 10).

UniGroup's board of directors is comprised exclusively of local agents of United and Mayflower. (Complaint ¶ 10).

All or substantially all of UniGroup's directors also serve as directors of Defendants United and Vanliner. (Complaint ¶ 10).

Many of UniGroup's corporate officers also serve as corporate officers of Defendants United and Vanliner. (Complaint ¶ 10).

Defendant UniGroup has had significant contacts within the Commonwealth of Massachusetts including direct communications with Massachusetts residents through advertisements and over the internet. (Complaint ¶ 11).

Two of UniGroups corporate directors reside in Massachusetts and, on information and belief, conduct business on behalf of UniGroup within the Commonwealth. (Complaint ¶ 11).[16]

Defendants United, Vanliner and UniGroup, with their interlocking boards of directors and corporate officers, and with their common ownership, are affiliated entities and operate a seamless business enterprise. (Complaint ¶ 12).

Many of the wrongs committed by Defendant United that are alleged in this complaint are carried out on United's behalf by officers and employees of Defendants UniGroup and Vanliner. (Complaint ¶ 12).

In addition to the jurisdictional facts alleged in Plaintiffs' Complaint, Plaintiffs submit

the following jurisdictional facts concerning UniGroup, including facts directed toward

UniGroup's relationship with United and United's local agents:

---

[16]  This information was obtained from review of 2003 and 2004 Annual Registration Reports and a May

UniGroup provides "central support services" to United Van Lines. See Exhibit A, Excerpt of UniGroup, Inc. 1995 Annual Report, provided by Mayflower Transit in discovery in *OOIDA v. Mayflower Transit Co.,* Case Nos. IP 98-0457 and IP98-0458, U.S. District Court for the Southern District of Indiana, p. MTI 0000583.[17]

UniGroup provides "overall policy direction" for United. Exhibit A, p. MTI 0000583.

UniGroup "systematically engages in both annual and strategic (long-range) planning for its companies." Exhibit A, p. MTI 0000583.

Day-to-day activities of United are overseen by chief operating officers, all of whom report to the president of UniGroup.  Exhibit A, p. MTI 0000585.

UniGroup has provided "a degree of self-sufficiency" through the establishment of "our own equipment, insurance, and financial subsidiaries which help to encourage the further growth of agents affiliated with United Van Lines and now with Mayflower Transit." Exhibit A, p. MTI 0000584.

United Van Lines benefits from specialized programs and services made available by other UniGroup subsidiaries, including Vanliner Group. "Business volume realized by these subsidiaries helps to strengthen UniGroup at the same time that agents of both van lines[18] realize economic benefits made possible by their combined buying power." Exhibit A, p. MTI 0000583.

UniGroup provides centralized services and addresses the "common administrative needs" of United, Mayflower, and other of its subsidiaries, including human resources, information technology, financial services, legal services, supply and mail services, conference services, corporate travel, advertising/promotions/public relations, food services, and corporate security. Exhibit A, p. MTI 0000585.[19]
In 2003, UniGroup developed a new model lease for use by United and Mayflower agents. See Exhibit B, deposition excerpts of George Smith, Assistant Secretary to UniGroup, Mayflower and United, pages 65-66.

The cover sheet of the new lease agreement is copyrighted "2003 UniGroup, Inc., All

---

19, 2004 press release. Defendants contend that only one UniGroup Director resides in Massachusetts.

[17] Mayflower is represented in those cases by the same counsel as UniGroup in this matter. Accordingly, counsel in this matter is familiar with Exhibit A.

[18] United Van Lines and Mayflower Transit, Inc.

[19] See also UniGroup's website, www.unigroupinc.com, under "Profile," which currently makes the same representations regarding UniGroup's involvement with United.

Rights Reserved." See Exhibits C and D; executed leases of Plaintiffs Lee and Bullard.

UniGroup personnel provided training to United agents regarding implementation of the new lease agreements. See Exhibit B, pages 71- 76.

UniGroup required that agents adopt the new lease, and it imposes penalties for non-compliance. See Exhibit E, Deposition Excerpts of Steven Dawkins, Executive Vice President of UniGroup Transportation Services Group,
pages 74-75, 83-84.

UniGroup provides training to United and Mayflower agents (including agents in Massachusetts) through UniGroup University, an on-line training system. Hundreds of courses are offered, with the goal of standardization of practices. See Exhibit E, pages 53-54; Exhibit F, United brochure obtained from Conlon Moving & Storage, Inc., p. 6.

Exhibit F, a United Van Lines brochure obtained from United agent Conlon Moving & Storage in Seekonk, Massachusetts, touts the training of agency personnel by UniGroup University, and also provides advertising information about UniGroup, stating:

> United Van Lines is the largest operating subsidiary of UniGroup, Inc.
> Founded in 1987, UniGroup is also the parent company of Mayflower Transit,
> Group, Inc., providing specialized insurance coverages for movers; Trans
> Advantage, Inc., which sells and leases rolling stock and sell movers' supplies;
> UniGroup Worldwide, which arranges transportation of household goods and
> other commodities; and Pinnacle Group Associates, Inc., a full-service relocation
> company.[20]

Thus, anyone obtaining this brochure from this local Massachusetts agent obtains

advertising information about UniGroup and its subsidiaries.

It is quite clear from these facts, which cannot be contested by UniGroup, that UniGroup

is much more than a passive investment holding company. On the contrary, UniGroup is

involved in promulgating and implementing policies and procedures related to United and its

local agents. In fact, UniGroup is intimately involved with owner-operator leases, the very issue

at hand in this litigation. UniGroup developed a model lease that it requires its agents to use.

By virtue of Unigroup's control of United and its agents in this regard alone, the "nature and

---

[20]   Exhibit F, pages 6, 9.

8

extent" of the parent-subsidiary relationship, as well as "the relevance of the subject matter of the suit to defendant's affairs within the state"[21] are factors under which this Court should find that UniGroup is subject to the jurisdiction of this Court. Moreover, UniGroup's control of United and its agents should deem UniGroup subject to the jurisdiction of this Court because "a corporation which is actually responsible for its subsidiary's decision to undertake instate activities should, in all fairness, be within the state court's jurisdictional reach." [22]

With respect to the requirement that the cause of action arise out of the defendant's conducting business in Massachusetts, there is no question that this cause of action arises out of UniGroup's conducting business within Massachusetts. Plaintiff Pelletier entered into his lease agreement with a United agent in Massachusetts. The alleged violations of the Truth-in-Leasing regulations arise out of that lease agreement. Similarly, all other owner-operators who entered into lease agreements with United agents in Massachusetts have causes of action for violations of the Truth-in-Leasing regulations arising out of those Massachusetts leases.

## CONCLUSION

Applying the standard of review for a motion to dismiss under 12(b)(2), Defendant's motion should be denied. Plaintiffs have satisfied the requirement that they make a *prima facie* showing of jurisdictional facts sufficient to bring UniGroup before this Court. In the alternative, should the Court find that a sufficient showing has not been made, Plaintiffs request that the

---

[21] *Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d at 440.

[22] *Donatelli*, 893 F.2d at 466.

Court stay its decision on the motion to dismiss and grant leave for jurisdictional discovery to be taken.[23]

## REQUEST FOR ORAL ARGUMENT

Plaintiffs believe that oral argument may assist the Court. Pursuant to Local Rule 7.1(d),

Plaintiffs respectfully request that the Court schedule oral argument on this issue.

Respectfully submitted,

OWNER-OPERATOR INDEPENDENT
DRIVERS ASSOCIATION, INC., et al.

By:

John A. Kiernan (BBO #271020)
Kenneth H. Naide (BBO #643213)
**BONNER KIERNAN TREBACH & CROCIATA**
One Liberty Square, 6th Floor
Boston, MA. 02109
(617) 426-3900

Paul D. Cullen, Sr. (*pro hac vice* app. pending)
David A. Cohen (*pro hac vice* app. pending)
Susan Van Bell (*pro hac vice* app. pending)
*THE CULLEN LAW FIRM, PLLC*
1101 30th Street, N.W., Suite 300
Washington, DC 20007
Telephone: (202) 944-8600

---

[23] *See Sunview Condo. Ass'n. V. Flexel Int'l., Ltd.,* 116 F.3d 962, 964 (1st Cir. 1997) (Plaintiff may take jurisdictional discovery if its claim is "colorable"); *Surpitski v. Hughes-Keenan Corp.,* 362 F.2d 254, 255-56 (1st Cir. 1966) (Holding that district court should have allowed discovery before ruling on a motion to dismiss for lack of personal jurisdiction where the plaintiff "had at least made good headway, and shown his position not to be frivolous.").

10

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that copies of the foregoing Plaintiffs' Opposition to Defendant UniGroup, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction has been served upon the counsel of record listed below, this 15th day of June, 2005 by posting said copies in the United States mail, first class, postage prepaid to:

Francis J. Sally
Jennifer E. Greaney
Sally & Fitch LLP
225 Franklin Street
Boston, Massachusetts 02110

David Wells
Michael J. Morris
Rebecca A. Pinto
Thompson Coburn LLP
One U.S. Bank Plaza
St. Louis, Missouri 63101

# UNIGROUP, INC.

# 1995 Annual Report



United Van Lines, Inc.

Mayflower Transit, Inc.

United Leasing, Inc.

Vanliner Group, Inc.

United Capital Services, Inc.

MTI 0000581

UNIGROUP, INC. • 1995 ANNUAL REPORT

U niGroup, Inc. is the parent company of United Van Lines, Inc., Mayflower Transit, Inc., and other subsidiaries which complement the worldwide operations of these two major household goods transportation companies. The largest of the supporting subsidiaries are Vanliner Group, Inc., which provides customized insurance and risk management services; United Leasing, Inc., which sells and leases trucks, trailers, and related equipment; and United Capital Services, Inc., which provides internal financing services.

UniGroup's corporate offices and world headquarters are located in suburban St. Louis, Missouri.

## FINANCIAL HIGHLIGHTS
### UNIGROUP, INC. AND SUBSIDIARIES

| Years Ended December 31 (Dollars in thousands) | 1995 | 1994 |
|---|---|---|
| Revenues | $1,405,931 | $995,028 |
| Earnings before income taxes | 30,130 | 19,824 |
| Income taxes | 10,814 | 6,297 |
| Net earnings | 19,316 | 13,527 |
| Total assets | 716,319 | 491,547 |
| Shareholders' equity | 146,501 | 121,599 |

MTI 0000582

## TO OUR SHAREHOLDERS:

The profile of UniGroup, Inc. changed significantly during 1995 with the acquisition of a second major van line — Mayflower Transit, Inc. — as a sister company to United Van Lines, Inc. Following the March 30 finalization of the Mayflower agreement, UniGroup proceeded to post its first-ever billion-dollar year, achieving consolidated revenues of $1.4 billion and making it one of the largest transportation companies in the United States.

Our decision to purchase Mayflower and in the process own two of the nation's top four movers was a precedent-setting step and the most significant industry organizational change in recent history. Equally important is the manner in which we are operating the two carriers — as ongoing competitors in the marketplace. The uninterrupted functioning of both van lines validates the premise on which UniGroup is based — to operate transportation and related companies which are recognized for offering customers the highest-quality service obtainable.

Since its formation in 1988, UniGroup has provided central support services to United Van Lines, Inc., United Leasing, Inc., and Vanliner Group, Inc. Mayflower Transit, for many years the best-known of all movers among consumers, presents to UniGroup and its other operating companies a number of business opportunities:

- Services required by all household goods movers for day-to-day operations are similar. As a result, synergies have been and continue to be achieved by UniGroup in extending to Mayflower Transit the types of services already provided to United Van Lines.

- United Van Lines has benefitted from specialized programs and services made available by other UniGroup subsidiaries, notably United Leasing; Vanliner Group; and United Capital Services, Inc., our financial services subsidiary. Business volume realized by these subsidiaries helps to strengthen UniGroup at the same time that agents of both van lines realize economic benefits made possible by their combined buying power.

- United and Mayflower both have respected names in the movers' marketplace. As such, each maintains its own operating identity and sales function, with UniGroup providing overall policy direction. At the same time, in an industry which has traditionally been afflicted by capacity problems, joint ownership of United and Mayflower presents some opportunities for operating efficiencies in both systems.

- UniGroup systematically engages in both annual and strategic (long-range) planning for its companies. Its oversight of two prominent van lines as well as other supporting subsidiaries is enabling it to chart a coordinated corporate course which will support the future growth of all of these activities by encouraging further synergies which are unfolding with each passing month.

During 1995, UniGroup's financial strength was enhanced when its Shareholders approved two new classes of stock — one available to Mayflower Transit agents; and the other available to executives of UniGroup and its operating companies. Approval

MTI 0000583



*Maurice Greenblatt*
*Chairman*



*Robert J. Baer*
*President*

came one year after Shareholders approved a restructuring of the company's stock which resulted in over $13 million in new equity. The more recent addition of the Mayflower agent and management stock produced another $5 million in new equity.

Over the past 15 years, Shareholders of United/UniGroup have realized an average annual return on equity of 15.3 percent, a record of achievement we are proud to report. The Board of Directors and Management team are committed to continuing to preserve and enhance UniGroup Shareholders' investments by employing sound business practices and, where and when appropriate, taking responsible business risks. The UniGroup concept has given us a degree of self-sufficiency through the establishment of our own equipment, insurance, and financial subsidiaries which help to encourage the further growth of agents affiliated with United Van Lines and now with Mayflower Transit.

Because we are forging new paths, we will be guided by a series of "corporate imperatives" by which we will seek to nurture the growth and profitability of our agents and our operating subsidiaries. It is reasonable to project that, by the year 2000, UniGroup will be a $2 billion organization. With the continuing support of our customers, agents, owner-operators, and Headquarters employees, we will strive to set the pace for household goods moving and the other related UniGroup businesses, both in the United States and around the world.

*Maurice Greenblatt*
Maurice Greenblatt
Chairman

*Robert J. Baer*
Robert J. Baer
President

MTI 0000584

UNIGROUP, INC.



*UniGroup, Inc. Management Team – from left, Douglas H. Wilton, John W. Hamilton, Charles E. Childers, President Robert J. Baer, Gary M. Cunningham, Clifford Saxton, Jr., and Arthur R. Coffey.*

UniGroup, Inc. was created in 1988 as the parent company of, and provider of centralized services to, United Van Lines, Inc.; Vanliner Group, Inc.; United Leasing, Inc.; and United Capital Services, Inc. In 1995, Mayflower Transit, Inc. became a UniGroup company, and UniGroup's support role was expanded to address common administrative needs of the two major van lines as well as the other operating companies.

The president and chief operating officer of UniGroup also serves as the chief executive officer of each of the operating subsidiaries. Day-to-day activities of these companies are overseen by chief operating officers, all of whom report to the president of UniGroup.

UniGroup operates the corporation's World Headquarters campus in Fenton (suburban St. Louis), Missouri, and Mayflower's headquarters offices in Carmel (suburban Indianapolis), Indiana. United Van Lines and Mayflower maintain separate agency support, sales, and operating functions coor-

dinated at the respective headquarters. At the same time, UniGroup administers combined services supporting both van lines as well as Vanliner Group, Inc. and United Leasing, Inc., including: Human Resources; Information Technology; Financial Services; Legal Services; Supply and Mail Services; Conference Services; Corporate Travel; Advertising/Promotions/Public Relations; Food Services; and Corporate Security.

The office of the president coordinates the corporation's annual strategic planning activities, which bring together the UniGroup Board of Directors and senior management to identify and discuss long-range objectives, together with appropriate strategies for achieving the objectives. The 1994 strategic planning meeting provided the impetus leading to the March 1995 acquisition of Mayflower Transit.

MTI 0000585

$C$

# LARSON MOVING & STORAGE CO.
## d/b/a
# MOHAWK MOVING & STORAGE, INC.

**and**

Abraham's Way, Inc.

# INDEPENDENT CONTRACTOR
# OPERATING AGREEMENT

©2003 UniGroup, Inc., All Rights Reserved

Rev. 6/21/04

**LARSON MOVING & STORAGE CO. d/b/a MOHAWK MOVING & STORAGE, INC.**
**INDEPENDENT CONTRACTOR OPERATING AGREEMENT**

## TABLE OF CONTENTS

1. SERVICES AND EQUIPMENT ........................................1
2. EXCLUSIVE POSSESSION AND
   RESPONSIBILITY..........................................................1
3. CUSTOMER REQUIREMENTS....................................1
4. CONTRACTOR'S PRINCIPAL
   RESPONSIBILITIES.......................................................1
   (a) Services ...................................................................1
       (1) Number of Shipments.....................................1
       (2) CONTRACTOR Availability.............................1
   (b) Identification of the Equipment...............................1
       (1) At Start ...........................................................1
       (2) After First 6 Months.......................................1
       (3) Removal Upon Termination............................2
       (4) No CONTRACTOR Artwork.............................2
   (c) Substitute Vehicles .................................................2
   (d) Drivers.....................................................................2
       (1) Initial Safety Qualification .............................2
       (2) Disqualification of Drivers..............................2
   (e) Drug and Alcohol Testing........................................2
   (f) Uniforms...................................................................2
   (g) Paperwork Requirements.........................................2
       (1) CONTRACTOR Submission of
           Documents.....................................................2
       (2) Copies of this Agreement..............................2
   (h) Safe and Lawful Operations....................................2
   (i) Passenger Authorization .........................................3
   (j) Collections...............................................................3
5. CONTRACTOR NOT EMPLOYEE OF
   COMPANY...................................................................3
   (a) CONTRACTOR Furnishes/Controls All
       Personnel................................................................3
   (b) Indemnification of COMPANY..................................3
   (c) CONTRACTOR'S Control Over Manner
       and Means of Performance ....................................3
   (d) CONTRACTOR'S Supplying of Records.................3
6. COMPENSATION.........................................................3
7. SETTLEMENT PERIOD AND DOCUMENT
   REVIEW.......................................................................3
   (a) Payment Within 15 Days .........................................3
   (b) Not Contingent on No-Exception Bill of
       Lading.....................................................................3
   (c) CONTRACTOR'S Access to Freight
       Documentation .......................................................4
   (d) COMPANY'S Right to Delete Names.......................4
   (e) COMPANY'S Access to CONTRACTOR'S
       Documents ..............................................................4
8. CONTRACTOR'S PRINCIPAL EXPENSES ..................4
   (a) Operating Expenses.................................................4
   (b) Maintenance and Inspection ...................................4
       (1) Equipment Maintained in Good and
           Safe Condition...............................................4
       (2) Inspection of Equipment................................4

       (3) CONTRACTOR'S Required
           Recordkeeping...............................................4
   (c) Fines ........................................................................4
   (d) Overweight and Overdimensional
       Shipments ...............................................................4
       (1) CONTRACTOR'S Initial Size/Weight
           Compliance Check..........................................4
       (2) CONTRACTOR Liable for Failure to
           Do Compliance Check ....................................4
   (e) License Plates and SSRS Fees................................5
       (1) COMPANY Will Obtain Plates if
           CONTRACTOR Wishes....................................5
       (2) Deduction Upon Termination .........................5
       (3) CONTRACTOR'S Right to Pro-Rata
           Refund .............................................................5
       (4) SSRS Fees .....................................................5
   (f) Fuel and Fuel Tax Expense .....................................5
       (1) CONTRACTOR'S Expense .............................5
       (2) CONTRACTOR'S Fuel Receipts .....................5
       (3) COMPANY and VAN LINE Will Make
           Required Filings ..............................................5
       (4) Credits and Debits to CONTRACTOR............5
       (5) COMPANY/VAN LINE Responsibility
           for Additional Tax............................................5
       (6) Administrative Fee .........................................5
   (g) Communications Equipment.....................................5
       (1) Equipment......................................................5
       (2) Messaging Usage Fee....................................6
   (h) Re-powering a Load .................................................6
   (i) Expenses Charged to COMPANY ............................6
       (1) General Prohibition ........................................6
       (2) Obligations Incurred With COMPANY
           Approval...........................................................6
9. USE OF COMPANY'S TRAILER AND OTHER
   EQUIPMENT ...............................................................6
   (a) Use of Trailer and Other Equipment
       Restricted to COMPANY Service ............................6
   (b) Inspection and Inventory Report .............................6
   (c) Allocation of Expense Responsibility......................6
       (1) COMPANY'S Trailer .......................................6
       (2) COMPANY Electronic Bar Code
           Inventory Equipment.......................................6
       (3) In-Van and Other COMPANY
           Equipment........................................................7
   (d) Return of Trailer Upon Request or
       Termination.............................................................7
   (e) COMPANY'S Explanation and Itemization
       of Damage Deduction.............................................7
10. NO REQUIRED PURCHASES FROM
    COMPANY OR VAN LINE...........................................7
11. CHARGE-BACKS AND OTHER DEDUCTIONS.............7
    (a) Charge-Backs and Documentation.........................7

Mohawk ___ Independent Contractor Operating Agreement - i

(b) Future Settlements, Escrow Fund, and
    Separate Billing ....................................... 7
12. ACCIDENTS AND CLAIMS ............................... 7
13. INSURANCE ..................................................... 7
14. INDEMNIFICATION ......................................... 8
    (a) Indemnification in General ..................... 8
    (b) Cargo Loss and Damage ........................ 8
    (c) CONTRACTOR'S Funding of
        Indemnification Obligation ....................... 8
    (d) Re-Powering and Termination-Related
        Expenses ............................................. 8
15. ESCROW FUND ................................................ 8
16. CONFIDENTIALITY ........................................... 8
    (a) Confidential Matters ............................... 8
    (b) CONTRACTOR'S Non-Disclosure
        Obligation ............................................. 8
    (c) COMPANY'S Right to Seek Injunction
        Against Disclosure ................................. 8
17. DURATION OF AGREEMENT AND
    TERMINATION ................................................. 8
    (a) Start of Agreement ................................. 8
    (b) Mutual Right to Terminate Agreement ..... 9
    (c) COMPANY'S Right to Take Possession of
        Goods ................................................... 9
18. CONTRACTOR'S OBLIGATIONS UPON
    TERMINATION ................................................. 9
    (a) CONTRACTOR'S Obligation to Complete
        Performance ......................................... 9
    (b) Required Removal of Identification Upon
        Termination ........................................... 9
    (c) COMPANY Right to Reimbursement of
        Termination-Related Expenses ................ 9
    (d) Liabilities and Entitlements Continue ....... 9

19. BENEFIT AND ASSIGNMENT ............................ 9
20. NOTICES ........................................................ 9
    (a) Parties Must Notify Each Other in Person
        or By U.S. Mail, Overnight Delivery,
        Satellite, or Fax .................................... 9
    (b) Obligation to Keep Addresses and Phone
        and Fax Numbers Up to Date ................ 10
21. GENERAL ...................................................... 10
22. COMPLETE AGREEMENT; AMENDMENTS TO
    AGREEMENT .................................................. 10
23. GOVERNING LAW ........................................... 10
24. DISPUTE RESOLUTION .................................... 10
    (a) Arbitration Required for All Disputes ...... 10
    (b) No Consolidated or Class Arbitrations ... 10
    (c) Demand for Arbitration ........................ 10
    (d) Parties to Be Bound by Arbitration Award ... 10
    (e) Allocation of Arbitration Fees and Other
        Expenses ............................................ 10

Attachment A - CONTRACTOR'S Compensation
Attachment B - Charge-Backs and Other Deductions
    Schedule 1 to Attachment B
    Schedule 2 to Attachment B
Attachment C - Insurance
Attachment D - Escrow Fund
Attachment E - Communications Equipment
Attachment F - Deductions For Lease Or Purchase Of Vehicle
Attachment G - List of Equipment
Attachment H - Amendment to Attachment D (Escrow Fund)
Attachment I - Electronic Bar Code Inventory Equipment
Statement of Lease
Equipment Receipt

Mohawk    Independent Contractor Operating Agreement - ii

## LARSON MOVING & STORAGE CO. d/b/a MOHAWK MOVING & STORAGE, INC.
### INDEPENDENT CONTRACTOR OPERATING AGREEMENT

Larson Moving & Storage Co. d/b/a Mohawk Moving & Storage, Inc. ("COMPANY"), is an authorized motor carrier that transports and stores household goods and general commodities under either its own operating authority or, as an agent of United Van Lines, LLC and/or Mayflower Transit, LLC ("VAN LINE"), under VAN LINE'S operating authority. *Mohawk Way Inc* ("CONTRACTOR") owns the transportation equipment described in Section 1 below or has the right to make it available for lease. Pursuant to the federal leasing regulations (49 C.F.R. Part 376), COMPANY and CONTRACTOR ("the parties") enter into this Independent Contractor Operating Agreement, including attachments ("Agreement"), as follows:

1.  SERVICES AND EQUIPMENT. During this Agreement, CONTRACTOR shall provide COMPANY with transportation-related services and the use of the transportation equipment listed below or in Attachment G ("Equipment"). Upon taking possession of the Equipment, COMPANY shall furnish CONTRACTOR a receipt identifying the Equipment and stating the date and time possession was transferred. Upon termination of this Agreement, CONTRACTOR shall furnish COMPANY a similar receipt.

| 42C:092 | 98 | FRT | 907499 |
|---------|------|------|------------------|
| Unit No. | Year | Make | VIN (Serial No.) |

2.  EXCLUSIVE POSSESSION AND RESPONSIBILITY. COMPANY shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement, although only for those periods that the Equipment is operated by or for COMPANY, either as an agent of VAN LINE or as an independent motor carrier. CONTRACTOR shall not operate the Equipment for any other motor carrier without COMPANY'S prior written consent, which shall not be unreasonably withheld. COMPANY shall not trip-lease the Equipment to any other motor carrier without CONTRACTOR'S prior written consent, which shall not be unreasonably withheld. COMPANY shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement, although only for those periods that the Equipment is operated by or for COMPANY.

3.  CUSTOMER REQUIREMENTS. Reasonable customer satisfaction is of the utmost importance and is the responsibility of both COMPANY and CONTRACTOR. CONTRACTOR agrees to meet all customer requirements approved by COMPANY that are reasonably related to transporting, loading and unloading, packing and unpacking, crating and uncrating, debris removal, and other services relating to goods being transported and that do not conflict with the terms of this Agreement.

4.  CONTRACTOR'S PRINCIPAL RESPONSIBILITIES.

4(a). Services. CONTRACTOR shall furnish all transportation, loading and unloading, packing and unpacking (with COMPANY furnishing packing materials when necessary), crating and uncrating, pad-wrapping, decking, strapping, securing, unwrapping, and all other services necessary in connection with all shipments offered by COMPANY and accepted by CONTRACTOR.

4(a)(1).    Number of Shipments. COMPANY does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR. CONTRACTOR may refuse any specific shipment offered by COMPANY as long as, in COMPANY'S reasonable judgment, COMPANY is nonetheless able to meet the needs of its customers. For example, COMPANY may require CONTRACTOR to provide services when CONTRACTOR is the only contractor under lease to COMPANY reasonably in a position to meet a particular customer's deadline or other requirements.

4(a)(2).    CONTRACTOR Availability. CONTRACTOR shall have the right, at times of CONTRACTOR'S choosing, to be unavailable to COMPANY for reasonable periods, but if such periods occur during times when customers are tendering COMPANY significant business, CONTRACTOR has an obligation to return to accepting dispatched loads as soon as possible. If CONTRACTOR plans a period of unavailability of more than twenty (20) calendar days and COMPANY so requests, CONTRACTOR shall make an additional contribution or contributions to CONTRACTOR'S Escrow Fund to cover CONTRACTOR'S ongoing expenses under this Agreement during such absence, either by authorizing COMPANY to increase or re-institute deductions from CONTRACTOR'S settlement compensation for Escrow Fund contributions or by making a cash contribution to CONTRACTOR'S Escrow Fund, as detailed in Attachment H.

4(b). Identification of the Equipment.

4(b)(1).    At Start. Before placing the Equipment in the service of COMPANY, CONTRACTOR shall, at CONTRACTOR'S expense, apply to the outside of the Equipment whatever identification COMPANY designates and as required by law. CONTRACTOR shall first remove, at CONTRACTOR'S expense, any paint, decals, or other items that would interfere with such identification or are otherwise offensive, in COMPANY'S reasonable judgment.

4(b)(2).    After First 6 Months. After CONTRACTOR'S first six (6) months operating under this Agreement, COMPANY shall have the right to require CONTRACTOR to repaint or otherwise apply

Mohawk ___ Independent Contractor Operating Agreement - 1

to the Equipment all identification, colors, lettering, decals, and insignia required by law or by COMPANY'S or VAN LINE'S corporate specifications, at CONTRACTOR'S expense. COMPANY reserves the right to require from time to time the repainting or remarking of the Equipment at CONTRACTOR'S expense.

    4(b)(3).    Removal Upon Termination. Upon termination of this Agreement or any other time the Equipment is being operated on behalf of any other carrier or entity, CONTRACTOR shall immediately, at CONTRACTOR'S expense, remove all COMPANY and VAN LINE identification.

    4(b)(4).    No CONTRACTOR Artwork. At no time during this Agreement shall CONTRACTOR place any carrier identification, paint, artwork, logo, or design upon the Equipment, except that of COMPANY or VAN LINE, without COMPANY'S prior written consent (which consent shall not be unreasonably withheld).

4(c). Substitute Vehicles. CONTRACTOR shall not substitute any vehicle or trailer for the Equipment without COMPANY'S prior written consent. In the event another vehicle or trailer is substituted, all terms and conditions of this Agreement shall apply to such vehicle or trailer to the same extent as to the Equipment. In the case of permanently substituted vehicles or trailers, CONTRACTOR shall, at CONTRACTOR'S expense, first repaint or otherwise apply to the vehicle or trailer all identification, colors, lettering, and insignia required by law or by COMPANY'S corporate specifications.

4(d). Drivers.

    4(d)(1).    Initial Safety Qualification. CONTRACTOR shall furnish competent drivers who meet COMPANY'S and VAN LINE'S current Safety Policies and as revised in the future (hereafter "COMPANY'S Safety Policies") set forth in COMPANY'S Policies and Procedures (as amended from time to time, the "COMPANY'S Policies and Procedures"), which shall be made available at COMPANY'S headquarters during normal business hours for CONTRACTOR'S inspection and copying at COMPANY'S expense and all applicable legal requirements.

    4(d)(2).    Disqualification of Drivers. If COMPANY or VAN LINE disqualifies CONTRACTOR, or any driver provided by CONTRACTOR, on grounds that CONTRACTOR is unsafe, unqualified or disqualified pursuant to law, in violation of COMPANY'S Safety Policies, or otherwise incompetent, COMPANY shall have the right and obligation to prohibit CONTRACTOR from handling shipments under COMPANY'S operating authority (in

the case of COMPANY disqualification) or shipments under VAN LINE'S operating authority (in the case of VAN LINE disqualification).

4(e). Drug and Alcohol Testing. CONTRACTOR and its drivers shall, as required by federal statutes and regulations, comply with the Drug and Alcohol Policy in COMPANY'S Safety Policies, including participating in COMPANY'S and/or VAN LINE'S random drug and alcohol testing program and submitting to all other required drug or alcohol tests. All such tests (whether pre-qualification, post-accident, random, reasonable-suspicion, return-to-duty, or follow-up) shall be done by an outside testing service selected by VAN LINE at CONTRACTOR'S expense.

4(f). Uniforms. To meet customer expectations regarding security, efficiency, and professionalism, CONTRACTOR and all of CONTRACTOR'S drivers, helpers, and other personnel shall wear uniforms that comply with COMPANY'S Policies and Procedures while before COMPANY'S customers, at an agency of COMPANY or VAN LINE, or at COMPANY'S or VAN LINE'S headquarters in the performance of services for COMPANY. CONTRACTOR shall bear the full expense of all such uniforms, and hereby authorizes COMPANY to deduct all such expense from CONTRACTOR'S settlement compensation.

4(g). Paperwork Requirements.

    4(g)(1).    CONTRACTOR Submission of Documents. CONTRACTOR shall regularly submit to COMPANY and/or VAN LINE, if applicable, all properly-completed driver logs and supporting documents (including original fuel receipts, each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained, and original toll receipts, if necessary), physical examination certificates, accident reports, vehicle inspection reports, annual certifications of traffic violation, and any other data, documents, or reports that COMPANY may designate.

    4(g)(2).    Copies of this Agreement. COMPANY shall, as set forth in 49 C.F.R. § 376.12(f), keep the original of this Agreement, with a copy to be retained by CONTRACTOR. Pursuant to 49 C.F.R. § 376.11(c)(2), a "Statement of Lease" relating to this Agreement shall be carried on the Equipment for those periods that the Equipment is operated by or for COMPANY under this Agreement.

4(h). Safe and Lawful Operations. CONTRACTOR agrees to ensure that, at all times, CONTRACTOR and all drivers, helpers, and other personnel furnished by CONTRACTOR comply with and carry out the terms of this Agreement as well as all laws of the various jurisdictions in which the Equipment will be operated (including state and federal motor carrier safety, traffic, and truck-size-and-

weight requirements), COMPANY'S Safety Policies, and COMPANY'S and VAN LINE'S operating authorities. CONTRACTOR is required to comply with the federal hours-of-service regulations, and nothing in this Agreement is intended to authorize CONTRACTOR or CONTRACTOR'S drivers to operate beyond the limits established by those regulations. CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S settlement compensation and/or Escrow Fund all penalties, fines, charge-backs, and other deductions assessed pursuant to the "SAFETY," "CLAIMS," and other sections of the COMPANY'S Policies and Procedures.

4(i). Passenger Authorization. CONTRACTOR shall not allow any passengers to ride in the Equipment unless authorized in writing by COMPANY or VAN LINE in advance on a Helper/Passenger Authorization for Transportation Form provided by COMPANY or VAN LINE, which both CONTRACTOR (or its driver) and the proposed passenger must first fill out, sign, and submit. CONTRACTOR assumes all liability for the person and property of the passenger.

4(j). Collections. When the transportation is to be performed on a collect-on-delivery ("C.O.D.") basis, CONTRACTOR shall promptly collect, in guaranteed funds (such as a money order or a cashier's, treasurer's, or certified check) and remit to COMPANY within three (3) calendar days all moneys (and supporting papers) due COMPANY from its shippers or consignees for transportation or other services performed by CONTRACTOR, COMPANY, or other entities. Such moneys and papers shall be the exclusive property of COMPANY regardless of the status of the account between CONTRACTOR and COMPANY. The use of all or any part of such moneys for any purpose other than to remit them to COMPANY shall be a misappropriation of COMPANY'S property and will be subject to a penalty of twenty-five percent (25%) of the misappropriated funds. CONTRACTOR shall be liable to COMPANY for the acts or omission of CONTRACTOR'S drivers, helpers, or other personnel with respect to such collections.

5.  CONTRACTOR NOT EMPLOYEE OF COMPANY. CONTRACTOR is an independent contractor with respect to the Equipment, transportation, and other services provided pursuant to this Agreement.

5(a). CONTRACTOR Furnishes/Controls All Personnel. CONTRACTOR shall furnish, hire, pay, supervise, control, and discharge all personnel needed to perform CONTRACTOR'S obligations under this Agreement, and under no circumstances shall any such personnel be considered the employees of COMPANY or VAN LINE.

5(b). Indemnification of COMPANY. CONTRACTOR agrees to defend, indemnify, and hold COMPANY harmless from any claim (including any for which

COMPANY is not indemnified by its insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, unpaid taxes or fees, or expense, including reasonable attorneys' fees and costs of litigation, that COMPANY incurs involving an allegation, finding, or judgment that CONTRACTOR or any of CONTRACTOR'S personnel is an employee of COMPANY.

5(c). CONTRACTOR'S Control Over Manner and Means of Performance. Subject to legal requirements and COMPANY'S customers' needs, CONTRACTOR assumes full control over and responsibility for scheduling work hours and rest periods; selecting routes and fuel stops; deciding when, where, and how maintenance is to be performed on the Equipment; arranging for packing and unpacking as required, loading and unloading, and other services relating to the goods being transported; complying with all applicable local, state, federal, or foreign requirements regarding the withholding of income taxes and payroll taxes from wages paid to CONTRACTOR'S personnel and the payment of Social Security and Medicare taxes; and obtaining and maintaining workers' compensation insurance on all of CONTRACTOR'S personnel (in accordance with Attachment C).

5(d). CONTRACTOR'S Supplying of Records. If COMPANY requests written proof of such control and responsibility, CONTRACTOR shall provide it.

6.  COMPENSATION. CONTRACTOR'S total compensation is set forth in Attachment A.

7.  SETTLEMENT PERIOD AND DOCUMENT REVIEW.

7(a). Payment Within 15 Days. COMPANY shall settle with CONTRACTOR, and pay CONTRACTOR any compensation due under Attachment A (less any charge-backs and other deductions under Attachment B), for any transportation or other services provided under this Agreement within fifteen (15) calendar days after CONTRACTOR'S submission, in proper form, of those documents necessary for COMPANY and/or VAN LINE to secure payment from the shipper, including but not limited to the signed freight bill, delivery receipt, descriptive inventories, weight tickets when required by the shipper, by COMPANY'S or VAN LINE'S tariff, or by law, supporting documents for any accessorial services performed, and bill of lading, plus properly completed driver logs as required by the U.S. Department of Transportation ("USDOT"). Nothing herein shall limit COMPANY'S and VAN LINE'S exclusive right to set the rate and amount charged to COMPANY'S and VAN LINE'S customers, shippers, consignors, or consignees.

7(b). Not Contingent on No-Exception Bill of Lading. Payment shall not be made contingent, however, upon submission of a bill of lading to which no exceptions have been taken.

7(c). CONTRACTOR'S Access to Freight Documentation. In the event CONTRACTOR'S compensation is based on a percentage of revenue for a shipment, COMPANY shall provide CONTRACTOR, at or before the time of settlement, a copy of the applicable rated freight bill or a computer-generated document containing the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. When a computer-generated document is provided, CONTRACTOR may view, during normal business hours, a copy of any actual document underlying the computer-generated document. Regardless of the method of compensation, CONTRACTOR may examine, during normal business hours, copies of COMPANY'S and VAN LINE'S tariffs or, in the case of contract carriage, other documents from which rates and charges are computed, provided that where rates and charges are computed from a contract, only those portions of the contract containing the same information that would appear on a rated freight bill will be disclosed.

7(d). COMPANY'S Right to Delete Names. COMPANY may delete the names of shippers and consignees shown on the freight bill or other form of documentation.

7(e). COMPANY'S Access to CONTRACTOR'S Documents. COMPANY shall have the right to review all of CONTRACTOR'S documents and records relating to the use of the Equipment and to the services provided under this Agreement, and CONTRACTOR agrees to provide COMPANY with access to such documents and records upon reasonable notice.

8.    CONTRACTOR'S PRINCIPAL EXPENSES.

8(a). Operating Expenses. CONTRACTOR shall furnish the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, Single-State Registration System fees, and state base plates, and shall furnish all oil, fuel, tires, and other parts, supplies, and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs. Unless otherwise provided in this Agreement, CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, deadhead (empty) mileage, loading and unloading expenses, federal heavy vehicle use tax and other highway use taxes, weight-distance taxes, state property or indefinite situs taxes, fuel taxes, registration fees, ferry and toll charges, and detention and accessorial charges not collected by COMPANY because of CONTRACTOR'S failure to provide the required documentation.

8(b). Maintenance and Inspection.

8(b)(1).    Equipment Maintained in Good and Safe Condition. CONTRACTOR shall

maintain the Equipment in a good and safe condition, including ensuring its systematic repair and maintenance, and in compliance with all laws and COMPANY'S Policies and Procedures.

8(b)(2).    Inspection of Equipment. CONTRACTOR shall make the Equipment available for inspection by COMPANY at COMPANY'S expense upon reasonable request, plus have the Equipment inspected semi-annually at COMPANY'S maintenance facility or at a facility that COMPANY authorizes. All semi-annual inspections shall be done at CONTRACTOR'S expense.

8(b)(3).    CONTRACTOR'S Required Recordkeeping. CONTRACTOR shall maintain systematic records of the inspection, repair, and maintenance of the Equipment and, when requested orally or in writing, promptly forward them to COMPANY.

8(c). Fines. CONTRACTOR shall ensure that CONTRACTOR and all of CONTRACTOR'S drivers, helpers, or other personnel pay all fines and civil penalties imposed for violation of any statute, ordinance, regulation, or order, if the violation results, at least partially, from the acts or omissions of CONTRACTOR or CONTRACTOR'S personnel. CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S settlement compensation all such fines and civil penalties that may be imposed on or paid by COMPANY in the first instance.

8(d). Overweight and Overdimensional Shipments.

8(d)(1).    CONTRACTOR'S Initial Size/Weight Compliance Check. Before starting any trip under this Agreement, CONTRACTOR shall determine whether all shipments are in compliance with the size and weight laws of the states in or through which CONTRACTOR will travel and shall notify COMPANY if the Equipment is overweight or in need of permits; provided, however, that except when the violation results from the acts or omissions of CONTRACTOR or CONTRACTOR'S employees or agents, COMPANY shall assume the risks and costs of fines for interstate overweight and oversize trailers when such trailers are preloaded, sealed, or the load is containerized, or for improperly permitted overdimensional and overweight loads, or the trailer or lading is otherwise outside of CONTRACTOR'S control.

8(d)(2).    CONTRACTOR Liable for Failure to Do Compliance Check. CONTRACTOR shall pay, or reimburse COMPANY, for any expenses or penalties due to CONTRACTOR'S failure to weigh each shipment or to notify COMPANY that the vehicle is overweight or in need of permits.



8(e). License Plates and SSRS Fees.

8(e)(1).      COMPANY Will Obtain Plates If CONTRACTOR Wishes. If CONTRACTOR so elects (by initialing "COMPANY shall obtain base plates..." in item 4 of Attachment B), COMPANY shall initially pay the full expense of the base plates and then deduct that expense from CONTRACTOR'S compensation, in accordance with Attachment B.

8(e)(2).      Deduction Upon Termination. If this Agreement is terminated prior to CONTRACTOR'S complete reimbursement of COMPANY'S expense, COMPANY is hereby authorized to deduct any remaining amount from CONTRACTOR'S final settlement and/or Escrow Fund.

8(e)(3).      CONTRACTOR'S Right to Pro-Rata Refund. If CONTRACTOR removes and returns the base plates to COMPANY upon the termination of this Agreement and if COMPANY then receives a refund or credit for the base plates or resells them to another contractor, COMPANY shall refund to CONTRACTOR a pro-rata share of the amount received by COMPANY, less any transfer or replacement fees owed to the plating jurisdictions. CONTRACTOR shall not be entitled to reimbursement for any unused portion of base plates, however, unless COMPANY redeems, reuses, or re-sells the plates to another contractor.

8(e)(4).      SSRS Fees. COMPANY shall pay all Single-State Registration Fees required for CONTRACTOR'S operations under this Agreement. SSRS Fees are the CONTRACTOR'S expense and will be deducted from the CONTRACTOR'S compensation in accordance with Attachment B. Upon termination, COMPANY is hereby authorized to deduct from CONTRACTOR'S final settlement and/or Escrow Fund all Single-State Registration Fees required for CONTRACTOR'S operations under this Agreement.

8(f). Fuel and Fuel Tax Expense.

8(f)(1)      CONTRACTOR'S Expense. All fuel expenses and fuel taxes shall be the responsibility of CONTRACTOR and, to the extent paid initially by COMPANY, shall be deducted from CONTRACTOR'S compensation in accordance with Attachment B.

8(f)(2).      CONTRACTOR'S Fuel Receipts. CONTRACTOR shall provide COMPANY and/or VAN LINE, if applicable, promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was

obtained), and an accurate accounting of all fuel purchases and miles traveled by state.

8(f)(3).      COMPANY and VAN LINE Will Make Required Filings. COMPANY (with respect to miles operated under COMPANY'S authority) and VAN LINE (with respect to miles operated under VAN LINE'S authority) shall submit, in its own name, all required reports and payments of fuel use taxes owed with respect to the Equipment under this Agreement.

8(f)(4).      Credits and Debits to CONTRACTOR. COMPANY shall (a) deduct monthly from CONTRACTOR'S settlements in accordance with Attachment B any net fuel use tax owed at that time with respect to CONTRACTOR'S operations in all taxing jurisdictions combined or (b) credit monthly to CONTRACTOR'S settlements any net fuel use tax credit or refund due CONTRACTOR at that time with respect to its operations in all taxing jurisdictions combined. COMPANY shall ensure that CONTRACTOR receives at least quarterly summaries of credits and debits for fuel taxes on a state-by-state basis either on CONTRACTOR'S settlement sheets or through separate accountings, at COMPANY'S option.

8(f)(5).      COMPANY/VAN LINE Responsibility for Additional Tax. COMPANY and VAN LINE (as to their respective operations) shall pay any additional amounts of fuel use tax assessed with respect to the combined operations of CONTRACTOR and all other contractors operating under COMPANY'S or VAN LINE'S operating authority as a result of International Fuel Tax Agreement base-state audits of COMPANY'S or VAN LINE'S fleetwide fuel use tax reports and payments.

8(f)(6)      Administrative Fee. As an administrative fee for VAN LINE'S fuel use tax reporting services to CONTRACTOR, CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S settlement compensation and remit to VAN LINE, in accordance with Attachment B, a Fuel Tax Surcharge of $0.00165 for every mile CONTRACTOR operates the Equipment on behalf of VAN LINE as shown on VAN LINE'S Fuel and Mileage Tax Report.

8(g). Communications Equipment

8(g)(1).      Equipment. To facilitate the serving of COMPANY'S customers' needs, CONTRACTOR shall, at CONTRACTOR'S expense, obtain, maintain in an operable and functioning condition, and carry at all times while operating the Equipment in COMPANY'S service a wireless mobile telephone, and maintain a corresponding contract for nationwide wireless telephone service, and shall supply to COMPANY in the signature block of this

Agreement the telephone number by which to reach such mobile telephone. In addition, CONTRACTOR shall make all necessary arrangements to obtain, install in each unit of Equipment, and maintain in an operable and functioning condition communications equipment that constitutes or, in COMPANY'S reasonable judgment, is technically and functionally compatible with the Qualcomm, Inc. OmniTRACS® Mobile Communications System or other system utilized by COMPANY and VAN LINE. Alternatively, CONTRACTOR may elect to rent the communications equipment from COMPANY on the terms set forth in Attachment E by so indicating in Section 1 thereof.

8(g)(2).        Messaging Usage Fee. CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S settlement compensation and/or Escrow Fund any Monthly Usage Charge (with no mark-up or administrative fee to COMPANY) owed pursuant to Attachment E.

8(h). Re-powering a Load. CONTRACTOR agrees to transport tendered goods in a reasonable and timely manner. If CONTRACTOR does not or cannot complete the delivery of the goods in such manner, CONTRACTOR shall immediately notify a COMPANY dispatcher by satellite, fax, or other communication. CONTRACTOR shall thereupon obtain, with COMPANY'S prior approval and at CONTRACTOR'S expense, a rental tractor through an approved vendor of COMPANY or of VAN LINE'S national account program, and/or a qualified substitute driver, and complete the delivery or, if COMPANY in its sole discretion chooses, COMPANY shall complete the transportation and delivery of the goods at CONTRACTOR'S expense. In the latter situation, COMPANY is hereby authorized to deduct such expense from CONTRACTOR'S settlement compensation and/or Escrow Fund.

8(i). Expenses Charged to COMPANY.

8(i)(1).        General Prohibition. Except as provided in Section 8(i)(2) below, CONTRACTOR has no authority to incur any obligation, for any reason, or open any charge account in the name of COMPANY. Should CONTRACTOR incur obligations or open charge account(s) in the name of COMPANY, CONTRACTOR agrees that COMPANY may deduct such expenses or obligations from CONTRACTOR'S settlement compensation and/or Escrow Fund.

8(i)(2).        Obligations Incurred With COMPANY Approval. CONTRACTOR may incur expenses or obligations in the name of COMPANY if COMPANY has granted prior approval and issued a corresponding purchase order to the vendor or service provider. CONTRACTOR agrees that COMPANY may deduct such expenses or obligations from CONTRACTOR'S settlement compensation and/or Escrow Fund.

9.   USE OF COMPANY'S TRAILER AND OTHER EQUIPMENT.

9(a). Use of Trailer and Other Equipment Restricted to COMPANY Service. Any trailer and/or in-van, electronic bar code inventory equipment, or other equipment supplied to CONTRACTOR by COMPANY shall be used by CONTRACTOR only to provide service under this Agreement. COMPANY, in its discretion, shall have the right to substitute, exchange, or otherwise replace a trailer or other equipment provided by COMPANY for use by CONTRACTOR.

9(b). Inspection and Inventory Report. Before taking possession of any COMPANY-assigned trailer and in-van moving, electronic bar code inventory equipment, or other equipment, whether at the beginning of this Agreement or when any substitution, exchange, or replacement is made as provided in Subsection (a) above, CONTRACTOR shall, together with a representative of COMPANY, conduct a visual inspection and furnish COMPANY with a completed, signed Trailer Inspection and Inventory Report. CONTRACTOR shall do the same upon returning the trailer to COMPANY'S facility or to such other location as COMPANY specifies pursuant to Section 9(d), during normal business hours. If CONTRACTOR drops off the trailer outside normal business hours, CONTRACTOR hereby authorizes COMPANY to complete the necessary Trailer Inspection and Inventory Report.

9(c). Allocation of Expense Responsibility.

9(c)(1).        COMPANY'S Trailer. With respect to COMPANY'S trailer, COMPANY shall be responsible for all expenses relating to regular maintenance of axles, brakes, and other electrical and mechanical systems, repairs of damage to the trailer attributable to ordinary wear and tear, and purchases of replacement tires, provided that all such expenses are approved by COMPANY before the work is performed. CONTRACTOR shall be responsible for all repairs of all damage to the trailer other than ordinary wear and tear, and CONTRACTOR hereby authorizes COMPANY to deduct all such amounts from CONTRACTOR'S settlement compensation and/or Escrow Fund. All trailer repairs and maintenance shall be performed at facilities designated or approved by COMPANY.

9(c)(2).        COMPANY Electronic Bar Code Inventory Equipment. As set forth in Attachment I, COMPANY shall perform regular maintenance on the electronic bar code inventory equipment and be responsible for repairs of damage attributable to ordinary wear and tear. CONTRACTOR shall be responsible for up to Five Thousand Dollars ($5,000) per incident for loss or repairs to the electronic bar code inventory equipment attributable to any cause other than ordinary wear and tear. CONTRACTOR

hereby authorizes COMPANY to deduct all such amounts from CONTRACTOR'S settlement compensation and/or Escrow Fund.

9(c)(3).    In-Van and Other COMPANY Equipment. COMPANY shall perform regular maintenance on its in-van or other equipment and be responsible for repairs of damage attributable to ordinary wear and tear. CONTRACTOR shall be responsible for all losses of in-van or other COMPANY equipment and all repairs to COMPANY'S in-van or other equipment attributable to something other than ordinary wear and tear. CONTRACTOR hereby authorizes COMPANY to deduct all such amounts from CONTRACTOR'S settlement compensation and/or Escrow Fund.

9(d). Return of Trailer Upon Request or Termination. Immediately upon COMPANY'S request or the termination of this Agreement, CONTRACTOR shall return the trailer and in-van, electronic bar code inventory equipment, or other equipment to COMPANY'S facility in Minneapolis, MN, or to such other closer location as COMPANY may specify at the time in the same good condition (ordinary wear and tear excepted) as received by CONTRACTOR. If not in such condition, COMPANY may, if it so chooses, restore the trailer or equipment to its previously delivered condition or, if less expensive, shall replace the trailer or equipment. With respect to damage to the trailer, in-van, electronic bar code inventory equipment, or other equipment (other than ordinary wear and tear), CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S final settlement compensation and/or Escrow Fund the full expense of all repairs or, in the case of replacement, the replacement cost less the value of the trailer or equipment when first delivered to CONTRACTOR. If CONTRACTOR fails to return COMPANY'S trailer or in-van, electronic bar code inventory equipment, or other equipment, CONTRACTOR shall reimburse COMPANY for all reasonable expenses incurred by COMPANY in recovering, repairing, or, if necessary, replacing its trailer or equipment, as provided above.

9(e). COMPANY'S Explanation and Itemization of Damage Deduction. Before deducting any such damage described in Section 9(d) above from CONTRACTOR'S settlement compensation and/or Escrow Fund, COMPANY shall provide CONTRACTOR with a written explanation and itemization of such damage or other loss.

10.    NO REQUIRED PURCHASES FROM COMPANY OR VAN LINE. CONTRACTOR is not required to purchase or rent any products, equipment, or services from COMPANY or VAN LINE as a condition of entering into this Agreement. In the event CONTRACTOR elects to purchase or rent equipment, products, or services from or through COMPANY or from any third party, for which the purchase or rental contract gives COMPANY the right to make deductions from CONTRACTOR'S settlements,

the parties agree to specify the terms of each such contract in an attachment or addendum to this Agreement.

11.    CHARGE-BACKS AND OTHER DEDUCTIONS.

11(a).    Charge-Backs and Documentation. COMPANY shall deduct from CONTRACTOR'S compensation at the time of payment or settlement all expenses, advances, escrow fund contributions, taxes, fees, fines, penalties, damages, losses, and other amounts paid, owed, or incurred by COMPANY, or that CONTRACTOR owes to a third party under a purchase or rental contract that, under this Agreement, CONTRACTOR is responsible for, as detailed in Attachment B or elsewhere in this Agreement. COMPANY shall provide CONTRACTOR with a written explanation and itemization of any deductions for cargo or property damage before making them. With respect to all other charge-backs and deductions, COMPANY shall make available to CONTRACTOR, upon request, copies of those documents that are necessary to determine the validity of the charge-back or deduction.

11(b).    Future Settlements, Escrow Fund, and Separate Billing. Whenever a reference is made in this Agreement to charging back or deducting from CONTRACTOR'S settlements or compensation, and insufficient funds are available to cover the obligation, COMPANY reserves the right, in its sole discretion, to (i) deduct the remaining amount from the CONTRACTOR'S next settlement, (ii) deduct it from CONTRACTOR'S Escrow Fund in accordance with Attachment D, or (iii) bill CONTRACTOR separately for the amount.

12.    ACCIDENTS AND CLAIMS. CONTRACTOR shall immediately report any accident or potential personal injury or property damage claim to COMPANY and VAN LINE, if applicable, involving operations or services performed under this Agreement, including CONTRACTOR'S written report of such accident or claim. CONTRACTOR and CONTRACTOR'S drivers shall cooperate fully with COMPANY and VAN LINE with respect to any legal action, regulatory hearing, or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement, or the services performed hereunder. CONTRACTOR shall, at COMPANY'S or VAN LINE'S request and, unless otherwise agreed, at CONTRACTOR'S sole expense, provide written reports or affidavits, attend hearings and trials, and assist in securing evidence or obtaining the attendance of witnesses. CONTRACTOR shall provide COMPANY and VAN LINE with any assistance as may be necessary for COMPANY or VAN LINE, or their representatives or insurers to investigate, settle, or litigate any accident, claim, or potential claim by or against COMPANY or VAN LINE.

13.    INSURANCE. COMPANY'S and CONTRACTOR'S obligations as to insurance are set forth in Attachment C. COMPANY'S or VAN LINE'S possession of legally-required

insurance in no way restricts COMPANY'S right of indemnification from CONTRACTOR under this Agreement.

## 14. INDEMNIFICATION.

14(a).    Indemnification in General. CONTRACTOR agrees to defend, indemnify, and hold COMPANY harmless from any claim (including any for which COMPANY is not indemnified by its insurance and any claim of loss of or damage to the Equipment or to CONTRACTOR'S other property) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that COMPANY incurs arising out of CONTRACTOR'S (including CONTRACTOR'S agents', subcontractors' or employees'), negligence, gross negligence, willful misconduct, or other culpable acts or omissions under this Agreement. Without limiting any other methods of collection of amounts due hereunder, any amounts due COMPANY under this subsection may be deducted from any money otherwise due CONTRACTOR at any periodic or final settlement or, following termination of this Agreement, from the Escrow Fund established below and in Attachment D.

14(b).    Cargo Loss and Damage. CONTRACTOR'S indemnification of COMPANY under subsection (a) above related to cargo loss, damage, or delay to cargo or damage to COMPANY'S trailer (ordinary wear and tear excepted) shall be limited to those amounts set forth in the table in Section 1 of Attachment B (under "Claims" and Schedule 1 to Attachment B) in accordance with COMPANY'S Claims Policies and Variable Charge-back programs as contained in COMPANY'S Policies and Procedures.

14(c).    CONTRACTOR'S Funding of Indemnification Obligation. To fund its unlimited indemnification of COMPANY under subsection (a) above related to injuries to persons (including death) or loss of or damage to the property of third parties to this Agreement, CONTRACTOR shall maintain commercial automobile public liability insurance with the policy limits and other coverage terms specified in Section 2(a) of Attachment C. In the alternative, if CONTRACTOR elects to do so by signing the "Confirmation of Participation in PL/PD Limiter Program" appended to Attachment C, CONTRACTOR may participate in COMPANY'S Indemnity-Limiter Program. In consideration of CONTRACTOR'S either providing the required commercial automobile public liability insurance coverage or authorizing COMPANY to make monthly deductions of the indemnity-limiter cost set forth in Attachment B from CONTRACTOR'S settlement compensation, CONTRACTOR'S indemnification of COMPANY under subsection (a) above related to injuries to persons (including death) or loss of or damage to the property of third-parties to this Agreement shall be limited to the amounts set forth in the table in Section 1 of Attachment B.

14(d).    Re-Powering and Termination-Related Expenses. Subsections (b) and (c) above shall not limit or preclude COMPANY from deducting from CONTRACTOR'S compensation or, upon termination, from CONTRACTOR'S Escrow Fund, or from seeking to recover from CONTRACTOR through other lawful means, all amounts COMPANY pays or otherwise incurs in re-powering a load or in connection with termination of this Agreement.

## 15. ESCROW FUND. CONTRACTOR authorizes COMPANY to establish and administer an escrow fund in accordance with the provisions of Attachment D (referred to throughout this Agreement as "Escrow Fund").

## 16. CONFIDENTIALITY.

16(a).    Confidential Matters. CONTRACTOR agrees to preserve as "Confidential Matters" all names of COMPANY'S or VAN LINE'S customers, trade secrets, know-how, and information relating to COMPANY'S or VAN LINE'S business, forms, processes, developments, sales and promotional systems, prices, and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, other contractors, or other sources of any kind resulting from the performance of services under this Agreement.

16(b).    CONTRACTOR'S Non-Disclosure Obligation. CONTRACTOR agrees to regard such Confidential Matters as the sole property of COMPANY or VAN LINE and shall not publish, disclose, or disseminate the same to others without the prior written consent of COMPANY.

16(c).    COMPANY'S Right to Seek Injunction Against Disclosure. In the event of any breach or threatened breach by CONTRACTOR of this Section and notwithstanding the Dispute Resolution section below, COMPANY shall be entitled to injunctive relief from an arbitrator restraining CONTRACTOR from disclosing, in whole or in part, COMPANY'S or VAN LINE'S customers and all other Confidential Matters. Nothing hereunder shall be construed as prohibiting COMPANY from pursuing, through arbitration, any remedies available to COMPANY at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR. Should COMPANY obtain an injunction and/or be awarded damages, CONTRACTOR shall pay COMPANY'S reasonable attorneys' fees and costs of litigation.

## 17. DURATION OF AGREEMENT AND TERMINATION.

17(a).    Start of Agreement. As to each piece of Equipment, this Agreement shall begin on the date and at the time stated on the receipt that COMPANY gives CONTRACTOR upon taking possession of the piece.



17(b).    Mutual Right to Terminate Agreement.
Either party may terminate this Agreement at any time for
any reason by giving at least thirty (30) days' prior written
notice to that effect to the other party. This Agreement may
also be terminated by COMPANY at any time upon
immediate oral, followed by written, notice in the event of a
material breach of the terms of this Agreement by
CONTRACTOR. The effective date and time of termination
shall be as set forth in the written notice of termination or in
the receipt for Equipment issued by CONTRACTOR,
whichever date and time are earlier.

17(c).    COMPANY'S Right to Take Possession of
Goods. If, in COMPANY'S judgment, CONTRACTOR has
subjected COMPANY to liability because of
CONTRACTOR'S acts or omissions, COMPANY may take
possession of the goods being transported and
COMPANY'S trailer entrusted to CONTRACTOR and
complete performance. In such event, CONTRACTOR
shall waive any recourse against COMPANY for such
action and CONTRACTOR shall reimburse COMPANY for
all direct or indirect costs, expenses, or damages, including
reasonable attorneys' fees and costs of litigation, incurred
by COMPANY as a result of COMPANY'S taking
possession of the goods and completing performance.

18. CONTRACTOR'S OBLIGATIONS UPON
TERMINATION.

18(a).    CONTRACTOR'S Obligation to Complete
Performance. Upon termination of this Agreement,
CONTRACTOR, unless otherwise instructed by
COMPANY, shall complete performance of all
transportation and other services required by COMPANY
and any bills of lading pertaining to any shipment or
shipments that CONTRACTOR may be engaged in hauling
at the time of termination. CONTRACTOR shall receive no
compensation for any shipment with respect to which
CONTRACTOR has failed to complete all required
transportation and other services. In the event COMPANY
instructs CONTRACTOR not to complete performance of
transportation or other services that CONTRACTOR is
willing and able to perform, COMPANY will pay
CONTRACTOR compensation determined in accordance
with Attachment A for the portion of such services that
CONTRACTOR performed prior to termination.

18(b).    Required Removal of Identification Upon
Termination. Upon termination or the completion of the
transportation or other services provided for herein,
whichever occurs later, CONTRACTOR, unless otherwise
notified or instructed by COMPANY, shall, at
CONTRACTOR'S own expense, immediately and
permanently obliterate or remove from the Equipment all
COMPANY and VAN LINE identification and all COMPANY
or VAN LINE identification devices and, except in the case
of identification painted directly on the Equipment, return
them to COMPANY via hand-delivery or overnight delivery
with the express charges prepaid (provided that if the

identification device has been lost or stolen, a written
notice (letter) certifying its removal will satisfy this
requirement); immediately return COMPANY'S property,
including trailers, in-van, electronic bar code inventory
equipment, or other equipment, base plates, paperwork,
and goods being transported, to COMPANY'S facility in
Minneapolis, MN, or to such other closer location as
COMPANY may specify at the time; and immediately pay
COMPANY all amounts CONTRACTOR owes COMPANY
at that time under this Agreement.

18(c).    COMPANY Right to Reimbursement of
Termination-Related Expenses. If CONTRACTOR fails to
return COMPANY'S property or goods being transported to
COMPANY or remove and return all COMPANY
identification from the Equipment upon termination of this
Agreement, CONTRACTOR shall pay COMPANY all
expenses (including reasonable attorneys' fees) incurred
by COMPANY in seeking the return of such items, and
COMPANY may pursue all other remedies allowed by law
or authorized in this Agreement against CONTRACTOR.
Such remedies include withholding CONTRACTOR'S last
settlement payment until CONTRACTOR removes and,
except in the case of identification painted directly on the
Equipment, returns all COMPANY'S and VAN LINE'S
identification devices or delivers to COMPANY a letter
certifying that such devices have been removed, and
making deductions from any remaining balances in
CONTRACTOR'S Escrow Fund for the replacement value
of COMPANY'S unreturned property and for other amounts
CONTRACTOR owes COMPANY, as provided by
Section 5 of Attachment D.

18(d).    Liabilities and Entitlements Continue. If up to
and including the date this Agreement is terminated, one or
more events occur that give rise before or after the date of
termination to a liability or entitlement of CONTRACTOR or
COMPANY under this Agreement, such liability or
entitlement shall continue, notwithstanding the termination
of this Agreement, until each such liability or entitlement is
paid in full.

19. BENEFIT AND ASSIGNMENT. This Agreement shall
be binding upon and inure to the benefit of the parties to this
Agreement and their respective successors. CONTRACTOR
may not assign or subcontract all or any portion of its obligations
to another person without the prior written consent of
COMPANY.

20. NOTICES.

20(a).    Parties Must Notify Each Other in Person or
By U.S. Mail, Overnight Delivery, Satellite, or Fax. All
notices required or permitted by this Agreement shall be in
writing including electronic transmission (unless permitted
elsewhere in this Agreement to be done orally) and shall be
deemed provided when delivered in person, when
deposited in the United States Mail with first class postage
prepaid and properly addressed to the other party at the



address shown at the end of this Agreement, when deposited with an overnight delivery company with the express charges prepaid and properly addressed to the other party at the address shown at the end of this Agreement, when transmitted by satellite communication to the other party, or when faxed to the other party at the fax number shown at the end of this Agreement.

20(b). Obligation to Keep Addresses and Phone and Fax Numbers Up to Date. Each party shall be under a continuing duty to provide a correct address and telephone number to the other; COMPANY and CONTRACTOR (if the latter has a fax machine) a correct fax number to the other; and CONTRACTOR a correct nationwide wireless mobile telephone number. Notice of an address, telephone number, or fax number change shall be given in writing.

21. GENERAL. The headings used in this Agreement have no substantive effect and are used for convenience. Except as otherwise provided in Section 24, if any provision (including any sentence or part of a sentence) of this Agreement (including its appended attachments and addenda) is deemed invalid for any reason whatsoever, this Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties. Any provision voided by operation of the foregoing shall be replaced with provisions that shall be as close to the parties' original intent as permitted under applicable law. The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right. Original or faxed signatures shall be equally valid.

22. COMPLETE AGREEMENT; AMENDMENTS TO AGREEMENT. This Agreement constitutes the sole, entire, and existing agreement between the parties hereto; fully replaces and supersedes all prior agreements and undertakings, oral and written, express or implied, or practices, between the parties; and expresses all obligations and restrictions imposed on each of the respective parties during its term. If any amendments are to be made in this Agreement, they must be in writing and signed by both COMPANY and CONTRACTOR, except as otherwise provided in Attachments B and C with respect to certain changes in charge-backs and other deductions and insurance.

23. GOVERNING LAW. This Agreement is to be governed by the laws of the United States and, except as otherwise provided herein, the State of Minnesota, including the choice-of-law rules of such State. COMPANY and CONTRACTOR hereby consent to the jurisdiction of the state and federal courts of Minnesota.

24. DISPUTE RESOLUTION.

24(a). Arbitration Required for All Disputes. Any dispute (including a request for preliminary relief) arising in connection with or relating to this Agreement, its terms, or its implementation, including any allegation of tort or of breach of this Agreement or of violations of the requirements of any applicable government authorities, whether local, state, federal, or foreign, including but not limited to the federal leasing regulations (49 C.F.R. Part 376), shall be fully and finally resolved by arbitration in accordance with (1) the Commercial Arbitration Rules (and related arbitration rules for preliminary relief) of the American Arbitration Association ("AAA"); (2) the Federal Arbitration Act (ch. 1 of tit. 9 of United States Code, with respect to which the parties agree that this Agreement is not an exempt "contract of employment") or, if the Federal Arbitration Act is held not to apply, the arbitration laws of the State of Missouri; and (3) the procedures set forth below.

24(b). No Consolidated or Class Arbitrations. Notwithstanding anything to the contrary contained or referred to in this Agreement, the parties agree that no consolidated or class arbitrations shall be conducted. If a court or arbitrator decides for any reason not to enforce this ban on consolidated or class arbitrations, the parties agree that this Section 24, in its entirety, shall be null and void, and any disputes between the parties shall be resolved by court action, not arbitration.

24(c). Demand for Arbitration. A demand for arbitration shall be filed with the AAA's office located in or closest to Minneapolis, MN, and the arbitration shall be held in Minneapolis, MN, or as otherwise agreed to in writing by the parties. The demand shall be filed within the time allowed by the applicable statute of limitations. Failure to file the demand within such statute-of-limitations period shall be deemed a full waiver of the claim.

24(d). Parties to Be Bound by Arbitration Award. The parties agree to be fully and finally bound by the arbitration award, and, where allowed by law, a judgment may be entered on the award in any court having jurisdiction thereof.

24(e). Allocation of Arbitration Fees and Other Expenses. Each party shall pay its own AAA arbitration filing fees and an equal share of the fees and expenses of the arbitrator, provided that if the CONTRACTOR owns, leases (to COMPANY and other motor carriers combined), or controls only one commercial motor vehicle, COMPANY shall pay the full fees and expenses of the arbitrator as well as (i) the full arbitration filing fee, if COMPANY is the claimant, or (ii) the portion of the arbitration filing fee that exceeds the filing fee then in effect for civil actions in the United States district court for the district that includes Minneapolis, MN, if CONTRACTOR is the claimant. In all other respects, except to the extent otherwise determined

Mohawk Independent Contractor Operating Agreement - 10

by law, the parties shall be responsible for their own
respective arbitration expenses, including attorneys' fees.

COMPANY and CONTRACTOR hereby execute this Agreement on this 29 day of Sept , 2004, at 9:48 Am.

**THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES.**

**LARSON MOVING & STORAGE CO. d/b/a
MOHAWK MOVING & STORAGE, INC.**

By: _____
Signature of Authorized Representative
Parker Wegwerth
Printed Name
Director of Operations
Title

8271 West 35W Service Drive
Blaine, MN 55449
Tel. 763-784-1000
Fax 763-784-4345

CONTRACTOR: Abrahamis Way, Inc.

By: _____
Signature of Authorized Representative
Jennifer B. Lee
Printed Name
Sec.
Title

Street Address PO Box 1946

City, State, Zip Code Reidsville NC 27323

Phone Number 305 608 8378        Fax Number

Mobile Phone or Pager Number
Kaffcddp1@aol.com
Email Address
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
Federal Employer ID or Soc. Sec. No.



# SUDDATH RELOCATION SYSTEMS OF PENSACOLA, INC.

## and

MATT BULLARD _____ D/B/A Bullard Trucking

# INDEPENDENT CONTRACTOR OPERATING AGREEMENT A-04

2003 UniGroup, Inc., All Rights Reserved

## SUDDATH RELOCATION SYSTEMS OF PENSACOLA, INC.
## INDEPENDENT CONTRACTOR OPERATING AGREEMENT

### TABLE OF CONTENTS

1. SERVICES AND EQUIPMENT .................................... 1
2. EXCLUSIVE POSSESSION AND RESPONSIBILITY ..................................... 1
3. CUSTOMER REQUIREMENTS ............................ 1
4. CONTRACTOR'S PRINCIPAL RESPONSIBILITIES ...................................... 1
   (a) Services .......................................... 1
       (1) Number of Shipments ................... 1
       (2) CONTRACTOR Availability ............ 1
   (b) Identification of the Equipment ............... 1
       (1) At Start ....................................... 1
       (2) After First 6 Weeks ...................... 2
       (3) Removal Upon Termination ........... 2
       (4) No CONTRACTOR Artwork ............ 2
   (c) Substitute Vehicles .............................. 2
   (d) Drivers ............................................. 2
       (1) Initial Safety Qualification ............ 2
       (2) Disqualification of Drivers ............. 2
   (e) Drug and Alcohol Testing ..................... 2
   (f) Uniforms ........................................... 2
   (g) Paperwork Requirements ...................... 3
       (1) CONTRACTOR Submission of Documents ............................. 3
       (2) Copies of this Agreement ............. 3
   (h) Safe and Lawful Operations ................. 3
   (i) Passenger Authorization ....................... 3
   (j) Collections ........................................ 3
5. CONTRACTOR NOT EMPLOYEE OF COMPANY .......................................... 3
   (a) CONTRACTOR Furnishes/Controls All Personnel .................................... 3
   (b) Indemnification of COMPANY ................ 3
   (c) CONTRACTOR'S Control Over Manner and Means of Performance ................. 3
   (d) CONTRACTOR'S Supplying of Records ... 4
6. COMPENSATION ..................................... 4
7. SETTLEMENT PERIOD AND DOCUMENT REVIEW ............................................. 4
   (a) Payment Within 15 Days ...................... 4
   (b) Not Contingent on No-Exception Bill of Lading ........................................... 4
   (c) CONTRACTOR'S Access to Freight Documentation ................................ 4
   (d) COMPANY'S Right to Delete Names ...... 4
   (e) COMPANY'S Access to CONTRACTOR'S Documents ...................................... 4
8. CONTRACTOR'S PRINCIPAL EXPENSES ........ 4
   (a) Operating Expenses ............................ 4
   (b) Maintenance and Inspection ................. 4
       (1) Equipment Maintained in Good and Safe Condition ......................... 4
       (2) Inspection of Equipment ............... 4

       (3) CONTRACTOR'S Required Recordkeeping ......................... 5
   (c) Fines ............................................. 5
   (d) Overweight and Overdimensional Shipments ....................................... 5
       (1) CONTRACTOR'S Initial Size/Weight Compliance Check ........................ 5
       (2) CONTRACTOR Liable for Failure to Do Compliance Check .................... 5
   (e) License Plates and SSRS Fees ............. 5
       (1) COMPANY Will Obtain Plates If CONTRACTOR Wishes ................. 5
       (2) Deduction Upon Termination .......... 5
       (3) CONTRACTOR'S Right to Pro-Rata Refund .................................... 5
       (4) SSRS Fees ................................ 5
   (f) Fuel and Fuel Tax Expense ................. 5
       (1) CONTRACTOR'S Expense ............ 5
       (2) CONTRACTOR'S Fuel Receipts ..... 5
       (3) COMPANY and VAN LINE Will Make Required Filings ...................... 6
       (4) Credits and Debits to CONTRACTOR ... 6
       (5) COMPANY/VAN LINE Responsibility for Additional Tax ....................... 6
       (6) Administrative Fee ...................... 6
   (g) Communications Equipment ................. 6
       (1) Equipment ................................ 6
       (2) Messaging Usage Fee .................. 6
   (h) Re-powering a Load ............................ 6
   (i) Expenses Charged to COMPANY ........... 6
       (1) General Prohibition ..................... 6
       (2) Obligations Incurred With COMPANY Approval ................................... 6
9. USE OF COMPANY'S TRAILER AND OTHER EQUIPMENT .......................................... 7
   (a) Use of Trailer and Other Equipment Restricted to COMPANY Service .......... 7
   (b) Inspection and Inventory Report ............ 7
   (c) Allocation of Expense Responsibility ...... 7
       (1) COMPANY'S Trailer ..................... 7
       (2) COMPANY Electronic Bar Code Inventory Equipment .................... 7
       (3) In-Van and Other COMPANY Equipment ................................. 7
   (d) Return of Trailer Upon Request or Termination ................................... 7
   (e) COMPANY'S Explanation and Itemization of Damage Deduction .................... 7
10. NO REQUIRED PURCHASES FROM COMPANY OR VAN LINE ......................... 7
11. CHARGE-BACKS AND OTHER DEDUCTIONS .... 8
    (a) Charge-Backs and Documentation ........ 8

(b)   Future Settlements, Escrow Fund, and
         Separate Billing........................................8
12.  ACCIDENTS AND CLAIMS ...........................................8
13.  INSURANCE.................................................................8
14.  INDEMNIFICATION.......................................................8
    (a)   Indemnification in General ..............................8
    (b)   Cargo Loss and Damage..................................8
    (c)   CONTRACTOR'S Funding of
            Indemnification Obligation............................8
    (d)   Re-Powering and Termination-Related
            Expenses .......................................................9
15.  ESCROW FUND.............................................................9
16.  CONFIDENTIALITY........................................................9
    (a)   Confidential Matters ......................................9
    (b)   CONTRACTOR'S Non-Disclosure
            Obligation.......................................................9
    (c)   COMPANY'S Right to Seek Injunction
            Against Disclosure ........................................9
17.  DURATION OF AGREEMENT AND
     TERMINATION..............................................................9
    (a)   Start of Agreement .........................................9
    (b)   Mutual Right to Terminate Agreement.............9
    (c)   COMPANY'S Right to Take Possession of
            Goods .............................................................9
18.  CONTRACTOR'S OBLIGATIONS UPON
     TERMINATION..............................................................9
    (a)   CONTRACTOR'S Obligation to Complete
            Performance ...................................................9
    (b)   Required Removal of Identification Upon
            Termination ...................................................10
    (c)   COMPANY Right to Reimbursement of
            Termination-Related Expenses......................10
    (d)   Liabilities and Entitlements Continue............10
19.  BENEFIT AND ASSIGNMENT ....................................10
20.  NOTICES....................................................................10

    (a)   Parties Must Notify Each Other in Person
            or By U.S. Mail, Overnight Delivery,
            Satellite, or Fax............................................10
    (b)   Obligation to Keep Addresses and Phone
            and Fax Numbers Up to Date.......................10
21.  GENERAL ..................................................................10
22.  COMPLETE AGREEMENT; AMENDMENTS TO
     AGREEMENT...............................................................10
23.  GOVERNING LAW.......................................................11
24.  DISPUTE RESOLUTION................................................11
    (a)   Arbitration Required for All Disputes ............11
    (b)   No Consolidated or Class Arbitrations ..........11
    (c)   Demand for Arbitration ..................................11
    (d)   Parties to Be Bound by Arbitration Award.....11
    (e)   Allocation of Arbitration Fees and Other
            Expenses .....................................................11

Attachment A - CONTRACTOR'S Compensation
    Addendum 1 to Attachment A - Pack And Load Contractors
    Addendum 2 to Attachment A – Local Moving Services
Attachment B - Charge-Backs and Other Deductions
    Schedule 1 to Attachment B
    Schedule 2 to Attachment B
    Schedule 3 to Attachment B
Attachment C - Insurance
Attachment D-1 - Escrow Fund
Attachment D-2 – Repair and Operating Escrow Fund
Attachment D-3 – Estimated Tax Payment Escrow Fund
Attachment E - Communications Equipment
Attachment F - Deductions For Lease Or Purchase Of Vehicle
Attachment G - List of Equipment
Attachment H - Amendment to Attachment D (Escrow Fund)
Attachment I - Electronic Bar Code Inventory Equipment
Attachment J – Quarterly Income Tax
Statement of Lease
Receipt for Possession or Return of Equipment

## SUDDATH RELOCATION SYSTEMS OF PENSACOLA, INC.
## INDEPENDENT CONTRACTOR OPERATING AGREEMENT

Suddath Relocation Systems of Pensacola, Inc. ("COMPANY"), is an authorized motor carrier that transports and stores household goods and general commodities under either its own operating authority or, as an agent of United Van Lines, LLC and/or Mayflower Transit, LLC ("VAN LINE"), under VAN LINE'S operating authority. matthews c. bullards D/B/A Bullard Truckling ("CONTRACTOR") owns the transportation equipment described in Section 1 below or has the right to make it available for lease. Pursuant to the federal leasing regulations (49 C.F.R. Part 376), COMPANY and CONTRACTOR ("the parties") enter into this Independent Contractor Operating Agreement, including attachments ("Agreement") as follows:

1. SERVICES AND EQUIPMENT. During this Agreement, CONTRACTOR shall provide COMPANY with transportation-related services and the use of the transportation equipment listed below or in Attachment G ("Equipment"). Upon taking possession of the Equipment, COMPANY shall furnish CONTRACTOR a receipt identifying the Equipment and stating the date and time possession was transferred. Upon termination of this Agreement, CONTRACTOR shall furnish COMPANY a similar receipt.

| 44/448 | 1998 | FTTIT FID120 | 1FUYDSEB6WL9AL856 |
|---|---|---|---|
| Unit No. | Year | Make | VIN (Serial No.) |

2. EXCLUSIVE POSSESSION AND RESPONSIBILITY. COMPANY shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement, although only for those periods that the Equipment is operated by or for COMPANY, either as an agent of VAN LINE or as an independent motor carrier. CONTRACTOR shall not operate the Equipment for any other motor carrier without COMPANY'S prior written consent, which shall not be unreasonably withheld. COMPANY shall not trip-lease the Equipment to any other motor carrier without CONTRACTOR'S prior written consent, which shall not be unreasonably withheld. COMPANY shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement, although only for those periods that the Equipment is operated by or for COMPANY.

3. CUSTOMER REQUIREMENTS. Reasonable customer satisfaction is of the utmost importance and is the responsibility of both COMPANY and CONTRACTOR. CONTRACTOR agrees to meet all customer requirements approved by COMPANY that are reasonably related to transporting, loading and unloading, packing and unpacking, crating and uncrating, debris removal, and other services relating to goods being transported and that do not conflict with the terms of this Agreement.

4. CONTRACTOR'S PRINCIPAL RESPONSIBILITIES.

4(a). Services. CONTRACTOR shall furnish all transportation, loading and unloading, packing and unpacking (with Company furnishing packing materials except as otherwise provided in the Addendum to Attachment A), crating and uncrating, pad-wrapping, decking, strapping, securing, unwrapping, and all other services necessary in connection with all shipments offered by COMPANY and accepted by CONTRACTOR.

4(a)(1)   Number of Shipments. COMPANY does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR. CONTRACTOR may refuse any specific shipment offered by COMPANY as long as, in COMPANY'S reasonable judgment, COMPANY is nonetheless able to meet the needs of its customers. For example COMPANY may require CONTRACTOR to provide services when CONTRACTOR is the only contractor under lease to COMPANY reasonably in a position to meet a particular customer's deadline or other requirements.

4(a)(2)   CONTRACTOR Availability. CONTRACTOR shall have the right, at times of CONTRACTOR'S choosing, to be unavailable to COMPANY for reasonable periods, but if such periods occur during times when customers are tendering COMPANY significant business, CONTRACTOR has an obligation to return to accepting dispatched loads as soon as possible. If CONTRACTOR plans a period of unavailability of more than thirty (30) calendar days and COMPANY so requests, CONTRACTOR shall make an additional contribution or contributions to CONTRACTOR'S Repair Account to cover CONTRACTOR'S ongoing expenses under this Agreement during such absence, either by authorizing COMPANY to increase or re-institute deductions from CONTRACTOR'S settlement compensation for the Repair Account contributions or by making a cash contribution to CONTRACTOR'S Repair Account as detailed in Attachment H.

4(b). Identification of the Equipment.

4(b)(1).   At Start. Before placing the Equipment in the service of COMPANY, CONTRACTOR shall, at COMPANY'S expense, apply to the outside of the Equipment whatever identification COMPANY designates and as required by law,

CONTRACTOR shall first remove, at CONTRACTOR'S expense, any paint, decals, or other items that would interfere with such identification or are otherwise offensive, in COMPANY'S reasonable judgment.

4(b)(2)   After First 6 Weeks. After CONTRACTOR'S first six (6) weeks operating under this Agreement, COMPANY shall have the right to require CONTRACTOR to repaint or otherwise apply to the Equipment all identification, colors, lettering, decals, and insignia required by law or by COMPANY'S or VAN LINE'S corporate specifications, at CONTRACTOR'S expense. COMPANY may reimburse CONTRACTOR up to one-half (1/2) of the initial cost of repainting and identification of the Equipment upon CONTRACTOR'S submission of proper receipts. Notwithstanding the foregoing, if this Agreement is terminated for any reason within twelve (12) months after the date of completion of such repainting and identification, CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S final settlement compensation and/or from CONTRACTOR'S Escrow Fund a *pro rata* share of the repainting and identification expense paid by COMPANY, which shall be calculated by dividing the amount of the repainting and identification expense paid by COMPANY by twelve (12) and multiplying by the number of whole calendar months that remain between termination and the end of the twelve (12) month period. COMPANY reserves the right to require from time to time the repainting or remarking of the Equipment at CONTRACTOR'S expense. In the event CONTRACTOR replaces, adds or changes the Equipment, CONTRACTOR shall paint or otherwise apply to the Equipment all identification, colors, lettering, decals, and insignia required by law or by COMPANY'S or VAN LINE'S specifications at CONTRACTOR'S expense prior to qualification of equipment with COMPANY.

4(b)(3)   Removal Upon Termination. Upon termination of this Agreement or any other time the Equipment is being operated on behalf of any other carrier or entity, CONTRACTOR shall immediately, at CONTRACTOR'S expense, remove all COMPANY and VAN LINE identification.

4(b)(4)   No CONTRACTOR Artwork. At no time during this Agreement shall CONTRACTOR place any carrier identification, paint, artwork, logo, or design upon the Equipment, except that of COMPANY or VAN LINE without COMPANY'S prior written consent (which consent shall not be unreasonably withheld).

4(c). Substitute Vehicles. CONTRACTOR shall not substitute any vehicle or trailer for the Equipment without COMPANY'S prior written consent. In the event another vehicle or trailer is substituted, all terms and conditions of this Agreement shall apply to such vehicle or trailer to the same extent as to the Equipment. In the case of permanently substituted vehicles or trailers, CONTRACTOR shall, at CONTRACTOR'S expense, first repaint or otherwise apply to the vehicle or trailer all identification, colors lettering, and insignia required by law or by COMPANY'S corporate specifications.

4(d) Drivers

4(d)(1)   Initial Safety Qualification. CONTRACTOR shall furnish competent drivers who meet COMPANY'S and VAN LINE'S current Safety Policies and as revised in the future (hereafter "COMPANY'S Safety Policies") set forth in COMPANY'S Policies and Procedures (as amended from time to time, the "COMPANY'S Policies and Procedures"), which shall be made available at COMPANY'S headquarters during normal business hours for CONTRACTOR'S inspection and copying at COMPANY'S expense and all applicable legal requirements.

4(d)(2).  Disqualification of Drivers. If COMPANY or VAN LINE disqualifies CONTRACTOR, or any driver provided by CONTRACTOR, on grounds that CONTRACTOR is unsafe, unqualified or disqualified pursuant to law, in violation of COMPANY'S Safety Policies, or otherwise incompetent, COMPANY shall have the right and obligation to prohibit CONTRACTOR from handling shipments under COMPANY'S operating authority (in the case of COMPANY disqualification) or shipments under VAN LINE'S operating authority (in the case of VAN LINE disqualification).

4(e) Drug and Alcohol Testing. CONTRACTOR and its drivers shall, as required by federal statutes and regulations, comply with the Drug and Alcohol Policy in COMPANY'S Safety Policies, including participating in COMPANY'S and or VAN LINE'S random drug and alcohol testing program and submitting to all other required drug or alcohol tests. All such tests (whether pre-qualification, post-accident, random, reasonable-suspicion, return-to-duty, or follow-up) shall be done by an outside testing service selected by VAN LINE at CONTRACTOR'S expense.

4(f). Uniforms. To meet customer expectations regarding security, efficiency, and professionalism, CONTRACTOR and all of CONTRACTOR'S drivers, helpers, and other personnel shall wear uniforms that comply with COMPANY'S Policies and Procedures while before COMPANY'S customers, at an agency of COMPANY or VAN LINE, or at COMPANY'S or VAN LINE'S headquarters in the performance of services for COMPANY. CONTRACTOR shall bear the full expense of all such uniforms and hereby authorizes COMPANY to deduct all such expense from CONTRACTOR'S settlement compensation, with the following exception: if CONTRACTOR was not already under lease in COMPANY'S service, COMPANY shall furnish CONTRACTOR with an initial allotment of approved uniforms (five collared shirts, five pants or shorts, and five tee shirts) for himself/herself. However, if this

Agreement is terminated within the first twelve (12) months, COMPANY shall deduct from CONTRACTOR'S final settlement compensation and/or Escrow Fund the full expense incurred by COMPANY for CONTRACTOR'S initial allotment of uniforms.

### 4(g) Paperwork Requirements.

4(g)(1).   CONTRACTOR Submission of Documents. CONTRACTOR shall regularly submit to COMPANY and/or VAN LINE, if applicable, all properly-completed driver logs and supporting documents (including original fuel receipts, each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained, and original toll receipts, if necessary), physical examination certificates, accident reports, vehicle inspection reports, annual certifications of traffic violation, and any other data, documents, or reports that COMPANY may designate.

4(g)(2).   Copies of this Agreement. COMPANY shall, as set forth in 49 C.F.R. § 376.12(f), keep the original of this Agreement, with a copy to be retained by CONTRACTOR. Pursuant to 49 C.F.R. § 376.11(c)(2), a "Statement of Lease" relating to this Agreement shall be carried on the Equipment for those periods that the Equipment is operated by or for COMPANY under this Agreement.

4(h) Safe and Lawful Operations. CONTRACTOR agrees to ensure that, at all times, CONTRACTOR and all drivers, helpers, and other personnel furnished by CONTRACTOR comply with and carry out the terms of this Agreement as well as all laws of the various jurisdictions in which the Equipment will be operated (including state and federal motor carrier safety, traffic, and truck-size-and-weight requirements), COMPANY'S Safety Policies, and COMPANY'S and VAN LINE'S operating authorities. CONTRACTOR is required to comply with the federal hours-of-service regulations, and nothing in this Agreement is intended to authorize CONTRACTOR or CONTRACTOR'S drivers to operate beyond the limits established by those regulations. CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S settlement compensation and/or Escrow Fund all penalties, fines, charge-backs, and other deductions assessed pursuant to the "SAFETY," "CLAIMS," and other sections of the COMPANY'S Policies and Procedures. CONTRACTOR'S failure to comply with this Section 4(h) shall be a material breach of this Agreement and COMPANY may terminate this Agreement immediately.

4(i). Passenger Authorization. CONTRACTOR shall not allow any passengers to ride in the Equipment unless authorized in writing by COMPANY or VAN LINE in advance on a Helper/Passenger Authorization for Transportation Form provided by COMPANY or VAN LINE, which both CONTRACTOR (or its driver) and the proposed passenger must first fill out, sign, and submit. CONTRACTOR assumes all liability for the person and property of the passenger.

4(j). Collections. When the transportation is to be performed on a collect-on-delivery ("C.O.D.") basis, CONTRACTOR shall promptly collect, in guaranteed funds (such as a money order or a cashier's, treasurer's, or certified check) and remit to COMPANY within three (3) calendar days all moneys (and supporting papers) due COMPANY from its shippers or consignees for transportation or other services performed by CONTRACTOR, COMPANY, or other entities. Such moneys and papers shall be the exclusive property of COMPANY regardless of the status of the account between CONTRACTOR and COMPANY. The use of all or any part of such moneys for any purpose other than to remit them to COMPANY shall be a misappropriation of COMPANY'S property. CONTRACTOR shall be liable to COMPANY for the acts or omission of CONTRACTOR'S drivers, helpers, or other personnel with respect to such collections.

5.   CONTRACTOR NOT EMPLOYEE OF COMPANY. CONTRACTOR is an independent contractor with respect to the Equipment, transportation, and other services provided pursuant to this Agreement.

5(a) CONTRACTOR Furnishes/Controls All Personnel. CONTRACTOR shall furnish, hire, pay, supervise, control, and discharge all personnel needed to perform CONTRACTOR'S obligations under this Agreement; and under no circumstances shall any such personnel be considered the employees of COMPANY or VAN LINE.

5(b) Indemnification of COMPANY. CONTRACTOR agrees to defend, indemnify, and hold COMPANY harmless from any claim (including any for which COMPANY is not indemnified by its insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, unpaid taxes or fees, or expense, including reasonable attorneys' fees and costs of litigation, that COMPANY incurs involving an allegation, finding, or judgment that CONTRACTOR or any of CONTRACTOR'S personnel is an employee of COMPANY.

5(c) CONTRACTOR'S Control Over Manner and Means of Performance. Subject to legal requirements and COMPANY'S customers' needs, CONTRACTOR assumes full control over and responsibility for scheduling work hours and rest periods; selecting routes and fuel stops; deciding when, where, and how maintenance is to be performed on the Equipment; arranging for packing and unpacking as required; loading and unloading; and other services relating to the goods being transported; complying with all applicable local, state, federal, or foreign requirements regarding the withholding of income taxes and payroll taxes from wages paid

to CONTRACTOR'S personnel and the payment of Social Security and Medicare taxes; and obtaining and maintaining workers' compensation insurance on all of CONTRACTOR'S personnel (in accordance with Attachment C).

5(d). CONTRACTOR'S Supplying of Records. If COMPANY requests written proof of such control and responsibility, CONTRACTOR shall provide it.

6. COMPENSATION. CONTRACTOR'S total compensation is set forth in Attachment A.

## 7. SETTLEMENT PERIOD AND DOCUMENT REVIEW.

7(a). Payment Within 15 Days. COMPANY shall settle with CONTRACTOR, and pay CONTRACTOR any compensation due under Attachment A (less any charge-backs and other deductions under Attachment B), for any transportation or other services provided under this Agreement within fifteen (15) calendar days after CONTRACTOR'S submission, in proper form, of those documents necessary for COMPANY and/or VAN LINE to secure payment from the shipper, including but not limited to the signed freight bill, delivery receipt, descriptive inventories, weight tickets when required by the shipper, by COMPANY'S or VAN LINE'S tariff, or by law, supporting documents for any accessorial services performed, and bill of lading, plus properly completed driver logs as required by the U.S. Department of Transportation ("USDOT"). Nothing herein shall limit COMPANY'S and VAN LINE'S exclusive right to set the rate and amount charged to COMPANY'S and VAN LINE'S customers, shippers, consignors, or consignees.

7(b). Not Contingent on No-Exception Bill of Lading. Payment shall not be made contingent, however, upon submission of a bill of lading to which no exceptions have been taken.

7(c). CONTRACTOR'S Access to Freight Documentation. In the event CONTRACTOR'S compensation is based on a percentage of linehaul or revenue for a shipment, COMPANY shall provide CONTRACTOR, at or before the time of settlement, a copy of the applicable rated freight bill or a computer-generated document containing the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. When a computer-generated document is provided, CONTRACTOR may view, during normal business hours, a copy of any actual document underlying the computer-generated document. Regardless of the method of compensation, CONTRACTOR may examine, during normal business hours, copies of COMPANY'S and VAN LINE'S tariffs or, in the case of contract carriage, other documents from which rates and charges are computed, provided that where rates and charges are computed from a contract, only those portions of the contract containing the same information that would appear on a rated freight bill will be disclosed.

7(d). COMPANY'S Right to Delete Names. COMPANY may delete the names of shippers and consignees shown on the freight bill or other form of documentation.

7(e). COMPANY'S Access to CONTRACTOR'S Documents. COMPANY shall have the right to review all of CONTRACTOR'S documents and records relating to the use of the Equipment and to the services provided under this Agreement and CONTRACTOR agrees to provide COMPANY with access to such documents and records upon reasonable notice.

## 8. CONTRACTOR'S PRINCIPAL EXPENSES.

8(a). Operating Expenses. CONTRACTOR shall furnish the Equipment ready to operate and fully roadworthy including the state base plate, and shall furnish all oil, fuel, tires, and other parts, supplies, and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs. COMPANY shall furnish the necessary licenses, permits, cab cards, and Single-State Registration System fees, as well as pay all highway use taxes and weight-distance taxes. Unless otherwise provided in this Agreement, CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, deadhead (empty) mileage, loading and unloading expenses, and federal heavy vehicle use tax, state property or indefinite situs taxes, fuel taxes, registration fees, ferry and toll charges, and detention and accessorial charges not collected by COMPANY because of CONTRACTOR'S failure to provide the required documentation.

### 8(b). Maintenance and Inspection.

8.b)(1). Equipment Maintained in Good and Safe Condition. CONTRACTOR shall maintain the Equipment in a good and safe condition, including ensuring its systematic repair and maintenance, and in compliance with all laws and COMPANY'S Policies and Procedures.

8(b)(2). Inspection of Equipment. CONTRACTOR shall make the Equipment available for inspection by COMPANY at COMPANY'S expense upon reasonable request, plus have the Equipment inspected semi-annually at a facility authorized by COMPANY. COMPANY will reimburse CONTRACTOR for fifty percent (50%) of the cost upon submission of proper receipts.

8(b)(3). CONTRACTOR'S Required Recordkeeping. CONTRACTOR shall maintain systematic records of the inspection, repair, and maintenance of the Equipment and, when requested orally or in writing, promptly forward them to COMPANY.

8(b)(4). Truck Wash. COMPANY will reimburse CONTRACTOR for 50% of the cost of a truck wash, which shall include both the Equipment and the trailer, upon submission of proper receipts

8(c). Fines. CONTRACTOR shall ensure that CONTRACTOR and all of CONTRACTOR'S drivers, helpers, or other personnel pay all fines and civil penalties imposed for violation of any statute, ordinance, regulation, or order, if the violation results, at least partially, from the acts or omissions of CONTRACTOR or CONTRACTOR'S personnel. CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S settlement compensation all such fines and civil penalties that may be imposed on or paid by COMPANY in the first instance.

8(d). Overweight and Overdimensional Shipments.

8(d)(1). CONTRACTOR'S Initial Size/Weight Compliance Check. Before starting any trip under this Agreement, CONTRACTOR shall determine whether all shipments are in compliance with the size and weight laws of the states in or through which CONTRACTOR will travel and shall notify COMPANY if the Equipment is overweight or in need of permits; provided, however, that except when the violation results from the acts or omissions of CONTRACTOR or CONTRACTOR'S employees or agents, COMPANY shall assume the risks and costs of fines for interstate overweight and oversize trailers when such trailers are preloaded, sealed, or the load is containerized, or for improperly permitted overdimensional and overweight loads, or the trailer or lading is otherwise outside of CONTRACTOR'S control.

8(d)(2). CONTRACTOR Liable for Failure to Do Compliance Check. CONTRACTOR shall pay, or reimburse COMPANY, for any expenses or penalties due to CONTRACTOR'S failure to weigh each shipment or to notify COMPANY that the vehicle is overweight or in need of permits.

8(e). License Plates and SSRS Fees.



8(e)(1). COMPANY Will Obtain Plates If CONTRACTOR Wishes. If CONTRACTOR so elects (by initialing "COMPANY shall obtain base plates..." in item 4 of Attachment B), COMPANY shall initially pay the full expense of the base plates and then deduct that expense, as well as an administrative fee, from CONTRACTOR'S compensation, in accordance with Attachment B.

8(e)(2). Deduction Upon Termination. If this Agreement is terminated prior to CONTRACTOR'S complete reimbursement of COMPANY'S expense, COMPANY is hereby authorized to deduct any remaining amount from CONTRACTOR'S final settlement and/or Escrow Fund.

8(e)(3). CONTRACTOR'S Right to Pro-Rata Refund. If CONTRACTOR removes and returns the base plates to COMPANY upon the termination of this Agreement and if COMPANY then receives a refund or credit for the base plates or resells them to another contractor, COMPANY shall refund to CONTRACTOR a pro-rata share of the amount received by COMPANY, less any transfer or replacement fees owed to the plating jurisdictions. CONTRACTOR shall not be entitled to reimbursement for any unused portion of base plates, however, unless COMPANY redeems, reuses, or re-sells the plates to another contractor

8(e)(4). SSRS Fees. COMPANY shall pay all Single-State Registration Fees required for CONTRACTOR'S operations under this Agreement, provided that if this Agreement is terminated within twelve (12) months of its start, COMPANY is hereby authorized to deduct the full amount of such fees from CONTRACTOR'S final settlement and/or Escrow Fund

8(f). Fuel and Fuel Tax Expense.

8(f)(1). CONTRACTOR'S Expense. All fuel expenses and fuel taxes shall be the responsibility of CONTRACTOR and, to the extent paid initially by COMPANY, shall be deducted from CONTRACTOR'S compensation in accordance with Attachment B

8(f)(2). CONTRACTOR'S Fuel Receipts. CONTRACTOR shall provide COMPANY and/or VAN LINE, if applicable, promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding tag indicating the fuel purchase for which the receipt was obtained), and an accurate accounting of all fuel purchases and miles traveled by state

8(f)(3).    COMPANY and VAN LINE Will Make Required Filings. COMPANY (with respect to miles operated under COMPANY'S authority) and VAN LINE (with respect to miles operated under VAN LINE'S authority) shall submit, in its own name, all required reports and payments of fuel use taxes owed with respect to the Equipment under this Agreement.

8(f)(4).    Credits and Debits to CONTRACTOR. COMPANY shall (a) deduct monthly from CONTRACTOR'S settlements in accordance with Attachment B any net fuel use tax owed at that time with respect to CONTRACTOR'S operations in all taxing jurisdictions combined or (b) credit monthly to CONTRACTOR'S settlements any net fuel use tax credit or refund due CONTRACTOR at that time with respect to its operations in all taxing jurisdictions combined. COMPANY shall ensure that CONTRACTOR receives at least quarterly summaries of credits and debits for fuel taxes on a state-by-state basis either on CONTRACTOR'S settlement sheets or through separate accountings, at COMPANY'S option.

8(f)(5).    COMPANY/VAN LINE Responsibility for Additional Tax. COMPANY and VAN LINE (as to their respective operations) shall pay any additional amounts of fuel use tax assessed with respect to the combined operations of CONTRACTOR and all other contractors operating under COMPANY'S or VAN LINE'S operating authority as a result of International Fuel Tax Agreement base-state audits of COMPANY'S or VAN LINE'S fleetwide fuel use tax reports and payments.

8(f)(6).    Administrative Fee. As an administrative fee for VAN LINE'S fuel use tax reporting services to CONTRACTOR, CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S settlement compensation and remit to VAN LINE, in accordance with Attachment B, a Fuel Tax Surcharge of $0.00165 for every mile CONTRACTOR operates the Equipment on behalf of VAN LINE as shown on VAN LINE'S Fuel and Mileage Tax Report.

8(g). Communications Equipment.

8(g)(1).    Equipment. To facilitate the serving of COMPANY'S customers' needs, CONTRACTOR shall, at CONTRACTOR'S expense, obtain, maintain in an operable and functioning condition, and carry at all times while operating the Equipment in COMPANY'S service a wireless mobile telephone, and maintain a corresponding contract for nationwide wireless telephone service, and shall supply to COMPANY in the signature block of this Agreement the telephone number by which to reach such mobile telephone. In addition, CONTRACTOR shall make all necessary arrangements to obtain, install in each unit of Equipment, and maintain in an operable and functioning condition communications equipment that constitutes or, in COMPANY'S reasonable judgment, is technically and functionally compatible with the Qualcomm, Inc. OmniTRACS® Mobile Communications System or other system utilized by COMPANY and VAN LINE.

8(g)(2).    Messaging Usage Fee. CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S settlement compensation and/or Escrow Fund any Monthly Usage Charge (with no mark-up or administrative fee to COMPANY) owed pursuant to Attachment E.

8(h). Re-powering a Load. CONTRACTOR agrees to transport tendered goods in a reasonable and timely manner. If CONTRACTOR does not or cannot complete the delivery of the goods in such manner, CONTRACTOR shall immediately notify a COMPANY dispatcher by telephone or satellite communication. CONTRACTOR shall thereupon obtain, with COMPANY'S prior approval and at CONTRACTOR'S expense, a rental tractor through an approved vendor of COMPANY or of VAN LINE'S national account program, and/or a qualified substitute driver, and complete the delivery or, if COMPANY in its sole discretion chooses, COMPANY shall complete the transportation and delivery of the goods at CONTRACTOR'S expense. In the latter situation, COMPANY is hereby authorized to deduct such expense from CONTRACTOR'S settlement compensation and/or Escrow Fund.

8(i). Expenses Charged to COMPANY.

8(i)(1).    General Prohibition. Except as provided in Section 8(i)(2) below, CONTRACTOR has no authority to incur any obligation, for any reason, or open any charge account in the name of COMPANY. Should CONTRACTOR incur obligations or open charge account(s) in the name of COMPANY, CONTRACTOR agrees that COMPANY may deduct such expenses or obligations from CONTRACTOR'S settlement compensation and/or Escrow Fund.

8(i)(2).    Obligations Incurred With COMPANY Approval. CONTRACTOR may incur expenses or obligations in the name of COMPANY if COMPANY has granted prior approval and issued a corresponding purchase order to the vendor or service provider. CONTRACTOR agrees that COMPANY may deduct such expenses or obligations from CONTRACTOR'S settlement compensation and/or Escrow Fund.

## 9.   USE OF COMPANY'S TRAILER AND OTHER EQUIPMENT.

9(a) Use of Trailer and Other Equipment Restricted to COMPANY Service. Any trailer and/or in-van, electronic bar code inventory equipment, or other equipment supplied to CONTRACTOR by COMPANY shall be used by CONTRACTOR only to provide service under this Agreement. COMPANY, in its discretion, shall have the right to substitute, exchange, or otherwise replace a trailer or other equipment provided by COMPANY for use by CONTRACTOR.

9(b) Inspection and Inventory Report. Before taking possession of any COMPANY-assigned trailer and in-van moving, electronic bar code inventory equipment, or other equipment, whether at the beginning of this Agreement or when any substitution, exchange, or replacement is made as provided in subsection (a) above, CONTRACTOR shall, together with a representative of COMPANY, conduct a visual inspection and furnish COMPANY with a completed, signed Trailer Inspection and Inventory Report. CONTRACTOR shall do the same upon returning the trailer to COMPANY'S facility or to such other location as COMPANY specifies pursuant to Section 9(d), during normal business hours. If CONTRACTOR drops off the trailer outside normal business hours. CONTRACTOR hereby authorizes COMPANY to complete the necessary Trailer Inspection and Inventory Report.

### 9(c) Allocation of Expense Responsibility.

9(c)(1). COMPANY'S Trailer. With respect to COMPANY'S trailer, COMPANY shall be responsible for all expenses relating to regular maintenance of axles, brakes, and other electrical and mechanical systems, repairs of damage to the trailer attributable to ordinary wear and tear, and purchases of replacement tires, provided that all such expenses are approved by COMPANY before the work is performed. CONTRACTOR shall be responsible for all repairs of all damage to the trailer other than ordinary wear and tear, and CONTRACTOR hereby authorizes COMPANY to deduct all such amounts from CONTRACTOR'S settlement compensation and/or Escrow Fund. All trailer repairs and maintenance shall be performed at facilities designated or approved by COMPANY.

9(c)(2). COMPANY Electronic Bar Code Inventory Equipment. As set forth in Attachment I, COMPANY shall perform regular maintenance on the electronic bar code inventory equipment and be responsible for repairs of damage attributable to ordinary wear and tear. CONTRACTOR shall be responsible for up to Two Hundred Fifty Dollars ($250.00) per incident for loss or repairs to the electronic bar code inventory equipment attributable to any cause other than ordinary wear and tear. CONTRACTOR hereby authorizes COMPANY to deduct all such amounts from CONTRACTOR'S settlement compensation and/or Escrow Fund.

9(c)(3). In-Van and Other COMPANY Equipment. COMPANY shall perform regular maintenance on its in-van or other equipment and be responsible for repairs of damage attributable to ordinary wear and tear. CONTRACTOR shall be responsible for all losses of in-van or other COMPANY equipment and all repairs to COMPANY'S in-van or other equipment attributable to something other than ordinary wear and tear. CONTRACTOR hereby authorizes COMPANY to deduct all such amounts from CONTRACTOR'S settlement compensation and/or Escrow Fund

9(d) Return of Trailer Upon Request or Termination. Immediately upon COMPANY'S request or the termination of this Agreement, CONTRACTOR shall return the trailer and in-van, electronic bar code inventory equipment, or other equipment to COMPANY'S facility in Pensacola, Florida, or to such other closer location as COMPANY may specify at the time in the same good condition (ordinary wear and tear excepted) as received by CONTRACTOR. If not in such condition, COMPANY may, if it so chooses, restore the trailer or equipment to its previously delivered condition or, if less expensive, shall replace the trailer or equipment. With respect to damage to the trailer and to in-van, electronic bar code inventory equipment, or other equipment (other than ordinary wear and tear), CONTRACTOR hereby authorizes COMPANY to deduct from CONTRACTOR'S final settlement compensation and/or Escrow Fund the full expense of all repairs or, in the case of replacement, the replacement cost less the value of the trailer or equipment when first delivered to CONTRACTOR. If CONTRACTOR fails to return COMPANY'S trailer or in-van, electronic bar code inventory equipment, or other equipment, CONTRACTOR shall reimburse COMPANY for all reasonable expenses incurred by COMPANY in recovering, repairing, or, if necessary, replacing its trailer or equipment, as provided above.

9(e) COMPANY'S Explanation and Itemization of Damage Deduction. Before deducting any such damage described in Section 9(d) above from CONTRACTOR'S settlement compensation and/or Escrow Fund, COMPANY shall provide CONTRACTOR with a written explanation and itemization of such damage or other loss.

10. NO REQUIRED PURCHASES FROM COMPANY OR VAN LINE. CONTRACTOR is not required to purchase or rent any products, equipment, or services from COMPANY or VAN LINE as a condition of entering into this Agreement. In the event

CONTRACTOR elects to purchase or rent equipment, products, or services from or through COMPANY or from any third party, for which the purchase or rental contract gives COMPANY the right to make deductions from CONTRACTOR'S settlements, the parties agree to specify the terms of each such contract in an attachment or addendum to this Agreement.

## 11 CHARGE-BACKS AND OTHER DEDUCTIONS

11(a).    Charge-Backs and Documentation. COMPANY shall deduct from CONTRACTOR'S compensation at the time of payment or settlement all expenses, advances, escrow fund contributions, taxes, fees, fines, penalties, damages, losses, and other amounts paid, owed, or incurred by COMPANY, or that CONTRACTOR owes to a third party under a purchase or rental contract that, under this Agreement, CONTRACTOR is responsible for, as detailed in Attachment B or elsewhere in this Agreement. COMPANY shall provide CONTRACTOR with a written explanation and itemization of any deductions for cargo or property damage before making them. With respect to all other charge-backs and deductions, COMPANY shall make available to CONTRACTOR, upon request, copies of those documents that are necessary to determine the validity of the charge-back or deduction.

11(b).    Future Settlements, Escrow Fund, and Separate Billing. Whenever a reference is made in this Agreement to charging back or deducting from CONTRACTOR'S settlements or compensation, and insufficient funds are available to cover the obligation, COMPANY reserves the right, in its sole discretion, to (i) deduct the remaining amount from the CONTRACTOR'S next settlement, (ii) deduct it from CONTRACTOR'S Escrow Fund in accordance with Attachment D, or (iii) bill CONTRACTOR separately for the amount.

12. ACCIDENTS AND CLAIMS. CONTRACTOR shall immediately report any accident or potential personal injury or property damage claim to COMPANY'S Risk Management Department and VAN LINE, if applicable, involving operations or services performed under this Agreement, including CONTRACTOR'S written report of such accident or claim. CONTRACTOR and CONTRACTOR'S drivers shall cooperate fully with COMPANY and VAN LINE with respect to any legal action, regulatory hearing, or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement, or the services performed hereunder. CONTRACTOR shall, at COMPANY'S or VAN LINE'S request and, unless otherwise agreed, at CONTRACTOR'S sole expense, provide written reports or affidavits, attend hearings and trials, and assist in securing evidence or obtaining the attendance of witnesses. CONTRACTOR shall provide COMPANY and VAN LINE with any assistance as may be necessary for COMPANY or VAN LINE, or their representatives or insurers, to investigate, settle, or litigate any accident, claim, or potential claim by or against COMPANY or VAN LINE.

13. INSURANCE. COMPANY'S and CONTRACTOR'S obligations as to insurance are set forth in Attachment C. COMPANY'S or VAN LINE'S possession of legally-required insurance in no way restricts COMPANY'S right of indemnification from CONTRACTOR under this Agreement

## 14. INDEMNIFICATION

14(a).    Indemnification in General. CONTRACTOR agrees to defend, indemnify, and hold COMPANY harmless from any claim (including any for which COMPANY is not indemnified by its insurance and any claim of loss of or damage to the Equipment or to CONTRACTOR'S other property) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that COMPANY incurs arising out of CONTRACTOR'S (including CONTRACTOR'S agents', subcontractors' or employees'), negligence, gross negligence, willful misconduct, or other culpable acts or omissions under this Agreement. Without limiting any other methods of collection of amounts due hereunder, any amounts due COMPANY under this subsection may be deducted from any money otherwise due CONTRACTOR at any periodic or final settlement or, following termination of this Agreement, from the Escrow Fund established below and in Attachment D.

14(b).    Cargo Loss and Damage. CONTRACTOR'S indemnification of COMPANY under subsection (a) above related to cargo loss, damage, or delay to cargo shall be limited to those amounts set forth in the table in Section 1 of Attachment B (under "Claims" and Schedule 1 to Attachment B) in accordance with COMPANY'S Claims Policies and Variable Charge-back programs as contained in COMPANY'S Policies and Procedures.

14(c)    CONTRACTOR'S Funding of Indemnification Obligation. To fund its unlimited indemnification of COMPANY under subsection (a) above related to injuries to persons (including death) or loss of or damage to the property of third parties to this Agreement, CONTRACTOR shall maintain commercial automobile public liability insurance with the policy limits and other coverage terms specified in Section 2(a) of Attachment C. In the alternative, if CONTRACTOR elects to do so by signing the "Confirmation of Participation in PLPD Limiter Program" appended to Attachment C, CONTRACTOR may participate in COMPANY'S Indemnity-Limiter Program, in consideration of CONTRACTOR'S either providing the required commercial automobile public liability insurance coverage or authorizing COMPANY to make monthly deductions of the indemnity-limiter cost set forth in Attachment B from CONTRACTOR'S settlement compensation. CONTRACTOR'S indemnification of COMPANY under subsection (a, above related to injuries to persons (including death) or loss of or damage to the property of third-parties to this Agreement shall be limited to the amounts set forth in the table in Section 1 of Attachment B.

14(d).    Re-Powering and Termination-Related Expenses. Subsections (b) and (c) above shall not limit or preclude COMPANY from deducting from CONTRACTOR'S compensation or, upon termination, from CONTRACTOR'S Escrow Fund, or from seeking to recover from CONTRACTOR through other lawful means, all amounts COMPANY pays or otherwise incurs in re-powering a load or in connection with termination of this Agreement.

15. ESCROW FUND. CONTRACTOR authorizes COMPANY to establish and administer a claim and chargeback account (the "Claim Account"), a repair and operating account (the "Repair Account") and an estimated tax payment account (the "Tax Account") in accordance with the provisions of Attachments D1, D2 and D3 (collectively referred to throughout this Agreement as "Escrow Fund").

16. CONFIDENTIALITY.

16(a).    Confidential Matters. CONTRACTOR agrees to preserve as "Confidential Matters" all names of and other information belonging to COMPANY'S or VAN LINE'S customers, trade secrets, know-how, and information relating to COMPANY'S or VAN LINE'S business, forms, processes, developments, sales and promotional systems, prices, and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, other contractors, or other sources of any kind resulting from the performance of services under this Agreement.

16(b).    CONTRACTOR'S Non-Disclosure Obligation. CONTRACTOR agrees to regard such Confidential Matters (including, as between COMPANY and CONTRACTOR, information belonging to COMPANY'S or VAN LINE'S customers) as the sole property of COMPANY or VAN LINE and shall not publish, disclose, or disseminate the same to others without the prior written consent of COMPANY.

16(c).    COMPANY'S Right to Seek Injunction Against Disclosure. In the event of any breach or threatened breach by CONTRACTOR of this Section and notwithstanding the Dispute Resolution section below, COMPANY shall be entitled to injunctive relief from an arbitrator restraining CONTRACTOR from disclosing, in whole or in part, COMPANY'S or VAN LINE'S customers and all other Confidential Matters. Nothing hereunder shall be construed as prohibiting COMPANY from pursuing, through arbitration, any remedies available to COMPANY at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR. Should COMPANY obtain an injunction and/or be awarded damages, CONTRACTOR shall pay COMPANY'S reasonable attorneys' fees and costs of litigation.

17. DURATION OF AGREEMENT AND TERMINATION.

17(a).    Start of Agreement. As to each piece of Equipment, this Agreement shall begin on the date and at the time stated on the receipt that COMPANY gives CONTRACTOR upon taking possession of the piece.

17(b).    Mutual Right to Terminate Agreement. Either party may terminate this Agreement at any time for any reason by giving at least thirty (30) days' prior written notice to that effect to the other party. This Agreement may also be terminated by COMPANY at any time upon immediate oral, followed by written, notice in the event of a material breach of the terms of this Agreement by CONTRACTOR including, by way of example and not limitation, a breach of Section 4(h) and CONTRACTOR'S use of an unauthorized driver or use of unqualified Equipment. The effective date and time of termination shall be as set forth in the written notice of termination or in the receipt for Equipment issued by CONTRACTOR, whichever date and time are earlier.

17(c).    COMPANY'S Right to Take Possession of Goods. If, in COMPANY'S judgment, CONTRACTOR has subjected COMPANY to liability because of CONTRACTOR'S acts or omissions, COMPANY may take possession of the goods being transported and COMPANY'S trailer entrusted to CONTRACTOR and complete performance. In such event, CONTRACTOR shall waive any recourse against COMPANY for such action and CONTRACTOR shall reimburse COMPANY for all direct or indirect costs, expenses, or damages, including reasonable attorneys' fees and costs of litigation, incurred by COMPANY as a result of COMPANY'S taking possession of the goods and completing performance.

18. CONTRACTOR'S OBLIGATIONS UPON TERMINATION.

18(a).    CONTRACTOR'S Obligation to Complete Performance. Upon termination of this Agreement, CONTRACTOR, unless otherwise instructed by COMPANY, shall complete performance of all transportation and other services required by COMPANY and any bills of lading pertaining to any shipment or shipments that CONTRACTOR may be engaged in hauling at the time of termination. CONTRACTOR shall receive no compensation for any shipment with respect to which CONTRACTOR has failed to complete all required transportation and other services. In the event COMPANY instructs CONTRACTOR not to complete performance of transportation or other services that CONTRACTOR is willing and able to perform, COMPANY will pay CONTRACTOR compensation determined in accordance with Attachment A for the portion of such services that CONTRACTOR performed prior to termination.

18(b).    Required Removal of Identification Upon Termination. Upon termination or the completion of the transportation or other services provided for herein, whichever occurs later, CONTRACTOR, unless otherwise notified or instructed by COMPANY, shall, at CONTRACTOR'S own expense, immediately and permanently obliterate or remove from the Equipment all COMPANY and VAN LINE identification and all COMPANY or VAN LINE identification devices and, except in the case of identification painted directly on the Equipment, return them to COMPANY via hand-delivery or overnight delivery with the express charges prepaid (provided that if the identification device has been lost or stolen, a written notice (letter) certifying its removal will satisfy this requirement); immediately return COMPANY'S property, including trailers, in-van, electronic bar code inventory equipment, or other equipment, base plates, paperwork, and goods being transported, to COMPANY'S facility in Pensacola, Florida, or to such other closer location as COMPANY may specify at the time; and immediately pay COMPANY all amounts CONTRACTOR owes COMPANY at that time under this Agreement.

18(c).    COMPANY Right to Reimbursement of Termination-Related Expenses. If CONTRACTOR fails to return COMPANY'S property or goods being transported to COMPANY or remove and return all COMPANY identification from the Equipment upon termination of this Agreement, CONTRACTOR shall pay COMPANY all expenses (including reasonable attorneys' fees) incurred by COMPANY in seeking the return of such items, and COMPANY may pursue all other remedies allowed by law or authorized in this Agreement against CONTRACTOR. Such remedies include withholding CONTRACTOR'S last settlement payment until CONTRACTOR removes and, except in the case of identification painted directly on the Equipment, returns all COMPANY'S and VAN LINE'S identification devices or delivers to COMPANY a letter certifying that such devices have been removed, and making deductions from any remaining balances in CONTRACTOR'S Escrow Fund for the replacement value of COMPANY'S unreturned property and for other amounts CONTRACTOR owes COMPANY, as provided by Section 5 of Attachment D.

18(d).    Liabilities and Entitlements Continue. If up to and including the date this Agreement is terminated, one or more events occur that give rise before or after the date of termination to a liability or entitlement of CONTRACTOR or COMPANY under this Agreement, such liability or entitlement shall continue, notwithstanding the termination of this Agreement, until each such liability or entitlement is paid in full.

19    BENEFIT AND ASSIGNMENT. This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors. CONTRACTOR may not assign or subcontract all or any portion of its obligations to another person without the prior written consent of COMPANY.

20. NOTICES.

20(a).    Parties Must Notify Each Other in Person or By U.S. Mail, Overnight Delivery, Satellite, or Fax. All notices required or permitted by this Agreement shall be in writing including electronic transmission (unless permitted elsewhere in this Agreement to be done orally) and shall be deemed provided when delivered in person, when deposited in the United States Mail with first class postage prepaid and properly addressed to the other party at the address shown at the end of this Agreement, when deposited with an overnight delivery company with the express charges prepaid and properly addressed to the other party at the address shown at the end of this Agreement, when transmitted by satellite communication to the other party, or when faxed to the other party at the fax number shown at the end of this Agreement.

20(b).    Obligation to Keep Addresses and Phone and Fax Number's Up to Date. Each party shall be under a continuing duty to provide a correct address and telephone number to the other; COMPANY and CONTRACTOR (if the latter has a fax machine) a correct fax number to the other; and CONTRACTOR a correct nationwide wireless mobile telephone number. Notice of an address, telephone number, or fax number change shall be given in writing.

21. GENERAL. The headings used in this Agreement have no substantive effect and are used for convenience. Except as otherwise provided in Section 24, if any provision (including any sentence or part of a sentence) of this Agreement (including its appended attachments and addenda) is deemed invalid for any reason whatsoever, this Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties. Any provision voided by operation of the foregoing shall be replaced with provisions that shall be as close to the parties' original intent as permitted under applicable law. The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right nor shall such failure or refusal be deemed a customary practice contrary to such provision or right. Original or faxed signatures shall be equally valid.

22. COMPLETE AGREEMENT; AMENDMENTS TO AGREEMENT. This Agreement constitutes the sole entire and existing agreement between the parties hereto; fully replaces and supersedes all prior agreements and undertakings, oral and written, express or implied, or practices, between the parties; and expresses all obligations and restrictions imposed on each of the respective parties during its term. If any amendments are to be made in this Agreement, they must be in writing and signed by both COMPANY and CONTRACTOR, except as otherwise provided in Attachments B and C with respect to certain changes in charge backs and other deductions and insurance.

23. GOVERNING LAW. This Agreement is to be governed by the laws of the United States and, except as otherwise provided herein, the State of Florida including the choice-of-law rules of such State. COMPANY and CONTRACTOR hereby consent to the jurisdiction of the state and federal courts of Florida.

### 24. DISPUTE RESOLUTION.

24(a).    Arbitration Required for All Disputes. Any dispute (including a request for preliminary relief) arising in connection with or relating to this Agreement, its terms, or its implementation, including any allegation of tort or of breach of this Agreement or of violations of the requirements of any applicable government authorities, whether local, state, federal, or foreign, including but not limited to the federal leasing regulations (49 C.F.R. Part 376), shall be fully and finally resolved by arbitration in accordance with (1) the Commercial Arbitration Rules (and related arbitration rules for preliminary relief) of the American Arbitration Association ("AAA"); (2) the Federal Arbitration Act (ch. 1 of tit. 9 of United States Code, with respect to which the parties agree that this Agreement is not an exempt "contract of employment") or, if the Federal Arbitration Act is held not to apply, the arbitration laws of the State of Missouri; and (3) the procedures set forth below.

24(b).    No Consolidated or Class Arbitrations. Notwithstanding anything to the contrary contained or referred to in this Agreement, the parties agree that no consolidated or class arbitrations shall be conducted. If a court or arbitrator decides for any reason not to enforce this ban on consolidated or class arbitrations, the parties agree that this Section 24, in its entirety, shall be null and void, and any disputes between the parties shall be resolved by court action, not arbitration.

24(c).    Demand for Arbitration. A demand for arbitration shall be filed with the AAA's office located in or closest to Jacksonville, Florida, and the arbitration shall be held in Pensacola, Florida, or as otherwise agreed to in writing by the parties. The demand shall be filed within the time allowed by the applicable statute of limitations. Failure to file the demand within such statute-of-limitations period shall be deemed a full waiver of the claim.

24(d).    Parties to Be Bound by Arbitration Award. The parties agree to be fully and finally bound by the arbitration award, and, where allowed by law, a judgment may be entered on the award in any court having jurisdiction thereof.

24(e).    Allocation of Arbitration Fees and Other Expenses. Each party shall pay its own AAA arbitration filing fees and an equal share of the fees and expenses of the arbitrator, provided that if the CONTRACTOR owns, leases (to COMPANY and other motor carriers combined), or controls only one commercial motor vehicle, COMPANY shall pay the full fees and expenses of the arbitrator as well as (i) the full arbitration filing fee, if COMPANY is the claimant, or (ii) the portion of the arbitration filing fee that exceeds the filing fee then in effect for civil actions in the United States district court for the district that includes Jacksonville, Florida if CONTRACTOR is the claimant. In all other respects, except to the extent otherwise determined by law the parties shall be responsible for their own respective arbitration expenses, including attorneys' fees.

COMPANY and CONTRACTOR hereby execute this Agreement on this ____ 1ST ____ day of ___ September ___
20 O 4 at ___ i l : 4 7 _____ A.m.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES.

SUDDATH RELOCATION SYSTEMS
OF PENSACOLA, INC

By: _____
Company

BRETT    HAROTLE
Printed Name
TERMINAL MANAGER
Title

CONTRACTOR: Matthew O. Bullard Sr

D/B/A: Bullard Trucking

By: _____
Contractor

Matthew O. Bullard Sr
Printed Name
Ocrtus
Title
325 Cypress Lane
Street Address
Payton    IL    61866
City, State, Zip Code
217-892-9972
Phone Number                Fax Number
217-202-5080
Mobile Phone or Pager Number

Email Address
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
Federal Employer ID or Soc. Sec. No.

2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF INDIANA

 3                    INDIANAPOLIS DIVISION

 4

 5    Owner-operators Independent Drivers Association,

 6    INC., et al.,

 7

 8              Plaintiffs,

 9

10    vs.                    Case No. IP98-0457 C B/S

11                          Case No. IP98-0458 C B/S

12    MAYFLOWER TRANSIT, INC.,

13

14              Defendant.

15

16       Deposition of STEVEN JAMES DAWKINS, taken on

17    behalf of the PLAINTIFFS, at the offices of Thompson

18    Coburn, One US Bank Plaza, in the City of St. Louis,

19    State of Missouri, on the 28th day of September,

20    2004, before Robert D. Perry, Illinois and Missouri

21    Certified Shorthand Reporter and Notary Public.

22

23

24

25
```

3

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFFS:

 4       Mr. David A. Cohen

 5       The Cullen Law Firm, PLLC

 6       1101 30th Street N.W., Suite 300

 7       Washington, DC  20007

 8

 9    FOR THE DEFENDANT:

10       Mr. David Wells

11       Mr. Michael Morris

12       Thompson Coburn

13       One US Bank Plaza

14       St. Louis, MO  63101

15

16    ALSO PRESENT:  Mr. George F. Smith, UniGroup.

17

18

19

20

21

22

23

24

25
```

5

```
 1   STEVEN JAMES DAWKINS,
 2   of lawful age, having been first duly sworn to
 3   testify the truth, the whole truth, and nothing but
 4   the truth in the case aforesaid, deposes and says
 5   in reply to oral interrogatories propounded as
 6   follows, to-wit:
 7                    EXAMINATION
 8              QUESTIONS BY MR. COHEN:
 9        Q:   Good morning, Mr. Dawkins.
10        A:   Good morning.
11        Q:   My name is David Cohen, I represent the
12   Plaintiffs in this case.  Could you state your name
13   for the record, please?
14        A:   Steven James Dawkins.
15        Q:   And what is your address?
16        A:   617 Castle Ridge Drive, Ballwin, Missouri,
17   63021.
18        Q:   Mr. Dawkins, have you ever provided
19   testimony in a deposition before?
20        A:   Yes.
21        Q:   And on how many occasions?
22        A:   One or two, I can't recall.
23        Q:   And when was the first time that you
24   testified at a deposition?
25        A:   It's been probably five years ago.
```

74

```
 1        A:    No.

 2        Q:    That fact was never conveyed to you?

 3              MR. WELLS:   Well, we're not going to get into

 4     attorney-client communications with either inside

 5     counsel or outside counsel, but if you can answer it

 6     other than that, please go ahead.

 7        A:    I don't remember that, no.

 8        Q:    (By Mr. Cohen)   Have you had discussions

 9     with outside counsel regarding the legality of

10     Mayflower's fuel tax practices?

11        A:    No.

12        Q:    Are you aware of the fact that Mayflower

13     is now recommending to its agents that they adopt a

14     uniform lease agreement with their van operators?

15        A:    Yes.

16        Q:    And how did you acquire that knowledge?

17        A:    I'm the, one of the entities that insures

18     that agents comply, so that when we made the

19     decision that this would be a uniform agreement, we

20     put in -- we put in penalties and so forth for

21     non-compliance, and I would have to be enforcing

22     those penalties, if necessary.

23        Q:    Why was it then, in light of your

24     testimony that the relationship between an agent and

25     its van operators was not something that Mayflower
```

1   or UniGroup ordinarily got involved in, why was it
2   then that Mayflower and UniGroup were, or are now
3   requiring or accepting that their agents adopt a
4   model lease?

5       A:   When Mayflower was purchased in '95, prior
6   to that time and for some short period of time
7   afterwards, there was, as you mentioned earlier, a
8   practice for Mayflower to have its goods
9   transported, at least in part, or not a large part,
10  by contract truckmen, directly leased to the van
11  line.  There were also agents who had been acquired
12  over years, who had varying kinds of agreements and
13  contracts with their van operators.  UniGroup had
14  also a similar situation, and it became clear that
15  there was quite a disparity of varying kinds of
16  agreements out there, and there had been some
17  complaints, and so, in an effort to conform all of
18  those agreements, so that there weren't any more
19  complaints and there wasn't any misunderstanding, it
20  was decided that we would say "here is the rule, and
21  this is the form that everyone will use henceforth
22  to conform these practices to be the same", and
23  eliminated any misunderstanding about what was
24  expected.

25      Q:   Sir, you mentioned, or used the word

```
 1        A:    I know that most have.  I don't know
 2   exactly the number that haven't, but the vast
 3   majority have adopted it.
 4        Q:    Does Mayflower have -- or strike that.
 5   Are United's agents, have they been required to
 6   adopt this new model lease?
 7        A:    Yes.
 8        Q:    And was there training exercises for
 9   United agents as well?
10        A:    Same exercises.
11        Q:    Are you tracking whether or not Mayflower
12   and United agents are adopting or actually
13   implementing the new model lease?
14        A:    What do you mean by "tracking"?  I'm not
15   sure I follow the question.
16        Q:    Well, you said you thought that most have
17   adopted it, but not all.
18        A:    Okay.
19        Q:    And it seems to me to indicate that there
20   has been some tracking, that there has been some
21   following of this.
22        A:    Oh.  Well, the agents are required to
23   submit their form or their draft document, then
24   their completed document.  So, to the extent that we
25   get the completed documents in, I know that, we know
```

```
1   that they are compliant. Some agents don't have any
2   van operators, any owner-operators, they have
3   employees or they don't have any trucks
4   over-the-road or whatever, so, they are sort of
5   excused, obviously. And a handful, as I said, I'm
6   not sure, but a handful has not come to the final,
7   ultimate, get-the-job-done, so, yes, we're tracking,
8   to answer the question.
9        Q:   But those agents who do have
10  owner-operators lease to them but have not adopted
11  the new model lease, do you know what steps UniGroup
12  or Mayflower is going to take to insure compliance?
13       A:   Yes, I do.
14       Q:   What are those steps?
15       A:   Well, there is a series of increasingly
16  onerous penalties for failure to adopt the form.
17       Q:   Are these penalties memorialized in some
18  written document?
19       A:   Yes, they would be.
20       Q:   Is that a, do you know whether or not it's
21  a general bulletin that was issued to agents?
22       A:   That would be called a bulletin or a
23  policy or something of that nature, yes.
24       Q:   You also mentioned that there is a hotline
25  that's been established?
```

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **OWNER-OPERATOR INDEPENDENT DRIVERS** ) | |
| **ASSOCIATION, INC., NORMAN PELLETIER,** ) | |
| **MATTHEW O. BULLARD, SR., and DENNIS A. LEE** ) | |
| **on behalf of themselves and all others similarly situated,** ) | |
| ) | |
| **Plaintiffs,** | )**Case No. 05cv10317 MLW** |
| ) | |
| **VS.** ) | |
| ) | |
| **UNITED VAN LINES, LLC., VANLINER INSURANCE**) | |
| **COMPANY, AND UNIGROUP, INC.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## AFFIDAVIT OF JOEL PERKINS

I, JOEL PERKINS, declare and state:

1.      I am a paralegal in the law firm of Bonner Kiernan Trebach & Crociata, One Liberty Square, Sixth Floor, Boston, Massachusetts, 02109. I am over the age of 21 and am competent to give this affidavit.

2.      I am associated in this matter with John A. Kiernan and Kenneth H. Naide, Esq., Bonner Kiernan Trebach & Crociata, One Liberty Square, Sixth Floor, Boston, Massachusetts, 02109, and Paul D. Cullen, Sr., David A. Cohen, Susan Van Bell, THE CULLEN LAW FIRM, LLC, 1101 30th Street, N.W., Suite 300, Washington, D.C. 20007 who have filed appearances on behalf of the plaintiffs in this case.

3.      On May 19, 2005, I personally obtained the brochure attached as Exhibit "F" to the plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction from Conlon Moving & Storage, Inc., 55 Mead Street, Seekonk, Massachusetts.

A true and accurate copy of the business card of Michael Carolla, Account Manager, Conlon

Moving and Storage was provided to me on this date and is attached to Exhibit F.


Signed under the pains and penalties of perjury this 14th day of June, 2005.

Joel Perkins

## CONLON

Moving & Storage, Inc.

 **Van Lines**

### MICHAEL CAROLLA
*Account Manager*

| | |
|---|---|
| 55 Mead Street | 255 York Avenue |
| Seekonk, MA 02771-5913 | Pawtucket, RI 02861 |
| Phone: (508) 336-7768 Ext. 26 | Phone: (401) 351-2220 Ext. 23 |
| Fax: (508) 336-4499 | Toll Free: (800) 631-7356 Ext. 23 |
| Home: (508) 679-1403 | Email: mcarolla@conlonmoving.com |