## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No. 05 CV 10317 MLW** |
| | ) | |
| **UNITED VAN LINES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT

Pursuant to Federal Rule of Civil Procedure 7 and Local Rule 7.1, Plaintiffs respectfully submit this Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Class Action Complaint. In opposition to Defendants' Motion, Plaintiffs submit the following:

### I. INTRODUCTION

Plaintiffs have alleged that United has violated the Truth-in-Leasing regulations by failing to calculate owner-operator compensation properly (Count I); failing to provide documents relevant to compensation (Count II); unlawful pass-through of public liability and property damage ("PLPD") insurance (Count III); and failing to monitor and control the actions of its local agents (Count IV). Defendants UniGroup and Vanliner, as affiliates of United, have directed, aided, and profited from United's violations of the Truth-in-Leasing regulations. The result of these practices is that owner-operators are wrongfully deprived of compensation because of unauthorized and undisclosed deductions from their share of revenue, and because they are unlawfully forced to purchase insurance coverage that is the lawful responsibility of United Van

Lines and/or is an unnecessary purchase. Defendants' claims that the Court should dismiss the Complaint are without merit. The combination of the relevant statutory law and the factual allegations of Plaintiffs' Complaint mandate that Defendants' motion should be denied in its entirety.

## II. STANDARD OF REVIEW OF MOTION TO DISMISS

Motions to dismiss under Fed. R. Civ. P. 12(b)(6) "customarily evoke a generous standard of appraisal."[1] A motion to dismiss should be granted only if the complaint "shows no set of facts which could entitle the plaintiff to relief".[2] The court must accept the well-pleaded factual averments of the complaint as true and "construe these facts in the light most flattering to the [plaintiff's] cause . . .".[3] As noted by the First Circuit in *Resolution Trust Corporation v. Driscoll*:

> It is, of course, true that at the start of complex litigation a party may not have all the facts, so courts normally hesitate to dismiss under Fed.R.Civ.P. 12(b)(6) at the outset. At the start, a reasonable basis for belief and an outline of what one might reasonably hope to prove may suffice to permit discovery and ward off premature motions to dismiss.[4]

Applying these standards, Defendants' motion to dismiss should be denied.

## III. DEFENDANTS' CONTENTION THAT COUNT I SHOULD BE DISMISSED FOR LACK OF STANDING IS COMPLETELY WITHOUT MERIT.

Defendants contend that Plaintiffs have not made sufficient factual allegations to establish their standing to challenge United's undisclosed deductions from their compensation.

That claim is completely without merit.

---

[1] *Collier v. City of Chicopee*, 158 F.3d 601, 602 (1st Cir. 1998), citing *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1998) (emphasizing minimal nature of requirements imposed by Rule 12(b)(6))
[2] *Gooley*, 851 F.2d at 514.
[3] *Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir. 1987).
[4] 985 F.2d 44, 48 (1st Cir. 1993).

When ruling on a motion to dismiss for want of standing, the trial court "must accept as

true all material allegations of the complaint, and must construe the complaint in favor of the

complaining party."[5]    In practical effect, the standard is much the same as the standard applied

to motions to dismiss under Rule 12(b)(6).[6]

To satisfy the Article III constitutional limitation on standing, a plaintiff must meet three

minimum elements:

> [F]irst, plaintiff must have suffered "injury in fact" – an invasion of a legally
> protected interest that is (a) concrete and particularized, and (b) actual or
> imminent, not conjectural or hypothetical; second, there must be a causal
> connection between the injury and the conduct complained of, such that the injury
> is fairly traceable to the challenged action of the defendant and not the result of
> independent action of some third party not before the court; finally, it must be
> likely, and not merely speculative, that the injury will be redressed by a favorable
> decision.[7]

In a class action suit, the named plaintiffs must satisfy these requirements personally, and not

solely on behalf of other unidentified class members.[8]

Here, all of these requirements have been met. Among the allegations contained in the

Complaint are the following:

> The causes of action in this complaint arise because the conduct of United and its
> authorized agents towards owner-operator drivers like the Plaintiffs Pelletier, Lee,
> and Bullard, deprived them of their rights and benefits under the federal Truth-in-
> Leasing regulations. Complaint ¶ 18 (Statutory and Regulatory Framework).
>
> United has systematically failed to compensate Named Plaintiffs and similarly
> situated owner-operators. Complaint ¶ 28 (Count I).
>
> United's compensation practices violate 49 C.F.R. § 376.12 (d) to the extent that
> they fail to disclose various deductions made from the amounts paid by the
> shipper prior to calculating owner-operator compensation. Complaint ¶ 33

---

[5] *United States v. AVX Corp.,* 962 F.2d 108, 114 (1st Cir. 1992), quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206 , 45 L.Ed. 2d 343 (1975).

[6] *Id.*

[7] *Pagan v. Dubois*, 894 F.Supp. 45, 47 (D.Mass. 1995), citing *Libertad v. Welch*, 53 F.3d 428, 436 (1st Cir. 1995).

[8] *In re Eaton Vance Corp. Securities Litigation*, 219 F.R.D. 38, 41 (D.Mass. 2003).

(Count I).

> As a direct and proximate result of the violations of 49 C.F.R. §§ 376.12(d) and
> the preamble, Named Plaintiffs and other similarly situated owner-operators are
> being deprived of compensation rightfully belonging to them and have incurred
> and are incurring substantial monetary damages. Complaint ¶ 35 (Coun: I).

These allegations state the actual violation of a protected legal interest with respect to the

Named Plaintiffs: they are being deprived of compensation due to United's violation of the

Truth-in-Leasing regulations. The allegations show a causal connection between United's

policies and practices and the injuries to the Named Plaintiffs. Finally, these injuries will be

redressed by a favorable decision with respect to the relief requested in the Complaint. [9]

Defendants rely on cases which are thoroughly distinguishable from this matter.

*In re Eaton Vance Corp. Securities Litigation* was a class action suit against four mutual funds

brought by investors alleging misrepresentations made in fund prospectus information. The court

dismissed the claims against two of the mutual funds because none of the named plaintiffs had

purchased shares or conducted any business with those funds. Similarly, in *In re Pharmaceutical

Industry Average Wholesale Price Litigation*,[10] a class action suit against pharmaceutical

manufacturers for drug overcharges, the court dismissed claims against some of the

manufacturers because none of the named plaintiffs had purchased drugs from those

manufacturers. In *Pagan v. Dubois*, the court dismissed claims made by prisoners at a

Massachusetts correctional institution, alleging violations of constitutional rights of Latino

prisoners, because the named plaintiffs did not allege that they were harmed by the practices at

issue.

The instant matter is completely different. Here, specific information is provided about

each Named Plaintiff and the lease agreements executed by each Named Plaintiff with United

---

[9] *Pagan*, 894 F.Supp. at 47, citing *Libertad*, 53 F.3d at 436.

agents that are the subject of the alleged violations of the Truth-in-Leasing regulations. United's policies and practices that result in loss of compensation to the Named Plaintiffs have been set forth. An allegation is made that each of the Named Plaintiffs has been deprived of compensation rightfully belonging to him as a result of these practices.

Given that the Named Plaintiffs have standing, Defendants' contention that OOIDA does not have associational standing is also without merit. In *United States v. AVX Corp.*, another case relied on by Defendants, the First Circuit dismissed an appeal brought by an environmental association that had been an intervenor in the trial court because the association had no standing in its own right after the other parties entered into a consent decree. The underlying case involved a cleanup action of New Bedford Harbor. The association made generalized assertions about its members' use of the area and the harm to them caused by the environmental pollution. The First Circuit noted that "NWF makes only the most nebulous allegations regarding its members' identities and their connection to the relevant geographic area . . . [T]he members are unidentified; their places of abode are not stated; the extent and frequency of any individual use of the affected resources is left open to surmise. In short, the asserted injury is not anchored in any relevant particulars."[11] In this instance, such relevant information has been alleged in the Complaint with great particularity. The Complaint specifically alleges that the Named Plaintiffs are members of OOIDA.[12]

Applying the standard for ruling on a motion to dismiss for lack of standing -- that the Court must accept as true all material allegations of the complaint, and must construe the

---

[10] 263 F.Supp.2d 172 (D.Mass. 2003)

[11] 962 F.2d at 117.

[12] *United States v. AVX Corp.*, 962 F.2d at 116 (association must establish that "at least one of [its] members possesses standing to sue in his or her own right.").

complaint in favor of the complaining party – there is no question that the allegations establish the standing of the Named Plaintiffs with respect to Count I.[13]

## IV.    DEFENDANTS' UNSUPPORTED ASSERTION THAT FAILURE TO PROVIDE REQUIRED DOCUMENTS IS A "TECHNICAL VIOLATION" DOES NOT PROVIDE A BASIS FOR DISMISSAL OF COUNT II.

Defendants' argument with respect to dismissal of Count II can be treated summarily.

With no legal support, Defendants have arrived at the bold conclusion that failure to provide documents related to calculation of compensation is "at most, a technical regulatory violation." Motion p. 11. Defendants claim that "since plaintiffs allege, at most, technical noncompliance with § 376.12(g) without any resulting damages, Count II should be dismissed." Motion p. 12. Not only is Defendants' conclusion without legal support, their assertion flies in the face of Plaintiffs' pleaded allegations that, as a direct and proximate result of the failure to provide owner-operators with documentation that would allow them to verify the accuracy of their compensation, owner-operators are being deprived of compensation and have incurred substantial monetary damages. Complaint ¶¶ 40-41.

Applying the standard of review for a motion to dismiss – that the Court must accept the well-pleaded factual averments of the complaint as true and construe them in the light most favorable to the plaintiff – Plaintiffs' allegations of damages in Count II are certainly sufficient to withstand dismissal.

_____

[13]  Defendants' claim that only United's agents, and not the Named Plaintiffs, have standing to sue United, is wrong. As is set forth in paragraph 16 of the Complaint and discussed in Section VI below, United is legally responsible to ensure that owner-operators receive the rights and benefits provided to them by the Truth-in-Leasing regulations regardless of whether United is a party to the lease. *See also OOIDA v. Mayflower Transit, Inc.,* 161 F.Supp.2d 948 (S.D. Ind. 2001) (Finding carrier's potential liability for violations of Truth-in-Leasing regulations established by operation of law; whether or not carrier signed lease with owner-operators is irrelevant to finding of potential liability).

## V.    UNITED'S CLAIM THAT COUNT III SHOULD BE DISMISSED IS BASED UPON AN ERRONEOUS INTERPRETATION OF THE STATUTORY MANDATE THAT MOTOR CARRIERS MUST MAINTAIN PL/PD INSURANCE.

From the early days of regulation of the trucking industry through the present time,

federally-regulated motor carriers have been required to maintain liability insurance on their

trucks in an amount sufficient to pay for bodily injury, death, or property damage to the public

resulting from the negligent operation, maintenance, or use of those vehicles.[14]  Today, proof of

the requisite amount of public liability and property damage insurance ("PL/PD") is required

before the DOT will register a motor carrier to provide interstate transportation services.[15]  The

mandatory nature of this PL/PD insurance makes it unique, transforming it from one of many

items subject to negotiation to a responsibility that must be borne solely by the carrier as a matter

of law.  A carrier may not provide transportation services without this liability insurance,

whether the transportation is provided by the carrier's own trucks or by trucks leased from

owner-operators.[16]

### 1.    The Plain Language of the Leasing Regulations Places The Financial Burden of PL/PD Insurance on the Carrier

United's claim that 49 C.F.R. 376.12(j)(1) contemplates that a carrier may pass the costs

of PL/PD insurance through to owner-operators is wrong.  Reflecting the mandatory nature of

PL/PD insurance coverage, the Leasing Regulations treat PL/PD insurance differently than other

types of insurance.  While the insurance provision allows the parties to a lease to determine

---

[14] 49 U.S.C. § 13906(a)(1995) (previously codified at 49 U.S.C. § 10927(a)(1978) & 49 U.S.C. § 315 (1935)).

[15] 49 U.S.C. § 13902(a)(1)(C).

[16] *See, e.g., M.D.I., Inc., Petition for Acceptance of Alternative Security for the Protection of the Public*, 1986 Fed. Car. Cases 47,335 (¶ 37,281.02); *Rediehs Express, Inc. v. Maple*, 491 N.E.2d 1006 (Ind.App. 1986), *cert denied*, 480 U.S. 923 (1987).

whether the carrier or the owner-operator will be responsible for any insurance coverage other

than PL/PD, it plainly states the "legal obligation of the authorized carrier" to maintain PL/PD

insurance. As set forth in 49 C.F.R. § 376.12(j)(1):

> The lease shall clearly specify the legal obligation of the authorized carrier to
> maintain insurance coverage for the protection of the public pursuant to FHWA
> regulations under 49 U.S.C. 13906. The lease shall further specify who is
> responsible for providing any other insurance coverage for the operation of the
> leased equipment, such as bobtail insurance. If the authorized carrier will make a
> chargeback to the lessor for any of this insurance, the lease shall specify the
> amount which will be charged-back to the lessor.

The first sentence removes PL/PD insurance from the general rule set out in the second sentence

allowing the parties to a lease to allocate insurance responsibilities and costs in any manner they

deem appropriate. Thus, responsibility for PL/PD insurance alone may not be shifted to owner-

operators.

The last sentence of (j)(1) refers to chargebacks for "any of this insurance" without

specific language identifying the types of insurance contemplated by the word "this." Basic rules

of statutory construction, however, lead to the conclusion that "this" refers back to "any other

insurance coverage for the operation of the leased equipment." It is well established in

construing statutes that words and phrases should be given their plain, ordinary and natural

meaning, and should whenever possible be interpreted in a way that gives meaning to every

word, phrase, and constituent part of involved provision.[17] Nothing should be rendered

redundant or superfluous.[18] Further, critical words like "this" may not be read in isolation. They

---

[17] *O'Kane v. Apfel*, 224 F.3d 686, 689 (7th Cir. 2000); *In re Merchants Grain, Inc.*, 93 F.3d 1347, 1354-1355 (7th Cir. 1996), *cert denied sub nom*, 519 U.S. 1111 (1997); *In re McFarland*, 84 F.3d 943, 946-947 (7th Cir. 1996); *In re Lifschulz Fast Freight Corp.*, 63 F.3d 621, 628 (7th Cir. 1995), *cert denied sub nom*, 519 U.S. 931 (1996).

[18] *Merchants Grain, supra; Lifschulz Fast Freight, supra.*

must be construed in the context of the entire regulatory scheme, its object, and policy.[19]

If 376.12(j)(1) allows carriers to chargeback the costs of PL/PD insurance to owner-
operators then more than a third of this provision will be rendered meaningless. The entire first
sentence, stating the legal obligation of the carrier to maintain PL/PD insurance, as well as the
word "other" in the second sentence, could be removed without changing its meaning because
the condensed version of the rule would clearly allow the parties to decide who is responsible for
PL/PD insurance. To illustrate, with these changes (j)(1) would read:

> The lease shall further specify who is responsible for providing any insurance
> coverage for the operation of the leased equipment, such as bobtail insurance. If
> the authorized carrier will make a charge back to the lessor for any of th.s
> insurance, the lease shall specify the amount which will be charged-back to the
> lessor.

To give effect to every word and phrase in (j)(1), as written, it must be presumed that the ICC
added the sentence pertaining exclusively to PL/PD insurance to distinguish this insurance from
"any other insurance coverage" by preventing the parties to a lease from allocating responsibility
and charging back the cost of PL/PD insurance to owner-operators. In the next section we show
that this is exactly what the ICC had in mind when it drafted this provision.

Moreover, the well-established last antecedent rule of statutory construction provides,
where one word or phrase modifies another, that the modifying words or phrases are to be
applied only to the words or phrase immediately preceding them.[20] They are not to be construed
as extending to and including other more remote phrases.[21] Applying this rule here, the phrase

---

[19] *Grammatico v. United States*, 109 F.3d 1198, 1204 (7th Cir. 1997); *Lifschulz Fast Freight, supra*.

[20] *F.T.C. v. Mandel Bros., Inc.*, 359 U.S. 385, 389-390 (1959) (Supreme Court applied last antecedent
rule to reverse contrary Seventh Circuit decision); *O'Kane, supra*, 224 F.3d at 690; *State of Illinois v.
Consolidated Rail Corp.*, 589 F.2d 1327, 1332 (7th Cir. 1978); *Yasuda Fire & Marine Ins. Co. of
America v. Lakeshore Electric Corp.*, 744 F. Supp 964, 872 (S.D. Ind. 1989).

[21] *Id*.

"this insurance" in the third sentence of 376(j)(1) modifies only the immediately preceding
sentence. Thus, chargebacks are limited to "any other insurance coverage." This result is
supported by the fact that the first two sentences of (j)(1) undeniably refer to different types of
insurance.

Placing the obligation to pay for PL/PD insurance squarely on the shoulders of the motor
carrier is consistent with the broad regulatory scheme envisioned by the Leasing Regulations. As
set forth in 49 C.F.R. § 376.12(c), a carrier must maintain "exclusive possession, control, and
use" of leased vehicles and "assume complete responsibility for the operation of the equipment."

> The regulations provided for enforcement of safety responsibility, for financial
> responsibility, and for adequate insurance coverage. Responsibility for control
> over the lease equipment is delegated to the lessee [carrier]. Since only the carrier
> has ICC authority, it is not permitted to delegate it, abrogate it, or evade the
> responsibilities imposed on it by means of a contractual device, for there are basic
> requirements that are inherent in the relationship of the carrier for hire with
> operating authority to the public. Thus, responsibility to the public under the
> leasing device is fixed"[22]

The assumption of full responsibility for PL/PD insurance is an integral component of this broad
control and responsibility obligation that may not be avoided through a lease provision.

### 2. The ICC Intended that the Leasing Regulations Place Full Responsibility for PL/PD Insurance on the Motor Carrier.

Modifications made to the proposed insurance provision before it was adopted further
evidence the ICC's intention to place the full responsibility for PL/PD insurance, including the
burden of paying for such insurance, on motor carriers. When the ICC initiated rulemaking
proceedings to determine whether modifications to existing leasing rules were necessary, it
envisioned a rule that would treat all types of insurance in a uniform manner.[23] After receiving

---

[22] *Rediehs Express, supra*, 491 N.E.2d 1006.

[23] *See* 42 Fed. Reg. 59984, 59984-85 (Nov. 23, 1977).

10

public comments, the ICC proposed the following rule which expressly allowed the parties to

decide who would be responsible for all types of insurance, public liability included:

> The lease shall clearly specify who is responsible for providing the various types
> of insurance coverage, such as cargo, bobtail, **and public liability and property
> damage coverage**. If the authorized carrier provides any or all parts of the above
> coverage and makes a charge-back to the lessor for such coverage, the lease shall
> specify the amount charged-back to the lessor and shall also specify the full cost
> of the policy to the authorized carrier for the current year of operations. . .[24]

If the ICC meant to allow carriers to pass through PL/PD charges, it could simply have kept this

proposed language. But it did not do so. To the contrary, the proposed rule was significantly

altered after a second round of comments was received. The reference to public liability and

property damage insurance was removed from the sentence allowing the parties to specify who is

responsible for the various types of insurance coverage. The requirement that the authorized

carrier must provide liability insurance was placed in a sentence by itself. These deliberate

changes make it clear that the ICC meant to preclude carriers from delegating the responsibility

for PL/PD coverage to owner-operators by making them pay the costs of such insurance. As

explained in the ICC commentary accompanying the final rule:

> The question was also raised as to whether a carrier, under the terms of paragraph
> (1) of the proposed rule, may delegate its legal responsibilities to carry cargo,
> property damage and public liability insurance for the protection of the public.
> The answer is no. We are, therefore, specifically including in paragraph (1) of the
> final rule the requirement formerly set forth in paragraph (4) of the proposed rule
> to dispel any such notions. This rule does not in any way lessen a carrier's
> obligation to the public concerning insurance coverage for its operations as set
> forth in regulations passed pursuant to 49 U.S.C. 10927 (section 215 of the old
> act).[25]

---

[24] *Lease and Interchange of Vehicles*, 129 M.C.C. 700, 720 (1978) (emphasis added).

[25] *Lease and Interchange of Vehicles*, 131 M.C.C. 141, 149-150 (1979).

### 3. United's Interpretation of the Safety Incentives Intended by the Legislation is Erroneous.

United claims that requiring carriers to pay for PL/PD insurance provides a safety disincentive for owner-operators and does not change the safety incentives for carriers. It is clear, however, that Congress intended to place the financial incentive to operate safely upon motor carriers, not owner-operators, and that United's interpretation would frustrate this express Congressional goal.

Since 1935, the Interstate Commerce Act has required carriers to obtain insurance or a surety bond sufficient to protect the public before it would grant the carrier operating authority. The amount of the coverage was increased significantly when Congress embarked upon deregulation of the trucking industry in 1980. At that time, concerns were raised that easier entry into the trucking business would increase safety problems and pose a threat to members of the public who share the highways with commercial truckers. To address this concern, the Motor Carrier Act of 1980 significantly increased minimum liability insurance requirements to $750,000 for carriers engaged in interstate commerce.[26] These substantial fixed minimums were predicated on Congress' belief that such requirements would not only ensure an adequate level of protection for the public, but would also provide motor carriers with an additional incentive to operate their vehicles in a safe manner. As stated in the House report accompanying the proposed legislation:

> The purpose of this provision is to create additional incentives to carriers to maintain and operate their trucks in a safe manner as well as to assure that carriers maintain an appropriate level of financial responsibility.
>
> . . .
>
> The action of the Committee in increasing financial responsibility is to encourage the carriers to engage in practices and procedures that will enhance the safety of

---

[26] 49 U.S.C. § 31139(b)(2) (previously at 49 U.S.C. § 10927 (note)); H.Rep. No. 96-1069, pp.6, 41-42, *reprinted in* 1980 *U.S.C.C.A.N.* 2283, 2288, 2323-24.

their equipment so as to afford the best protection to the public.[27]

The implementing regulations at 49 C.F.R. § 387.1, similarly state that one purpose of these

regulations is to create incentives for motor carriers to focus on safer highway transportation.

Congress determined that increased financial responsibility would improve safety

performance because unsafe motor carriers would incur higher insurance premiums or be unable

to obtain coverage. As explained in the House report:

> Specifying minimum insurance levels is one way to help improve motor carrier
> safety. Insurance companies are equipped to evaluate the performance of the
> motor carriers. The premiums they assess are in direct relation to the risks they
> assume. Therefore, an unsafe carrier will have an increased premium, and a
> totally unsafe carrier may not be able to obtain the insurance necessary to operate,
> or at best will be at an insurance cost disadvantage.[28]

If United and its agents are allowed to pass through to owner-operators the entire cost of this

public liability insurance that they are required by law to obtain, it would eliminate the additional

financial incentive envisioned by Congress to encourage carriers to implement better safety

programs and enforce stringent safety standards. A carrier's conduct need not be modified to

avoid an increase in insurance premiums if he does not bear the burden of paying those

premiums. Further, carriers will have found another way to evade responsibility Congress

intentionally imposed on them through the use of a lease arrangement.

## 4. The ICC Chose To Effectuate The Will Of Congress By Allocating Premium Costs For PL/PD Insurance To Authorized Carriers.

United has correctly pointed out that the ICC and the courts are reluctant to interfere with

the right of carriers and owner-operators to negotiate lease terms that involve the allocation of

costs and revenues, preferring instead to rely on full disclosure of the terms of the lease as the

---

[27] H.Rep. No. 96-1069, *supra*, at 41-42, 1980 *U.S.C.C.A.N.* at 2323-24.

[28] *Id*. at 43, 1980 *U.S.C.C.A.N.* at 2325.

primary means of ensuring fair treatment of owner-operators. Motion p. 18-19. The hands-off policy, however, has not been universal. For example, the ICC placed stringent restrictions upon the carrier's treatment of sums that may be deducted from owner-operator compensation and held in an escrow fund.[26] The ICC also created a short time frame for payment of owner-operator compensation and limited the documentation that carriers may require before compensation was paid.[27] The ICC also intervened where the shifting of particular costs was deemed inappropriate. For example, the regulations provide that the carrier must in certain circumstances assume fines imposed for overweight and oversized trailers.[29]

PL/PD insurance is just another area where the ICC took affirmative action, in this situation to implement the policy choice already made by Congress to place the legal obligation and responsibility for the cost of PL/PD insurance upon authorized carriers. United argues, in essence, that because the ICC refused to issue a rule precluding indemnification and hold harmless clauses or a rule prohibiting the exclusion of insurance surcharges from compensation, it did not bar carriers from passing through the cost of PL/PD insurance. Motion p. 18-19.

There is no reason to think that the ICC would have treated the pass- through of PL/PD premiums the same as other insurance-related charges. Insurance surcharges are additional charges levied upon shippers. Accordingly, the surcharge issue was not whether they could be charged to owner-operators, but whether owner-operators are entitled to a portion of the surcharge as additional compensation.

Indemnification and hold-harmless clauses also differ significantly from provisions shifting the premium cost of PL/PD insurance. The use of indemnification and hold-harmless

---

[29]*Id*. at § 376.12(f).

[30] *Id.* at § 376-12(e).

clauses which shift a portion of the risk from the carrier to an owner-operator for injuries caused by his own negligent acts has previously been approved by the ICC.[31] United's practice of shifting the entire cost of maintaining liability insurance coverage, however, does not fall within the scope of those decisions. The Leasing Regulations do not provide any guidance regarding the use of indemnification or hold-harmless clauses.[32] As discussed above, subsection (j)(1) of those Regulations does contain a provision prohibiting the delegation of responsibility for PL/PD coverage. Making an owner-operator bear some financial responsibility for his own negligent conduct gives the owner-operator an incentive to operate safely,[33] without disturbing the carrier's financial incentive to conduct its operations in the safest possible manner. However, making an owner-operator pay for the carrier's PL/PD insurance, combined with United's policies on indemnification and hold harmless requirements, totally eliminates the carrier's financial incentive to operate safely. Indeed, this approach unfairly places the entire financial burden associated with the carrier's obligation to protect the public on the owner-operator.

For all these reasons, the factors that favor the use of indemnification and hold-harmless clauses do not provide a legitimate basis for United's cost-shifting practices.

In sum, United's request that Count III be dismissed should be denied because it is based upon an erroneous interpretation of the statutory requirements that Plaintffs' have alleged that United has violated.

---

[31] *Petition for Investigation of Indemnification and Hold-Harmless Clauses*, Ex. Parte No. MC-188 (June 9, 1988), 1988 WL 225577 (I.C.C.); *see also Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28 (1979) (approving such clauses in trip lease between two carriers).

[32] *Transamerican Freight,* 423 U.S. at 39-40; *see generally* 49 C.F.R. Part 376.12.

[33] *Transamerican Freight,* 423 U.S. at 41; *Petition for Investigation, supra*, 1988 WL at 3.

## VI.  UNITED IS LIABLE UNDER 49 C.F.R. §376.12(m) FOR ITS AGENTS' VIOLATIONS OF THE FEDERAL TRUTH-IN-LEASING REGULATIONS

In spite of the clear statutory language of both 14 U.S.C. § 13907 and 49 C.F.R.

§ 376.12(m), United attempts to convince this Court that Count IV, which alleges that United is

responsible for the violations of the leasing regulations committed by its agents, should be

dismissed.  As with United's other claims, this claim is without merit.

In language precisely on point here, the Truth-in-Leasing Regulations require United to

ensure that owner-operators receive the rights and benefits conferred by the Regulations.

49 C.F.R. §376.12(m) expressly provides:

> This paragraph applies to owners who are not agents but whose equipment is used
> by an agent of an authorized carrier in providing transportation on behalf of the
> authorized carrier.  In this situation, *the authorized carrier is obligated to ensure*
> *that these owners receive all the rights and benefits due an owner under the*
> *leasing regulations, especially those set forth in paragraphs (d)-(k) of this section.*
> *This is true regardless of whether the lease for the equipment is directly between*
> *the authorized carrier and its agent rather than directly between the authorized*
> *carrier and each of these owners.  The lease between an authorized carrier and*
> *its agent shall specify this obligation.*

(Emphasis added).  The referenced subparagraphs (d) through (k) include the leasing regulations

implicated in this case, to wit, the provisions pertaining to chargeback items (49 C.F.R.

§376.12(h)), insurance (49 C.F.R. §376.12(j)), and escrow funds (49 C.F.R. §376.12(k)).

As set forth above, as the authorized carrier, United's obligation to comply with the

Truth-in-Leasing Regulations is mandatory and unqualified.  Thus, 376.12(m) expressly makes

United fully responsible for the wrongdoing alleged in the Plaintiffs' Complaint, whether such

violations were committed by United itself *or* its agents.

Any conceivable doubt that 376.12(m) was intended to make a carrier like United liable

for its agents' actions is removed by the administrative history of this provision.  As discussed

above, the Truth-in-Leasing Regulations were intended to eliminate improper and abusive

16

practices in lease arrangements. 129 M.C.C. at 700; 131 M.C.C. at 142. Following the adoption

of the Regulations, a group of carriers filed petitions complaining that the ICC had not directly

answered questions raised during the proceeding about the applicability of the leasing regulations

to leases between the carriers and their agents. In response, the Commission instituted a

supplemental rulemaking, concluding in pertinent part that the Truth-in-Leasing regulations

apply to make carriers liable for leases between agents and owner-operators. *See* 45 Fed.Reg.

13159-13160 (Feb. 28, 1980). In connection with this conclusion, the Commission stated:

> The Commission never intended for authorized carriers to be able to escape any of
> their obligations to owner-operators under the new leasing rules *merely by*
> *contracting directly with an agent* rather than with individual owner-operators.
>
> . . .
>
> [Thus, w]e now propose to issue a rule codifying the responsibility of all motor
> carriers for ensuring that owner-operators performing transportation on their
> behalf receive the rights and benefits contained in the leasing rules. *The proposed*
> *rule makes it clear that the obligation exists regardless of whether the lease is*
> *directly between the carrier and its agent rather than between the carrier and the*
> *owner-operator.*

Id. at 13160 (emphasis added). Moreover, in the comments to the Final Rule, the agency stated

that the Regulations were amended in order to clarify:

> that the obligation of an authorized carrier to ensure that the owner of the
> equipment receives all of the rights, benefits, and protections of the leasing
> regulations cannot be avoided simply by acting through an agent. The duty on the
> carrier's part will apply irrespective of whether the carrier leases the equipment
> directly from the equipment owner or indirectly through an intermediary third-
> party.

47 Fed. Reg. 28396, 28397-28398 (June 30, 1982). In short, notwithstanding the vigorous

opposition of the carriers, the agency adopted the rule now set forth at 376.12(m).[34]

In deciding that carriers cannot avoid the leasing regulations through the use of agents,

the ICC referred to its earlier decision in *North American Van Lines, Inc. et al., - Investigation*

---

[34] See 132 M.C.C. 822, 823-824 (June 22, 1982); 47 Fed. Reg. 28396, 28397 (June 30, 1982). The
original rule was at 49 C.F.R. §1057.12(n).

*and Revocation of Certificates*, 132 M.C.C. 66 (1980). In that proceeding, the carriers raised,

and lost, the argument that they could not be held liable for violations of the Commission's

regulations by employees or agents unless the carrier had actual knowledge of, and/or intent to

commit, the violations. The agency flatly rejected the defense, reasoning:

> Where an affirmative duty to do something is imposed upon a corporation, it must
> be performed by some or several of its employees or agents. Conscious disregard
> of or indifference to the performance of this duty is what amounts to willful
> failure on the part of the corporation. *United States v. E. Brooke Matlack, Inc.,*
> 149 F.Supp. 814 (W.D. Ky. 1957). Moreover, the Interstate Commerce Act
> provides for regulation of the carrier, not of its individual employees, and clearly
> places the responsibility for compliance upon the carrier. A carrier cannot escape
> this responsibility by attributing violations to its employees or agents. The duty
> which Congress has placed on the Commission to regulate motor carriers under
> the act can be effectively performed only by holding the carriers accountable.
> *See Burns Motor Freight, Marlington, W. Va., Transferee*, 93 M.C.C. 629, 632
> (1964).

Id. at 71 (emphasis added).[35]

In *ICC v. Atlas Van Lines*,[36] the court expressly held the carrier, Atlas Van Lines, liable

for its agents' violations of the Truth-in-Leasing Regulations. That case involved the last of

three separate ICC investigations into the handling of owner-operator settlement and/or escrow

funds by agents of Atlas Van Lines. In the first proceeding, Atlas as well as the involved agent

was required to sign a settlement agreement acknowledging their failure to comply with the

Truth-in-Leasing Regulations, even though the actual wrongdoer was the agent. In the second

proceeding, which involved the handling of payments to owner-operators under a direct-lease

program, Atlas was required to establish a regulatory compliance program with a full-time

compliance officer who would review Atlas agents' agreement with owner-operators and audit

---

[35] To a similar effect, the courts have held that the leasing regulations were enacted "to prevent a motor
carrier from skimming its lease operators' profits by exacting hidden charges; a motor carrier cannot
circumvent this regulation by laundering its kickback through a third party." *Jacobs v. Central
Transport, Inc.*, Nos. 95-2395, 95-2396, 95-2397, 1996 WL 223688, at *8, (4th Cir. May 3, 1996).
[36] 825 F. Supp. 771 (N.D. Tex. 1993)

agent records to ensure compliance with the leasing regulations. Finally, in the third proceeding, an enforcement proceeding instituted by the ICC against Atlas in federal district court, the court required Atlas to pay owner-operators compensation, escrow funds, and interest owed to them by a bankrupt Atlas agent who also owed money to Atlas. Atlas was also enjoined by the court from subsequent violations of the leasing regulations because the repeated violations of the regulations by Atlas agents "amount to a pattern of non-compliance by Atlas, [to the extent] that Atlas has been unwilling *to prevent violations of ICC regulations by its agents.*" *Id.* at 775 (emphasis added).

In *OOIDA v. Mayflower Transit, Inc.*,[37] the Court denied Mayflower's motion to dismiss an action based on Mayflower's alleged violations of the Truth-in-Leasing regulations in regard to improperly retaining owner-operator escrow funds. The Court reasoned that

> It is uncontested here that Mayflower had agency relationships with the business entities with which the plaintiffs had leases. Indeed, mayflower admits that plaintiffs had agreements with "Mayflower agents," whose relationships with Mayflower were established by agency agreements. Since Mayflower was obligated to ensure that the owners' rights were protected "regardless of whether the lease for the equipment is directly between the authorized carrier and its agent rather than directly between the authorized carrier and each of these owners," Mayflower's potential liability appears to be established by operation of law.[38]

Thus, there is no question that United is responsible for the acts of its agents in ensuring compliance with the Truth-in-Leasing regulations, as alleged in Count IV, and that Count IV should not be dismissed.

---

[37] 161 F.Supp.2d 948 (S.D. Ind. 2001)

[38] *Id.* at 958, quoting 49 C.F.R. § 376.12(m).

19

## CONCLUSION

Applying the standard of review for a motion to dismiss, Defendants' motion should be

denied. Plaintiffs' factual allegations are sufficient as to every count, and are supported by the

relevant legal authority. Wherefore, Plaintiffs respectfully request that the Court deny

Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Class Action Complaint in its entirety.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs believe that oral argument may assist the Court. Pursuant to Local Rule 7.1(d),

Plaintiffs respectfully request that the Court schedule oral argument on this issue.

Respectfully submitted,

OWNER-OPERATOR INDEPENDENT
DRIVERS ASSOCIATION, INC., et al.

By:

John A. Kiernan (BBO #271020)
Kenneth H. Naide (BBO #643213)
**BONNER KIERNAN TREBACH & CROCIATA**
One Liberty Square, 6th Floor
Boston, MA. 02109
(617) 426-3900

Paul D. Cullen, Sr. (*pro hac vice* app. pending)
David A. Cohen (*pro hac vice* app. pending)
Susan Van Bell (*pro hac vice* app. pending)
***THE CULLEN LAW FIRM, PLLC***
1101 30th Street, N.W., Suite 300
Washington, DC 20007
Telephone: (202) 944-8600

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that copies of the foregoing Plaintiffs'
Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Class Action Complaint
has been served upon the counsel of record listed below, this ___15th___ day of June, 2005 by posting
said copies in the United States mail, first class, postage prepaid to:

Francis J. Sally
Jennifer E. Greaney
Sally & Fitch, LLP
225 Franklin Street
Boston, Massachusett 02110

David Wells
Michael J. Morris
Rebecca A. Pinto
Thompson Coburn LLP
One U.S. Bank Plaza
St. Louis, Missouri 63101