UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OWNER-OPERATOR INDEPENDENT DRIVERS )
ASSOCIATION, INC., et al., )
)
     Plaintiffs, )
)     No. 05 CV 10317 MLW
v. )
)
UNITED VAN LINES, LLC, et al., )
)
     Defendants. )

**DEFENDANTS' MOTION FOR LEAVE TO SUBMIT REPLY
MEMORANDA IN FURTHER SUPPORT OF THEIR PENDING
MOTIONS TO DISMISS AND TO TRANSFER VENUE**

COME NOW Defendants United Van Lines, LLC, Vanliner Insurance Company, and

UniGroup, Inc., and respectfully move this Court for leave to file reply memoranda in further

support of the following motions:  (1) Defendants' Motion to Transfer Venue Pursuant to 28

U.S.C. § 1404, (2) Defendant UniGroup, Inc.'s Motion to Dismiss for Lack of Personal

Jurisdiction, (3) Defendants UniGroup, Inc.'s and Vanliner Insurance Company's Motion to

Dismiss Non-Motor Carrier Defendants, and (4) Defendants' Rule 12(b)(6) Motion to Dismiss

Plaintiffs' Class Action Complaint.  In support hereof, Defendants state as follows:

    1.     Defendants filed the aforementioned motions on May 2, 2005.  Plaintiffs filed

oppositions to such motions on June 16, 2005.

    2.     This Court's Local Rules require a party to seek leave of court before submitting

reply memoranda in support of motions.  *See* Local Rule 7.1(b)(3).

    3.     In this putative nationwide class action lawsuit, Defendants believe that reply

briefs are necessary to adequately address the issues raised in plaintiffs' opposition briefs, and

will also assist the Court in its determination of the several pending motions.

4.     Michael Morris, one of the counsel for defendants herein, conferred with David

Cohen, one of the counsel for plaintiffs, on June 21 and again on July 6, 2005.  Mr. Cohen

advised on both occasions that plaintiffs do not object to defendants' submission of these reply

memoranda.

WHEREFORE, Defendants United Van Lines, LLC, Vanliner Insurance Company, and

UniGroup, Inc. respectfully move this Court for leave to file their reply memoranda (**attached

hereto as Exhibits A through D**) in further support of the aforementioned motions.

Respectfully submitted,

THOMPSON COBURN LLP


By:___/s/ Michael J. Morris_____
     David Wells (admitted *pro hac vice*)
     Michael J. Morris (admitted *pro hac vice*)
     Rebecca A. Pinto (admitted *pro hac vice*)
     One U.S. Bank Plaza
     St. Louis, MO 63101
     (314) 552-6000 (phone)
     (314) 552-7000 (facsimile)

     SALLY & FITCH LLP
     Francis J. Sally (BBO # 439100)
     Jennifer E. Greaney (BBO # 643337)
     225 Franklin Street
     Boston, Massachusetts 02110
     (617) 542-5542 (phone)
     (617) 542-1542 (facsimile)

     Attorneys for Defendants United Van Lines, LLC,
     Vanliner Insurance Company, and UniGroup, Inc.

## <u>CERTIFICATE OF SERVICE</u>

  The undersigned hereby certifies that on this 11th day of July, 2005, the foregoing Defendants' Motion for Leave to Submit Reply Memoranda in Further Support of Their Pending Motions to Dismiss and to Transfer Venue was electronically filed with the Clerk of the Court using the CM/ECF system, which in turn forwarded the same to the following counsel of record:

    John A. Kiernan
    Kenneth H. Naide
    BONNER KIERNAN TREBACH & CROCIATE
    One Liberty Square, 6th Floor
    Boston, MA 02109
    (617) 426-3900

  I further certify that on the same date, I sent a copy of the above-described filing, by U.S. Mail first class postage prepaid, to the following counsel of record:

    Paul D. Cullen, Sr.
    David A. Cohen
    Susan Van Bell
    THE CULLEN LAW FIRM, PLLC
    1101 30th Street, N.W., Suite 300
    Washington, DC 20007

      /s/ Michael J. Morris_____

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 05 CV 10317 MLW |
| v. | ) ) | |
| UNITED VAN LINES, LLC, et al., | ) ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION
TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404**

**INTRODUCTION**

As plaintiffs' Opposition confirms, it is difficult to imagine a case more appropriate for transfer than this putative nationwide class action lawsuit.  Indeed, plaintiffs all but concede the propriety of transfer by tacitly acknowledging the absence of any meaningful connection between Massachusetts and the parties and events underlying this lawsuit.  Specifically, plaintiffs admit that:

- None of the parties to this case—plaintiff or defendant—is or has ever been a Massachusetts resident.

- None of the parties to this case—plaintiff or defendant—has any offices, records, employees, or any other presence in Massachusetts.

- All defendants in this case—as well as lead plaintiff OOIDA—are located in Missouri.

- Less than 3% of defendant United's independent agents (none of whom are even parties to this lawsuit) are located in Massachusetts.

- By far the greatest concentration of witnesses—for both plaintiffs and defendants—is in Missouri.

- By far the greatest concentration of documents—for both plaintiffs and defendants—is in Missouri.

- The one (and only) Massachusetts connection upon which plaintiffs rely is that one of the four named plaintiffs once signed a lease with a non-party United agent located in Massachusetts.  However, even that tenuous connection was admittedly eliminated **two years** before this suit was filed.  *See* Compl. ¶5 (plaintiff Pelletier terminated his lease with Massachusetts agent Humboldt Storage & Moving in March 2003).

In the face of all these compelling facts warranting transfer, plaintiffs argue only that because they chose to sue in Massachusetts, their forum choice should not be disturbed. However, as defendants explained in their opening brief, settled case law confirms that plaintiffs' forum preference is entitled to virtually no deference here for at least three reasons: (1) Massachusetts is not the home forum of even one named plaintiff; (2) plaintiffs' demand for nationwide class treatment renders largely irrelevant any single putative class member's forum preference; and (3) Massachusetts is not the situs of **any** events material to this lawsuit.  Indeed, the failure to demonstrate any meaningful Massachusetts connection strongly suggests that plaintiffs filed suit in this forum for tactical reasons that deserve no weight under § 1404.

Accordingly, because the balance of relevant convenience factors overwhelmingly favors transfer pursuant to § 1404, and because plaintiffs' choice of forum is properly accorded little if any weight in the present circumstances, this case should be transferred to the U.S. District Court for the Eastern District of Missouri.  Alternatively, if transfer to Missouri is not granted, this suit should be transferred to U.S. District Court for the Southern District of Indiana, where plaintiff OOIDA and another of defendants' corporate affiliates (Mayflower Transit, LLC) are presently litigating a similar case.

## ARGUMENT

### I.    Plaintiffs' Choice of Forum Deserves Little Weight

While plaintiffs repeatedly argue that their choice of a forum should control, they are tellingly unable to (1) offer any cogent explanation for why they filed suit in Massachusetts to begin with, or (2) cite a single decision from any jurisdiction holding that a plaintiff's choice of forum should control in similar circumstances.  In fact, as defendants pointed out in their opening brief, federal courts have repeatedly refused to defer to plaintiff's forum choice on facts considerably **less** compelling than those presented in this case.

For example, federal courts regularly refuse to defer to the named plaintiff's choice of forum in nationwide class action lawsuits, even where—unlike here—at least one named plaintiff resides in district where suit was filed.  As the U.S. Supreme Court has emphasized:

> [W]here there are hundreds of potential plaintiffs…all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened.

*Koster v. American Lumbermens Mut. Casualty Co.*, 330 U.S. 330 U.S. 518, 524 (1947); s*ee also O'Hopp v. ContiFinancial Corp.,* 88 F. Supp.2d 31, 36 (E.D.N.Y. 2000)(granting transfer of nationwide class action where one of thirteen named plaintiffs resided in plaintiffs' chosen forum); *Job Haines Home for the Aged v. Young*, 936 F. Supp. 223, 226-27 (D.N.J. 1996)("[T]he question this Court must address is whether, in a class action…where the underlying facts have virtually nothing whatsoever to do with the forum state, and it is only a fortuitous happenstance that the named class representative resides in the forum state, a court must preserve the plaintiff's choice of forum. The answer is clearly 'no'"); *Firmani v. Clarke*, 325 F. Supp. 689, 691 (D. Del. 1971)(refusing to defer to named plaintiff's home forum in a nationwide shareholder's suit).

Indeed, even in individual actions, courts have long refused to defer to a plaintiff's choice of a forum which is not also his or her home. *See*, *e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981)("When the home forum has been chosen, it is reasonable to assume that [plaintiff's] choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable"); *Ryan, Klimek, Ryan Partnership v. Royal Ins. Co. of America*, 695 F. Supp. 644, 647 (D.R.I. 1988)(rationale for deferring to plaintiff's forum selection "is greatly weakened where plaintiff's chosen forum is not also his home"); *Burnstein v. Applied Extrusion Tech., Inc.*, 829 F. Supp. 106, 110 (D. Del. 1992)("When the plaintiff has chosen to bring suit in a district that is not his 'home turf' and which has no connection to any of the acts giving rise to the lawsuit, the convenience to the plaintiff is not as great as it would be were he litigating at or near his principal place of business or at the site of the activities at issue in the lawsuit").

Plaintiffs are unable to distinguish this substantial and well-reasoned body of federal precedent, and fail to address it in their Opposition, so they simply pretend it does not exist. Even more significantly, plaintiffs do not offer a single legitimate reason why this action should be litigated in Massachusetts rather than in either of the two alternative—and far more convenient and logical—forums which defendants have proposed. Thus, plaintiffs' entire Opposition ultimately boils down to one (and only one) assertion: that this lawsuit should be litigated in Massachusetts because that is where they chose to file it. As amply demonstrated by the above-cited case law, however, this argument does not come close to carrying the day. Rather, "[t]he forum chosen by the Plaintiff must reflect rational and legitimate concerns." *Burnstein*, 829 F. Supp. at 110.

In this case, plaintiffs have articulated no "rational or legitimate" reasons justifying their forum selection. Their failure to do so, particularly in the face of a motion to transfer, leads to

only one reasonable conclusion: inappropriate litigation tactics (such as the desire to force defendants to litigate in an inconvenient, remote, and costly forum) likely prompted plaintiffs to file suit in Massachusetts. More importantly, since any careful balancing of the relevant convenience factors strongly favors transfer, this Court should now transfer the present case to the Eastern District of Missouri or, alternatively, to the Southern District of Indiana.

## II.    **Considerations of Fairness and Convenience Overwhelmingly Favor Transfer**

As previously mentioned, plaintiffs' Opposition offers no explanation for why this lawsuit should proceed in Massachusetts, where none of the relevant parties or documents have ever been located. Instead, plaintiffs simply assert (without evidentiary support) that "Defendants overstate the inconvenience…of litigating this matter in Boston." (Opp. at 4). Plaintiffs also urge the Court to disregard the convenience and fairness factors that federal courts have long deemed to be most relevant in assessing motions to transfer. (*Id.* at 4-6). Such factors include the location of the parties, potential witnesses, and pertinent documents.

This Court should reject plaintiffs' meritless and factually unsupported arguments. The distance between the parties, witnesses, and documents on the one hand, and the trial venue on the other, remain highly significant factors that the court must consider under § 1404. As the Fifth Circuit recently explained in concluding that the district court erred in denying transfer:

> **When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled.** Additional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment. Furthermore, the task of scheduling fact witnesses so as to minimize the time when they are removed from their regular work or home responsibilities gets increasingly difficult and complicated when the travel time from their home or work site to the court facility is five or six hours one-way as opposed to 30 minutes or an hour.

*In re Volkswagen AG*, 371 F.3d 201, 204-05 (5th Cir. 2004)(emphasis added)(granting mandamus to compel transfer from one federal judicial district in Texas to another).

It is widely accepted that "[c]ourts typically regard the convenience of witnesses as the most important factor in considering a § 1404(a) motion to transfer." *Herbert Ltd. Partnership v. Electronic Arts Inc.*, 325 F. Supp.2d 282, 286, 288 (S.D.N.Y. 2004). Here, this "most important" factor unquestionably favors transfer to Missouri. Defendants have offered uncontroverted affidavit testimony that "substantially more witnesses with relevant knowledge"—for both plaintiffs and defendants—"work and/or reside in Missouri…than in any other state." *See Aff. of J. Schmelzle, at ¶12* (Ex. C to defendants' motion to transfer). Plaintiffs do not dispute this fact, either with evidence of their own or even with any contrary argument in their Opposition. Nor do plaintiffs dispute that (1) all defendants—and lead plaintiff OOIDA—reside in Missouri, (2) none of the named plaintiffs is or ever has been a Massachusetts residents, and (3) all but one of the named plaintiffs reside hundreds of miles from their chosen forum. Indeed, as noted in defendants' opening brief, only one of the seven named parties to this action (plaintiff Pelletier) even resides in the same **region** as this Court. By contrast, no less than four parties (including all defendants and the lead plaintiff) reside in Missouri, and a fifth resides in neighboring Illinois.

Plaintiffs are also forced to concede the truth of another important fact established by the uncontroverted Schmelzle affidavit: namely, that for both plaintiffs and defendants, "substantially more relevant documents are located in Missouri than in any other state." *See Schmelzle Aff. at ¶13*. Since plaintiffs cannot dispute this fact, they unconvincingly seek to downplay it by claiming, again without evidentiary support, that it is "likely that much of Defendants' documentation is stored electronically." (Pls.' Opp. at 6). In fact, and as plaintiff OOIDA well knows from its experience in the *Mayflower* litigation, the defendant companies in

- 6 -

this case maintain the great majority of their documents in hard copy form.  In the *Mayflower* case, UniGroup and its affiliates have made available for inspection (in Missouri only) literally hundreds of thousands of documents, and have then copied and physically produced the nearly 90,000 of those documents which plaintiffs have designated.  Virtually all of this massive document production has been made by means of hard copies only.  There is no reason to believe that the present lawsuit, brought against the same corporate family, will be significantly different—and plaintiffs certainly offer no facts or evidence to suggest otherwise.  Accordingly, litigating this case in Massachusetts (and especially any substantive hearings and/or trials) will necessarily require substantial transportation and storage expenses and will also present a host of related logistical challenges.  The great majority of these costs and difficulties can be avoided or lessened considerably by transferring this case to Missouri where it properly belongs.

Plaintiffs also make no effort to address (let alone attempt to distinguish) the well-reasoned decision in *OOIDA  v. C.R. England, Inc.*, CV F 02-5664, slip. op. (E.D. Cal Aug. 19, 2002)(Ex. D to defendants' motion to transfer), where the district court granted the defendant motor carrier's request for transfer on facts less compelling than those present here.  *See id.* at 9-10 (granting transfer under § 1404 because "California is the state of residence of only one of the named Plaintiffs[,] none of the operative facts…occurred in this forum[, and] if this case is transferred to Utah, not only will it be closer to C.R. England's headquarters, it will be closer to OOIDA's Missouri[] headquarters,…and the state of residence of at least three of the other named Plaintiffs").

Very simply, as in *C.R. England,* not a single pertinent convenience or fairness factor favors litigating this case in Massachusetts rather than Missouri.  Indeed, plaintiffs do not dispute that this lawsuit is far more closely centered in Missouri than it is in any other state.  Thus, for

the convenience of the parties and witnesses, this case should be transferred to the Eastern

District of Missouri.[1]

Alternatively, this case should be transferred to the Southern District of Indiana.

Plaintiffs' contention that their claims in this case are not "identical" to those they have advanced

in the *Mayflower* litigation (Opp. at 6) conveniently ignores the fact that the Court's § 1404

analysis is properly guided by practical rather than formalistic considerations. *See*, *e.g.*, *Howe v.*

*Goldcorp Investments, Ltd.*, 946 F.2d 944, 950 (1st Cir. 1991)("[*F*]*orum non conveniens* is a

flexible, practical doctrine designed to avoid trials in places so inconvenient that transfer is

needed to avoid serious unfairness"); *General Comm. of Adjustment GO-386 v. Burlington*

*Northern R.R.*, 895 F. Supp. 249, 252 (E.D. Mo. 1995)(granting transfer because "although the

parties may differ in the cases, they are all carriers and unions or local committees…with a

significant stake in the resolution of this issue").

As plaintiffs themselves concede, OOIDA's claims in the *Mayflower* litigation parallel

their claims in this case in several important respects.  In fact, the district court in the *Mayflower*

case is presently considering the parties' competing summary judgment positions on one of the

exact same claims asserted by OOIDA against United here—*i.e.*, whether a motor carrier is

permitted, by contract, to pass through to its owner-operators the costs of insuring against the

---

[1] Since plaintiffs really have no convincing explanation for why this case should proceed in
Massachusetts, they resort to the specious argument that their forum selection must be honored due to
their purported "lack of economic resources, lack of bargaining power, and lack of viable avenues of
redress." (Opp. at 4.)  In reality, and notwithstanding plaintiffs' disingenuous insinuation to the contrary,
this litigation is not being funded or directed by a few individuals with modest economic resources.
Rather, it is being prosecuted by lead plaintiff OOIDA, a well-funded national trade association which
routinely files nationwide class action lawsuits against motor carriers. *See* Opp. at 6 ("OOIDA has
brought more than twenty class actions against motor carriers all over the United States, in many
jurisdictions.").  *See also* <http://www.ooida.com> (noting that OOIDA's current membership exceeds
126,000 owner-operators).  Moreover, even if one erroneously assumes that plaintiffs' resources are as
limited as they pretend, that only confirms that this case should be litigated in a central location (such as
Missouri or Indiana)—especially since lead plaintiff OOIDA is itself a Missouri resident.

risks, losses, and liabilities created by those very owner-operators.  In addition, plaintiffs do not dispute that the *Mayflower* district court has developed a thorough knowledge of the parties, the motor carrier industry, the types of claims typically asserted by OOIDA in its numerous class actions, and the technical nuances of the federal leasing regulations that govern these complex cases.  Thus, if this Court concludes for some reason that transfer to Missouri would not be appropriate, then it should transfer the present action to the Southern District of Indiana.

### <u>CONCLUSION</u>

Plaintiffs' Opposition offers no explanation for why this case was initially filed in Massachusetts, and no cogent reason why this Court should continue to be burdened by adjudicating plaintiffs' complex and technical class claims in this district.  The uncontroverted facts establish that by far the most logical and convenient forum for this lawsuit—for all parties—is the Eastern District of Missouri.  The next best forum, still considerably more convenient than Massachusetts, is the Southern District of Indiana.

Accordingly, defendants respectfully request that this case be transferred pursuant to 28 U.S.C. § 1404(a) to the U.S. District Court for the Eastern District of Missouri or, in the alternative, to the U.S. District Court for the Southern District of Indiana.

Respectfully submitted,

THOMPSON COBURN LLP


By: /s/ Michael J. Morris
      David Wells (*admitted pro hac vice*)
      Michael J. Morris (*admitted pro hac vice*)
      Rebecca A. Pinto (*admitted pro hac vice*)
      One U.S. Bank Plaza
      St. Louis, MO 63101
      (314) 552-6000 (phone)
      (314) 552-7000 (facsimile)

      SALLY & FITCH LLP
      Francis J. Sally (BBO # 439100)
      Jennifer E. Greaney (BBO # 643337)
      225 Franklin Street
      Boston, Massachusetts 02110
      (617) 542-5542 (phone)
      (617) 542-1542 (facsimile)

      Attorneys for Defendants United Van Lines, LLC,
      Vanliner Insurance Company, and UniGroup, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 11th day of July, 2005, the foregoing Reply Memorandum in Further Support of Defendants' Motion to Transfer Venue Pursuant to 28 U.S.C. §1404 was electronically filed with the Clerk of the Court using the CM/ECF system, which in turn forwarded the same to the following counsel of record:

> John A. Kiernan
> Kenneth H. Naide
> BONNER KIERNAN TREBACH & CROCIATE
> One Liberty Square, 6th Floor
> Boston, MA 02109
> (617) 426-3900

I further certify that on the same date, I sent a copy of the above-described filing, by U.S. Mail first class postage prepaid, to the following counsel of record:

> Paul D. Cullen, Sr.
> David A. Cohen
> Susan Van Bell
> THE CULLEN LAW FIRM, PLLC
> 1101 30th Street, N.W., Suite 300
> Washington, DC 20007

/s/ Michael J. Morris

**EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 05 CV 10317 MLW |
| v. | ) ) | |
| UNITED VAN LINES, LLC., et al., | ) ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANT UNIGROUP'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

**INTRODUCTION**

Defendant UniGroup, Inc. ("UniGroup") is not subject to personal jurisdiction in this case. The sworn Affidavit of George Smith, previously submitted by UniGroup in support of its present motion, establishes the following:

- UniGroup has no offices, employees, or corporate records in Massachusetts;

- UniGroup does not own any real estate or personal property in Massachusetts;

- UniGroup is not authorized to transact business, and does not transact business, in Massachusetts;

- UniGroup provides no transportation, relocation, trucking, motor carrier or other services in Massachusetts; and

- UniGroup does not enter into contracts, pay state or local taxes, or maintain any bank accounts in Massachusetts.

*See Smith Aff.* (Ex. A to UniGroup's 5/2/05 Motion to Dismiss) at ¶¶ 4-12.

Plaintiffs' opposition brief does not contest a single one of these facts. Plaintiffs thus essentially concede that UniGroup has no presence whatever in Massachusetts, and has not itself taken any actions for which it can properly be sued in this state.

Nevertheless, plaintiffs claim they can join UniGroup in this action because the other two defendants, United Van Lines and Vanliner Insurance Company, are UniGroup subsidiaries which transact business in Massachusetts. (Opp. at 4-8). Plaintiffs' argument, however, is directly contrary to settled First Circuit precedent which holds that, in the absence of extraordinary circumstances not present here, a parent company like UniGroup is **not** subject to suit in Massachusetts simply because its subsidiaries have a presence there. *See e.g., Donatelli v. National Hockey League*, 893 F.2d 459, 465-66 (1st Cir. 1990); *United Elec. Workers  v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1087 (1st Cir. 1992). On the contrary, it is only "in rare situations" that courts may disregard affiliated companies' separate corporate identities for personal jurisdiction purposes. *Id.* at 1091. No such rare circumstances exist or are even alleged in this case.

Recognizing that their Complaint does not justify subjecting UniGroup to personal jurisdiction, plaintiffs' Opposition recites a host of additional unpleaded "facts" regarding the alleged ownership and management links between UniGroup and its subsidiaries, and the various corporate and administrative services which UniGroup provides to its affiliates. (Opp. at 6-8). Yet these unpleaded facts, to the extent they are properly considered at all, do nothing more than establish that UniGroup and its subsidiaries are part of the same corporate family. The First Circuit has long emphasized that such standard hallmarks of a parent-subsidiary relationship do not, as a matter of law, justify the exercise of jurisdiction over a nonresident corporate parent which does not itself transact business or engage in any other activities in the forum. *United*

*Elec. Workers*,  960 F.2d at 1083-84, 1086-87; *Escude Cruz  v. Ortho Pharm. Corp.,* 619 F.2d 902, 905 (1st Cir. 1980).

Plaintiffs also advance new allegations regarding UniGroup's alleged involvement in preparing a new form of owner-operator lease agreement, including the fact that UniGroup's copyright appears on the lease.  These new allegations are equally insufficient to establish personal jurisdiction.  Whatever role UniGroup may have played in preparing the new lease, none of those activities took place in Massachusetts and plaintiffs do not claim otherwise.

The total absence of Massachusetts contacts, therefore, confirms that UniGroup is not subject to suit in this Court.  *See United Elec. Workers,* 960 F.2d at 1090 (all claims against nonresident parent company dismissed for lack of personal jurisdiction where plaintiffs could not show that parent's involvement in the relevant contract negotiations "**took  place in the forum state** or by means of communications to and from the forum")(emphasis added); *Escude Cruz,* 619 F.2d at 905 ("[T]he cause of action against a nonresident **must have resulted from the defendant's activity"** in the forum)(emphasis added).

Accordingly, because this Court lacks personal jurisdiction over UniGroup, all claims against it should be dismissed.

### ARGUMENT

A.    Plaintiffs Have Not Met Their Burden To Prove Personal Jurisdiction

Plaintiffs admit that it is their burden to "make a *prima facie* showing of personal jurisdiction." (Opp. at 2).  Plaintiffs further concede that once UniGroup has challenged their assertion of jurisdiction, they cannot simply "rest on [the] unsupported allegations in their pleadings" but rather must come forward with **evidence** that UniGroup has sufficient "minimum contacts" with Massachusetts to constitutionally justify haling it into this Court.  *See e.g., Boit*

*v.Gar-Tec Products, Inc.,* 967 F.2d 671, 675 (1st Cir. 1992); *Foster-Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 145 (1st Cir. 1995).

Plaintiffs have not met their burden of proof.  By their silence, they admit the truth of **all** the facts recited in the Smith Affidavit.  Plaintiffs concede, in other words, that UniGroup owns no property, has no employees, enters into no contracts, provides no goods or services, and transacts no business of any sort in Massachusetts.  *Smith Aff. at ¶¶ 4-10.*

Not only do plaintiffs admit all of the foregoing facts, but they do not counter such facts with any evidence of their own establishing any UniGroup contacts with Massachusetts.  Instead, they largely rehash their pleaded (and plainly insufficient) allegations regarding UniGroup's ownership and alleged "control" of its defendant subsidiaries.  Plaintiffs then throw in some new unpleaded and equally insufficient claims regarding UniGroup's alleged involvement—**in Missouri**—in preparing a new form of lease.  However, none of plaintiffs' arguments, old or new, come close to proving that UniGroup is subject to jurisdiction.

The First Circuit has frequently noted that "the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." *Mass. School of Law at Andover, Inc. v. American Bar Association,* 142 F.3d 26, 34 (1st Cir. 1998); *Workgroup Tech Corp. v. MGM Grand Hotel,* 246 F. Supp. 2d 102,108 (D. Mass. 2003).  Since plaintiffs in this case have fallen far short of meeting this burden, their suit against UniGroup should be dismissed

   B.    Controlling Precedent, Including Cases Cited by Plaintiffs, Confirms That
         UniGroup Is Not Subject To Personal Jurisdiction

Plaintiffs devote the bulk of their Opposition to asserting (and then reasserting) the same litany of facts regarding the ownership and management interrelationships among the three corporate defendants in this case.  Thus, plaintiffs repeatedly argue that:

- UniGroup is owned by independent agents of United and Mayflower, and UniGroup's board of directors consists largely of United and Mayflower representatives.

- A number of UniGroup officers are also officers of United and Vanliner.

- UniGroup provides "overall policy direction" to its subsidiaries, as well as "long-term strategic planning."

- United's chief operating officer reports to the president of UniGroup.

- UniGroup provides "centralized services" to United and Vanliner, including human resources, information technology, legal, financial, and various administrative functions.

- The sales revenue generated by United benefits UniGroup, while UniGroup's centralized corporate services benefit United.

(Opp. at 6-8). These unsurprising and undisputed facts merely confirm the obvious: UniGroup, United, and Vanliner are commonly-owned but separately-managed business entities which work together to promote their collective interests. As one court has aptly put it, "[t]hese facts show no more than the normal business influence of a corporate parent." *Giar v. Centea*, 2003 U.S. Dist. Lexis 6383 (S.D.N.Y 2003). The First Circuit has made it clear, moreover, that such standard interrelationships between parent and subsidiary do not provide a lawful basis for the exercise of personal jurisdiction:

> [A]n out-of-state parent's controlling stock interest in a Massachusetts corporation does not alone create jurisdiction over the parents…[Similarly], overall financial and policy control over its subsidiaries is not enough. **Such control is inherent in ownership and, if overall control were sufficient, every parent would be present wherever a wholly owned subsidiary was present in a state. For this purpose, a separately managed company is a separate entity.**

*Andresen v. Diorio*, 349 F.3d 8, 12 (1st Cir. 2003)(emphasis added); s*ee also United Elec. Workers*, 960 F.2d at 1088 (parent's ownership of a Massachusetts subsidiary is "manifestly insufficient" to justify the exercise of jurisdiction); *Escude Cruz*, 619 F.2d at 905 ("[A]llegations

of interlocking directorships and stock ownership will not suffice" to confer jurisdiction);

*Central States, Southeast and Southwest Areas Pension Fund v. Reime*, 230 F.3d 934, 945 (7th

Cir. 2000)(Canadian parent which provided support services to affiliates could not be sued in

Illinois; "parent corporations regularly provide certain services to their subsidiaries and such

parents do not expect that performing these activities will subject them to liability").

  The case law upon which plaintiffs purport to rely only further supports UniGroup's

position.  For example, in *Donatelli v. National Hockey League*, the First Circuit reversed a

district court's ruling permitting a nonresident parent defendant to be sued in Rhode Island.  893

F.2d at 472.  The Court of Appeals began its analysis by stressing that the courts must

"presume[] the independence of parent and subsidiary when determining whether jurisdiction

may be asserted over the parent solely on the basis of the subsidiary's contacts with the forum."

*Id*. at 465.  This jurisdictional presumption of separateness, the Court continued, can only "be

overcome by clear evidence." *Id*., quoting *Escude Cruz*, 619 F.2d at 905.  Then, in language

which plaintiffs in this case notably fail to mention, the *Donatelli* Court described the sort of

"clear evidence" a plaintiff must produce to justify the exercise of jurisdiction:

> In those cases where personal jurisdiction has been found to exist [over a nonresident parent entity], **there is invariably a "plus" factor— something beyond the subsidiary's mere presence within the bosom of the corporate family**.

*Id*. at 465-66 (emphasis added)(citations omitted).

  In order to satisfy their burden of establishing such a "plus factor," plaintiffs in this case

must demonstrate that the parent company (UniGroup) played an "active role in [United's]

decision **to establish a presence within the forum."** *Donatelli,* 893 F.2d at 466 (emphasis

added).  If (and only if) a plaintiff provides such proof, personal jurisdiction may be justified

"because the parent presumably weighed the benefits it would derive before [it] **directe[d] the subsidiary to enter the forum**." *Id. (*emphasis added).

    Conversely, a nonresident parent cannot be sued if its subsidiaries entered the forum "by their own choice and for their own benefit." *Id*. at 471. As summarized by the First Circuit:

> **Absent a showing that the [parent] had substantial influence over the [subsidiary's] decision to conduct activities in the forum, then it seems unfair to consider attributing the [subsidiary's] activities to the [parent];** the "constitutional touchstone" of personal jurisdiction, after all, is whether the defendant "purposefully established 'minimum contacts' in the forum State." *** Unless such a showing can be made, ascribing the [subsidiary's] contacts to the [parent] would be tantamount to haling the [parent] into the forum solely as the result of attenuated third-party contacts or activities for which the [parent] was not responsible.
>
>                ***
>
> <u>**If the plaintiff cannot show that the [parent] substantially influenced the decisionmaking leading to the [subsidiary's] in-forum activities, then their can be no attribution**</u> [and personal jurisdiction does not exist].

*Id*. at 469 (emphasis added)(citations omitted).

    Application of these settled jurisdictional principles to the present case demonstrates that plaintiffs have not made or even attempted the necessary evidentiary showing. Most importantly, nowhere in plaintiffs' lengthy recitation of "Jurisdictional Facts Concerning UniGroup" (Opp. at 6-8) is there a single fact which suggests—let alone proves—that UniGroup "substantially influenced" United's "decision to conduct activities in the forum." *Donatelli*, 893 F.2d at 469. Nor could there be, given the fact that United has been doing business in Massachusetts since at least the 1940's while UniGroup was not even formed until 1988.[1] Thus, since United's operations in Massachusetts long preceded UniGroup's very existence, it is clear UniGroup played no role at all in United's "decision to establish a presence within the forum."

---

[1] *See* Supplemental Affidavit of George Smith (annexed hereto as Exhibit A), at ¶¶ 3-4.

*Donatelli* 893 F.2d at 466; *see* Supp. Aff. of G. Smith, at ¶ 3. UniGroup, therefore, is not subject to suit in Massachusetts.

Plaintiffs' other primary authority, *Kleinerman v. Morse*, 533 N.E.2d 221 (Mass. App. 1989), also does not support plaintiffs' position. Rather, *Kleinerman* is far more notable for its strikingly different facts, which only further confirm that personal jurisdiction over UniGroup in the present case is inappropriate.

First, the court in *Kleinerman* stressed that "ownership alone of the controlling stock of a subsidiary does not confer jurisdiction over an out-of-state parent corporation." 533 N.E. 2d at 224. Rather, "[t]he burden of establishing facts sufficient to fend off a motion to dismiss for lack of jurisdiction over the person is on the plaintiff." *Id.* at 222-223.

Second, the parent's direct Massachusetts activities in *Kleinerman* "went well beyond isolated incidents." 583 N.E. 2d at 224. Indeed, plaintiff adduced substantial proof of the parent's extensive "correspondence, memoranda, and visits of inspection and supervision" to Massachusetts. *Id.* There is **no** such evidence concerning UniGroup.

Finally, the parent in *Kleinerman* had formed a subsidiary for the sole and specific purpose of transacting business in Massachusetts, and then later dissolved it. Further, it was the parent's decision to discontinue operations in Massachusetts which then led the subsidiary to terminate the plaintiff's employment contract. *Id.* at 223-224.

Under these rare circumstances—where the nonresident parent was directly responsible for the subsidiary's Massachusetts activities and for the subsidiary's termination of the very contract at issue in the lawsuit—the court in *Kleinerman* concluded that the parent could be sued in Massachusetts. *Id.*

In this case, by contrast, the admitted facts as to UniGroup are dramatically different:

- First, plaintiffs concede that UniGroup itself has never transacted any business or engaged in any activities in Massachusetts.

- Second, UniGroup did not direct United (or any other subsidiary) to commence doing business in Massachusetts. Quite the reverse is true: United was formed many decades ago, and it began to conduct its business in Massachusetts long before UniGroup was even formed. *See* Supp. Aff. of G. Smith, at ¶¶ 3-4.

- Third, in *Kleinerman* the parent's actions and decisions in Massachusetts were central to the plaintiff's pleaded claims. Conversely, in this case, plaintiffs cannot point to a single UniGroup contact with Massachusetts which has any relevance to any of their pleaded claims.

Accordingly, the case law cited in plaintiffs' Opposition actually supports UniGroup's position that it is not subject to personal jurisdiction in Massachusetts. The claims against UniGroup should therefore be dismissed.

      C.        **UniGroup's Alleged Involvement In Preparing A New Form Of Lease Has No Connection With Massachusetts, And Hence Cannot Justify The Exercise Of Personal Jurisdiction**

In a last-ditch effort to justify their suit against UniGroup, plaintiffs have attached discovery materials which their counsel obtained in a separate lawsuit against a different UniGroup subsidiary as support for a brand-new argument: namely, that UniGroup should remain a defendant because of its involvement in developing a new owner-operator form of lease. (Opp. at 17, and Exs. A, B, and E).[2]

Even assuming, for the sake of argument, that plaintiffs are permitted to rely on such extraneous discovery materials from another lawsuit, they do not establish the required linkage between UniGroup and Massachusetts. Regardless of the nature of UniGroup's involvement in the new lease, plaintiffs do not allege and cannot establish that **any** of UniGroup's activities

---

[2] Plaintiffs' newly submitted documents were all obtained in the separate lawsuit styled *OOIDA v. Mayflower Transit,* Case Nos. IP98-0457 and IP98-0458, pending in the U.S. District Court for the Southern District of Indiana. The only defendant in that case is Mayflower Transit, LLC. OOIDA and the other plaintiffs have never attempted to join UniGroup, Vanliner, or any other affiliates of Mayflower as party defendants.

relating to such lease took place in Massachusetts. The relevant issue here is whether UniGroup "purposefully established 'minimum contacts' in the forum state." *Donatelli*, 893 F.2d at 469 (emphasis added). Plaintiffs' assertion that UniGroup was involved in preparing and/or implementing a new form of lease—**from its headquarters in Missouri**—has no bearing at all on whether UniGroup can properly be sued **in Massachusetts**. Simply put, plaintiffs cannot establish any link whatever between UniGroup and the forum in which they have filed suit.

Plaintiffs' contentions regarding UniGroup and the new form of lease are quite similar to jurisdictional arguments the First Circuit squarely rejected in *United Elec. Workers*. In that case, the nonresident parent company (ITD) owned 100% of a Massachusetts subsidiary (PSC), appointed all PSC directors, and installed an ITD executive as PSC's president. Further, ITD played "an active role" in PSC's operations, shared extensive financial information with PSC, and regularly supplied PSC with operating funds and a variety of corporate services. 960 F.2d at 1083-84. Plaintiffs alleged, moreover, that a senior ITD executive had been personally involved in negotiating the very PSC collective bargaining agreement which was the subject of the lawsuit. *Id*. at 1089.

However, notwithstanding ITD's extensive involvement in PSC operations and its direct involvement in the contract at issue, the First Circuit ruled that ITD could not be sued in Massachusetts. In arriving at this conclusion, the Court of Appeals emphasized that "[e]xplicit in the Massachusetts long-arm statute is the specific-jurisdiction requirement that the cause of action [must] arise from the defendant's activity **within the state**." *Id*. at 1087, quoting *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 981 (1st Cir. 1986)(emphasis added). Since the plaintiff in *United Elec. Workers* was unable to demonstrate that any of the parent company's actions or decisions occurred in Massachusetts, there was no lawful basis for jurisdiction:

> ITD was not a party to the [collective bargaining agreement]…[and] **there is no indication… that [ITD'S] involvement in the negotiations took place <u>in the forum state</u> or by means of communications to and from the forum**. *** If the negotiations took place outside the forum state, their existence cannot serve to bolster the argument for the assertion of jurisdiction in the forum.*** **Here, the [contract] negotiations constitute too thin a reed to support the district courts' exercise of personal jurisdiction over ITD**.

*United Elec. Workers*, 960 F.2d at 1090 (emphasis added); *See also Pathe Computer Control Sys. Corp. v. Kinmont Industries, Inc.*, 955 F.2d 94, 96 (1st Cir. 1992)("We can find no controlling authority, and plaintiff has offered none, for extending jurisdiction over an out-of-state corporation, where the plaintiff also resides out-of-state, the negotiations occurred out-of-state, and the dispute involved negotiations-related claims").

Likewise, plaintiffs here concede that UniGroup is not and never has been a party to any lease agreement with any owner-operator, and they do not claim that UniGroup's involvement in the new lease was in any way related to Massachusetts. Thus, since plaintiffs' claims against UniGroup do not "arise directly out of, or relate to, the defendant's forum state activities," UniGroup is not subject to suit. *United Elec. Workers*, 960 F.2d at 1089.[3]

Finally, the alleged appearance of a UniGroup copyright on the new form of lease also provides no basis for the exercise of jurisdiction. The First Circuit has held that the mere appearance of a nonresident's intellectual property designation (such as a trademark, copyright, or patent) in the forum state is legally insufficient to establish personal jurisdiction. *See Escude Cruz*, 619 F.2d at 906 ("The trademark obtained by [a parent company] in Puerto Rico is not a

---

[3] Plaintiffs' submission of lease agreements signed by individual plaintiffs Bullard and Lee only further confirms the **absence** of any UniGroup connection with Massachusetts. The Bullard lease, between an Illinois resident (Bullard) and a United agent in Minnesota, is governed by Minnesota law. The Lee lease, between a North Carolina resident and a United agent in Florida, is governed by Florida law. UniGroup is not a party to either lease agreement, and neither of those contracts evidence any Massachusetts nexus of any sort. *See* Opp., Exs. C and D.

sufficient minimum contact to confer personal jurisdiction"). This is particularly true where, as here, UniGroup's copyright was obtained under federal law rather than Massachusetts law.[4]

In short, plaintiffs have wholly failed to satisfy their burden of demonstrating that UniGroup has legally sufficient "minimum contacts" with Massachusetts. All claims against UniGroup must therefore be dismissed.

E.     Plaintiffs' Request For Additional Discovery Should Be Denied

At the very end of their Opposition, plaintiffs half-heartedly ask this Court to defer ruling until after plaintiffs have conducted some unexplained "jurisdictional discovery." (Opp. at 9-10). Plaintiffs' request should be summarily denied, especially since they fail to provide the slightest description of the discovery they would like to pursue. The truth is that plaintiffs know UniGroup has no Massachusetts contacts of any sort, and that there is no "discovery" which will ever suggest otherwise.[5]

In short, plaintiffs' request for unspecified discovery is simply a red herring. *See Poe v. Babcock Int'l*, 662 F Supp. 4, 7 (M.D. Pa. 1985)("Since plaintiff has met defendants' [jurisdictional] affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter should be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction");

---

[4] Plaintiffs' submission of a United agent's brochure which includes a casual reference to UniGroup adds nothing to plaintiffs' argument. The undisputed fact is that **UniGroup** "does not advertise or otherwise solicit business in Massachusetts or from Massachusetts residents." *See Smith Aff. ¶ 14*. There is neither case law nor logic to support plaintiffs' unsupported belief that a **third party's** reference to a nonresident in a marketing brochure can somehow justify exercise of jurisdiction over such nonresident.

[5] If plaintiffs were aware of any facts linking UniGroup with Massachusetts, even remotely, they surely would have pointed them out to this Court. It is worth noting that plaintiffs' counsel has had access to more than 90,000 documents produced by UniGroup-related entities in the *OOIDA v. Mayflower* lawsuit for several years already. The fact that none of those 90,000 documents suggests any UniGroup connection with Massachusetts speaks volumes about the merits of plaintiffs' belated and unconvincing plea for "discovery."

*Leema Enterprises, Inc. v. Willi*, 575 F. Supp. 1533 (S.D.N.Y. 1983)(Denying plaintiffs' "inappropriate" request for discovery because it would "grant them the opportunity to conduct a fishing expedition in an attempt to manufacture" personal jurisdiction).  Tus, plaintiffs' request for precisely such a "fishing license" in this case should be denied.

## CONCLUSION

For all of the foregoing reasons, and the reasons set forth in defendants' opening brief, plaintiffs' claims against defendant UniGroup, Inc. in this case should be dismissed for lack of personal jurisdiction.

Respectfully submitted,

THOMPSON COBURN LLP

By:  /s/ Michael J. Morris
David Wells (*admitted pro hac vice*)
Michael J. Morris (*admitted pro hac vice*)
Rebecca A. Pinto (*admitted pro hac vice*)
One U.S. Bank Plaza
St. Louis, MO 63101
(314) 552-6000 (phone)
(314) 552-7000 (facsimile)

SALLY & FITCH LLP
Francis J. Sally (BBO # 439100)
Jennifer E. Greaney (BBO # 643337)
225 Franklin Street
Boston, Massachusetts 02110
(617) 542-5542 (phone)
(617) 542-1542 (facsimile)

Attorneys for Defendant UniGroup, Inc.

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on this 11th day of July, 2005, the foregoing Reply Memorandum in Further Support of Defendant UniGroup's Motion to Dismiss for Lack of Personal Jurisdiction was electronically filed with the Clerk of the Court using the CM/ECF system, which in turn forwarded the same to the following counsel of record:

> John A. Kiernan
> Kenneth H. Naide
> BONNER KIERNAN TREBACH & CROCIATE
> One Liberty Square, 6th Floor
> Boston, MA 02109
> (617) 426-3900

I further certify that on the same date, I sent a copy of the above-described filing, by U.S. Mail first class postage prepaid, to the following counsel of record:

> Paul D. Cullen, Sr.
> David A. Cohen
> Susan Van Bell
> THE CULLEN LAW FIRM, PLLC
> 1101 30th Street, N.W., Suite 300
> Washington, DC 20007

/s/ Michael J. Morris

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., et al. | ) ) ) | |
| Plaintiffs, | ) ) | No. 05 CV 10317 MLW |
| v. | ) ) | |
| UNITED VAN LINES, LLC., et al. | ) ) | |
| Defendants. | ) | |

**<u>SUPPLEMENTAL AFFIDAVIT OF GEORGE SMITH</u>**

George Smith, being first duly sworn, deposes and states as follows:

1.      I am  employed by defendant UniGroup, Inc. ("UniGroup") as Senior Specialist–Corporate & Regulatory Law.  I also serve as Assistant Secretary of UniGroup.  I have been employed by UniGroup or one of its corporate predecessors since 1986.

2.      I am over the age of 21.  I am competent to give this supplemental affidavit, which is being submitted in further support of Defendant UniGroup, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction.  The facts stated herein are based upon my personal knowledge and/or examination of business records kept in the ordinary course of business, and are true and correct to the best of my knowledge, information, and belief.

3.      Defendant United Van Lines, LLC ("United") is a motor carrier registered with the U.S. Department of Transportation. United (and its various corporate predecessors) has served Massachusetts as an interstate motor carrier since at least 1945.

4.      Defendant UniGroup, Inc. ("UniGroup") was formed as a holding company in 1988. UniGroup did not instruct or direct United to do business in Massachusetts, because United had already been serving Massachusetts as an interstate motor carrier for many years prior to 1988.

5.      Further affiant sayeth not.


_/s/ George F. Smith_____
George F. Smith
Senior Specialist–Corporate & Regulatory Law

STATE OF MISSOURI           )
                            ) SS.
COUNTY OF ST. LOUIS         )


On this 11th day of July, 2005, before me appeared George F. Smith, to me personally known, who being by me duly sworn, did state that he is authorized to make this supplemental affidavit, and that the statements made herein are true to the best of his knowledge, information and belief.

IN TESTIMONY WHEREOF, I hereunto set my hand and affix my official seal in the County and State aforesaid, the date and year written above.


_____
                              Notary Public

(SEAL)

My Commission Expires:

_____

EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 05 CV 10317 MLW |
| v. | ) ) | |
| UNITED VAN LINES, LLC, et al., | ) ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS'
MOTION TO DISMISS NON-MOTOR CARRIER DEFENDANTS**

**INTRODUCTION**

Defendants UniGroup, Inc. ("UniGroup") and Vanliner Insurance Company ("Vanliner")
have moved to dismiss all claims against them because they are not regulated interstate motor
carriers. Hence, as a matter of law, UniGroup and Vanliner are not subject to the federal statutes
and regulations upon which plaintiffs' claims are premised.

In their Opposition, plaintiffs admit that UniGroup and Vanliner are not, in fact,
"authorized carriers." Plaintiffs also concede that neither UniGroup nor Vanliner has entered
into any of the owner-operator lease agreements which form the basis of this lawsuit. Finally,
plaintiffs acknowledge that their Complaint does not allege any regulatory violations or other
direct wrongdoing by either UniGroup or Vanliner.

Nevertheless, plaintiffs argue that UniGroup and Vanliner should be held derivatively
liable for alleged leasing regulation violations committed by their motor carrier affiliate,
defendant United Van Lines ("United"). Plaintiffs' claim of derivative liability, however, is
illogical, inequitable, and contrary to the controlling statutory and regulatory language.

Moreover, as plaintiffs implicitly concede, their position on this issue is unsupported by applicable case law or other precedent.

In practical effect, plaintiffs seek to pierce the three defendants' corporate veils, and hold each accountable for actions taken by any one of them. Since that is plaintiffs' goal, they are required to plead and prove all of the stringent elements of corporate veil-piercing. Yet plaintiffs make no such allegations in the Complaint, and admit by their silence in the Opposition that they lack any factual basis to advance such a claim.

Accordingly, since it is undisputed that (1) neither UniGroup nor Vanliner are regulated "authorized carriers," and (2) they did not commit **any** of the regulatory violations alleged in the present lawsuit, all claims against them should be dismissed.

## ARGUMENT

Plaintiffs admit that all of the statutory and regulatory provisions upon which their suit is based apply solely to "authorized carriers." *See* 49 U.S.C. § 14704(a)(1); 49 C.F.R. §§ 376.1, 376.2(a), 376.11(a), 376.12. As plaintiffs put it, "Defendants correctly state that the Motor Carrier Act and accompanying regulations apply [only] to 'authorized carriers.'" (Opp. at 2).

Plaintiffs are also forced to acknowledge that all substantive allegations in their Complaint are directed solely against defendant United, the only motor carrier defendant. UniGroup and Vanliner are not themselves alleged to have committed any wrongs, but rather have been joined simply because they are corporate affiliates of United. Specifically:

- ③    Count I alleges that **United** improperly calculated owner-operator compensation, and makes no reference of any sort to either UniGroup or Vanliner.

- ③    Count II alleges that **United** (and its independent agents) failed to provide drivers with rated freight bills and other documents, but again makes no reference to UniGroup or Vanliner.

&#9314;    Count III alleges that **United** (and its agents) improperly charged owner-operators for liability insurance. This count makes no reference at all to UniGroup, and refers to Vanliner only in passing (as an insurer who issued some of the insurance policies for which United or its agents charged owner-operators). Count III does not allege that either UniGroup or Vanliner themselves committed any wrongs.

&#9314;    Finally, Count IV asserts that **United** failed to comply with an alleged regulatory obligation to "monitor and oversee the business practices" of its agents. Count IV does not once refer to either UniGroup or Vanliner.

In sum, plaintiffs effectively concede, as they must, that UniGroup and Vanliner committed none of the pleaded regulatory violations for which they seek redress in this lawsuit.

Nevertheless, plaintiffs claim that UniGroup and Vanliner can still be sued because, "in some circumstances," the statutory definition of an "authorized carrier" can be expanded to apply to activities of non-motor carrier affiliates of a carrier. (Opp. at 2). Plaintiffs' view of "some circumstances," however, is both breathtakingly expansive and without precedent.

Specifically, plaintiffs contend that non-motor carrier affiliates can be held derivatively liable for a carrier's alleged regulatory noncompliance whenever those affiliates' activities are "intertwined" with those of the carrier. (Opp. at 6). In the specific context of this case, plaintiffs assert that derivative liability is permissible because "the business of the three [affiliated defendant]entities are so inter-related that the policies and practices at issue herein serve to increase the profits of all three." (*Id*. at 6 n. 18). Plaintiffs' position, therefore, is that **every** affiliate of a motor carrier—regardless of the nature of its activities and whether or not it is involved in the claimed regulatory violations—is **always** derivatively liable so long as the collective operations of the various related entities are "intertwined" and the non-carrier affiliate indirectly "benefi[ts]" from the carrier's claimed regulatory noncompliance. (*Id.*)

Neither legal authority nor reason supports such a result. To the contrary, federally authorized "motor carriers" are subject to a comprehensive array of technical statutory and

regulatory provisions which govern the unique and specialized activities of such entities.[1]  The necessary consequence of plaintiffs' position is that **all** those regulations apply to each and every business entity affiliated by ownership or management with a motor carrier—even if such affiliates perform entirely unregulated business functions (e.g., a parent holding company like UniGroup).  Yet there is nothing in any federal statute, regulation, judicial decision, or administrative ruling that evinces a Congressional intent to regulate such non-motor carrier affiliates, or to render them vicariously liable for regulatory violations allegedly committed by their commonly-owned motor carrier.  And there is no reason to impose such an all-encompassing rule of vicarious liability, particularly in the absence of any Congressional mandate to that effect.

The two decisions cited by plaintiffs—one administrative and one judicial—do not come close to supporting their theory of automatic and unlimited derivative liability.  *See Dart Transit Co.*, 9 ICC 2d 701 (ICC June 24, 1993) and *OOIDA v. Arctic Express*, 87 F. Supp. 2d 820 (S.D. Ohio 2002).  In fact, as plaintiffs themselves are forced to admit, the "factual situations" in *Dart Transit* and *Arctic Express* "are distinguishable" from the present case.  (Opp. at 2).  Plaintiffs' concession in this regard is a considerable understatement.

---

[1] *See, e.g.*, 49 U.S.C.A. §13101 (legislative statement of transportation policy); § 13303 (requiring motor carriers to designate an agent for service of notice in administrative proceedings); § 13304 (requiring motor carriers designate an agent for service of process in judicial actions); §§ 13501-13508 (establishing jurisdiction of the Secretary of Transportation and Surface Transportation Board over motor carriers, and exemptions); § 13701 (providing that a carrier's rates must be reasonable, and authorizing the STB to prescribe rates under certain circumstances); § 13702 (requiring carriers to file tariffs with the STB and authorizing the agency to prescribe information and charges which must be included in such tariffs); § 13704 (authorizing household goods carriers to establish rates based on written, binding estimates); § 13705 (requiring passenger motor carriers to establish reasonable, through routes); 13706 (establishing liability for rates in certain property shipments); § 13902 (governing registration of motor carriers and suspension and revocation proceedings); § 13906(a) (establishing liability insurance requirements for motor carriers, and authorizing Secretary of Transportation to prescribe the mandatory levels of such insurance coverage); § 14101 (requiring carriers to provide transportation or service on reasonable request, and to provide safe and adequate service, equipment, and facilities).

In both *Dart Transit* and *Arctic Express*, the non-motor carrier affiliates which were ultimately deemed subject to suit had directly entered into transportation equipment lease arrangements with the plaintiff owner-operators. Just as important, **it was through those unregulated affiliates' contracts that the motor carrier defendant was able to implement the claimed leasing regulation violations**. *See Dart Transit Co.,* 9 ICC 2d at 702-06 (non-motor carrier affiliate "lease[d] motor-vehicle equipment to [the carrier's owner-operators], subject to a requirement that the equipment be used only in service for" the carrier; certain aspects of the unregulated affiliate's lease agreements, moreover, would have violated the leasing regulations if the affiliate were an "authorized carrier"); *Arctic Express, Inc.,* 87 F. Supp. 2d at 828-29 (relying on *Dart Transit* in concluding that a motor carrier's affiliate which entered into equipment lease agreements with the carrier's drivers was properly subject to leasing regulation violation claims).

Nothing remotely similar is alleged in the present case. To the contrary, plaintiffs concede that neither UniGroup nor Vanliner has ever entered into transportation equipment lease agreements or similar contracts with owner-operators. More importantly, plaintiffs do **not** allege that the motor carrier defendant—United—implemented or carried out its claimed leasing regulation violations through or by virtue of its unregulated affiliates (UniGroup and Vanliner). Rather, the sole basis of UniGroup's and Vanliner's claimed liability is that they are generally "intertwined" with United and thus indirectly "benefit" from its activities. This allegation is insufficient to properly raise an allegation of piercing the corporate veil.

In short, the policy and fairness considerations underlying *Dart Transit* and *Arctic Express* are entirely absent here. *See Arctic Express, Inc.,* 87 F. Supp. 2d 820, 828-29 ("The Commission's findings [in *Dart Transit*] prevent registered carriers from taking advantage of a

potential loophole in the Act.  If this loophole is not closed, a registered carrier could create a

non-registered business entity and thereby avoid the regulations promulgated under the Motor

Carriers Act").  There is no such comparable potential "loophole" in this case, and plaintiffs do

not contend otherwise.

Accordingly, this case is much closer to *OOIDA v. Landstar System, Inc.*, No. 3:02-cv-

1005, slip op. (M.D. Fla. June 4, 2004) (Ex. A to Defendants' Motion), in which the court

squarely rejected plaintiff OOIDA's attempt to hold the defendant motor carrier's corporate

affiliates liable for the carrier's claimed regulatory violations.  *See id.* at 5 (dismissing

subsidiaries because "Plaintiffs have not entered into lease agreements with those companies"

and "this is not a case where a contractual obligation binds all defendants").  This Court should

follow the considered and correct ruling in *Landstar* that affiliates of motor carriers are not,

merely by virtue of their status as related companies, subject to suit on leasing regulation claims.

Finally, plaintiffs fail to articulate any need to join UniGroup or Vanliner as party

defendants in this lawsuit.  Indeed, they openly acknowledge that if they are able to prove their

claims on the merits, they can obtain complete relief from motor carrier defendant United alone.

(Opp. at 7).  Thus, since there is admittedly no need to sue UniGroup or Vanliner, and since

plaintiffs' effort to do so is unsupported by precedent or the pleaded facts, their legally defective

claims against UniGroup and Vanliner should be dismissed.

## <u>CONCLUSION</u>

For all of the foregoing reasons, and the reasons set forth in defendants' opening

memorandum, all claims against defendants UniGroup and Vanliner should be dismissed with

prejudice and at plaintiffs' costs.

Respectfully submitted,


THOMPSON COBURN LLP


By:___/s/ Michael J. Morris_____
     David Wells (*admitted pro hac vice*)
     Michael J. Morris (*admitted pro hac vice*)
     Rebecca A. Pinto (*admitted pro hac vice*)
     One U.S. Bank Plaza
     St. Louis, MO 63101
     (314) 552-6000 (phone)
     (314) 552-7000 (facsimile)

     SALLY & FITCH LLP
     Francis J. Sally (BBO # 439100)
     Jennifer E. Greaney (BBO # 643337)
     225 Franklin Street
     Boston, Massachusetts 02110
     (617) 542-5542 (phone)
     (617) 542-1542 (facsimile)

     Attorneys for Defendants United Van Lines, LLC,
     Vanliner Insurance Company, and UniGroup, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 11th day of July, 2005, the foregoing Reply Memorandum in Further Support of Defendants' Motion to Dismiss Non-Motor Carrier Defendants was electronically filed with the Clerk of the Court using the CM/ECF system, which in turn forwarded the same to the following counsel of record:

> John A. Kiernan
> Kenneth H. Naide
> BONNER KIERNAN TREBACH & CROCIATE
> One Liberty Square, 6th Floor
> Boston, MA 02109
> (617) 426-3900

I further certify that on the same date, I sent a copy of the above-described filing, by U.S. Mail first class postage prepaid, to the following counsel of record:

> Paul D. Cullen, Sr.
> David A. Cohen
> Susan Van Bell
> THE CULLEN LAW FIRM, PLLC
> 1101 30th Street, N.W., Suite 300
> Washington, DC 20007

/s/ Michael J. Morris

- 8 -

EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OWNER-OPERATOR INDEPENDENT DRIVERS )
ASSOCIATION, INC., et al., )
 )
     Plaintiffs, )
 )    No. 05 CV 10317 MLW
v. )
 )
UNITED VAN LINES, LLC, et al., )
 )
     Defendants. )

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' RULE 12(b)(6)
MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**

**INTRODUCTION**

As demonstrated in Defendants' opening brief, each of plaintiffs' four pleaded claims is

legally deficient and should be dismissed for the following reasons:

*First*, Count I fails to state a claim because, in at least two important respects, plaintiffs

are unable to establish their standing to sue.  In particular, plaintiffs do not allege that their own

compensation was reduced as a result of any of the allegedly undisclosed deductions of which

they complain.  Plaintiffs admit, moreover, that they entered into regulated lease agreements with

independent agents of United rather than with United itself.  Consequently, the alleged wrongful

deductions were necessarily made by United to the **agents'** (and not plaintiffs') compensation.

Plaintiffs lack standing to sue for such third parties' alleged losses.

*Second*, Plaintiffs all but abandon Count II (claiming that United or its agents failed to

provide owner-operators with copies of rated freight bills) when they simply assert—without

discussing any of the cases or controlling statutory provisions cited by Defendants—that

Defendants' position is "without legal support."  (Opp. at 6).  In reality, it is plaintiffs'

position—*i.e.*, that they can recover damages for alleged technical regulatory violations which admittedly caused them no monetary loss—that lacks legal support.

*Third*, notwithstanding plaintiffs' confusing interpretative gymnastics, there is **nothing** in the federal leasing regulations, pertinent case law, or the Motor Carrier Act's legislative history that supports their position that motor carriers are legally obligated to provide owner-operators with free PL/PD insurance.  On the contrary, the leasing regulations expressly contemplate that once the carrier has satisfied its obligation to ensure that adequate PL/PD insurance coverage is in place to protect the public, it is perfectly free to recover the costs of such insurance from the very owner-operators whose actions are being insured against.  This result is eminently sensible, is supported by decades of applicable precedent, and is wholly consistent with the Congress' expressed policy to promote the safe operation of interstate transportation equipment.

*Fourth*, Count IV should be dismissed because no cause of action exists for a motor carrier supposed failure to "monitor and oversee the business practices of its local agents." [Compl. ¶ 49].  In their Opposition, plaintiffs completely ignore the basis for dismissal outlined in Defendants' opening brief—namely, that Count IV purports to state a cause of action that does not exist—and instead address the entirely distinct issue of whether a carrier may be held derivatively liable for specific regulatory violations committed by its agents.  Plaintiffs cite no authority (for none exists) to support their far broader claim that United is subject to private civil liability for allegedly failing to "oversee and monitor" its agents' general "business practices." Nor is there any legal basis for the breathtakingly expansive "accounting" remedy which plaintiffs demand.  In short, since Count IV does not state a legally cognizable private cause of action and also seeks an unlawful remedy, it should be dismissed.

## ARGUMENT

I.   **Count I Should Be Dismissed Because Plaintiffs Fail To Allege The Requisite
     Standing To Challenge The Purportedly Undisclosed Compensation Deductions**

As Defendants demonstrated in their opening brief, "[b]ecause standing is fundamental to the ability to maintain a suit…where standing is at issue, **heightened specificity is obligatory at the pleading stage**." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992)(emphasis added). In their Opposition, plaintiffs baldly assert, without a single citation to the Complaint, that "specific information is provided [in the Complaint] about each Named Plaintiff and the lease agreements executed by each Named Plaintiff with United agents that are the subject of the alleged violations." (Opp. at 4-5). But "specific information" is precisely what the Complaint lacks. The only information given about the named individual plaintiffs is that they entered into (and then terminated) lease agreements with certain United agents in particular years. [Compl. ¶¶ 5-7]. The Complaint nowhere alleges that any of these individuals were ever subject to any of the allegedly wrongful compensation deductions specified in Count I.

At a minimum, it is incumbent upon plaintiffs to: (1) set forth well-pleaded **facts** that each of them suffered an injury as a result of some concrete compensation practice alleged in Count I; (2) specify, as to each plaintiff, which allegedly unlawful practice(s) they claim affected them; and (3) specify how and in what respects each plaintiff was damaged as a result of such allegedly unlawful practices. *See*, *e.g.*, *Lynch v. Cannatella*, 810 F.2d 1363, 1377 (5th Cir. 1987)("The individual officers charged…are entitled to know the nature and degree of injury **each plaintiff** allegedly suffered as a result of that officer's actions")(emphasis added); *Herlihy v. Ply-Gem Indus., Inc.*, 752 F. Supp. 1282, 1291 (D. Md. 1990)(dismissing class action lawsuit

because "**each plaintiff** has not and cannot allege an injury arising from the conduct of each and every defendant")(emphasis added).[1]

Here, plaintiffs wholly fail to allege any facts showing that their compensation—as opposed to that of unnamed class members—was reduced as a result of any of the claimed regulatory violations.  Much less does the Complaint identify which (if any) of the purportedly unlawful deductions supposedly affected which named plaintiffs.  Since plaintiffs have not alleged individual standing to sue for any of the purported compensation violations, Count I should be dismissed.  Alternatively, plaintiffs must at a minimum plead facts establishing whether and how each of them was injured by each claimed regulatory violation.  Absent such minimal facts, "it is impossible for defendants even to formulate an answer."  *Aguilar*, 174 F. Supp.2d at 56.

Plaintiffs do not dispute, moreover, that their lease agreements were with United agents and not United itself.  Consequently, any compensation deductions made by United would have been charged to its agents and not to the owner-operators.  However, plaintiffs do not allege that any agents with whom they contracted passed on to them any of the challenged deductions.  The present case, therefore, is similar to the *Eaton Vance* and *Pharmaceutical Industry* decisions cited in defendants' opening brief.  In each of those cases, the courts held that named plaintiffs lacked standing because they had no direct contract or other relationship with the defendants. *See In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 41 (D. Mass. 2003)("[T]he named plaintiffs never purchased shares in or conducted any other business with two of the four

---

[1] *See also Aguilar v. New York Conv. Center Op .Corp.*, 174 F. Supp.2d 49, 56 (S.D.N.Y. 2001)("Without greater specificity regarding the alleged harm suffered by each plaintiff, it is impossible for defendants even to formulate an answer");*Bard v. Crockett*, 1989 WL 431981, *2 (W.D. Mo. Aug. 19, 1989) ("[P]laintiffs are directed to file a more definite statement. This statement…should specifically allege the injuries suffered by each plaintiff and the dates on which those injuries were suffered").

[defendants]….The named plaintiffs have therefore not been injured by [those defendants]"); *In re Pharm. Ind. Avg. Wholesale Price Litig.*, 263 F. Supp.2d 172, 193 (D. Mass. 2003)("[S]everal pharmaceutical companies correctly argue that the individually named plaintiffs do not have standing to bring suit against them because no plaintiff claims to have purchased their drug").

Accordingly, because the named individual plaintiffs fail to sufficiently allege standing in at least two respects, and because plaintiff OOIDA has therefore also failed to establish standing, Count I should be dismissed. [2]

## II.    Count II Does Not State A Claim Because It Alleges No Damages Resulting From The Claimed Failure Of United Agents To Provide Copies Of Rated Freight Bills

Other than their bald assertion that Defendants' position is "without legal support" (Opp. at 6), plaintiffs make no effort to defend Count II of their Complaint.  For instance, plaintiffs do not (and cannot) dispute that damages are a *prima facie* element of their asserted private cause of action for violation of the federal leasing regulations.  49 U.S.C. § 14704(a)(2)("A carrier…is liable for **damages** sustained by a person as a result of an act or omission of that carrier or broker in violation of this part")(emphasis added); *OOIDA v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir. 2003)("49 U.S.C. § 14704(a)(2) provides a right to recover **only to persons who have sustained damages as a result of a carrier violation**")(emphasis added).

In this case, the Complaint alleges no facts describing how the alleged failure of United agents to provide copies of rated freight bills resulted in cognizable monetary loss to any of the named plaintiffs or indeed to any putative class members.  Plaintiffs' cursory allegation that the absence of such freight bills made it difficult for them to "verify their compensation" and in some unexplained fashion "deprived [them] of compensation," *see* Compl. ¶¶ 40-41, are sheer

---

[2] Plaintiffs concede that, as Defendants have pointed out, OOIDA lacks the requisite standing if none of the individual plaintiffs has standing.  (*See* Opp. at 5).

conclusions unsupported by any facts.  Such factually barren conclusions are insufficient to withstand a motion to dismiss.  *See*, *e.g.*, *RTC. v. Driscoll*, 985 F.2d 44, 48 (1st Cir. 1993)(court need not accept a complaint's "legal conclusions or...bald assertions" without factual support).[3]

While § 14704(a)(1) also authorizes injunctive relief, plaintiffs concede by their silence that they do not seek an injunction in Count II and in fact would lack standing to do so since none of them are currently under contract with United or any of its agents.  Accordingly, because plaintiffs allege, at most, technical noncompliance with §376.12(g) without any resulting and legally required damages, Count II should be dismissed.

### III.    Count III Must Be Dismissed Because, As A Matter Of Law, Motor Carriers Are Not Required To Provide Plaintiffs With Cost-Free Liability Insurance

Notwithstanding plaintiffs' attempt to rescue Count III with a panoply of convoluted and illogical arguments, a review of the pertinent statutes, regulations, legislative history, and case law makes it clear that plaintiffs have failed to establish the fundamental prerequisite of their claim—namely, a legal duty on the part of all motor carriers to provide free liability insurance to all their owner-operators.  Instead, the "relief" plaintiffs demand in Count III would confer upon all owner-operators—as a matter of law and not as the product of consensual contract negotiations—a monumental and undeserved economic windfall.  Since neither law nor logic support such a result, Count III must be dismissed.

---

[3] *See also Ruderman v. Police Dept. of City of New York*, 857 F. Supp. 326, 330 (S.D.N.Y. 1994) ("[M]ere conclusory allegations…are meaningless as a practical matter and, as a matter of law, insufficient to state a claim"); *In re Allen*, 150 B.R. 21, 22 (Bankr. E.D. Va. 1993)("[N]otice pleading…does not give a plaintiff the right to assert conclusory allegations with no factual underpinnings").

A.    Neither the Language of the Pertinent Leasing Regulation nor the "Last
      Antecedent" Rule Supports Plaintiffs' Position Regarding PL/PD Insurance

As explained in defendants' opening brief, the language of the applicable leasing

regulation, 49 C.F.R. § 376.12(j)(1), could not be clearer: so long as a carrier "maintains" the

legally required public liability insurance, it may "charge back" the cost of such insurance to its

owner-operators:

> The lease shall clearly specify the legal obligation of the authorized carrier to
> **maintain** insurance coverage for the protection of the public pursuant to
> FMCSA regulations under 49 U.S.C. 13906.  The lease shall further specify
> who is responsible for **providing** any other insurance coverage for the
> operation of the leased equipment, such as bobtail insurance.  **If the
> authorized carrier will make a charge back to the lessor <u>for any of this
> insurance</u>**, the lease shall specify the amount which will be charged-back to
> the lessor.

49 C.F.R. § 376.12(j)(1)(emphasis added).

Resorting to an awkward interpretative slight-of-hand, and relying upon the so-called

"last antecedent" rule of grammatical construction, plaintiffs attempt to cobble together an

argument that the phrase "**<u>any of this insurance</u>**" actually means "any of this insurance, except

for public liability insurance."  Stated differently, plaintiffs argue that the third sentence of §

376.12(j)(1)—despite its unequivocal reference to "**<u>any</u>** of this insurance"—should be read to

refer only to the insurance described in the immediately preceding sentence and not to the

insurance described in **both** prior sentences of the regulation.

Plaintiffs' argument is specious.  Initially, as the First Circuit has held in a variety of

contexts, the statutory term "any" means precisely that—"any."  *See*, *e.g.*, *In re Smith & Wesson*,

757 F.2d 431, 433 (1st Cir. 1985)(although defendant "rejects the characterization of its suit as a

'pre-award contract claim'…the plain language of § 1491(a)(3)[, ']**any** contract claim brought

before the contract is awarded[,'] would appear to be clearly descriptive")(emphasis added);

*Goldings v. Winn*, 383 F.3d 17, 23 (1st Cir. 2004)(disagreeing with district court's interpretation of 18 U.S.C. § 3621(b), which "essentially used the limiting language of § 3624(c) to rewrite the unambiguous language of § 3621(b) so that **'at any time'** no longer means 'at any time,' but rather 'only for the lesser of the last six months or ten percent of a prisoner's term of imprisonment'")(emphasis added). *See also Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1325 (7th Cir. 1997)("[W]e first focus on the clear and absolute language in the phrase, '**any** obligation to pay.' Such absolute language may not be alternatively read to reference only a limited set of obligations as appellants suggest")(emphasis added).

Moreover, as even a cursory analysis of the cases applying the "rule of last antecedent" reveals, that doctrine is inapplicable here. The last antecedent rule is a principle of grammar used to interpret the relationship between words, phrases, or clauses **within a single sentence**. *Doe v. Bridgeport Police Dept.*, 2000 WL 33116540, *8 (D. Conn. Nov. 15, 2000)("The last antecedent is the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence"). *See also Miniat v. Ed Miniat, Inc.* 315 F.3d 712, 715 (7th Cir. 2002)("'Last antecedent'...is defined as the 'last word, phrase or clause that can be made an antecedent without impairing the meaning of the sentence'"). Accordingly, a "proviso usually is construed to apply to the provision or clause immediately preceding it." *Doe*, 2000 WL 33116540, *8.

It is nonsensical to apply the last antecedent rule to interpret the relationship between **multiple** sentences, and courts have repeatedly refused to do so. Neither grammar nor common sense requires that a free-standing sentence within a single paragraph be read to "modify" only the sentence closest to it. *See, e.g., Davis v. Dawson, Inc.*, 15 F. Supp.2d 64, 111 n. 146 (D. Mass. 1998)("The cases relied upon by Dawson…are inapposite inasmuch as they apply to

phrases with antecedents or immediately preceding clauses. 'For purposes of Section 1.5' has no immediately preceding clause inasmuch as it begins the sentence and the section").[4]

Even if the last antecedent rule were in any way relevant here (and it is not), that rule could not overcome the plain language of § 376.12(j)(1). This Court "need not reach the issue of the doctrine of the last antecedent because the [rule] is unambiguous....When a [rule] is as clear as a glass slipper and fits without strain, courts should not approve an interpretation that requires a shoehorn." *Demko v. U.S.*, 216 F.3d 1049, 1053 (Fed. Cir. 2000).[5]

Here, if the Interstate Commerce Commission had intended that § 376.12(j)(1) require a motor carrier to not only ensure that adequate public liability insurance is **"maintained,"** but also bear 100% of the **costs** of such insurance, it could have (and would have) expressly said so in plain English in the regulation itself. And yet neither the agency, Congress, any court, or any commentator has **ever** said this—a critical fact that plaintiffs concede by their silence. To the contrary, the third sentence of § 376.12(j)(1) expressly and unmistakably authorizes motor carriers to charge back to their owner-operators the cost of "any of this insurance." The ICC's failure to exclude public liability insurance from motor carriers' express chargeback authority is clear evidence that no such exclusion was or is intended.

---

[4] *See also In re Arbors of Houston Assocs. Ltd. P'ship,* 1999 WL 17649, *3 (6th Cir. Jan. 4, 1999)("The last antecedent rule, however, applies to 'qualifying words, phrases and clauses.' The clause after 'and'...is not a qualifying or modifying phrase, but a self-standing declaration…"); *In re CRS Steam, Inc.,* 217 B.R. 365, 374 (Bankr. D. Mass. 1998)("The typical application of the rule involves a statute containing several words or phrases set apart by commas or disjunctives, with the later qualifying phrase unseparated by a comma…There are no commas or disjunctives separating the phrases here. And there is no long list of phrases making the later qualifier quite remote from early phrases").

[5] *See also RTC v. Nernberg*, 3 F.3d 62, 65 (3d Cir. 1993)("We do not believe...that we should allow syntax to completely control the resolution of this issue and, thus, must find something a bit more substantial to support construction"); *Murphy Expl. & Prod. Co. v. U.S. Dept. of Interior,* 252 F.3d 473, 482 (D.C. Cir. 2001)("The rule of the last antecedent may be sound 'grammar,' but it does not dispose of this case"); *In re CRS Steam, Inc.,* 217 B.R. at 374 ("[T]he rule of the last antecedent is…only operative when there is nothing in the statute indicating that the relative words or qualifying provision is intended to have a different effect").

B.    The Administrative History Cited By Plaintiffs Further Confirms that Carriers
       May Recover from Owner-Operators the Cost of Providing PL/PD Insurance

The administrative authorities plaintiffs cite—and in particular the regulatory history of

§ 376.12(j)(1)—merely confirm the ICC's intent to allow carriers to charge back to owner-

operators the cost of PL/PD insurance. As plaintiffs note, the version of § 376.12(j)(1) originally

proposed by the ICC provided as follows:

> (1)  The lease shall clearly specify **who is responsible** for providing the various
> types of insurance coverage, such as cargo, bobtail, and **public liability and
> property damage coverage**. If the authorized carrier provides any or all parts of
> the above coverage and makes a charge-back to the lessor for such coverage, the
> lease shall specify the amount charged-back to the lessor....
>
> (4)  **The lease shall specify the legal obligation of the authorized carrier to
> maintain** [public liability] **insurance coverage....**

*Lease and Interchange of Vehicles*, 131 M.C.C. 141, 148-49, *available at* 1979 WL 11158, *6 -

*7 (I.C.C. Jan. 9, 1979)(emphasis added).

Plaintiffs acknowledge that if the rule had taken effect in this form, there would be no

doubt that a carrier could pass public liability insurance costs back to its owner-operators. (Opp.

at 11). Plaintiffs argue, however, that "[i]f the ICC meant to allow carriers to pass through

PL/PD charges, it could simply have kept this proposed language. But...the rule was

significantly altered after a second round of comments was received." (*Id.*).

A careful reading of the ICC's comments, however, reveals that these so-called

"significant alterations" were not in any way substantive. When the earlier form of the rule was

first proposed, several carriers objected to the proposed subsection (4) as "redundant." *Lease

and Interchange of Vehicles*, 129 M.C.C. 700, 721, *available at* 1978 WL 14342, *17 (I.C.C.

June 13, 1978). The ICC initially decided to keep the language as it was, stating that owner-

operators "should have full knowledge of the carriers' obligations **to the public** in terms of

insurance coverage." *Id.* at 722, 1978 WL 14342, *17 (emphasis added). Later, however, some confusion was expressed about the relationship between proposed subsections (1) and (4). Despite the language of subsection (4), some apparently believed that subsection (1) might be construed to permit a carrier to delegate to the owner-operator the responsibility of maintaining—as opposed to paying for—the legally required public liability insurance.

To eliminate this possible confusion, the ICC decided to move the contents of paragraph (4) into paragraph (1). In doing so, the ICC made clear that its purpose was simply to clarify the meaning the rule had always had, and **not** to effect any substantive change:

> The question was also raised as to whether a carrier, under the terms of paragraph (1) of the proposed rule ma[y] delegate its legal responsibilities to **carry** cargo, property damage and **public liability insurance** for the protection of the public. The answer is no. We are, therefore, specifically including in paragraph (1) of the final rule the requirement **formerly set forth in paragraph (4) of the proposed rule** to dispel any such notions.

*Lease and Interchange of Vehicles*, 131 M.C.C. at 148-49, *available at* 1979 WL 11158, *8 (emphasis added).

The proposed rule also highlights an additional flaw in plaintiffs' argument. Plaintiffs claim that because a carrier must ensure that adequate PL/PD insurance coverage is in place, it is necessarily prohibited from charging back the costs of that insurance. Yet the initially proposed rule stated that "[i]f the authorized carrier **provides** any…of the above coverage ***and* makes a charge-back** to the lessor for such coverage, the lease shall specify the amount charged back to the lessor...." *Id.*, 131 M.C.C. at 148-49, 1979 WL 11158, *6 (emphasis added). The early form of the rule therefore eliminates any doubt that a carrier is free to "provide" (*i.e.*, "maintain") the required public liability insurance and simultaneously "make a charge-back" to the owner-operator for such insurance. Requiring the carrier to make sure that adequate liability insurance is in place, while at the same time permitting it to pass along the resulting costs to the very

owner-operators whose actions are being insured against, is perfectly consistent with the express

and sole purpose of § 376.12(j)(1):  to protect the **public** against loss or damage caused by

uninsured or underinsured drivers.

      C.      Plaintiffs' Position that United Must Provide Free PL/PD Insurance to Owner-Operators is Directly Contrary to the Reasoning of All Pertinent Judicial and Administrative Precedent as Well as Congress' Express Policy

While plaintiffs claim that the myriad of administrative and judicial decisions cited by

Defendants are somehow "distinguishable," plaintiffs are unable to cite precedent from **any**

tribunal to support their contrary position.  The reason is simple:  in the nearly thirty years since

the leasing regulations were promulgated, not a single court, agency, or commentator has ever

suggested that motor carriers are legally required to provide their independent contractor drivers

with cost-free liability insurance.  If plaintiffs' position had any merit, surely the ICC, the

Department of Transportation, the Surface Transportation Board, or at least one court would

have said so by now.  The complete absence of any such supporting legal authority, particularly

after so many years, is a telling indicator that plaintiffs' claim is wholly without merit.  This

Court should reject plaintiffs' invitation to become the first tribunal in the country to give any

credence to their unsupported PL/PD argument.

Even more important, and as explained in Defendants' opening brief, the pertinent

judicial and administrative slates on this issue are far from blank.  The U.S. Supreme Court ruled

three decades ago that indemnity and hold-harmless clauses in owner-operator lease agreements

are fully consistent with public policy, even though such agreements effectively shift the ultimate

cost of a carrier's public liability to the driver.  *See Transamerican Freight Lines, Inc. v. Brada

Miller Freight Sys., Inc.*, 423 U.S. 28 (1975).  The plaintiff operator in *Brada Miller* argued—

precisely as do plaintiffs in this case—that such cost-shifting would violate the ICC's

requirement that the carrier always maintain complete responsibility for, and control of, the leased transportation equipment. *Compare* Opp. at 10 ("Placing the obligation to pay for PL/PD insurance squarely on the shoulders of the motor carrier is consistent with the broad regulatory scheme.…[A] carrier must maintain 'exclusive possession, control, and use' of leased vehicles and 'assume complete responsibility for the operation of the equipment'") *with Brada Miller*, 423 U.S. 28, 38 ("We readily conclude…that the indemnification clause does not impinge upon the requirement…that operational control and responsibility be in the lessee").

Likewise, the ICC long ago flatly rejected plaintiff OOIDA's argument (in a different proceeding) that it is somehow "unfair…to permit carriers to hold themselves out to the public as for-hire motor carriers, while at the same time **shifting their traditional common carrier liabilities for cargo damage and injury** to the public **to [their owner-operators]**." *Pet. for Investigation of Indemnification and Hold-Harmless Clauses*, 1988 WL 225577, *2-*4 (I.C.C. June 9, 1988)(emphasis added). Instead, the ICC found "no compelling public policy reason" to regulate indemnification and hold-harmless clauses, correctly concluding that these matters "are best left to the parties to negotiate."

Plaintiffs cannot logically distinguish the type of cost-shifting expressly endorsed by both the Supreme Court and the ICC from the type of cost-shifting at issue here because, in reality, there is no difference. Both indemnification clauses and the practice of passing through PL/PD costs have exactly the same purpose and effect—*i.e.*, to shift to owner-operators the ultimate financial responsibility for accidents and losses which those owner-operators may cause. Neither of these similar forms of cost-shifting in any way undermines the Congressional objective of **protecting the public** (not owner-operators) by requiring a ready source of funds (insurance

proceeds) to compensate persons who may be injured by such owner-operators.  Indeed, such

cost-shifting very much promotes this objective.  As the Supreme Court aptly summarized:

> The lessor [owner-operator], as a general rule, is the party more familiar with
> the equipment [he or she] leases....**An agreement placing the ultimate
> financial responsibility upon the negligent lessor thus may have a
> tendency to provide greater protection to the public and to shippers**.

*Brada Miller,* 423 U.S. 28, 41 (emphasis added).

By contrast, plaintiffs' contrary position would, if adopted, seriously undermine the

legislative policy of promoting public safety.  Plaintiffs admit that the underlying purpose of the

PL/PD leasing regulation is to protect the public from "threats" to safety created by uninsured or

underinsured "commercial truckers"—*i.e.,* owner-operators.  (Opp. at 12).  Yet in the very next

breath plaintiffs argue that the appropriate "safety incentive" is to require motor carriers, and not

the owner-operators, to bear all of the costs of liability insurance.  The logical consequence of

plaintiffs' position is that the owner-operators—whose conduct is the basis of the risks and losses

for which insurance is mandated—would never have **any** financial incentive to operate safely

(because, according to plaintiffs, the drivers can never be charged a single cent for liability

insurance).  Conversely, the motor carriers who only lease transportation equipment and driving

services from owner-operators would be required in all circumstances to absorb **all** of the

liability insurance costs associated with such owner-operators' actions.  This result stands logic

on its head and finds no support in any case law or other authority.

In short, there is no statute, regulation, judicial decision, administrative pronouncement,

commentary, or public policy to support plaintiffs' position that the leasing regulations somehow

mandate that owner-operators must receive 100% free liability insurance from motor carriers.

Rather, the pertinent legal authorities make clear that driver compensation and chargebacks are

"matter[s] of private contract over which the [government] has no jurisdiction,"[6] and that the federal government will not involve itself in "allocating revenues between the parties in owner-operator lease agreements."[7]

Count III, therefore, is nothing more than an end-run attempt by plaintiffs to obtain via judicial mandate an enormous financial windfall which they have been unable to secure for themselves, either in contract negotiations, case law, or statutory or regulatory provisions.  Since plaintiffs' purported claim for relief in Count III is without legal basis, it should be dismissed.

**IV.    Count IV Should Be Dismissed Because There Is No Cause Of Action For A Carrier's "Failure to Monitor And Control" The Actions Of Its Independent Agents, And No Precedent For The Sweeping "Relief" Sought By Plaintiffs**

Plaintiffs' Opposition completely fails to address the thrust of Defendants' motion to dismiss Count IV—namely, that plaintiffs have alleged a cause of action which does not exist and seek relief not authorized by law.  Instead, plaintiffs devote four full pages of their Opposition to arguing the entirely separate issue of whether United, as a motor carrier, may in certain situations be held derivatively liable for an agent's violation of particular disclosure requirements established by the federal leasing regulations.  (*See* Opp. at 16-19)(section entitled "United is Liable Under 49 C.F.R. § 376.12(m) for its Agents' Violations of the Federal Truth-in-Leasing Regulations").

The issue briefed by plaintiffs is irrelevant to Defendants' motion. The sole legal authority cited by plaintiffs in support of Count IV—49 C.F.R. § 376.12(m)—recognizes, at most, a motor carrier's derivative responsibility if one of its agents fails to comply with a

---

[6] *Pet. for Investigatory Rulemaking: Insurance Surcharges*, Ex Parte No. MC-178 (Sub-No. 5), 1991 WL 148568, at *2 (I.C.C. July 29, 1991).

[7] *Pet. for Investigation of Insurance Surcharges*, Ex Parte No. MC-178 (Sub-No. 1), 1987 WL 98704, at *1 (June 15, 1987).

particular leasing regulation requirement. It most certainly does **not** establish or recognize any sweeping private right of action against a carrier for its alleged failure to "monitor and oversee the business practices of its local agents." [*See* Compl. ¶ 49]. [8]

Simply put, § 376.12(m) no more creates a separate right of action in and of itself than does any other theory of claimed derivative liability. Just as there is no cause of action for "*Respondeat Superior*," "Agency and Principal," or "Piercing the Corporate Veil," there is likewise no independent cause of action created by the principles of derivative liability supposedly codified in § 376.12(m).

On the contrary, and as explained in Part II (pp. 9-11) of Defendants' opening brief, the enforcement scheme created by the ICC Termination Act provides only for recovery of "damages…as a result of an act or omission of [the carrier] in violation of this part," and for injunctive relief (which plaintiffs admit they cannot seek since they no longer drive for United or any of its agents). 49 U.S.C. § 14704(a). Accordingly, to plead a cognizable claim under the leasing regulations, plaintiffs must at the very least allege (1) a specific regulatory "violation," and (2) resulting "damages" sustained by each plaintiff. *See* 49 U.S.C. § 14704(a)(2). Nowhere does **any** statute or leasing regulation contemplate or permit a private right of action against a motor carrier based upon its purported failure to "monitor" all "business practices" of all its independent agents.

Since Count IV does not (1) identify any legal basis for a motor carrier's alleged duty to generally monitor all of its independent agents' business practices, (2) specify any violation of any specific leasing regulation for which United should be held derivatively liable, or (3) recite

---

[8] By virtue of their total silence, plaintiffs concede that 49 U.S.C. § 13907 (the only other legal authority cited in the Complaint as support for Count IV), does not create **any** private right of action. That statute, therefore, is irrelevant to the issue of whether Count IV states a legally cognizable claim for relief.

any resulting damages to plaintiffs, it fails to state a claim upon which relief can be granted and must be dismissed.

There is also no provision in the relevant statutory and regulatory scheme for the sweeping and extravagant "accounting" remedy which plaintiffs seek in Count IV. Specifically, plaintiffs demand that United be compelled to (1) produce an unlimited universe of records created and maintained by its hundreds of independent agents (none of whom are even parties to this lawsuit), and then (2) in some wholly unexplained fashion, provide plaintiffs with an "accounting" of each and every "transaction involving owner-operator compensation" and each and every agent "charge-back of sums to owner-operators…for products, equipment, or services that exceeded the cost of such items to United or its local agents." [*See* Compl., p. 19, ¶¶ 5-6]. Plaintiffs offer **no** legal authority for this demanded "relief," either in the Complaint or in their Opposition, because no such authority exists. Indeed, Count IV is simply an attempt by plaintiffs to evade firmly-established limits on discovery in federal courts, *e.g.*: (1) discovery must be reasonably related to legally viable claims or defenses asserted in the action; and (2) civil litigants cannot be compelled to collect or provide documents of non-parties such as United's independent agents.

As the district court in the similar *OOIDA v. Mayflower* class action correctly held, plaintiffs must avail themselves of established third-party discovery tools if they seek to obtain documents and information in the possession, custody, and control of the defendant's independently-owned and operated agents. *See OOIDA v. Mayflower*, Nos. IP98-0457 and IP98-0458, slip. op. (S.D. Ind. Oct. 20, 1998)(Ex. C to Defendants' Motion to Dismiss). Plaintiffs here should not be allowed to evade the settled limits on such third-party discovery by merely

- 17 -

alleging a non-existent "duty" by United to "monitor" its agents' "business practices." No such cause of action exists as a matter of law, and Count IV should be dismissed.

## **CONCLUSION**

For all the foregoing reasons, and the reasons set forth in Defendants' opening brief, Defendants United Van Lines, Vanliner Insurance Company, and UniGroup, Inc. respectfully request this Court to dismiss all counts of Plaintiffs' Class Action Complaint with prejudice and at plaintiffs' costs, and to grant defendants such other and further relief as may be appropriate in the circumstances.

Respectfully submitted,

THOMPSON COBURN LLP

By:   /s/ Michael J. Morris
        David Wells (*admitted pro hac vice*)
        Michael J. Morris (*admitted pro hac vice*)
        Rebecca A. Pinto (*admitted pro hac vice*)
        One U.S. Bank Plaza
        St. Louis, MO 63101
        (314) 552-6000 (phone)
        (314) 552-7000 (facsimile)

        SALLY & FITCH LLP
        Francis J. Sally (BBO # 439100)
        Jennifer E. Greaney (BBO # 643337)
        225 Franklin Street
        Boston, Massachusetts 02110
        (617) 542-5542 (phone)
        (617) 542-1542 (facsimile)

        Attorneys for Defendants United Van Lines, LLC,
        Vanliner Insurance Company, and UniGroup, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 11th day of July, 2005, the foregoing Reply Memorandum in Further Support of Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Class Action Complaint was electronically filed with the Clerk of the Court using the CM/ECF system, which in turn forwarded the same to the following counsel of record:

      John A. Kiernan
      Kenneth H. Naide
      BONNER KIERNAN TREBACH & CROCIATE
      One Liberty Square, 6th Floor
      Boston, MA 02109
      (617) 426-3900

I further certify that on the same date, I sent a copy of the above-described filing, by U.S. Mail first class postage prepaid, to the following counsel of record:

      Paul D. Cullen, Sr.
      David A. Cohen
      Susan Van Bell
      THE CULLEN LAW FIRM, PLLC
      1101 30th Street, N.W., Suite 300
      Washington, DC 20007

                    /s/ Michael J. Morris